**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FULTON COUNTY EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of THE GOLDMAN SACHS GROUP, INC., | Case No.: |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | |
| LLOYD BLANKFEIN, DAVID M. SOLOMON, M. MICHELE BURNS, DREW G. FAUST, MARK A. FLAHERTY, WILLIAM W. GEORGE, JAMES A. JOHNSON, ELLEN J. KULLMAN, LAKSHMI N. MITTAL, ADEBAYO O. OGUNLESI, PETER OPPENHEIMER, JAN E. TIGHE, DAVID A. VINIAR, and MARK O. WINKELMAN, | |
| Defendants, | |
| and | |
| THE GOLDMAN SACHS GROUP, INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

## TABLE OF CONTENTS

I.    Nature of the Action ........................................................................................... 1

II.   Jurisdiction and Venue ........................................................................................ 6

III.  Parties .................................................................................................................. 6

      A.    Plaintiff ...................................................................................................... 6

      B.    Nominal Defendant .................................................................................... 7

      C.    The Individual Defendants ......................................................................... 7

IV.   The 1MDB Scandal ............................................................................................ 10

      A.    Background of Goldman: The "Vampire Squid" ..................................... 10

      B.    Goldman Plays a Pivotal Role in the Formation of 1MDB ..................... 11

      C.    Goldman Refuses to Do Business with Low on Multiple Occasions, Citing
            "Significant Adverse Information and Questionable Sources of Wealth" ........... 12

      D.    Goldman Turns a Blind Eye to Low's Involvement in the 1MDB Bond
            Offerings ................................................................................................... 14

            1.    Project Magnolia: Defendants Ignore a Series of Blatant Red Flags in
                  a Rush to Siphon Fees From Asia's Largest Bond Issuance ................... 15

            2.    Goldman Again Turns a Blind Eye to Corruption, Illegal Activity, and
                  Low's Involvement in Project Maximus .................................................. 21

            3.    Goldman Again Disregards Illegal Activity, Corruption, and Low's
                  Involvement in Project Catalyze ............................................................. 24

      E.    "Too Many Red Flags": The Board Disregards Multiple, Significant Red Flags
            Arising From Goldman's Involvement in the 1MDB Deals ................................. 27

      F.    The Truth About the 1MDB Corruption Comes to Light ..................... 32

      G.    The Massive Fallout From the 1MDB Scandal was Swift and Severe ............... 34

            1.    Goldman's Conduct Relating to 1MDB Has Spawned Multiple
                  Criminal, Civil, and Regulatory Actions ................................................ 34

            2.    Defendants' Misconduct Has Exposed Goldman to Billions of Dollars
                  of Liabilities ............................................................................................ 41

V.    The Defendants Violated Section 10(b) of the Exchange Act and Breached their Fiduciary Duties by Knowingly or Recklessly Issuing Materially False and Misleading Statements During the Relevant Period ...................................................................... 43

    A.    Defendants Caused Goldman Sachs to Conduct a Massive Stock Repurchase Program ........................................................................................................ 43

    B.    In Connection with the Share Repurchases, Defendants Issued Materially False and Misleading Statements ..................................................................... 45

        1.    False and Misleading Statements Regarding Goldman's Financial Results ........................................................................................... 46

        2.    False Statements Regarding Goldman's Risk Exposure and Risk Management ..................................................................................... 47

        3.    False Statements Regarding Goldman's Internal Controls ...................... 49

    C.    In Repurchasing Stock, Goldman Relied on Defendants' False and Misleading Statements ......................................................................................... 52

    D.    Neither the Statutory "Safe Harbor" Nor the "Bespeaks Caution" Doctrines Apply to Defendants' Misrepresentations ........................................... 54

    E.    Defendants' Misstatements and Omissions Damaged Goldman ......................... 54

    F.    Defendants Blankfein, Solomon, and Viniar Unlawfully Profited at Goldman's Expense by Selling Shares While in Possession of Non-Public Information ....... 55

VI.    The Defendants Violated Section 14(a) of the Exchange Action and SEC Rule 14a-9, and Beached Their Fiduciary Duties by Causing the Company to File Materilly Misleading Proxy Statements ......................................................................................... 58

    A.    Defendants Caused Goldman to Issue Materially False and Misleading Statements in the 2016 Proxy ................................................................ 58

    B.    Defendants Caused Goldman to Issue Materially False and Misleading Statements in the 2017 Proxy ................................................................ 62

    C.    Defendants Caused Goldman to Issue Materially False and Misleading Statements in the 2018 Proxy ................................................................ 66

VII.    Additional Damages to Goldman ..................................................................... 70

VIII.    Defendants Were Obligated to Safeguard the Company's Interests .............................. 71

    A.    The Duties of All Defendants ...................................................................... 71

B.      The Board and its Committees Were Expressly Charged with Overseeing and
        Monitoring Goldman's Compliance Function and Risk Exposure ...................... 73

IX.    Derivative and Demand Futility Allegtions ...................................................... 79

A.      Demand is Excused Because the Defendants' Conduct Did Not Constitute a
        Valid Exercise of Business Judgment ................................................. 80

B.      Demand is Excused Because the Director Defendants Face a Substantial
        Likelihood of Liability .......................................................................... 82

C.      Demand is Futile Because the Directors are Financially Beholden to Goldman .. 84

X.     Claims Against Defendants ............................................................................ 86

XI.    Praryer for Relief  ......................................................................................... 95

XII.   Jury Demand ................................................................................................ 96

Plaintiff Fulton County Employees' Retirement System ("Fulton County" or "Plaintiff"), by and through its undersigned attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against Defendants named herein.

## I.    NATURE OF THE ACTION

1.    This shareholder derivative action brought for the benefit of Nominal Defendant Goldman Sachs Group, Inc. ("Goldman" or the "Company"), arises from Goldman's destructive business culture which, according to a recent federal indictment, prioritized the consummation of deals ahead of the proper operation of its compliance functions.

2.    In 2010, Goldman survived a near existential threat stemming from the worldwide financial meltdown and its role in the Abacus mortgage-backed securities scandal, which resulted in a record payment of over $500 million in fines to the SEC.  Subsequently, Goldman Sachs embarked on an aggressive strategy of global expansion to avoid increased regulations and scrutiny in the U.S. and to "be Goldman Sachs in more places."[1]  Integral to this strategy was expansion in Asia, where institutions held more than $12 trillion in assets.  To facilitate these lucrative relationships, Goldman Sachs hired "rainmakers" with strong appetites for risk to mastermind the development of the richly profitable Asian market.[2]

3.    This strategy appeared highly successful.  From 2012 to 2013, Goldman bankers earned the Company approximately $600 million in fees on three bond offerings for the deeply corrupt Malaysian sovereign wealth fund 1 Malaysia Development Berhad ("1MDB").  These were among the largest bond offerings ever issued in Asia, totaling over $6.5 billion on their face.  They were also extremely suspicious and enveloped by numerous red flags:

---

[1] *The Wall Street Journal*, "Goldman Sachs Strategy: Be Goldman in More Places" (Dec. 20, 2010) available at https://blogs.wsj.com/deals/2010/12/20/goldman-sachs-strategy-be-goldman-in-more-places/.

[2] *Financial Times*, "How Goldman's high-flying Italian partner was embroiled in scandal" (Nov. 11, 2018), available at https://www.ft.com/content/faebf3fc-e3e6-11e8-8e70-5e22a430c1ad.

a.      The offerings were structured as private placements rather than public bond offerings, with Goldman buying the bonds and then selling them to investors to conceal these deals from public scrutiny;

b.      Goldman's bankers on the deal worked closely with rogue Malaysian financier, Jho Low.  Goldman had already rejected Low as a private wealth management client, citing "significant adverse information" along with his "questionable sources of wealth. . . ."  Despite Low's involvement as the central figure in the 1MDB scheme, funneling millions of dollars in bribes to corrupt officials, Low met with then-CEO Lloyd Blankfein twice to discuss Goldman's business with 1MDB;

c.      The bonds were expensive, priced hundreds of basis points above comparable securities. Goldman's approximately $600 million in fees for underwriting the 1MDB bond offerings was also abnormally high, amounting to up to 11% of the issue, which was a gross deviation from the standard fees of half a percentage point for typical Malaysian investment-grade bond deals, and one percentage point for high yield debt;

d.      1MDB obtained a guarantee on the debt from an Abu Dhabi government investment fund, International Petroleum Investment Company ("IPIC"), which had seldom, if ever, provided such guarantees.  Officials of IPIC were the recipient of millions of dollars in bribes;

e.      Senior Goldman bankers who spoke out against the offerings, including the Company's President in Asia and the son of the future Prime

Minister of Australia, were overruled, replaced with yes-men, and eventually found themselves out of a job at Goldman.

4.      Goldman's Board failed to respond to these and a myriad of other obvious warning signs – including multiple contemporaneous exposés from highly reputable financial publications pointing out these red flags and detailing the dubious aspects of these deals.  For example, on July 2, 2012, just months after the first of three 1MDB bond offerings closed, the *Financial Times* published an article characterizing the first bond as "one puzzle wrapped up in another," describing its pricing as a "mystery" because it was so dramatically out of line with similar offerings.[3]  An April 2013 *Reuters* article asked "[w]hy wasn't the transaction launched, marketed and distributed like any conventional bond transaction rather than placed privately?," and noted 1MDB had been "criticized" for "lacking transparency."[4]  A May 1, 2013 *Financial Times* article questioned the "hurried nature of the deal" and noted the "sharp criticism" Goldman was already facing for its grossly outsized profits.[5]  Indeed, the circumstances surrounding the offering were so suspicious that they were referred to as "red flags" in a *Bloomberg* article,[6] and the offerings became a contentious issue in Malaysian elections that year.

---

[3] *Financial Times*, "1MDB of Malaysia's $1.75bn bond: one puzzle wrapped up in another" (July 2, 2012), available at https://www.ft.com/content/6c879300-465c-3a2b-ab04-a35e1d2e831e.

[4] *Reuters*, "Time for 1MDB to come out in the open," (Apr. 15, 2013), available at https://www.reuters.com/article/malaysia-bonds/comment-time-for-1mdb-to-come-out-in-the-open-idUSL3N0D241620130415.

[5] *Financial Times*, "Goldman Sachs criticised over $3bn Malaysia bond deal," (May 1, 2013) available at https://www.ft.com/content/ed31cbde-b222-11e2-8540-00144feabdc0.

[6] *Bloomberg*, "Goldman-Arranged Bond Sale Stings Najib Before Malaysia Election," *Bloomberg*, (May 2, 2013) available at https://www.bloomberg.com/news/articles/2013-05-02/goldman-arranged-bond-sale-stings-najib-before-malaysia-election.

5.      By early 2014, the suspicious bond deals attracted the scrutiny of the Federal
Reserve, which warned Goldman about its inadequate vetting of the deals and questioned why
1MDB had issued such large bond offerings when it appeared to already have been flush with
cash.[7]  Yet, even facing intensive scrutiny from the Company's main U.S. regulator, the Board
took no action to investigate Goldman's involvement with 1MDB or to prevent further
entanglements.

6.      Beginning in 2015 and 2016, additional news reports were published regarding
the endemic corruption of the 1MDB deals.  Malaysian police raided 1MDB's offices in 2015.
In March 2016, *Bloomberg* reported that Tim Leissner, Goldman's lead banker on the 1MDB
deals, had been subpoenaed in connection to a probe linked to 1MDB.  That same year, two
high-ranking Abu Dhabi officials connected to 1MDB were dismissed from their positions and
arrested in connection with their roles in the bond issuances.

7.      In the face of these additional, significant red flags, however, Defendants
repeatedly failed to act.  Had the Board done even a cursory investigation of these highly suspect
bond offerings, it would have easily discovered the fraud, embezzlement and corruption taking
place.   Indeed, merely by directing a search of Goldman's internal email system for
communications relating to the deals, the Board would have learned (1) that Low was at the
center of the corrupt 1MDB bond offerings; (2) that Goldman employees had lied about Low's
involvement in the deals; and (3) that after the deals closed, Goldman employees and Low
engaged in a massive money laundering and bribery scheme. Indeed, even a cursory search of
Goldman's records and emails for information about Low would have revealed that Low was so

---

[7] *The Wall Street Journal*, "Fed Warned Goldman on Malaysia Bond Deals" (Apr. 6, 2016),
available      at      https://www.wsj.com/articles/fed-warned-goldman-on-malaysia-bond-deals-
1459974246.

4

problematic that Goldman's own Compliance Group had refused to approve Low as a private banking client, due to widespread suspicion that his wealth was ill-gotten and negative news coverage surrounding his lavish spending.

8.      The dam finally broke in late 2018, when the full extent of Goldman's exposure to the 1MDB scandal became apparent.  Goldman's bankers and other co-conspirators had looted the bond offerings on a historic scale, siphoning off billions of dollars from the proceeds.  In August of that year, Goldman bankers Tim Leissner and Roger Ng were indicted on charges of conspiracy to commit money laundering and conspiracy to violate the Foreign Corrupt Practices Act ("FCPA") in connection with their roles in the 1MDB scandal.  Leissner has since pled guilty to the charges, while Ng is currently in a Malaysian prison awaiting extradition.  Low is on the run and believed to be hiding in China.  The Prime Minister of Malaysia, who was the recipient of tens of millions of dollars of bribes, lost his re-election bid in May 2018, ending a 61-year reign for his party.  Since his election defeat, he has been arrested and hit with 38 charges related to the scandal.

9.      In 2018, Goldman was the worst performing stock in the Dow Jones Industrial Average, with much of its share price decline due to the 1MDB scandal.  Goldman has been sued for $7.5 billion by the Malaysian government and recently increased its provision for litigation and regulatory proceedings to $516 million – from just $9 million a year earlier – with sources explaining that the increase is directly tied to the 1MDB scandal.  The Federal Reserve and the New York Department of Financial Services, among other regulators, have also opened investigations.  Analysts, meanwhile, have estimated that Goldman could face up to $5 billion in costs relating to the scandal, to say nothing of the massive reputational damages inflicted on the Company.

10.     In short, throughout the Relevant Period (January 1, 2012 to the present), Defendants failed to serve the best interests of Goldman and its shareholders.  Defendants have cast aside their fiduciary duties in the name of fees and profits, actively fostering a corporate culture that placed closing deals over compliance, and knowingly permitting and condoning a system whereby Goldman's hamstrung controls could be "easily circumvented," according to Ng's indictment.  Their misconduct has gravely injured the Company, and as a result, Defendants are liable to Goldman for breaches of their fiduciary duties, for liability under Sections 10(b) and 14(a), of the Securities Exchange Act of 1934 ("Exchange Act"), as well as other violations of state law.

## II.      JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

12.     Venue is proper in this Court because Goldman has its principal place of business in this District, Plaintiff's claims arose in this District, and Goldman has suffered and will continue to suffer harm in this District.

## III.     PARTIES

### A.      Plaintiff

13.     Plaintiff Fulton County Employees' Retirement System ("Plaintiff" or "Fulton County") oversees all matters relating to the management and payment of pension and retirement benefits to all eligible employees of Fulton County, Georgia. Fulton County is, and at all relevant times was, a shareholder of Nominal Defendant Goldman.

### B.      Nominal Defendant

14.     Nominal Defendant The Goldman Sachs Group, Inc. ("Goldman" or the "Company") is incorporated under the laws of Delaware and located within this district at 200 West Street, New York, New York, 10282.  Goldman is a leading global investment banking, securities, and investment management firm that specializes in providing a wide range of financial services to a substantial and diversified client base.  Goldman is a bank holding company and a financial holding company regulated by the Board of Governors of the Federal Reserve System under the U.S. Bank Holding Company Act of 1956.

### C.      The Individual Defendants

15.     Defendant Lloyd C. Blankfein ("Blankfein") has served as senior chairman of Goldman Sachs since 2019, and chairman and chief executive from 2006 until the end of 2018. He was elected to the Board in 2003. In fiscal year 2016 Goldman paid Blankfein $20,206,898 in total compensation; his base salary was $2 million. In 2017, Blankfein's total compensation was $21,995,266; his base salary was unchanged at $2 million.

16.     Defendant David Solomon ("Solomon") is Chairman and Chief Executive Officer. In July 2018, Solomon was named CEO, succeeding Lloyd Blankfein as of October 1, 2018, and became chairman at the end of 2018. Prior to this, he was President and Chief Operating Officer from January 2017 to September 2018, and joint head of the investment banking division from July 2006 to December 2016, during the time of the 1MDB offerings. In fiscal year 2017, Goldman paid Solomon $16,376,111.00 in total compensation. Of this total, $1,850,000 was received as a salary, $5,745,000 was received as a bonus, $8,547,708 was awarded as stock and $233,207 came from other types of compensation.

17.     Defendant M. Michele Burns ("Burns") has served as a Director at Goldman since 2011. Burns is also Chair of the Compensation Committee and a member of the Risk and

Governance Committees.  From 2012 through 2017, Burns was awarded more than $3.5 million in fees, stock awards, and other compensation for her service on the Board.

18.     Defendant Drew Faust ("Faust") has served as a Director at Goldman since July 2018 and is a member of the Governance, Public Responsibilities and Risk Committees.

19.     Defendant Mark Flaherty ("Flaherty") has served as a Director at Goldman since 2014. He also is a member of Audit, Governance and Risk Committees. From 2014 through 2017, Flaherty was awarded more than $1.7 million in fees, stock awards, and other compensation for his service on the Board.

20.     Defendant William W. George ("George") has served as a Director at Goldman since 2002. He also Chairs the Public Responsibilities Committee and is a member of the Compensation and Governance Committees. From 2012 through 2017, George was awarded approximately $3.5 million in fees, stock awards, and other compensation for his service on the Board.

21.      Defendant James A. Johnson ("Johnson") has served as a Director at Goldman since 1999. He also is a member of Compensation, Governance and, Public Responsibilities Committees. From 2012 through 2017, Johnson was awarded more than $3.5 million in fees, stock awards, and other compensation for his service on the Board.

22.     Defendant Ellen Kullman ("Kullman") has served as a Director at Goldman since 2016. She also is a member of the Compensation, Governance and Risk Committees.  From 2016 through 2017, Kullman was awarded more than $600,000 in fees, stock awards, and other compensation for her service on the Board.

23.     Defendant Lakshmi Mittal ("Mittal") has served as a Director at Goldman since 2008. He is also a member of the Compensation, Governance and, Public Responsibilities

Committees. From 2012 through 2017, Mittal was awarded more than $3.3 million in fees, stock awards, and other compensation for his service on the Board.

24.     Defendant Adebayo Ogunlesi ("Ogunlesi") has served as a Director at Goldman since 2012. He is the Lead Director, and is also a member of the Audit, Compensation, Corporate Governance Nominating and Risk Committees. From 2012 through 2017, Ogunlesi was awarded more than $3.1 million in fees, stock awards, and other compensation for his service on the Board.

25.     Defendant Peter Oppenheimer ("Oppenheimer") has served as a Director at Goldman since 2014. He also is the Chair of the Audit committee and is a member of the Governance and Risk Committees. From 2014 through 2017, Oppenheimer was awarded more than $2.2 million in fees, stock awards, and other compensation for his service on the Board.

26.     Defendant Jane Tighe ("Tighe") has served as a Director at Goldman since 2018 and is a member of the Governance, Audit and Risk committees.

27.     Defendant David Viniar ("Viniar") has served as a Director at Goldman since 2013. He also is a member of the Risk Committee. He also served as Executive Vice President of Goldman and Chief Financial Officer from May 1999 - January 2013, and Head of Operations, Technology, Finance and Services Division from December 2002 - January 2013. Viniar was also Head of the Finance Division and Co-head of Credit Risk Management and Advisory and Firmwide Risk from December 2001 - December 2002 and Co-head of Operations, Finance and Resources from March 1999 - December 2001.  From 2013 through 2017, Viniar was awarded more than $2.8 million in fees, stock awards, and other compensation for his service on the Board.

9

28.    Defendant Mark Winkelman ("Winkelman") has served as a Director at Goldman since 2014. He also is the Chair of the Risk Committee and is a member of the Audit and Governance Committees. From 2014 through 2017, Winkelman was awarded more than $1.7 million in fees, stock awards, and other compensation for his service on the Board.

29.    Defendants Blankfein, Solomon, Burns, Flaherty, George, Johnson, Kullman, Mittal, Ogunlesi, Oppenheimer, Viniar, Winkelman, Tighe, and Faust are collectively referred to herein as the "Individual Defendants."

30.    Defendants Solomon, Burns, Faust, Flaherty, George, Johnson, Kullman, Mittal, Ogunlesi, Oppenheimer, Tighe, Viniar, and Winkelman are collectively referred to herein as the "Director Defendants."

## IV.    THE 1MDB SCANDAL

### A.    Background of Goldman: The "Vampire Squid"

31.    Goldman is a leading global investment banking, securities and investment management firm that provides a wide range of financial services to a substantial and diversified client base that includes corporations, financial institutions, governments and individuals. According Goldman's 2017 Annual Report, Goldman's total net revenues in 2017 exceeded $32 billion, which the *Financial Times* recently noted makes Goldman the second largest investment bank in the world.

32.    Goldman is divided into four main business segments: Investment Banking, Institutional Client Services, Investing & Lending and Investment Management.  Relevant here, Goldman's Investment Banking segment serves public and private sector clients around the world, providing financial advisory services and helping governments and companies raise capital, including through bond offerings.

33.     In addition to being one of the world's largest financial institutions, Goldman is also one of the most controversial.  In 2009 the Company was infamously described as a "great vampire squid" for its role in various aspects of the 2008 financial crisis.  One year later, in 2010, Goldman was forced to pay a record $550 million fine to the SEC to settle the infamous "Abacus" affair, in which it structured a born-to-lose mortgage investment product that *The Wall Street Journal* described as "one of the worst-performing mortgage deals of the housing crisis."

**B.     Goldman Plays a Pivotal Role in the Formation of 1MDB**

34.     According to data compiled by *Bloomberg*, since 2011 Goldman worked on approximately $18.8 billion of Malaysian mergers and acquisitions, making it the top foreign adviser in that country with a 20.5% market share.  Goldman's business in Malaysia included raising funds for Malaysian municipality Terengganu through the formation of the Terengganu Investment Authority ("TIA") in 2009.  Later that year, the Malaysian Ministry of Finance assumed control of TIA and, in September 2009, changed its name to 1Malaysia Development Berhad., or 1MDB, expanding its focus from a regional to a national scope.  A sovereign wealth fund, 1MDB's stated purpose was to pursue investment and development projects for the economic benefit of Malaysia and its people, primarily relying on debt to fund the investments.

35.     From the very outset of its work with 1MDB, Goldman employees, including former Southeast Asia Chairman Tim Leissner and former managing director Roger Ng, worked closely with Malaysian financier Jho Low.  Low served as the key intermediary between Goldman and 1MDB, paying off officials to help Goldman win 1MDB's business.  Low has been described as the "Asian Great Gatsby," traveling the planet, dating supermodels and socialites, and spending up to $500,000 on extravagant parties in Las Vegas and London featuring private performances by Lady Gaga and Dr. Dre.  Low's close relationship with former Malaysian Prime Minister Najib Razak was crucial to the scheme.

36.     In February 2009, TIA raised approximately $1.4 billion.  Low worked as a consultant with Leissner and Ng to complete this deal.  From the beginning, Low's involvement should have raised red flags to Goldman.  Indeed, in a March 31, 2009 email to a Goldman employee and TIA's Executive Director of Business Development, Low himself identified significant issues relating to TIA's transparency, writing:

> Bro, here is outline of the issues I would like to discuss with the Terengganu Investment  Authority. In essence **the disquiet surrounding the plan is that the fund will operate entirely on borrowed money**, which is largely anathema because it puts taxpayer's money at risk. Could they elaborate on this concern?
>
> **There is also the issue of transparency** and will the money go towards portfolio investments or be used to buy strategic stakes in companies.? [sic]

C.     **Goldman Refuses to Do Business with Low on Multiple Occasions, Citing "Significant Adverse Information and Questionable Sources of Wealth"**

37.     In September 2009, Ng referred Low for a private wealth management account with Goldman's private bank in Switzerland.  In an email copying Leissner, Ng told a private banker at Goldman's Swiss office that Low was "currently our partner in a lot of transactions in [M]alaysia.  Largely the mid-east and [M]alaysia rationship [sic]."  As part of the "onboarding" process, Goldman's compliance personnel reviewed Low's finances and raised questions about the lack of information regarding the sources of his wealth.  Throughout this process, Leissner and Ng were consulted about Low's application and supported it.  Ultimately, Goldman's Compliance Group refused to approve Low's application based, in part, on unresolved questions concerning the source of his wealth and negative news coverage of his lavish spending.

38.     By November 2009, news of Low's exploits and questions regarding the source of his wealth were being openly circulated within Goldman.  On November 9, one Goldman banker emailed a *New York Post* article to Leissner and Ng, which noted Low's extravagant spending at New York city clubs and stated that "when *The Post* interviewed Malaysian experts at such think

tank [sic] as the Council on Foreign Relations, no one had ever heard of [Low] . . . Speculation is brewing over where [Low] is getting his money from."  Nevertheless, on November 22, 2009, Goldman CEO Lloyd Blankfein met personally with Low and Prime Minister Najib at the Four Seasons in New York.  The meeting, set up by Leissner and Ng, was ostensibly to discuss potential deals between Goldman and 1MDB.  Indeed, in an email sent to Leissner, Ng, and others that day, Low set out an agenda for the meeting, which included a "debrief" with Malaysian officials, including Prime Minister Najib, and the "1mdb boys" to take place after Goldman executives left.

39.    Goldman employees continued to work with Low, hopeful that his connections to Prime Minister Najib would result in business for the Company.  In an April 7, 2010 email, Low asked Ng for help to secure the appearance of an American politician at an event honoring the charitable work of the Prime Minister's wife. Ng forwarded this email to Leissner, who in turn forwarded it to other high-ranking executives of Goldman.  These efforts resulted in former Secretary of State Lawrence Eagleburger presenting the Prime Minister's wife with the International Peace and Harmony Award nine days later.  The Prime Minister, through Low, later solicited a "donation" of over $300,000 to that charitable organization through Goldman's charitable giving program.

40.    Beginning in January 2011, Leissner engaged with Low again on a deal known as Project Gold, in which a private equity firm controlled by Low sought to acquire the assets of a private gold mining company in Kazakhstan.  Goldman's Intelligence Group reviewed the entities and persons involved in the transaction and, upon learning that Low controlled the private equity firm, the Group emailed Leissner expressing its concern over Low's control. Following this response, the Project Gold deal team informed the Intelligence Group that

13

Goldman would instead advise a different private equity firm on the transaction.  Notably, however, the second firm was still controlled by Low. Upon learning of this fact, the head of Goldman's Intelligence Group in Asia described the new arrangement as "even more problematic."

41.     Shortly thereafter, in March 2011, Leissner again referred Low for another private wealth management account at Goldman – this time, with the Company's Singapore office. Goldman initiated a "high priority" background check on Low, who was again denied.  In connection with this second attempt, a compliance employee wrote, in reference to Low, that "we have pretty much zero appetite for a relationship with this individual."  Another compliance employee further explained to a Goldman private banker that Low "was reviewed by both my EMEA [Europe, Middle East, and Africa] counterpart and [the Intelligence Group] team, and it was concluded that no business will be allowed due to *significant adverse information and questionable source of wealth*.  Please be informed that we do not recommend onboarding this client in PWM Singapore."

### D.     Goldman Turns a Blind Eye to Low's Involvement in the 1MDB Bond Offerings

42.     Between 2009 and 2011, Low assisted in the misappropriation of more than $1 billion from 1MDB.  The looting would continue in 2012 and 2013, when 1MDB hired Goldman to conduct three giant bond offerings totaling $6.5 billion.  These bonds offerings were so suspicious on their face that serious alarm bells should have been ringing at Goldman.  But Goldman's internal controls completely missed these signals, and the 1MDB bond offerings would be looted to the tune of $4.5 billion.  And when the dubious nature of these deals were exposed in highly regarded financial publications like the *Financial Times*, Goldman again ignored the red flags and allowed the fraudulent schemes to continue.

### 1.     Project Magnolia: Defendants Ignore a Series of Blatant Red Flags in a Rush to Siphon Fees From Asia's Largest Bond Issuance

43.     On March 19, 2012, 1MDB engaged Goldman through its Singapore office – the same office that had rejected Low as a private wealth management client – as the "sole bookrunner and arranger" for debt financing in connection with 1MDB's anticipated acquisition of Malaysian power production company Tanjong Energy.  Within Goldman, this bond deal was referred to by the name Project Magnolia.

44.     On its face, the bond offering, touted as "Asia's biggest sole-led dollar-bond sale ex-Japan," was suspect for a number of reasons.  First, the $1.75 billion 10-year bond was essentially a private placement.  Goldman structured the deal such that Goldman itself bought the entire issue, which it would then quickly sell to investors it had already lined up in South Korea, China, and the Philippines.  In addition to causing Goldman to take on all of the risk of the $1.75 billion deal, this structure was suspicious because it would result in an immediate payday for 1MDB, Low, and the fund's corrupt officials.

45.     Second, the bond issuance was expensive and mispriced.  The bond priced at 425 basis points over 10-year Treasuries, at a yield just short of 6%.  But comparable oil and energy sector bonds in Asia at that time carried a spread of 215 basis points over 10-year Treasuries.  Thus, Malaysia would have to pay over 2% more on these bonds as compared to similar debt.

46.     Third, Goldman received an abnormally high fee for underwriting the 1MDB bond offering.  1MDB agreed to pay Goldman: (a) a fee of 1% of the principal amount of the notes, or $17.5 million, as an "arranger fee," and (b) $175 million as a "commission," for a total of approximately $192.5 million.  These fees amount to roughly 11% of the principal amount of the offering and were to be deducted directly from the subscription proceeds of the bonds.  By comparison, underwriting a typical Malaysian investment-grade bond deal typically results in a

fee of half a percentage point, with a fee of one percentage point for high-yield debt, and mere basis points for government debt.[8]

47.     Fourth, the fact that the bond offering was privately placed ensured that the deal's pricing and fees remained concealed from the public.  Indeed, one Goldman employee was told to keep all correspondence about the bond off of email, because if word got out that Goldman already had investors lined up in South Korea, China, and the Philippines, its profits would not appear to be justified.[9]  Had the deal been canvassed to a broad base of investors in a public offering, syndicate bankers would find the optimum price point at which the deal could be successfully placed, while secondary trading would lower an issuer's implied cost of funding. Public offerings also provide access to a broad investor base which can be called upon in the future to provide funds.

48.     Fifth, 1MDB obtained a guarantee on the debt from Abu Dhabi government investment fund IPIC, which enabled the bond to receive a rating of Aa3 from Moody's.  IPIC typically invests in multi-billion dollar acquisitions and stakes in global companies, and observers at the time wondered why IPIC would be interested in the fee from guaranteeing another sovereign wealth fund, which is typically modest.  As detailed below, the upside to IPIC was the massive bribes Leissner, Ng, and Low directed to IPIC officials.

49.     Fifth, though competition for Asian bond-underwriting is highly competitive, Goldman won the business on a no-bid basis.

50.     Sixth, within Goldman, several senior bankers spoke out against Project Magnolia.  David Ryan, President of Goldman in Asia, had visited with 1MDB's staff in

---

[8] *Bloomberg*, "Rogue Bankers Don't Explain Goldman's 1MDB Mess," (Dec. 21, 2018), available at https://www.washingtonpost.com/business/rogue-bankers-dont-explain-goldmans-1mdb-mess/2018/12/21/514b593e-050e-11e9-958c-0a601226ff6b_story.html.
[9] Wright, Tom; Hope, Bradley. *Billion Dollar Whale* (p. 186). Hachette Books. Kindle Edition.

Malaysia and came away with concerns over 1MDB's plans to take on so much debt and the inexperience of its management, who had not previously overseen multi-billion-dollar investments.[10]  Ryan also considered Goldman's fee from the transaction to be excessive.

51.    Alex Turnbull, a Singapore-based Vice President in Goldman's special situations unit and whose father, Malcolm Turnbull, would later become Australia's prime minister, also raised concerns internally.  Notably, Turnbull was not even involved in the deal, but his knowledge of how bond markets worked cause him to email colleagues expressing disbelief about Goldman's profits.  Turnbull recalled:

> When the 1MDB deal was done with Goldman I sent an email to some of my colleagues saying, 'What the f--k is going on with this? The pricing is nuts, what is the use of the funds?' . . .  And I got a talking-to by compliance.[11]

52.    The email led to a reprimand from Goldman's compliance department, resulting in Turnbull's boss chiding him to remain quiet if he wanted a promotion.[12]  Turnbull later recounted that:

> My comments were a penetrating glimpse of the obvious and the concerns I expressed were widely shared by the market participants at the time . . . .  I called out the insane pricing and bizarre structure at GS when the deal was done and got yelled at by compliance for casting doubt on the integrity of PFI, the group that did the deal . . . .  As a result, I was 'B-tracked' and resigned.[13]

53.    These criticisms were strikingly prescient, as the explanation for Goldman's engagement on the largest sole-led bond deal in Asia (excluding Japan) is simple: it engaged in a historically massive bribery scheme.  Leissner, Ng, and Low funneled millions of dollars to

---

[10] 58.  Wright, Tom; Hope, Bradley. *Billion Dollar Whale* (p. 183). Hachette Books. Kindle Edition.

[11] *Financial Times*, "Australia PM's son says Goldman sidelined him after 1MDB warnings" (March 8, 2018), available at https://www.ft.com/content/cb0fbf5c-2284-11e8-9a70-08f715791301.

[12] *Id*.

[13] *Financial Review*, "Alex Turnbull's 1MDB complaints about Goldman Sachs look prescient" (July 11, 2018), available at https://www.afr.com/markets/market-data/world-markets/alex-turnbulls-1mdb-complaints-about-goldman-sachs-look-prescient-20180710-h12gxa.

Prime Minister Najib, the chairman of 1MDB's board of advisors, and Najib's relatives and associates.  Nearly $577 million – a sum equivalent to more than one-third of the net proceeds of the Project Magnolia bond offering – was diverted to a shell company (Aabar-BVI) immediately after 1MDB received the proceeds of the bond offering. That shell company distributed the funds to officials of IPIC, 1MDB and others.  As just one example of the misappropriation of these funds, one official, Riza Shahriz Bin Abdul Aziz, a relative of Prime Minister Najib and a friend of Low, purchased luxury real estate in the United States and the United Kingdom, and funded his movie production company, Red Granite Pictures, which was a producer of the 2013 movie *The Wolf of Wall Street*.

54.    Seventh, Low was inextricably intertwined with 1MDB and the bond offering. Emails – a simple search of which would have immediately revealed his involvement – obtained from Goldman pursuant to valid search warrants revealed that, during the course of Project Magnolia, Leissner and Ng met with Low on several occasions.   By early March 2012, Goldman had initiated a compliance review of Project Magnolia, which was conducted, in part, by Goldman's Intelligence Group. As part of that review, on March 27, 2012, one Goldman executive acknowledged in an email that Low was a "1MDB Operator or intermediary in Malaysia."[14]  The compliance review included a firm-wide meeting of the Capital and Suitability Committee regarding Project Magnolia on April 4, 2012.   During this meeting, Leissner informed the Global Co-Head of the Intelligence Group that Low was present for the March 5 meeting in Abu Dhabi with IPIC, which would guarantee the bond.  The Intelligence Group failed to investigate the conduct of Leissner, Ng, or Low any further, instead simply concluding

---

[14] Wright, Tom; Hope, Bradley. *Billion Dollar Whale* (p. 182). Hachette Books. Kindle Edition.

that Goldman "should ask that any payments from any of participants to any intermediaries are declared and transparent."

55.     By early April, individuals at Goldman outside of the Intelligence Group became aware of Low's involvement with Project Magnolia. In an email dated April 3, 2012, a Goldman employee noted "that Jho Low is also known to have close friends/contacts in Abu Dhabi." Later that day, another Goldman employee wrote in response that "[a Goldman Managing Director] said Jho Low [was] not involved at all in deal as far as he aware [sic] but that Low was present when [Leissner] met . . . [the] Chairman of IPIC, in Abu Dhabi."  Despite a compliance review and these raised suspicions, later that month Leissner ***again*** met Low and several other Singaporean bankers over lunch in Singapore to discuss aspects of Project Magnolia.

56.     Project Magnolia closed on May 21, 2012.   Notably, Leissner had asked investment bank Lazard Ltd. for an independent valuation of the Tanjong Energy power plants before the deal closed.  According to *The Wall Street Journal*:

> Lazard declined, saying it believed 1MDB was overpaying and that the deal smacked of political corruption. Goldman stepped in and said the plants were worth what 1MDB was paying. 1MDB soon wrote down the power plants by $400 million, and the owner of the plants donated $170 million to 1MDB's charity arm, which Prime Minister Najib Razak used as a political slush fund.[15]

57.     *The Wall Street Journal* later reported that the deal earned Goldman's highest internal prize, the Michael P. Mortara Award. The selection committee for the prize congratulated bankers in four Goldman divisions for "solving an important client's problem through outstanding firmwide cooperation."[16]

---

[15] *The Wall Street Journal,* "Goldman Sachs ignored 1MDB Warning Signs in Pursuit of Asian Business," Tom Wright and Liz Hoffman, (Dec. 17, 2018).
[16] *Id.*

58.    On June 2, 2012, shortly after Goldman's work on the first of the 1MDB bond offerings was finished (and as detailed below, ***while Goldman's work on the second 1MDB bond deal was ongoing***), Thomson Reuters' *International Financing Review* proclaimed that the "putative tentacles" of Goldman's infamous "vampire squid wrapped around the face of humanity" were "rather extensively and firmly engaged" in the Malaysian government.[17]   The article noted that other banks "have been cheesed off by the cosy [sic] relationship Goldman enjoys with the Malaysian government, and the "***metamorphosis***" of 1MDB from a sovereign wealth fund into "***what appears to be a fee-printing machine***."

59.    The article further criticized the shady, private structure of the deal, including the IPIC guarantee, and noting that "[a] public deal would also have meant more clarity on pricing and fees."   Indeed, the article pointed out that the deal was unjustifiably priced over 215 basis points higher – almost double – than it should have been.  The secretive nature of the deal was especially troubling because, as the article noted, at the time "[i]t was the biggest sole-led bond deal ever printed in ex-Japan Asia."

60.    A month later, on July 2, 2012, the *Financial Times* published a story describing the issue as "one puzzle wrapped up in another" and questioning several aspects of the deal.[18] The article recounted how Goldman's rivals "berat[ed]" Goldman "for selling 1MDB an expensive, overly-complex structure," noting that the deal would allow Goldman to "soar up the league tables."[19]  Noting the bond's unusual pricing, the article stated:

---

[17] *International Financing Review*, "Goldman ruffling feathers in Asian debt," (June 2, 2012), available at http://www.ifre.com/goldman-ruffling-feathers-in-asian-debt/21021716.fullarticle.

[18] *Financial Times*, "1MDB of Malaysia's $1.75bn bond: one puzzle wrapped up in another" (July 2, 2012), available at https://www.ft.com/content/6c879300-465c-3a2b-ab04-a35e1d2e831e.

[19] League tables are rankings of banks based on their deal volumes, which are closely followed and touted by banks, as those that do the most business tend to be more sought after by clients.

According to Reuters' IFR calculations at the time, the bond priced at 425 basis points over 10-year Treasuries, at a yield just short of 6 per cent. Yet Malaysian oil company Petronas, in a similar business and with a higher rating, was trading at just 185 basis points over comparable Treasuries.

61.     "Yet," the *Financial Times* noted, "the pricing of the deal is not its biggest mystery," which was IPIC's involvement in the deal:

Bankers are wondering why an Abu Dhabi government investment fund would guarantee what is essentially Malaysian sovereign debt. After all, 1MDB has secured a Malaysian state guarantee in the past. Why is a Gulf emirate, many miles away, guaranteeing this bond?

62.     Despite some of the most respected financial publications in the world noting these significant red flags in connection with Goldman's underwriting of the first 1MDB bond offering, the Board did nothing. Any Board acting in good faith should have responded to this red flag by immediately launching an investigation to determine if the Project Magnolia bond offerings were tainted by corruption or bribery.  Indeed, even a rudimentary investigation would have included a search of Leissner's emails, which would have revealed not only Low's participation in the deal, but also the illicit bribery and money laundering scheme perpetuated by Leissner and Ng.  In fact, as noted above, Low was already on Goldman's radar.  Goldman's private wealth management had already rejected Low twice as a private wealth management client, citing "significant adverse information and questionable sources of wealth."  Had Goldman investigated the deal and connected the dots, the scheme would have easily been uncovered.  But the Board did nothing, exposing Goldman to massive liability from these obviously suspicious bond offerings.

> **2.     Goldman Again Turns a Blind Eye to Corruption, Illegal Activity, and Low's Involvement in Project Maximus**

63.     On May 21, 2012, before the ink was even dry on the Project Magnolia deal, Leisner informed a colleague at Goldman that 1MDB had retained Goldman as an advisor on a

second bond deal with 1MDB.  Known internally as Project Maximus, the bond offering was designed to raise approximately $1.75 billion for lMDB and resulted in substantial revenues and other fees for Goldman.

64.    As with Project Magnolia, Leissner and Low communicated regularly throughout the deal, a fact to which Goldman compliance personnel turned a blind eye. On June 15, 2012, Low sent Leissner and several 1MDB officials an email with the subject line "Financial Plan – Key Points to Adhere to for [Goldman]," that laid out a multi-year plan for lMDB business including plans to "acquire more Energy companies in Malaysia." Low wrote, "PLEASE HAVE [GOLDMAN] STATE THE FOLLOWING AND FOLLOW THE FOLLOWINGS [sic] IN FINANCIAL GUIDELINES." Three days later, on June 18, a member of the deal team at Goldman sent a high-ranking official at lMDB an email that included a presentation from Goldman for lMDB's Board of Directors containing many of the points outlined by Low.

65.    As with Project Magnolia, senior Goldman executives also spoke out against Project Maximus, but were ignored or silenced. David Ryan argued that Goldman should lower its fee on the second bond, given how easy it had been to sell the first bond. He was overruled, however, by senior executives, including then-Chief Operating Officer and President Gary Cohn. After speaking out Ryan was effectively sidelined on Project Maximus, despite being the President of Goldman's Asian operations.  Instead, Goldman brought in a banker named Mark Schwartz, as Chairman in Asia.  Schwartz, whose position was senior to that of Ryan's, was a proponent of the 1MDB business.[20]  According to *The Wall Street Journal*, Ryan, who had been

---

[20] Wright, Tom; Hope, Bradley. *Billion Dollar Whale* (p. 189). Hachette Books. Kindle Edition.

considered a "rising star" at Goldman, left the Company the next year.[21] *Bloomberg* reported that Ryan, who had argued that Goldman should reassess, and potentially end, its relationship with the fund, left Goldman in part due to frustration that his concerns about 1MDB were not heeded.[22]

66.     Goldman instituted a compliance review of Project Maximus at an October 10, 2012 firmwide Capital Committee meeting – just two months after the July 2012 *Financial Times* article that pointed out multiple red flags in relation to Goldman's underwriting of the first 1MDB offering.   Despite the Capital Committee's cursory scrutiny, Leissner continued communicating with Low about 1MDB business during this time – including an October 5 email sent to Leissner entitled "Presentation for Executive Council."  Leissner responded that he would have added that one of the benefits of the way the deal was structured was that it "***allows for a greater degree of confidentiality*** as the bonds and the guarantee are separated."

67.     Project Maximus closed on or about October 17, 2012.  As with Project Magnolia, Goldman purchased the entire issuance, which it then resold to investors.  Goldman's fee for this second 1MDB bond deal was $114 million.  For his role in bringing in the business, Leissner was paid more than $10 million in salary and bonuses in 2012, making him one of Goldman's top-paid employees that year.

68.     The issuance raised approximately $1.75 billion for lMDB's energy company acquisition and "for general corporate purposes (which may include future acquisitions)."  In truth, however, $790,354,855 – a sum equivalent to roughly half of the net proceeds of the

---

[21] *The Wall Street Journal*, "Goldman Sachs Ties to Scandal-Plagued 1MDB Run Deep," (Dec. 22, 2016), available at https://www.wsj.com/articles/goldman-sachs-ties-to-scandal-plagued-1mdb-run-deep-1482362362.
[22] *Bloomberg*, "Gary Cohn Backed Goldman Sachs's 1MDB Dealings, Book Says" (Sep. 13, 2018), available at https://www.bloomberg.com/news/articles/2018-09-13/gary-cohn-backed-goldman-sachs-s-dealings-with-1mdb-book-says.

Project Maximus bond offering – was again diverted to a shell company on the same day that 1MDB received the proceeds of this bond sale. This time, Low used a portion of the siphoned funds to, among other things, purchase jewelry, pay off credit card bills, pay expenses related to a private jet, and transfer money to family members. Leissner directed that nearly $3 million be transferred from holding company accounts to accounts beneficially owned by 1MDB officials.

### 3. Goldman Again Disregards Illegal Activity, Corruption, and Low's Involvement in Project Catalyze

69. In November 2012, soon after Project Maximus closed, Leissner and Low began working on the next 1MDB bond deal, a proposed $3 billion issuance known as Project Catalyze. On January 15, 2013, Goldman was engaged on the project, again on a no-bid basis. Goldman's Asia President David Ryan was suspicious when he heard how Goldman won the business, but he was again overruled by Asia Chairman Mark Schwartz and COO Gary Cohn. Just two days after Goldman won the business, Leissner transferred $1 million each to two accounts beneficially owned by 1MDB officials.

70. In January 2013, Goldman's Intelligence Group began conducting a compliance review on Project Catalyze. After making a series of perfunctory inquiries, Project Catalyze was approved on March 13, 2013, over the concerns of one of Goldman's own lawyers on the deal. As with Project Magnolia and Project Maximus, Goldman suspiciously structured the bond such that it would purchase the entire issuance and resell it to clients it had lined up. 1MDB officials wanted to deposit the $3 billion worth of immediate proceeds resulting from this structure into a bank account at the small Swiss private bank BSI, which had just expanded into Asia in 2011. Kevin Wong, a Singapore-based partner of Linklaters and one of Goldman's lawyers on the deal, pointed out in an email that it was unusual to use such a small private bank for a $3 billion deposit, but his concerns were ignored.

24

71.     Project Catalyze closed on March 19. For its work, Goldman earned just short of $300 million. In a press release issued on April 23, 2013, 1MDB indicated that, "[t]he proceeds from the US $3 billion capital raised will be utilised for investments in strategic and important high-impact projects like energy and strategic real estate which are vital to the long term-economic [sic] growth of both countries." The press release gave, as an example of a future investment project, the Tun Razak Exchange (TRX). The Tun Razak Exchange is a project to develop a financial center in downtown Kuala Lumpur that has yet to be completed. Wong's concerns, however, were alarmingly prescient. Days after the $3 billion in proceeds were deposited at BSI, more than $1.26 billion was diverted to unrelated overseas shell company accounts, including two accounts at Falcon Bank in Singapore. In addition, among other transfers: (i) on July 3, 2013, $65 million traceable to Project Catalyze was ultimately transferred to an account controlled by Leissner; (ii) on July 19, 2013, Leissner transferred approximately $6 million to an account in the name of a management company that he controlled; and (iii) on September 10, 2013, approximately $27.3 million traceable to Project Catalyze was transferred to a New York jeweler to purchase a 22 carat pink diamond for the Prime Minister's wife.

72.     Despite the Intelligence Group turning a blind eye to Leissner's illicit payments and Low's involvement in the deal, public reports began circulating regarding Low's role. A member of Goldman's Capital Committee emailed Leissner on April 24, 2013 asking about these reports linking Low to 1MDB. Leissner replied that Low "was an advisor alongside other prominent figures to the King of Malaysia at the time of the creation of lMDB." Notably, despite this statement and Leissner's earlier April 4, 2012 statement to the Global Co-Head of the Intelligence Group that Low was present for a March 5, 2012 meeting in Abu Dhabi with IPIC, no one followed up on Low's involvement in the bond deals.

73.    On September 25, 2013, Leissner and Low met *again* with Blankfein and others at the Time Warner Center in New York to discuss business opportunities for Goldman in Malaysia, including with 1MDB.  Then, in 2014, 1MDB began planning for an IPO of the power assets owned by its subsidiary 1MDB Energy Holdings Limited ("1MEHL") on the Malaysian stock exchange. 1MEHL was the holding company for 1MDB Energy and 1MDB Energy, the entities that had acquired the Tanjong and Genting power assets, respectively, through issuance of the 2012 bond notes. 1MDB retained Goldman to serve in an advisory capacity, but only after a June 2014 online chat between Low and Leissner, during which the two discussed the need to "suck up to" a 1MDB official and to send "cakes" to the wife of a politician.  Several months after this chat, a bank account owned and controlled by Leissner and his relative was used to transfer approximately $4.1 million to a high-end New York jeweler, in part, to pay for gold jewelry for the politician's wife.

74.    In all, Goldman ultimately reaped approximately $600 million in fees relating to the nearly $6.5 billion of 1MDB bond issuances.  Most notably, the sheer amount of the fees that Goldman received in connection with the 1MDB bond offerings was a red flag that should have raised suspicions at the Board level.  These abnormally high fees amounted to up to 11%  for underwriting the bonds, which were especially high compared with half a percentage point for underwriting a typical Malaysian investment-grade bond deal, one percentage point for high-yield debt, and mere basis points for government debt.[23]  The amount Goldman earned from 1MDB alone is nearly equivalent to the $694 million in revenue from its entire global bond underwriting business in the first quarter of 2013.

---

[23] *Bloomberg*, "Rogue Bankers Don't Explain Goldman's 1MDB Mess," (Dec. 21, 2018), available   at   https://www.washingtonpost.com/business/rogue-bankers-dont-explain-goldmans-1mdb-mess/2018/12/21/514b593e-050e-11e9-958c-0a601226ff6b_story.html.

E.     **"Too Many Red Flags": The Board Disregards Multiple, Significant Red Flags Arising From Goldman's Involvement in the 1MDB Deals**

75.     That Goldman received the lucrative 1MDB business at such high fee rates in the highly competitive Asian bond underwriting market should have raised red flags as to whether Goldman obtained the business through bribery or other malfeasance.  In fact, when banks underwrite bonds in some Asian countries, those banks routinely complain of zero fees on government bond and stock sales.  According to *The Wall Street Journal*, "[b]anks that agree to arrange bond offerings for ultralow fees are generally hoping to build relationships with corporate clients for future deals. They are also hoping to generate revenue from related businesses, such as fees for setting up foreign-currency swaps or on bond-trading commissions."[24]

76.     Indeed, less than two months after Project Catalyze closed, the *Financial Times* again noted significant red flags with respect to Goldman's involvement in that offering, observing that "Goldman Sachs is facing sharp criticism over its potential profits for arranging a $3bn bond deal for a Malaysian government fund . . . ."[25]  The article quoted Malaysian politician Wong Chen, who said, "[s]omeone must have made a big pile. That margin should rightfully belong the Malaysian government. . . .  We will fight to recoup that margin if we come to power."

77.     In addition to Goldman's outsized share of the proceeds, the article noted several abnormalities with respect to Project Catalyze.  First, in a large government-related deal, it was highly unusual for the use of the bond offering's proceeds not be specified in greater detail.  The

---

[24] *The Wall Street Journal*, "The New Floor for Bond Underwriting Fees: $1," (Jan. 3, 2018), available at https://www.wsj.com/articles/the-new-floor-for-bond-underwriting-fees-1-1514973603.

[25] *Financial Times*, "Goldman Sachs criticised over $3bn Malaysia bond deal," (May 1, 2013), available at https://www.ft.com/content/ed31cbde-b222-11e2-8540-00144feabdc0.

article noted that the general consensus among other bankers was "in a government-related deal of this size, it is highly unusual for the use of proceeds not to be spelt out in more detail." Second, the article noted that the bond was unusually and hurriedly structured: "[i]n a sign of the hurried nature of the deal, Goldman bought the bonds first, then asked Standard & Poor's to provide a rating." Third, it was unusual for unrated bonds to gain a credit rating after they were sold. The article noted that one person at a rating agency "could not think of a single similar example in the case of government-linked bonds."

78.     In a follow-up article the next day, the *Financial Times* again noted the "sharp criticism" that Goldman was facing as a result of the deal.[26] The article explained that Goldman bought the still-unrated bonds at just 90 cents on the dollar, while at the same time noting the unfavorable yield which was "a full 1 percentage point more than Malaysian sovereign bonds in the market."

79.     That same day, *Bloomberg* further called into question the deal's transparency, quoting a Malaysian corporate lawyer and parliamentary candidate who explained that **"[t]he private placement raised too many red flags**, coming so close to the election date. . . . They were rushing this out and they don't know how to spend it. **We don't know who received this private placement and who they may sell it on to**."[27] *Bloomberg* also put Goldman's excessive fees into context, noting that in January of that year, Korea Development Bank (which was higher rated than 1MDB) paid just 0.3% for a $500 million debt sale, compared to the 3.1% that constituted Goldman's fees at the time, for a much larger sale. One day later, on May 3, 2013, *Bloomberg* reported that a group of candidates from a Malaysian political party were considering

---

[26] *Financial Times*, "Goldman in Malaysia: know your client," (May 2, 2013), available at https://www.ft.com/content/389759ad-41d0-3416-9439-0df463757cdf.

[27] *Bloomberg*, "Goldman-Arranged Bond Sale Stings Najib Before Malaysia Election" (May 2, 2013).

renegotiating terms of $3 billion worth of 1MDB-related bonds if they were elected.[28]  The article quoted another Malaysian politician as stating that "[t]he 1MDB transaction has been shrouded in secrecy. We would go back to the renegotiation table and see what would have been a fairer deal should there be any questionable part of the deal mix."

80.     One week later, on May 9, 2013, *Bloomberg* published an article[29] which again questioned Goldman's suspiciously high fees.  The article noted:

> Goldman Sachs Group Inc. made about $500 million arranging three bond sales in the past year for 1Malaysia Development Bhd., the state investment fund led by Prime Minister Najib Razak, said a person familiar with the matter.
>
> The total is almost as much as Malaysia, Southeast Asia's third-largest economy, pays each month on its debt and compares with Goldman's record $694 million of global bond underwriting fees in the first quarter, according to data compiled by Bloomberg.

81.     According to the article, Goldman's fees from the 1MDB deals were significantly higher when compared to past Malaysian deals with other underwriters:

> Malaysia has sold eight dollar bonds since the start of 1999, raising $7.1 billion, according to data compiled by Bloomberg. The last was in June 2011, when the government issued $2 billion.
>
> Citigroup, JPMorgan Chase & Co., CIMB Group Holdings Bhd. and HSBC are among the lead underwriters, managing 69 percent of the sales, Bloomberg data show. The banks charged an average 0.47 percent of the bond sales in fees for five deals between 1999 and 2002. The government didn't disclose commissions for the rest of the deals.

82.     The article noted that Goldman reported a 36% increase in investment banking fees in the first quarter of 2013, including a 69% rise in fixed-income underwriting revenue, while fees across the industry gained just 17%.

---

[28] *Bloomberg*, "Goldmans' Malaysian Bond Fees Would Face Scrutiny in Poll Upset" (May 3, 2013).

[29] *Bloomberg*, "Goldman Said to Earn $500 Million Arranging Malaysia Bond," (May 9, 2013), available at https://www.bloomberg.com/news/articles/2013-05-08/goldman-said-to-earn-500-million-arranging-malaysia-bond.

83.     The board's inaction in the face of these glaring red flags was particularly egregious because in 2013, the Federal Reserve required Goldman to implement "sweeping changes" in order "to tighten its oversight of risk."[30]   The *Financial Times* reported that the "[n]otorious 1MDB deal was approved after meetings where recused bankers stayed in room," and that the reforms:

> [R]esulted from a wider questioning of controls, including concerns that committee minutes did not record debate in sufficient detail.
>
> ***All of Goldman's company-wide and regional committees were affected by the reforms, which were introduced shortly after the bank financed the last of the 1MDB bonds in March 2013, receiving a total of $600m in fees. They included its capital and client suitability committees, which oversaw the 1MDB financing, and approved all such deals.***
>
> One person close to its Asia Pacific capital committee, which initially reviewed the first 1MDB deal in 2012, said that the Fed questioned why committees seemed to reject very few deals as being too risky or inappropriate.

84.     The Federal Reserve's scrutiny continued into 2014. *The Wall Street Journal* reported that the Federal Reserve raised concerns with Goldman that the 1MDB deals could have put the firm's reputation at risk.[31]   The *Journal* elaborated that "[b]y early 2014, The Federal Reserve, Goldman's main U.S. regulator, was scrutinizing the bond deals, questioning the firm on why 1MDB had continued to sell bonds despite holding ample cash, the people said. Fed officials were also critical of Goldman's vetting of the 1MDB deals, noting they had posed reputational risk."

85.     Low's involvement with Goldman did not end with the 1MDB bond offerings. He continued to pop up in other deals in which Goldman had a role.  *The Wall Street Journal*

---

[30] *Financial Times* "NY Fed told Goldman to improve risk reporting shortly after 1MDB" (Nov. 25, 2018), available at https://www.ft.com/content/bc59bc34-f0a0-11e8-ae55-df4bf40f9d0d.

[31] *The Wall Street Journal*, "Fed Warned Goldman on Malaysia Bond Deals" (April 6, 2016), available at https://www.wsj.com/articles/fed-warned-goldman-on-malaysia-bond-deals-1459974246.

reported on Goldman's response to Low's presence in a 2013 deal that is currently being investigated:

> "Jho Low's appearance is not welcome," one compliance officer wrote to a banker in 2013 when Mr. Low teamed up with a Goldman client to buy a Houston-based oil company. "But if he is in a very minor role…then we may be able to live with it." That deal, a takeover of Coastal Energy brokered by Goldman, is being investigated by U.S. prosecutors.[32]

86.     In addition – and significantly – Goldman also found itself in legal trouble arising from its dealings with other sovereign wealth funds.  In January 2014, the Libyan Investment Authority ("LIA") *filed a $1 billion lawsuit against Goldman* after LIA lost 98% of the $1.3 billion it invested with Goldman in 2007, while Goldman made $350 million in profit. It is inconceivable that the Board would have been unaware of this significant legal lability. Court documents revealed that, in order to win business from LIA, Goldman flew the younger brother of LIA's Deputy Chief to Dubai at its own expense, and then paid for his accommodations at the Ritz Carlton and arranged for two prostitutes to spend the evening.  Evidence also showed that Goldman offered this individual an internship, in addition to the gifts such as lavish dinners and personal electronics devices that Goldman plied other LIA executives with.  When Goldman's relationship with LIA deteriorated, a close friend of Libya's then-leader Muammar Qaddafi threatened the lives of several Goldman bankers, and the Banks' security team had to rush them to an airport for a flight to London.

87.     On June 18, 2015, *The Wall Street Journal* published an article entitled "Fund Controversy Threatens Malaysia's Leader," detailing how 1MDB indirectly funded Najib's 2013 election campaign. A probe into 1MDB subsequently followed. On July 2, 2015, *The Wall Street Journal* published another article, entitled "Investigators Believe Money Flowed to Malaysian

---

[32] *The Wall Street Journal*, "Goldman Sachs ignored 1MDB Warning Signs in Pursuit of Asian Business," (Dec. 17, 2018), available at https://www.wsj.com/articles/goldman-sachs-ignored-1mdb-warning-signs-in-pursuit-of-asian-business-11545088802.

Leader Najib's Accounts Amid 1MDB Probe," reporting how Malaysian investigators traced nearly $700 million in deposits to what they believed to be Najib's personal bank accounts. Thereafter, in 2015 and 2016, IPIC Managing Director and Aabar Chairman Khadem al-Qubaisi and Aabar CEO Mohamed al-Husseini, who partnered with 1MDB in the bond deals described above, were dismissed and jailed for their roles in the 1MDB scandal.

88.     Despite the presence of these significant red flags, the Board failed to conduct any investigation into Goldman's role in the 1MDB offerings. Had the Board performed even a cursory investigation, it would have discovered the plain weaknesses in the Company's internal controls that allowed Leissner, Ng, and others to repeatedly engage in bribery, money laundering, and other illicit conduct, to Goldman's detriment.

### F.     The Truth About the 1MDB Corruption Comes to Light

89.     On August 4, 2016, Goldman Sachs filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q"). The Q2 2016 10-Q's discussion of "Regulatory Investigations and Reviews and Related Litigation" merely stated, in relevant part:

> [Goldman Sachs] and certain of its affiliates are subject to a number of other investigations and reviews by, and in some cases have received subpoenas and requests for documents and information from, various governmental and regulatory bodies and self-regulatory organizations and litigation and shareholder requests relating to various matters relating to the firm's businesses and operations, including . . . [t]ransactions involving government-related financings and other matters, **_including those related to 1Malaysia Development Berhad (1MDB), a sovereign wealth fund in Malaysia_**, municipal securities, including wall-cross procedures and conflict of interest disclosure with respect to state and municipal clients, the trading and structuring of municipal derivative instruments in connection with municipal offerings, political contribution rules, municipal advisory services and the possible impact of credit default swap transactions on municipal issuers[.]

90.     On November 1, 2018, U.S. federal prosecutors in the Eastern District of New York unsealed indictments against Leissner, Ng, and Low related to the 1MDB probe, explicitly

describing them as "agents acting within the scope of their employment on behalf of" the Company.  That same day, the United States Attorney's Office for the E.D.N.Y. announced that Leissner's guilty plea was unsealed for a two-count criminal information charging Leissner with conspiring to launder money and conspiring to violate the Foreign Corrupt Practices Act.  The U.S. Attorney's Office also stated that, "[a]ccording to court filings, Leissner has been ordered to forfeit $43,700,000 as a result of his crimes."

91.    The indictment of Ng and Low further alleged that Goldman's system of internal accounting controls could be easily circumvented and that the Company's business culture, particularly in Southeast Asia, at times prioritized consummation of deals ahead of the proper operation of its compliance functions. In addition, an unnamed participating managing director of the firm is alleged to have been aware of the bribery scheme and to have agreed not to disclose this information to the firm's compliance and control personnel. That employee, who is widely believed to be Andrea Vella, has since been put on leave.

92.    On November 8, 2018, *Bloomberg* reported on the personal involvement of Goldman Sachs's then-CEO, Lloyd Blankfein, in a meeting to establish ties with Malaysia and its new sovereign wealth fund that was referenced in the court documents unsealed the prior week. In a November 8, 2018 article entitled "Goldman's Blankfein Said to Have Attended 2009 1MDB Meeting," *Bloomberg* noted that "Blankfein was the unidentified high-ranking Goldman Sachs executive referenced in U.S. court documents who attended a 2009 meeting with the former Malaysian prime minister," and that "[t]he meeting was arranged with the help of men who are now tied to the subsequent plundering of the 1MDB fund[.]" On this news, Goldman Sachs's stock price fell by $9.00, or nearly 4%, closing at $222.65 on November 9, 2018.

93.     Days later, on November 12, 2018, Malaysian government officials denounced Goldman Sachs's role in the 1MDB scandal.   New Malaysian Prime Minister Mahathir Mohamad stated that "[t]here is evidence that Goldman Sachs has done things that are wrong" and "[o]bviously we have been cheated through the compliance by Goldman Sachs people." Meanwhile, the country's Finance Minister Lim Guan Eng said that Malaysia would seek a "full refund" of the approximately $600 million in fees that the Company earned in connection with 1MDB's $6.5 billion bond deal.   On this news, Goldman Sachs's stock price fell $16.60 per share, or nearly 7.5%, to close at $206.05 on November 12, 2018.

94.     On December 17, 2018, multiple news outlets reported that Malaysia had filed criminal charges against Goldman Sachs and two former executives for their role in the 1MDB fraud and money-laundering scandal. That same day, in response to these charges, Goldman Sachs denied any wrongdoing through its spokesman Edward Naylor, who stated: "We believe these charges are misdirected and we will vigorously defend them and look forward to the opportunity to present our case.   The firm continues to cooperate with all authorities investigating these matters."  Following this news, Goldman Sachs's stock price fell $4.76 per share, or 2.76%, to close at $168.01 on December 17, 2018.

**G.     The Massive Fallout From the 1MDB Scandal was Swift and Severe**

**1.     Goldman's Conduct Relating to 1MDB Has Spawned Multiple Criminal, Civil, and Regulatory Actions**

95.     Fallout from the 1MDB scandal has resulted in multiple criminal and civil suits and regulatory investigations.  In a closed proceeding on August 28, 2018, Leissner pled guilty to two counts of conspiracy to violate the Foreign Corrupt Practices Act and conspiracy to commit money laundering.  He is scheduled to be sentenced on June 28, 2019.  He has further agreed to

return $43.7 million, while also admitting that upwards of $200 million flowed from 1MDB to accounts he or a relative controlled.

96.    The United States has also unsealed an indictment of Ng and Low.  Ng was thereafter detained in Malaysia and has been denied bail.  The United States is seeking Ng's extradition, and he has also since been charged in Malaysia in connection with the 1MDB scandal.  Separately, Ng and his family have agreed to surrender about $29 million to authorities in Singapore, which would then repatriate the funds to Malaysia.  Low is still at large and is believed to be in hiding in China.

97.    In November 2018, Goldman partner Andrea Vella was put on leave over his role in the 1MDB deals.  That same month, *Bloomberg* reported that Vella matched the description of "Co-Conspirator #4" in the Leissner charging documents, fueling speculation as to whether Vella and other Goldman employees would also be charged in connection with 1MDB.

98.    On December 4, 2018, Goldman's Chief Operating Officer John Waldron confirmed to CNBC that Goldman was in "active conversations" with the Department of Justice. The *Financial Times* reported that Department of Justice officials have "spoken to senior executives at the bank, including [current CEO David] Solomon."[33]  On the Company's January 16, 2019 earnings call, Solomon reiterated that the Department of Justice investigation was still "open," and that Goldman was cooperating with both the DoJ and other unnamed "regulators." Indeed, in addition, the Federal Reserve, the SEC, and the New York State Department of Financial Services are all moving forward with separate investigations of Goldman's role in the 1MDB scandal.  The New York DFS, which oversees Goldman's state-chartered banking unit,

---

[33] *Financial Times*, "Goldman's business culture criticised by US officials" (Nov. 2, 2018), available at https://www.ft.com/content/763db0c4-ddff-11e8-9f04-38d397e6661c.

recently sent subpoenas to Goldman and several of its employees, asking them to appear for interviews in early 2019.

99.     Fallout from the 1MDB scandal has also roiled Goldman's corporate ranks.  In October 2018, Lloyd Blankfein, who met with Low twice, stepped down as CEO of Goldman "to pursue other interests."  On February 1, 2019, Goldman announced that it would not pay out deferred bonuses that Blankfein and two other former top executives earned in prior years, and will instead await the outcome of an investigation into 1MDB.  Blankfein stands to lose as much as $7 million if the full amount of the bonus is withheld.  Goldman also said it might claw back some of the $23 million it paid new CEO David Solomon in 2018.

100.    The U.S. Justice Department's Information charging Ng and Low described Goldman's business culture – particularly in Southeast Asia – as "highly focused on consummating deals" and "prioritizing this goal ahead of the proper operation of its compliance function," while Goldman's system of internal controls was described as "easily circumvented." Leissner himself explained that it was "very much in line of its culture of Goldman Sachs to conceal facts from certain compliance and legal employees."[34]   Almost immediately, news reports began to surface casting aspersions over, and calling into significant doubt, Goldman's denial of wrongdoing and attempts to portray Leissner and Ng as rogue employees.

101.    *Bloomberg* interviewed ten former Goldman partners at their annual former partners dinner on December 12, 2018, writing that "[t]o them, it's the biggest threat to

---

[34] CNN, "Ex-Goldman Sachs banker tied to 1MDB scandal blames bank's 'culture' in guilty plea" (Nov. 9, 2018), available at https://www.cnn.com/2018/11/09/business/lloyd-blankfein-goldman-sachs-1mdb/index.html.

Goldman's reputation since the firm's post-crisis makeover."[35]   Dennis Suskind, the former Goldman partner who **hired** Blankfein, was quoted by *Bloomberg* as saying "[i]t doesn't smell right. . .  The thing about the firm is that **they should have been monitoring it closer**."[36]  Michael Dubno, Goldman's former chief technology officer, described the fallout from 1MDB as "a terrifying thing.  **We were more careful, more clean – so whenever you see something like this it is very disturbing**."[37]

102.   CNBC also interviewed several current and former Goldman employees, describing them as "doubt[ing] the firm's rogue banker defense."[38]  These employees explained that due to their size and structure, the 1MDB deals should have been heavily reviewed:

> [D]eals as large as those that helped create the $6.5 billion 1MDB fund require scrutiny from several top firm-wide committees. The 2012 and 2013 bond transactions at the heart of 1MDB were "bought deals" that meant **Goldman had to use its capital to buy newly created securities before offloading them to investors**. That's riskier than in more typical arrangements where Goldman is merely distributing bonds to investors.[39]

According to *Bloomberg*, "[s]uch 'hard 'underwriting' is highly unusual in the aftermath of the financial crisis, as banks are careful about meeting capital requirements. . . . All this should have

---

[35] *Bloomberg*, "Lloyd Blankfein's Final Days at Goldman Clouded by 1MDB Scandal" (Dec. 13, 2018), available at https://www.bloomberg.com/news/articles/2018-12-13/lloyd-blankfein-s-final-days-at-goldman-clouded-by-1mdb-scandal.

[36] *Id.*

[37] *Id.*

[38] CNBC, "As Goldman's 1MDB scandal deepens, insiders doubt the firm's rogue banker defense" (Dec. 18, 2018), available at https://www.cnbc.com/2018/12/17/as-goldmans-1mdb-mess-deepens-insiders-doubt-the-firms-rogue-banker-defense.html.

[39] CNBC, "As Goldman's 1MDB scandal deepens, insiders doubt the firm's rogue banker defense" (Dec. 18, 2018), available at https://www.cnbc.com/2018/12/17/as-goldmans-1mdb-mess-deepens-insiders-doubt-the-firms-rogue-banker-defense.html.

triggered a wringer of committee approvals, especially because bank capital – so precious after the financial crisis – was at risk."[40]

103.    CNBC further reported that Steven Scherr, who became Goldman's CFO in November 2018, was "[a]mong those who approved" 1MDB, and that former CEO Blankfein and current CEO David Solomon "also reviewed the deals."[41]   Indeed, the news outlet quoted one incredulous former Goldman employee, who still has dealings with the Company, as saying **"[a]nyone who's been there a long time knows you can't do big things without senior people knowing, period**.  No matter how senior you are, there's always somebody above you.  **So a lot of people had to decide they were comfortable committing billions of dollars to this**."[42]  The *Financial Times* added that:

> The 1MDB deals were scrutinised by at least 30 Goldman executives, including Mr. Blankfein and his successor David Solomon, sources have said. But they focused on making sure 1MDB officials fully understood that they had picked a fundraising structure that would allow Goldman to make unusually large sums in exchange for taking on additional risk. By contrast, when the outsized nature of Goldman's 1MDB fees first emerged, senior executives at rival banks told me they would never have dared take such proposals to their internal risk committees for fear of being laughed out of the room.[43]

104.    Indeed, the *Financial Times* reported that "[u]nder the Bank Secrecy Act, Goldman employees had an obligation to be especially careful when dealing with people linked

---

[40] *Bloomberg*, "Rogue Bankers Don't Explain Goldman's 1MDB Mess" (Dec. 21, 2018), available at https://www.bloomberg.com/opinion/articles/2018-12-21/rogue-bankers-don-t-explain-goldman-s-gs-1mdb-mess.

[41] CNBC, "As Goldman's 1MDB scandal deepens, insiders doubt the firm's rogue banker defense" (Dec. 18, 2018), available at https://www.cnbc.com/2018/12/17/as-goldmans-1mdb-mess-deepens-insiders-doubt-the-firms-rogue-banker-defense.html.

[42] *Id.*

[43] *Financial Times,* "Goldman Sachs has some serious questions to answer," Brooke Master, (Nov. 6, 2018).

to Najib Razak, the former Malaysian prime minister" because "[t]he law requires enhanced due diligence when handling transactions connected to a 'politically exposed person.'"[44]

105.  *The New York Times* was much more blunt in its assessment. Citing the government's description of Goldman's culture and deficient controls, the *Times* wrote that Goldman "seems unlikely to be able to slough off its role in the looting of a multibillion-dollar Malaysian government investment fund as the work of a few miscreants."[45]

106.  In addition, Singapore has expanded its criminal investigation of 1MDB to include Goldman Sachs. Authorities in that country are investigating whether some of the $600 million in fees that Goldman earned from the three bond deals flowed to a Singapore subsidiary.

107.  Finally, other financiers and financial firms have found themselves part of the 1MDB scandal:

a.  Movie production company Red Granite Pictures, founded by Prime Minister Najib's stepson and close Low friend Riza Aziz, paid $60 million to settle U.S. Justice Department claims it financed the movie *The Wolf of Wall Street* with money siphoned from 1MDB;

b.  Deutsche Bank AG's former Asia Pacific Head of Financial Institutions Tan Boon-Kee has been questioned by Singaporean authorities for their roles in the scandal;

c.  On July 10, 2018, Switzerland's Office of the Attorney General announced that six individuals and two Swiss banks are suspected of involvement

---

[44] *Financial Times*, "Goldman's business culture criticised by US officials" (Nov. 2, 2018), available at https://www.ft.com/content/763db0c4-ddff-11e8-9f04-38d397e6661c.
[45] *The New York Times*, "Goldman Blames Rogue Staff for Its 1MDB Scandal. That May Not Wash." (Nov. 15, 2009), available at https://www.nytimes.com/2018/11/15/business/dealbook/goldman-sachs-1mdb.html.

in using financing intended for 1MDB for other purposes, "most particularly for the personal enrichment of the persons involved."

d.      Central Bank of Malaysia Governor Muhammad Ibrahim resigned in June 2018, as questions swirled over the role the central bank played in a land purchase deal from Najib's government, who in turn used the proceeds to pay off 1MDB's debts. The Central Bank has instituted a review of the deal;

e.      The Monetary Authority of Singapore, that nation's central bank, has fined UBS Group AG, DBS Group Holdings Ltd., Credit Suisse Group AG, United Overseas Bank Ltd. and Standard Chartered Plc, among others, for anti-money laundering violations in the wake of the 1MDB scandal;

f.      Falcon Private Bank Ltd., the Zurich-based bank linked to at least $3.8 billion of 1MDB fund flows, was ordered to cease operations in Singapore while Switzerland threatened to withdraw its license if there were any further breaches of money-laundering regulations;

g.      BSI SA, a 143-year-old Swiss bank that worked with 1MDB, lost its license to do business in Singapore for breaches of money laundering rules;

h.      Switzerland's financial regulator will conduct a detailed review of JPMorgan Chase & Co.'s anti-money laundering controls after finding the bank seriously breached regulations in its dealings with 1MDB;

i.      Singapore has banned at least eight financial professionals in connection with 1MDB; and

j.      In 2017, Malaysia's finance ministry and 1MDB reached a $1.2 billion settlement with Abu Dhabi's sovereign wealth fund over a debt dispute. Now

Malaysia is seeking to challenge an arbitration award that requires it to make multi-billion dollar payments to IPIC.

### 2.    Defendants' Misconduct Has Exposed Goldman to Billions of Dollars of Liabilities

108.    The 1MDB scandal has also significantly impacted Goldman's bottom line.  In 2018, Goldman's share price has performed the worst among its bank peers, plummeting 34% "thanks to negative headlines tied to the 1MDB scandal," as CNBC reported.[46]

109.    As discussed above, the criminal charges Malaysia filed against Goldman in December 2018 seek $7.5 billion from the Company in connection with 1MDB.  Malaysia's attorney general, Tommy Thomas, stated, "Malaysia considers the allegations in the charges against all the accused to be grave violations of our securities laws."  Finance Minister Lim Guan Eng later told reporters that "[a]n apology is just not sufficient.  Not enough.  There must be the necessary reparations and compensations."   On January 24, 2019, *Bloomberg* reported that Malaysian police raided Rahmat Lim & Partners, the law firm that represented Goldman in the 1MDB deals, to search for documents related to the bonds.[47]

110.    Initial reports from analysts estimated that Goldman could be liable for up to $2.5 billion.  In particular, UBS reported in December 2018 that "potential fines typically range from the $600 million banking fees Goldman earned from 1MDB transactions to the $2.5 billion sum

---

[46] CNBC, "Goldman Sachs says it was lied to in 1MDB scandal that has plagued its stock" (Dec. 17, 2018), available at https://www.cnbc.com/2018/12/17/goldman-sachs-says-it-was-lied-to-in-1mdb-scandal-that-has-plagued-its-stock.html.

[47] *Bloomberg*, "Malaysian Police Seek 1MDB Deal Documents From Goldman's Lawyer" (Jan. 24, 2019), available at https://www.bloomberg.com/news/articles/2019-01-24/malaysia-police-seek-1mdb-deal-documents-from-goldman-s-lawyer.

embezzled from the funds."[48]   Goldman's stock was downgraded by Morgan Stanley analysts who cited regulatory concerns.

111.   As Goldman's involvement in the scandal deepened, analysts continued to increase their estimates of Goldman's exposure.   Wells Fargo analyst Mike Mayo reported that Goldman could face up to $5 billion in costs tied to 1MDB, as well as another 18 months of "overhang" on the Company's performance.[49]   He further noted that "one issue has been and remains the silence of the CEO to investors" – unfavorably comparing Goldman's response to the 1MDB scandal to JPMorgan's response to the 2012 "London Whale" incident.

112.   In 4Q2019, Goldman's provision for litigation and regulatory proceedings surged to $516 million – from just $9 million a year earlier.   CNBC reported that "most of that [increase] is tied to the 1MDB case, according to a person with direct knowledge of the matter."[50]

113.   The 1MDB scandal also resulted in Prime Minister Najib losing re-election in May 2018, ending a 61-year reign for his party.   Since his election defeat, Najib has been arrested and hit with 38 charges related to the scandal.   Malaysia's new prime minister, Mahathir Mohamad, came to power in part on a pledge to investigate the 1MDB scandal and has taken an increasingly tough line against Goldman and has accused the bank of cheating the country.

---

[48] CNBC, "Goldman Sachs likely to boost legal reserves for 1MDB -analysts" (Dec.10, 2018), available   at   https://www.cnbc.com/2018/12/05/reuters-america-goldman-sachs-likely-to-boost-legal-reserves-for-1mdb-analysts.html.

[49] CNBC, "Goldman Sachs says it was lied to in 1MDB scandal that has plagued its stock" (Dec. 17, 2018), available at https://www.cnbc.com/2018/12/17/goldman-sachs-says-it-was-lied-to-in-1mdb-scandal-that-has-plagued-its-stock.html.

[50] CNBC, "Goldman CEO Solomon on ex-banker's role in 1MDB scandal: 'We apologize to the Malaysian people'" (Jan. 16, 2019), available at https://www.cnbc.com/2019/01/16/goldman-sachs-ceo-solomon-addresses-1mdb-scandal.html.

Malaysian officials have told Goldman that they plan to pull the country's pension money from Goldman's asset-management arm.

## V. THE DEFENDANTS VIOLATED SECTION 10(B) OF THE EXCHANGE ACT AND BREACHED THEIR FIDUCIARY DUTIES BY KNOWINGLY OR RECKLESSLY ISSUING MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

### A. Defendants Caused Goldman Sachs to Conduct a Massive Stock Repurchase Program

114. In breach of their fiduciary duties to Goldman and its shareholders, and in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, Defendants issued, and caused the Company to issue, statements that, in light of the illicit money laundering and bribery scheme detailed above, were materially false or misleading when made. Defendants' misrepresentations artificially inflated the price of Goldman's shares, causing the Company to purchase shares at artificially inflated prices through its significant stock repurchase program.

115. By causing Goldman to conduct share repurchases, Defendants signaled to investors their purported belief that Goldman shares were trading at a discount, which caused investors to purchase shares and thereby drive the price up. Further, and relatedly, the Company's repurchasing of shares artificially inflated its financial metrics such as earnings per share, as the repurchases resulted in fewer outstanding shares. The artificial inflation of Goldman shares was both financially beneficial to Defendants, as numerous Defendants' compensation was tied to the Company's financial performance, and helped mask Goldman's illicit activities described herein, thereby helping to perpetuate them.

116. In sum, as detailed in the chart below, between September 2012 and September 2018, Goldman repurchased over 150 million shares of its stock, paying over $26 billion:

| Repurchase Date (Three months ending | Common shares (In millions) | Average cost per share | Total Cost (In Millions) |
|---|---|---|---|

| unless otherwise noted) | | | |
|---|---|---|---|
| September 2018[51] | 5.3 | $234.93 | $1,224 |
| June 2018[52] | 0 | $0 | $0 |
| March 2018[53] | 3.0 | $264.32 | $800 |
| December 2017 (year-end)[54] | 29.0 | $231.87 | $6,721 |
| September 2017[55] | 9.6 | $225.12 | $2,169 |
| June 2017[56] | 6.6 | $221.92 | $1,466 |
| March 2017[57] | 6.2 | $243.22 | $1,500 |
| December 2016 (year-end)[58] | 36.6 | $165.88 | $6,069 |
| September 2016[59] | 7.8 | $162.83 | $1,275 |
| June 2016[60] | 11.1 | 156.60 | $1,744 |
| March 2016[61] | 10.0 | $154.44 | $1,550 |
| December 2015 (year-end)[62] | 22.1 | $189.41 | $4,195 |
| September 2015[63] | 5.4 | $196.00 | $1,050 |
| June 2015[64] | 1.2 | $208.20 | $245 |
| March 2015[65] | 6.8 | $185.18 | $1,250 |
| December 2014 (year-end)[66] | 31.8 | $171.79 | $5,469 |
| September 2014[67] | 7.1 | $176.00 | $1,250 |
| June 2014[68] | 7.8 | $160.89 | $1,250 |

---

[51] 3Q 2018 Form 10-Q at p. 67.
[52] 2Q 2018 Form 10-Q at p. 67.
[53] 1Q 2018 Form 10-Q at p. 63.
[54] 2017 Form 10-K at p. 166.
[55] 3Q 2017 Form 10-Q at p. 64.
[56] 2Q 2017 Form 10-Q at p. 64.
[57] 1Q 2017 Form10-Q at p. 63.
[58] 2016 Form 10-K at p. 172.
[59] 3Q 2016 Form 10-Q at p. 68.
[60] 2Q 2016 Form 10-Q at p. 68.
[61] 1Q 2016 Form 10-Q at p. 65.
[62] 2015 Form 10-K at p. 180.
[63] 3Q 2015 Form 10-Q at p. 71.
[64] 2Q 2015 Form 10-Q at p. 75.
[65] 1Q 2015 Form 10-Q at p. 73.
[66] 2014 Form 10-K at p. 190.
[67] 3Q 2014 Form 10-Q at p. 77.
[68] 2Q 2014 Form 10-Q at p. 77.

| March 2014[69] | 10.3 | $166.58 | $1,720 |
| December 2013 (year-end)[70] | 39.3 | $157.11 | $6,170 |
| September 2013[71] | 10.2 | $161.59 | $1,650 |
| June 2013[72] | 10.5 | $152.80 | $1,600 |
| March 2013[73] | 10.1 | $150.53 | $1,520 |
| December 2012 (year-end)[74] | 42.0 | $110.31 | $4,640 |
| September 2012[75] | 11.8 | $106.17 | $1,250 |
| June 2012[76] | 14.3 | $104.81 | $1,500 |
| March 2012[77] | 3.3 | $111.28 | $362 |

117.    In conducting share repurchases, Defendants falsely signaled to the public that they believed Goldman shares were undervalued and that the repurchases were the best use of the Company's cash.   The share repurchases also had the effect of growing the Company's earnings per share—as share repurchases lower the number of shares outstanding, on which earnings per share are based—as well as its return on assets, return on equity, and other metrics. Together, these actions helped inflate Goldman's share price.

**B.      In Connection with the Share Repurchases, Defendants Issued Materially False and Misleading Statements**

118.    During the Relevant Period, Defendants issued materially false and misleading statements and omissions in the Company's Forms 10-K.

---

[69] 1Q 2014 Form 10-Q at p. 74.
[70] 2013 Form 10-K at p. 200.
[71] 3Q 2013 Form 10-Q at p. 85.
[72] 2Q 2013 Form 10-Q at p. 87
[73] 1Q 2013 Form 10-Q at p. 79.
[74] 2012 Form 10-K at p. 191.
[75] 3Q2012 Form 10-Q at p. 78.
[76] 2Q 2012 Form 10-Q at p. 77.
[77] 1Q 2012 Form 10-Q at p. 72.

1.    **False and Misleading Statements Regarding Goldman's Financial Results**

119.    On February 28, 2014, Goldman filed its Form 10-K for the year ended December 31, 2013 (the "2013 Form 10-K"), which was signed by directors Blankfein, Burns, Cohn, Claes Dahlbäck, George, Johnson, Mittal, Ogunlesi, James Schiro, Deborah Spar, Mark Tucker, and Viniar.

120.    The 2013 Form 10-K's Management Discussion and Analysis section presented the operating results of Goldman's investment banking segment, which includes debt underwriting for 2012 and 2013, on page 60 as follows:

| in millions | Year Ended December | | |
|---|---|---|---|
| | **2013** | 2012 | 2011 |
| Financial Advisory | **$1,978** | $1,975 | $1,987 |
|   Equity underwriting | **1,659** | 987 | 1,085 |
|   Debt underwriting | **2,367** | 1,964 | 1,283 |
| Total Underwriting | **4,026** | 2,951 | 2,368 |
| Total net revenues | **6,004** | 4,926 | 4,355 |
| Operating expenses | **3,475** | 3,330 | 2,995 |
| **Pre-tax earnings** | **$2,529** | $1,596 | $1,360 |

121.    On February 23, 2015, Goldman filed its Form 10-K for the year ended December 31, 2014 (the "2014 Form 10-K"), which was signed by directors Blankfein, Burns, Cohn, Dahlbäck, Flaherty, George, Johnson, Mittal, Ogunlesi, Oppenheimer, Spar, Tucker, Viniar, and Winkelman.

122.    The 2014 Form 10-K's Management Discussion & Analysis section presented the operating results of Goldman's investment banking segment, which includes debt underwriting for 2012 and 2013, on page 59 as follows:

| $ in millions | Year Ended December | | |
|---|---|---|---|
| | **2014** | 2013 | 2012 |
| Financial Advisory | **$2,474** | $1,978 | $1,975 |
| Equity underwriting | **1,750** | 1,659 | 987 |
| Debt underwriting | **2,240** | 2,367 | 1,964 |
| Total Underwriting | **3,990** | 4,026 | 2,951 |
| Total net revenues | **6,464** | 6,004 | 4,926 |
| Operating expenses | **3,688** | 3,479 | 3,333 |
| **Pre-tax earnings** | **$2,776** | $2,525 | $1,593 |

123.    Defendants substantially reiterated these false and misleading statements on page 195 in Goldman's Form 10-K for the year ended December 31, 2015 (the "2015 Form 10-K"), listing identical results for its 2013 pre-tax earnings attributable to debt underwriting.[78]

124.    These financial results were materially false and misleading when made because the debt underwriting results for 2012 and 2013 were not the result of legitimate and lawful business practices, but instead due to illicit actions and violations of law arising from and relating to the 2012 and 2013 1MDB bond offerings that would have been prevented if Defendants had properly maintained the Company's internal and risk controls.

### 2.    False Statements Regarding Goldman's Risk Exposure and Risk Management

125.    Despite nearly two pages of reporting in the subsection entitled "Selected Country Exposures," the 2013 Form 10-K did not disclose Goldman's role in, or knowledge of, the bribery schemes arising from the 1MDB deals.[79] Defendants substantially reiterated these false and misleading statements and omissions in the 2014 Form 10-K[80] and 2015 Form 10-K.[81]

126.    Under the section entitled "Operational Risk Management," the 2013 Form 10-K states:

> Operational risk is the risk of loss resulting from inadequate or failed internal processes, people and systems or from external events. Our exposure to operational risk arises from routine processing errors as well as extraordinary incidents, such as major systems failures. ***Potential types of loss events related to internal and external operational risk include***:
>
> - ***Clients, products and business practices***;
>
> * * *

---

[78] The 2015 Form 10-K was signed by Blankfein, Burns, Cohn, Flaherty, George, Johnson, Mittal, Ogunlesi, Oppenheimer, Spar, Tucker, Viniar, and Winkelman.
[79] 2013 Form 10-K at p. 114.
[80] 2014 Form 10-K at pp. 110-111.
[81] 2015 Form 10-K at pp. 108-09.

*We maintain a comprehensive control framework designed to provide a well-controlled environment to minimize operational risks*. The Firmwide Operational Risk Committee, along with the support of regional or entity-specific working groups or committees, provides oversight of the ongoing development and implementation of our operational risk policies and framework. Operational Risk Management is a risk management function independent of our revenue-producing units, reports to our chief risk officer, and is responsible for developing and implementing policies, methodologies and a formalized framework for operational risk management with the goal of minimizing our exposure to operational risk.[82]

127. Defendants substantially reiterated these false and misleading statements in the 2014 Form 10-K,[83] 2015 Form 10-K,[84] 2016 Form 10-K,[85] and 2017 Form 10-K.[86]

128. Under the heading "Risk Identification and Reporting," the 2013 Form 10-K states:

The core of our operational risk management framework is risk identification and reporting. *We have a comprehensive data collection process, including firmwide policies and procedures, for operational risk events*.

We have established policies that require managers in our revenue-producing units and our independent control and support functions to escalate operational risk events. *When operational risk events are identified, our policies require that the events be documented and analyzed to determine whether changes are required in our systems and/or processes to further mitigate the risk of future events*.

In addition, our firmwide systems capture internal operational risk event data, key metrics such as transaction volumes, and statistical information such as performance trends. We use an internally-developed operational risk management application to aggregate and organize this information. *Managers from both revenue-producing units and independent control and support functions analyze the information to evaluate operational risk exposures and identify businesses, activities or products with heightened levels of operational risk. We*

---

[82] 2013 Form 10-K at p. 117.

[83] 2014 Form 10-K at p. 112.

[84] 2015 Form 10-K at p. 110.

[85] 2016 Form 10-K at p. 105. The 2016 Form 10-K was filed on February 27, 2017 and signed by Blankfein, Burns, Flaherty, George, Johnson, Kullman, Mittal, Ogunlesi, Oppenheimer, Spar, Tucker, Viniar, and Winkelman.

[86] 2017 Form 10-K at pp. 99-100.  The 2017 Form 10-K was filed on February 26, 2018, and signed by Blankfein, Burns, Flaherty, Geroge, Johnson, Kullman, Mittal, Ogunlesi, Oppenheimer, Viniar, and Winkelman.

*also provide periodic operational risk reports to senior management, risk committees and the Board*.[87]

129.    Defendants substantially reiterated these false and misleading statements in the 2014 Form 10-K,[88] 2015 Form 10-K,[89] 2016 Form 10-K,[90] and 2017 Form 10-K.[91]

130.    The foregoing statements were materially false and misleading when made because Goldman's risk framework was not comprehensive.  Indeed, as the Indictment filed against Ng and Low reveals, Goldman's system of internal controls could be easily circumvented and the Company's business culture, particularly in Southeast Asia, prioritized consummation of deals ahead of the proper operation of its compliance functions.  Thus, despite the multitude of red flags regarding 1MDB and having actual knowledge that Low was inextricably linked to 1MDB, the 1MDB deals were approved after a cursory review.

### 3.    False Statements Regarding Goldman's Internal Controls

131.    The 2013 Form 10-K also contained two certifications signed by Blankfein and then-CFO Harvey Schwartz.  The first certification stated:

1. I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2013 of The Goldman Sachs Group, Inc.;

2. *Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

---

[87] 2013 Form 10-K at p. 118.
[88] 2014 Form 10-K at p. 111.
[89] 2015 Form 10-K at p. 111.
[90] 2016 Form 10-K at p. 106.
[91] 2017 Form 10-K at p. 100.

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> (a) ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities***, particularly during the period in which this report is being prepared;

> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> (c) ***Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures***, as of the end of the period covered by this report based on such evaluation; and

> (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> (b) ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.[92]

---

[92] 2013 Form 10-K at Ex. 31.1.

132.    The 2014 Form 10-K,[93] 2015 Form 10-K,[94] 2016 Form 10-K,[95] and 2017 Form 10-K[96] contained substantially similar false certifications.

133.    The second certification, also signed by Blankfein and Schwartz, stated:

> Pursuant to 18 U.S.C. § 1350, the undersigned officer of The Goldman Sachs Group, Inc. (the "Company") hereby certifies that the Company's Annual Report on Form 10-K for the year ended December 31, 2014 (the "Report") fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934 and that ***the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company***.[97]

134.    The 2014 Form 10-K,[98] 2015 Form 10-K,[99] 2016 Form 10-K,[100] and 2017 Form 10-K[101] contained substantially similar false certifications.

135.    The foregoing certifications were materially false and misleading when made because they did not disclose that Goldman's system of internal controls could be easily circumvented and the Company's business culture, particularly in Southeast Asia, prioritized consummation of deals ahead of the proper operation of its compliance functions.

---

[93] 2014 Form 10-K at Ex. 31.1.

[94] 2015 Form 10-K at Ex. 31.1. These false and misleading certifications were signed by Blankfein and then-CFO Schwartz.

[95] 2016 Form 10-K at Ex. 31.1. These false and misleading certifications were signed by Blankfein and then-CFO Schwartz.

[96] 2017 Form 10-K at Ex. 31.1. These false and misleading certifications were signed by Blankfein and CFO Martin Chavez.

[97] 2013 Form 10-K at Ex. 32.1.

[98] 2014 Form 10-K at Ex. 32.1.

[99] 2015 Form 10-K at Ex. 32.1. These false and misleading certifications were signed by Blankfein and then-CFO Schwartz.

[100] 2016 Form 10-K at Ex. 32.1. These false and misleading certifications were signed by Blankfein and then-CFO Schwartz.

[101] 2017 Form 10-K at Ex. 32.1. These false and misleading certifications were signed by Blankfein and CFO Martin Chavez.

C.    **In Repurchasing Stock, Goldman Relied on Defendants' False and Misleading Statements**

136.    In repurchasing shares in connection with the stock repurchase program, Goldman relied on Defendants' false or misleading statements, either directly or through the "fraud on the market" doctrine articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), or through the doctrine articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

137.    Throughout the Relevant Period, Goldman justifiably expected Defendants to disclose material information as required by law and SEC regulations in the Company's periodic filings with the SEC.  Goldman would not have repurchased its securities at artificially inflated prices had Defendants disclosed all material information then known to them, as detailed in this Complaint. Thus, reliance by Goldman should be presumed with respect to Defendants' omissions of material information as established under the *Affiliated Ute* presumption of reliance.

138.    Additionally, the "fraud on the market" presumption applies to Defendants' misstatements of material fact or failures to disclose material facts.  At all relevant times, the market for Goldman's common stock was efficient, for the following reasons, among others:

a.    Goldman's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.    As a regulated issuer, Goldman filed periodic reports with the SEC and the NYSE;

c.    Goldman's common-stock trading volume was substantial on a daily basis, averaging tens of millions of shares per day throughout the Relevant Period;

52

d.      Goldman regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e.      Goldman was followed by numerous securities analysts employed by major brokerage firms, who wrote reports that were distributed to those brokerage firms' sales force and certain customers, and each of those reports was publicly available and entered the public market place; and

f.      The market price of Goldman's stock reacted rapidly to new information entering the market.

139.    As a result of the foregoing, the market for Goldman's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Goldman's stock.  The foregoing facts indicate the existence of an efficient market for trading of Goldman stock and support application of the fraud-on-the-market doctrine.

140.    Goldman relied on the integrity of the market price for the repurchase of its stock and is entitled to a presumption of reliance with respect to Defendants' misstatements and omissions alleged in this Complaint.

141.    Had Goldman known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements, the Company would not have repurchased Goldman stock at artificially inflated prices and been damaged thereby.

D. **Neither the Statutory "Safe Harbor" Nor the "Bespeaks Caution" Doctrines Apply to Defendants' Misrepresentations**

142.   Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA") nor the judicially created "bespeaks caution" doctrine applicable to forward-looking statements under certain circumstances applies to any of the false or misleading statements pleaded in this Complaint.   None of the subject statements constituted a forward-looking statement; rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Goldman's present financial condition and its internal controls, among other things.

143.   Alternatively, to the extent any of the false or misleading statements pleaded in this Complaint could be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Further, to the extent the PSLRA's safe harbor would otherwise apply to any forward-looking statements pleaded in this Complaint, Defendants are liable for those false or misleading statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Goldman or a Defendant who knew the statement was materially false or misleading when made.

E. **Defendants' Misstatements and Omissions Damaged Goldman**

144.   Throughout the Relevant Period, the price of Goldman's common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above.   Defendants engaged in a scheme to deceive the market and a course of conduct that operated as a fraud or deceit on Goldman, which repurchased shares at artificially inflated prices.   When Defendants' prior misrepresentations and fraudulent conduct were

54

disclosed and became apparent to the market, the price of Goldman stock fell as the prior artificial inflation dissipated.  As a result of its purchases of Goldman shares during the Relevant Period, the Company suffered damages under the federal securities laws.

145.    On November 8, 2018, the last trading day before news reports revealed Blankfein's meetings with Low, Goldman common stock traded at $231.65 per share.

146.    Defendants' disclosures over the next several weeks revealed to the market the false and misleading nature of Defendants' statements and omissions.  Throughout the next several weeks, additional news about the scandal, including the charges filed by the government of Malaysia, revealed the scope of Goldman's involvement in the 1MDB scandal.

147.    In response to those disclosures, the price of Goldman common stock declined precipitously.  Over a period of several weeks, as new information about the scandal continued to be revealed, Goldman's share price plummeted by approximately 33%, falling from its November 8, 2018 share price of $231.65 to close as low as $156.35 on December 24, 2018, wiping out billions of dollars of market capitalization during that time.

148.    The decline in Goldman's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to the market.  The timing and magnitude of the decline in the Company's share price negates any inference that the losses suffered by Goldman were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

**F.    Defendants Blankfein, Solomon, and Viniar Unlawfully Profited at Goldman's Expense by Selling Shares While in Possession of Non-Public Information**

149.    Defendants Blankfein, Solomon, and Viniar took advantage of the artificial inflation in Goldman's share price caused by Defendants' false and misleading statements.  These Defendants collectively sold or otherwise disposed of millions of dollars' worth of

Goldman stock during that time, all while in the possession of material, non-public information. The Company's share price was also lifted during this time by the share repurchase program, which was approved by the Defendants when they knew or recklessly disregarded the unlawful practices detailed in this Complaint.

150.    As detailed in the chart below, between 2015 and 2017, before the full extent and the impact of the 1MDB scandal on Goldman became known, Blankfein sold or otherwise disposed of over 750,000 shares of Goldman common stock for a total of over $30.6 million through his exercise of options:

| Transaction Date | Number of Shares Exercised | Exercise Price Per Share | Sell Price Per Share | Total Benefit from Exercise of Stock Options |
|---|---|---|---|---|
| 5/18/2015 | 8,625 | $131.64 | $205.05 | $633,194.03 |
| 5/19/2015 | 100,811 | $131.64 | $205.00 | $7,395,696.58 |
| 6/18/2015 | 96,227 | $131.64 | $215 | $8,021,482.72 |
| 6/19/2015 | 7,959 | $131.64 | $215 | $663,462.24 |
| 11/23/2015 | 1,750 | $131.64 | $189.19-$190.86 | $102,104.84 |
| 11/24/2015 | 1,750 | $131.64 | $187.42-$189.11 | $99,227.40 |
| 11/25/2015 | 1,750 | $131.64 | $188.85-$189.38 | $100,589.71 |
| 11/16/2016 | 104,614 | $199.84 | $207.66-211.19 | $1,175,048.39 |
| 11/18/2016 | 104,614 | $199.84 | $211.29-$211.32 | $1,197,894.40 |
| 11/20/2017 | 161,052 | $204.16 | $237.83-$238.78 | $5,567,549.38 |
| 11/21/2017 | 161,052 | $204.16 | $238.65-$239.42 | $5,671,817.32 |
| Total | 750,204 | | | $30,628,067.02[102] |

151.    As detailed in the charts below, between 2017 and 2018, before the full extent and the impact of the 1MDB scandal on Goldman became known, Solomon sold or otherwise disposed of over 372,000 shares of Goldman common stock for a total of over $40 million, through both open market transactions and through his exercise of options.

---

[102] Includes disposal of shares of Goldman stock withheld to fund the exercise price and satisfy withholding obligations in connection with the exercise of stock options on 11/16/16, 11/18/16, 11/20/17, and 11/21/17.

Exercise of stock options

| Transaction Date | Number of Shares Exercised | Exercise Price Per Share | Sell Price Per Share | Total Value Sell | Total Benefit from Exercise of Stock Options |
|---|---|---|---|---|---|
| 2/21/2017 | 94,564 | $204.16 | $252.17-$252.18 | $23,846,282.62 | $4,540,096.38 |
| 11/20/2017 | 47,282 | $204.16 | $238.68-$238.78 | $11,289,702.24 | $1,636,609.12 |
| 11/21/2017 | 47,282 | $204.16 | $239.28-$239.42 | $11,319,833.80 | $1,666,740.68 |
| 11/24/2017 | 42,987 | $78.78 | $237.94-$238.13 | $10,233,957.81 | $6,847,441.95 |
| 1/29/2018 | 64,000 | $78.78 | $271.53-$271.65 | $17,380,423.49 | $12,338,503.49 |
| 5/14/2018 | 9,750 | $78.78 | $244.67-$244.69 | $2,385,679.26 | $1,617,574.26 |
| 7/18/2018 | 27,125 | $78.78 | $232.08-$232.10 | $6,295,517.28 | $4,158,609.78 |
| 8/1/2018 | 27,125 | $78.78 | $237.92-$238.00 | $6,455,110.85 | $4,318,203.35 |
| Total | 360,115 | | | $89,206,507.36 | $37,123,779.02[103] |

Stock sales

| Transaction Date | Number of Shares | Price Per Share | Total Value |
|---|---|---|---|
| 2/7/2017 | 4,165 | $240.08 | $999,939.03 |
| 2/7/2017 | 2,085 | $240.08 | $500,571.60 |
| 8/7/2017 | 3,260 | $231.59 | $754,997.42 |
| 11/13/2017 | 2,400 | $238.49 | $572,385.12 |
| 5/14/2018 | 405 | $242.30 | $98,131.95 |
| Total | 12,315 | | $2,926,025.11 |

152.    As detailed in the charts below, between 2014 and 2018, before the full extent and the impact of the 1MDB scandal on Goldman became known, Viniar sold or otherwise disposed of over 600,000 shares of Goldman common stock for a total of over $28.2 million.

---

[103] Includes disposal of shares of Goldman stock withheld to fund the exercise price and satisfy withholding obligations in connection with the exercise of stock options on each of the transaction dates.

Exercise of stock options

| Transaction Date | Number of Shares Exercised | Exercise Price Per Share | Sell Price Per Share | Total Benefit from Exercise of Stock Options |
|---|---|---|---|---|
| 10/29/2014 | 135,312 | $131.64 | $186.17 | $7,378,089.79 |
| 11/11/2016 | 75,000 | $199.84 | $204.14-$204.22 | $312,551.93 |
| 11/14/2016 | 39,000 | $199.84 | $209.30-$209.33 | $368,959.92 |
| 11/15/2016 | 39,184 | $199.84 | $210.99 | $436,900.53 |
| 2/13/2017 | 70,380 | $204.16 | $246.93-$246.95 | $3,011,465.00 |
| 8/1/2017 | 100,000 | $204.16 | $227.79-$227.84 | $2,367,299.42 |
| 10/20/2017 | 100,000 | $204.16 | $245.19 | $4,102,890.51 |
| Total | 558,876 | | | $17,978,157.06[104] |

Stock sales

| Transaction Date | Number of Shares | Price Per Share | Total Value |
|---|---|---|---|
| 11/21/2017 | 25,000 | $238.02 | $5,950,507.50 |
| 1/18/2018 | 17,500 | $251.19 | $4,395,795.25 |
| Totals | 42,500 | | $10,346,302.75 |

## VI.   THE DEFENDANTS VIOLATED SECTION 14(A) OF THE EXCHANGE ACT AND SEC RULE 14A-9, AND BREACHED THEIR FIDUCIARY DUTIES BY CAUSING THE COMPANY TO FILE MATERIALLY MISLEADING PROXY STATEMENTS

153.   Defendants also violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing Goldman Sachs to issue proxy statements that failed to disclose the 1MDB fraud or the seriously deficient risk controls and compliance practices that allowed the 1MDB scheme to begin and helped perpetuate it.   Defendants' failure to disclose those material facts likewise constitutes a breach of their fiduciary duties.

### A.   Defendants Caused Goldman to Issue Materially False and Misleading Statements in the 2016 Proxy

154.   On April 8, 2016, Goldman Sachs issued its 2016 Proxy Statement in connection with the 2016 annual stockholders meeting to be held on May 20, 2016.   In the 2016 Proxy

---

[104] Includes disposal of shares of Goldman stock withheld to fund the exercise price and satisfy withholding obligations in connection with the exercise of stock options on 11/11/16, 11/14/16, 11/15/16, 2/13/17, 8/1/17, and 10/20/17.

Statement, the Defendants solicited stockholder votes to, among other things: (i) elect and re-elect themselves to the Board; and (ii) approve executive compensation.  With respect to each of these solicited votes, these Defendants issued materially false or misleading statements.

155.   The 2016 Proxy also described the Board's key role in risk oversight:

***Our Board's focus on overseeing risk management enhances our directors' ability to provide insight and feedback to senior management, and, if necessary, to challenge management, on our firm's strategic direction***

\* \* \*

Our Board is responsible for overseeing the risk management of our firm, which is carried out at the full Board as well as at each of its Committees, and in particular the Risk Committee.

Board risk management oversight includes:

- Strategic and financial considerations

- Legal, regulatory and compliance risks

- Other risks considered by committees

Risk Committee risk management oversight includes:

- Overall risk-taking tolerance and risk governance, as well as the Risk Appetite Statement (in coordination with our full Board)

- Liquidity, market, credit, operational and model risks

- Our Capital Plan, capital ratios and capital adequacy

- Technology and cybersecurity risks

Audit Committee risk management oversight includes:

- Financial, legal and compliance risk, in coordination with our full Board

- Coordination with our Risk Committee, including with respect [to] our risk assessment and risk management practices

Compensation Committee risk management oversight includes:

- Design firmwide compensation program and policies that are consistent with the safety and soundness of our firm and do not raise risks reasonably

likely to have a material adverse effect on our firm

- Jointly with our Risk Committee, annual CRO [Chief Risk Officer] compensation-related risk assessment . . .

Governance Committee risk management oversight includes:

- Managing risks related to board composition and board and executive succession

Public Responsibilities Committee risk management oversight includes:

- Brand and reputational risk, including client and business standards considerations as well as reports regarding the Firmwide Reputational Risk Committee that review certain transactions that may present heightened reputational risk

- Environmental, social and governance risk.[105]

\* \* \*

Risk Management

***Effective risk management underpins everything that we do, and compensation is carefully designed to be consistent with the safety and soundness of our firm***.

Our CRO presents his annual risk assessment jointly to our Compensation Committee and our Risk Committee in order to assist them with evaluating this design.

- This assessment is focused on whether our program is consistent with regulatory guidance requiring that financial services firms ensure that variable compensation does not encourage imprudent risk-taking.

- Our CRO's view was that the various components of our compensation programs and policies work together to balance risk and reward in a manner that does not encourage imprudent risk-taking.[106]

156. The 2016 Proxy Statement misleadingly suggested that the Board maintained "effective risk management" and omitted any disclosures regarding (i) Goldman's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately disclose a

---

[105] 2016 Proxy at 29.
[106] *Id.* at 40.

culture of complicity over compliance within Goldman; and (iii) the subpoenas/requests for documents by regulatory bodies related to 1MDB.

157.    The 2016 Proxy Statement harmed Goldman Sachs by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors.  As a result of the misleading statements in the 2016 Proxy Statement, Goldman Sachs stockholders voted to re-elect Blankfein, Burns, Cohn, Flaherty, George, Johnson, Mittal, Ogunlesi, Oppenheimer, Spar, Tucker, Viniar, Winkelman and elect Kullman to the Board.

158.    The 2016 Proxy Statement also urged stockholders to approve an advisory vote to approve executive compensation:

> Our Board and Compensation Committee recognize the fundamental interest our shareholders have in executive compensation. We continued our shareholder outreach program in 2015, and shareholder feedback obtained through these efforts, as well as the results of our prior Say on Pay votes, played an important role in our Compensation Committee's decisions regarding our executive compensation. Our 2015 Say on Pay vote received overwhelming shareholder support (97% of votes cast), which our Compensation Committee believes indicates a very positive response to our program.[107]

159.    Highlights from the 2016 Annual Proxy related to the firm's compensation practices included:

> Priority on Risk Management and Sound Compensation Practices.
>
> ***Our Compensation Committee considers our firm's safety and soundness in making all executive compensation determinations. Together with our Risk Committee, the Compensation Committee meets annually with our CRO to discuss his risk-related assessment of our compensation program.***[108]
>
> \*  \*  \*
>
> Our Compensation Principles guide our Compensation Committee in its review of compensation at our firm, including the Committee's determination of NEO [named executive officer] compensation . . .

---

[107] *Id.* at 60.
[108] *Id.* at 6.

\* \* \*

- ***Paying for Performance.  Firmwide compensation should directly relate to firmwide performance over the cycle.***

- ***Encouraging Firmwide Orientation and Culture.  Employees should think and act like long-term shareholders, and compensation should reflect the performance of the firm as a whole.***

- ***Compensation should be carefully designed to be consistent with the safety and soundness of our firm. Risk profiles must be taken into account in annual performance reviews, and factors like liquidity risk and cost of capital should also be considered.***[109]

160.    Those statements misleadingly conveyed that Goldman's compensation structures emphasized risk management and encouraged long-term stockholder value.    In reality, Goldman's compensation system actually encouraged—and consistently rewarded—extreme risk taking and widespread illegal practices.

161.    Under this false impression, numerous Goldman stockholders voted in support of compensation to Defendant Blankfein, totaling $23 million in 2015, without the benefit of material information regarding Blankfein's continued and ongoing failure to address the 1MDB fraud.

**B.    Defendants Caused Goldman to Issue Materially False and Misleading Statements in the 2017 Proxy**

162.    On March 17, 2017, Goldman filed its 2017 Proxy Statement in connection with the 2017 annual stockholders meeting held on April 28, 2017.  In the 2017 Proxy Statement, these Defendants solicited stockholder votes to, among other things: (i) elect and re-elect themselves to the Board; and (ii) approve executive compensation.  With respect to each of these solicited votes, these Defendants issued materially false or misleading statements.

163.    The 2017 Proxy also described the Board's key role in risk oversight:

---

[109] *Id*. at 39.

*Our Board's focus on overseeing risk management enhances our directors' ability to provide insight and feedback to senior management, and, if necessary, to challenge management, on our firm's strategic direction.*[110]

* * *

Our Board is responsible for overseeing the risk management of our firm, which is carried out at the full Board as well as at each of its Committees, and in particular the Risk Committee.

Board risk management oversight includes:

- Strategic and financial considerations

- Legal, regulatory and compliance risks

- Other risks considered by committees

Risk Committee risk management oversight includes:

- Overall risk-taking tolerance and risk governance

- Our Risk Appetite Statement (in coordination with our full Board)

- Liquidity, market, credit, operational and model risks

- Our Capital Plan, capital ratios and capital adequacy

- Technology and cybersecurity risks

Public Responsibilities Committee risk management oversight includes:

- Brand and reputational risk, including client and business standards considerations as well as reports regarding the Firmwide Reputational Risk Committee that review certain transactions that may present heightened reputational risk

- Environmental, social and governance risk.

Compensation Committee risk management oversight includes:

- Firmwide compensation program and policies that are consistent with the safety and soundness of our firm and do not raise risks reasonably likely to have a material adverse effect on our firm

- Jointly with our Risk Committee, annual CRO compensation-related risk

---

[110] 2017 Proxy at 29.

assessment …

Audit Committee risk management oversight includes:

- Financial, legal and compliance risk, in coordination with our full Board

- Coordination with our Risk Committee, including with respect [to] our risk assessment and risk management practices

Governance Committee risk management oversight includes:

- Managing risks related to board composition and board and executive succession[111]

* * *

Risk Management

**Effective risk management underpins everything that we do, and compensation is carefully designed to be consistent with the safety and soundness of our firm.**

Our CRO presents his annual risk assessment jointly to our Compensation Committee and our Risk Committee in order to assist them with evaluating the design of our program.

- This assessment is focused on whether our program is consistent with regulatory guidance requiring that financial services firms ensure that variable compensation does not encourage imprudent risk-taking.

- Our CRO's view was that the various components of our compensation programs and policies work together to balance risk and reward in a manner that does not encourage imprudent risk-taking.[112]

164. The 2017 Proxy Statement misleadingly suggested that the Board maintained "effective risk management" and omitted any disclosures regarding (i) Goldman's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately disclose a culture of complicity over compliance within Goldman; and (iii) the subpoenas/requests for documents by regulatory bodies related to 1MDB.

---

[111] *Id.* at 30.
[112] *Id.* at 44.

64

165.    The 2017 Proxy Statement harmed Goldman by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors.  As a result of the misleading statements in the 2017 Proxy Statement, Goldman stockholders voted to re-elect Blankfein, Burns, Flaherty, George, Johnson, Mittal, Ogunlesi, Oppenheimer, Kullman, Viniar, and Winkelman to the Board.

166.    The 2017 Proxy Statement also urged stockholders to approve an advisory vote to approve executive compensation:

> Our Say on Pay vote gives our shareholders the opportunity to cast an advisory vote to approve the compensation of all of our NEOs. We currently include this advisory vote on an annual basis; at this meeting our shareholders will vote on an advisory basis to determine the future frequency of our Say on Pay votes.[113]

167.    Highlights from the 2017 Annual Proxy related to the firm's compensation practices included:

> Compensation Committee Risk Management Committee Risk Management Oversight Includes:
>
> - ***Design Firmwide compensation program and policies that are consistent with the safety and soundness of our firm and do not raise risks reasonably likely to have a material adverse effect on our firm***
>
> - ***Jointly with our Risk Committee, annual CRO compensation-related risk assessment . . .***[114]
>
> \* \* \*
>
> Our Compensation Principles guide our Compensation Committee in its review of compensation at our firm, including the Committee's determination of NEO compensation . . .
>
> \* \* \*
>
> - ***Paying for Performance.  Firmwide compensation should directly relate to firmwide performance over the cycle.***

---

[113] *Id.* at 67.
[114] *Id.* at 29.

- ***Encouraging Firmwide Orientation and Culture.  Employees should think and act like long-term shareholders, and compensation should reflect the performance of the firm as a whole.***

- ***Compensation should be carefully designed to be consistent with the safety and soundness of our firm. Risk profiles must be taken into account in annual performance reviews, and factors like liquidity risk and cost of capital should also be considered.***[115]

168.    Those statements misleadingly conveyed that Goldman Sachs's compensation structures emphasized risk management and encouraged long-term stockholder value.  In reality, Goldman's compensation system actually encouraged—and consistently rewarded—extreme risk taking and widespread illegal practices.

169.    Under this false impression, numerous Goldman stockholders voted in support of compensation to Defendant Blankfein, totaling $22 million in 2016, without the benefit of material information regarding Blankfein's continued and ongoing failure to address the 1MDB fraud.

### C.    Defendants Caused Goldman to Issue Materially False and Misleading Statements in the 2018 Proxy

170.    On March 23, 2018, Defendants Blankfein, Ogunlesi, Burns, Cohn, Flaherty, George, Johnson, Kullman, Mittal, Oppenheimer, Viniar, and Winkelman caused Goldman to file the 2018 Proxy Statement in connection with the 2018 annual stockholders meeting to be held on May 2, 2018.  In the 2018 Proxy Statement, these Defendants solicited stockholder votes to, among other things: (i) elect and re-elect themselves to the Board; and (ii) approve executive compensation.  With respect to each of these solicited votes, these Defendants issued materially false or misleading statements.

171.    The 2018 Proxy also described the Board's key role in risk oversight:

***Our Board's focus on overseeing risk management enhances our directors'***

---

[115] *Id.* at 43.

***ability to provide insight and feedback to senior management, and, if necessary, to challenge management, on our firm's strategic direction.***[116]

\* \* \*

Our Board is responsible for overseeing the management of the firm's most significant risks on an enterprise-wide basis.  This oversight is executed by our full Board as well as each of its Committees, in particular our Risk Committee, and is carried out in conjunction with the Board's oversight of firm strategy.

Board risk management oversight includes:

- Strategic and financial considerations

- Legal, regulatory, reputational and compliance risks

- Other risks considered by Committees

Risk Committee risk management oversight includes:

- Overall risk-taking tolerance and risk governance, including our Enterprise Risk Management Framework

- Our Risk Appetite Statement (in coordination with our full Board)

- Liquidity, market, credit, operational and model risks

- Our Capital Plan, capital ratios and capital adequacy

- Technology and cybersecurity risks, including oversight of management's processes, monitoring and controls related thereto

Public Responsibilities Committee risk management oversight includes:

- Brand and reputational risk, including client and business standards considerations as well as the receipt of reports regarding the Firmwide Reputational Risk Committee regarding certain transactions that may present heightened reputational risk

- ESG (environmental, social and governance) risk.

Compensation Committee risk management oversight includes

- Firmwide compensation program and policies that are consistent with the safety and soundness of our firm and do not raise risks reasonably likely to have a material adverse effect on our firm

---

[116] 2018 Proxy at 34.

67

- Jointly with our Risk Committee, annual CRO compensation-related risk assessment . . .

Audit Committee risk management oversight includes:

- Financial, legal and compliance risk, in coordination with our full Board

- Coordination with our Risk Committee, including with respect our risk assessment and risk management practices

Governance Committee risk management oversight includes:

- Board composition and Board and executive succession[117]

\* \* \*

Risk Management

***Effective risk management underpins everything that we do, and compensation is carefully designed to be consistent with the safety and soundness of our firm***.

Our CRO presents his annual risk assessment jointly to our Compensation Committee and our Risk Committee in order to assist them with evaluating this design.

- This assessment is focused on whether our program is consistent with regulatory guidance requiring that financial services firms ensure that variable compensation does not encourage imprudent risk-taking.

- Our CRO's view was that the various components of our compensation programs and policies work together to balance risk and reward in a manner that does not encourage imprudent risk-taking.[118]

172.    The 2018 Proxy Statement misleadingly suggested that the Board maintained "effective risk management" and omitted any disclosures regarding (i) Goldman's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately disclose a culture of complicity over compliance within Goldman; and (iii) the subpoenas/requests for documents by regulatory bodies related to 1MDB.

173.    The 2018 Proxy Statement harmed Goldman Sachs by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors.  As a result of

---

[117] *Id.* at 35.
[118] *Id.* at 48.

the misleading statements in the 2018 Proxy Statement, Goldman Sachs stockholders voted to re-

elect Blankfein, Burns, Flaherty, George, Johnson, Mittal, Ogunlesi, Oppenheimer, Viniar,

Winkelman and Kullman to the Board.

174.    The 2018 Proxy Statement also urged stockholders to approve an advisory vote to

approve executive compensation:

> Our Say on Pay vote gives our shareholders the opportunity to cast an advisory
> vote to approve the compensation of all of our NEOs. We currently include this
> advisory vote on an annual basis.[119]

175.    Highlights from the 2018 Annual Proxy related to the firm's compensation

practices included the following:

Compensation Committee Risk Management Oversight Includes:

- ***Firmwide compensation program and policies that are consistent with
the safety and soundness of our firm and do not raise risks reasonably
likely to have a material adverse effect on our firm.***

- ***Jointly with our Risk Committee, annual CRO compensation-related
risk assessment . . .***[120]

*   *   *

Our Compensation Principles guide our Compensation Committee in its review of
compensation at our firm, including the Committee's determination of NEO
compensation . . .

*   *   *

- ***Paying for Performance.  Firmwide compensation should directly relate
to firmwide performance over the cycle.***

- ***Encouraging Firmwide Orientation and Culture.  Employees should
think and act like long-term shareholders, and compensation should
reflect the performance of the firm as a whole.***

- ***Discouraging Imprudent Risk-Taking.  Compensation should be
carefully designed to be consistent with the safety and soundness of our***

---

[119] *Id.* at 69.
[120] *Id.* at 35.

*firm. Risk profiles must be taken into account in annual performance reviews, and factors like liquidity risk and cost of capital should also be considered.*[121]

176.    Those statements misleadingly conveyed that Goldman's compensation structures emphasized risk management and encouraged long-term stockholder value.    In reality, Goldman's compensation system actually encouraged—and consistently rewarded—extreme risk taking and widespread illegal practices.

177.    Under this false impression, numerous Goldman stockholders voted in support of compensation to Defendant Blankfein, totaling $24 million in 2017, without the benefit of material information regarding Blankfein's continued and ongoing failure to address the 1MDB fraud.

## VII.    ADDITIONAL DAMAGES TO GOLDMAN

178.    In addition to the damages caused to Goldman detailed above, Defendants' misconduct has wrought extreme reputational damage upon Goldman.  This is especially harmful to Goldman because the Company's business is built on its reputation and its client's trust.  As Goldman's Business Principles state, "[o]ur assets are our people, capital and reputation.  If any of these is ever diminished, *the last is the most difficult to restore*. We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us. *Our continued success depends upon unswerving adherence to this standard*."  Goldman's 2018 Proxy further noted that "[o]ur Board has long recognized the importance of oversight of the firm's culture and reputation, and recent events serve to underscore that we must remain resolute in this focus."

---

[121] *Id.* at 47.

179.    Defendants breached this trust by acting in direct contravention of Goldman's publicly-touted credo.  This reputational harm undoubtedly translates into long-term damage to the Company, and has already begun with analysts, such as Morgan Stanley, downgrading the Company.

180.    The costs to Goldman in terms of lost revenue and profits from its illicit conduct have yet to fully materialize.  Initial reports, however, suggest the costs associated with the scandal will continue to grow, perhaps into the billions.  These include costs incurred in defending against, and the potential settlement of, civil and criminal legal proceedings brought against the Company related to the 1MDB scandal.

## VIII.  DEFENDANTS WERE OBLIGATED TO SAFEGUARD THE COMPANY'S INTERESTS

### A.    The Duties of All Defendants

181.    By reason of their positions as officers and/or directors of Goldman and because of their ability to control the business, corporate, and financial affairs of the Company, Defendants owed Goldman and its shareholders the duty to exercise due care and diligence in the management and administration of the affairs of the Company, including ensuring that Goldman operated in compliance with all applicable federal and state laws, rules and regulations. Defendants were and are required to act in furtherance of the best interests of Goldman and its shareholders so as to benefit all shareholders equally and not in furtherance of Defendants' personal interest or benefit.  Each director and officer owes to Goldman and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

182.    Because of their positions of control and authority as directors or officers of Goldman, Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts complained of in this Complaint.   Due to their positions with Goldman, Defendants had knowledge of material non-public information regarding the Company.

183.    To discharge their duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls and financial and corporate affairs of the Company.   By virtue of such duties, the officers and directors of Goldman were required to, among other things:

a.    Manage, conduct, supervise, and direct the employees, businesses and affairs of Goldman in accordance with laws, rules and regulations, and the charter and by-laws of Goldman;

b.    Ensure that Goldman did not engage in imprudent or unlawful practices and that the Company complied with all applicable laws and regulations;

c.    Remain informed as to how Goldman was, in fact, operating, and, upon receiving notice or information of imprudent or unsound practices, to take reasonable corrective and preventative actions, including maintaining and implementing adequate financial and operational controls;

d.    Supervise the preparation, filing, or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by Goldman, and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of officers of the Company;

e.    Preserve and enhance Goldman's reputation as befits a public corporation;

f.      Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business; and

g.      Refrain from unduly benefiting themselves and other Goldman insiders at the expense of the Company.

**B.      The Board and its Committees Were Expressly Charged with Overseeing and Monitoring Goldman's Compliance Function and Risk Exposure**

184.    Among the Board's most critical duties is overseeing the Company's compliance function and risk management structure.  Goldman's 2017 Annual Report to shareholders, for example, states that "[r]isk management governance starts with the Board, which both directly and through its committees, including its Risk Committee, oversees our risk management policies and practices implemented through the E[nterprise] R[isk] M[anagement] framework."  This ERM framework, Goldman explained "is designed to enable comprehensive risk management processes" including "legal, compliance, conduct, regulatory and reputational risk exposures."  The Annual Report explains that:

> ***The Board receives regular briefings on firmwide risks***, including liquidity risk, market risk, credit risk, operational risk and model risk from our independent control and support functions, including the chief risk officer, ***and on compliance risk and conduct risk from the head of Compliance, on legal and regulatory matters from the general counsel, and on other matters impacting our reputation from the chair of our Firmwide Client and Business Standards Committee***. The chief risk officer, as part of the review of the firmwide risk portfolio, regularly advises the Risk Committee of the Board of relevant risk metrics and material exposures, including risk limits and thresholds established in our risk appetite statement.

185.    Further, the Board maintains several standing committees to monitor specific aspects of Goldman's business.  Specifically among these are the Audit Committee, the Compensation Committee, the Corporate Governance and Nominating Committee, the Risk

Committee, and the Public Responsibilities Committee. The following chart illustrates the membership of these committees:

| | Audit Committee | Compensation Committee | Corporate Governance and Nominating Committee | Risk Committee | Public Responsibilities Committee |
|---|---|---|---|---|---|
| M. Michele Burns | | Chair | • | • | |
| Drew G. Faust | | | • | • | • |
| Mark Flaherty | • | | • | • | |
| William W. George | | • | • | | Chair |
| James A. Johnson | | • | • | | • |
| Ellen J. Kullman | | • | • | • | |
| Lakshmi N. Mittal | | • | • | | • |
| Adebayo O. Ogunlesi* | * | * | Chair | * | * |
| Peter Oppenheimer | Chair | | • | • | |
| Jan E. Tighe | • | | • | • | |
| David A. Viniar | | | | • | |
| Mark O. Winkelman | • | | • | Chair | |

*Ex officio member of all committees*

186. The Audit Committee is currently comprised of Oppenheimer, Ogunlesi, Flaherty, Tighe, and Winkelman. According to Goldman's Audit Committee Charter, the Audit Committee's purpose is to, among other matters, "assist the Board in its oversight of (i) the integrity of the Company's financial statements [and] (ii) the Company's compliance with legal and regulatory requirements. . . ."

187. The Audit Committee's Charter in effect during the Relevant Period specifically provided that the job of the Committee is to, among other things:

   a.   To discuss with the Director of Internal Audit periodically:

   •   The adequacy of the Company's internal controls.

   •   Progress against the Internal Audit plan and the rationale for any changes thereto.

74

- Internal Audit's control risk assessment, including any significant findings and management's responses thereto.

- The Internal Audit function and responsibilities and any scope restrictions encountered during the execution of Internal Audit responsibilities.

- Internal Audit's assessment of the procedures and controls around the firm's risk management functions.

- Key performance measures regarding the operation and effectiveness of Internal Audit.

b.    To discuss with management periodically the guidelines and policies that govern the process by which risk assessment and risk management is undertaken, coordinating with the Risk Committee, as appropriate.

c.    To discuss with the Company's General Counsel and/or Chief Compliance Officer any significant legal, compliance or regulatory matters that may have a material impact on the Company's business, financial statements or compliance policies.

188.    The Board's Risk Committee is currently comprised of a majority of the Board, and currently consists of Ogunlesi, Winkelman, Burns, Faust, Flaherty, Kullman, Oppenheimer, Tighe, and Viniar.  The Risk Committee's Charter states that its purpose is to "assist the Board in its oversight of the Company's overall risk-taking tolerance and management of financial and operational risks . . . ."  The Chair of the Risk Committee is *required* to liaise with the Chair of the Audit Committee "to assist that Committee in its review of the Company's risk assessment and risk management matters . . . ."

189.    The Risk Committee's Charter specifically provides that the job of the Committee is to, among other things:

a.    Review and discuss with management the Company's operational risk strategy and operational risk policies and controls.

b.    Review and discuss with management the Company's model risk strategy and model risk policies and controls.

75

c.   Review and discuss with management (and approve as appropriate) the Company's Enterprise Risk Management Framework.

d.   To discuss with management periodically risk assessment and risk management matters, including the policies related thereto, coordinating with the Audit Committee, as appropriate.

e.   Receive, as and when appropriate, reports from Internal Audit and members of management on the results of risk management reviews and assessments.

190.   In addition, the 2017 Annual Report significantly stated that "[t]he Board, directly or indirectly through its Risk Committee, approves limits and thresholds included in our risk appetite statement, at firmwide, business and *product levels*."

191.   Goldman also maintained a Code of Business Conduct and Ethics (the "Code"). The Code states in relevant part that:

> This Code of Business Conduct and Ethics (the "Code") embodies the commitment of The Goldman Sachs Group, Inc. and its subsidiaries ***to conduct our business in accordance with all applicable laws, rules and regulations and the highest ethical standards. All employees and members of our Board of Directors are expected to adhere to those principles and procedures*** set forth in this Code that apply to them . . . .
>
> The Code should be read in conjunction with Our Business Principles, which provide in part that, "Integrity and honesty are at the heart of our business. ***We expect our people to maintain high ethical standards in everything they do, both in their work for the firm and in their personal lives***. Our Business Principles are attached to this Code.  Each employee, consultant and director should also read and be familiar with the portions of the Compendium of Firmwide Compliance Policies (the "Compendium") applicable to such employee, consultant or director, which Compendium is not part of this Code.

**SECTION I**

**A. Compliance and Reporting**

Employees and directors should strive to identify and raise potential issues before they lead to problems, and should ask about the application of this Code whenever in doubt. Any employee or director who becomes aware of any existing or potential violation of this Code should promptly notify, in the case of employees, an appropriate contact listed in the Directory of Contacts included in the Compendium and, in the case of directors and the Chief Executive Officer, the Chief Financial Officer and the Principal Accounting Officer (the "Senior Financial Officers"), one of the firm's General Counsel (we refer to such contacts as "Appropriate Ethics Contacts"). The firm will take such disciplinary or preventive action as it deems appropriate to address any existing or potential violation of this Code brought to its attention.

Any questions relating to how these policies should be interpreted or applied should be addressed to an Appropriate Ethics Contact.

## B. Personal Conflicts of Interest

A "personal conflict of interest" occurs when an individual's private interest improperly interferes with the interests of the firm. Personal conflicts of interest are prohibited as a matter of firm policy, unless they have been approved by the firm. ***In particular, an employee or director must never use or attempt to use his or her position at the firm to obtain any improper personal benefit for himself or herself, for his or her family members, or for any other person***, including loans or guarantees of obligations, from any person or entity.

Service to the firm should never be subordinated to personal gain and advantage. Conflicts of interest should, to the extent possible, be avoided.

***Any employee or director who is aware of a material transaction or relationship that could reasonably be expected to give rise to a conflict of interest or perceived conflict of interest should discuss the matter promptly with an Appropriate Ethics Contact***.

## C. Public Disclosure

It is the firm's policy that the information in its public communications, including SEC filings, be full, fair, accurate, timely and understandable. All employees and directors who are involved in the company's disclosure process, including the Senior Financial Officers, are responsible for acting in furtherance of this policy. In particular, these individuals are required to maintain familiarity with the disclosure requirements applicable to the firm and are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about the firm to others, whether within or outside the firm, including the firm's independent auditors. In addition, any employee or director who has a supervisory role in the firm's disclosure process has an obligation to discharge his or her responsibilities diligently.

### D. Compliance with Laws, Rules and Regulations

***It is the firm's policy to comply with all applicable laws, rules and regulations***. It is the personal responsibility of each employee and director to adhere to the standards and restrictions imposed by those laws, rules and regulations. . . .

Generally, it is both illegal and against firm policy for any employee or director who is aware of material nonpublic information relating to the firm, any of the firm's clients or any other private or governmental issuer of securities to buy or sell any securities of those issuers, or recommend that another person buy, sell or hold the securities of those issuers.

More detailed rules governing the trading of securities by the firm's employees and directors are set forth in the Compendium. Any employee or director who is uncertain about the legal rules involving his or her purchase or sale of any firm securities or any securities in issuers that he or she is familiar with by virtue of his or her work for the firm should consult with an Appropriate Ethics Contact before making any such purchase or sale.

### SECTION II

### A. Corporate Opportunities

Employees and directors owe a duty to the firm to advance the firm's legitimate business interests when the opportunity to do so arises. Employees and directors are prohibited from taking for themselves (or directing to a third party) a business opportunity that is discovered through the use of corporate property, information or position, unless the firm has already been offered the opportunity and turned it down.

More generally, employees and directors are prohibited from using corporate property, information or position for personal gain or competing with the firm. Sometimes the line between personal and firm benefits is difficult to draw, and sometimes both personal and firm benefits may be derived from certain activities.

The only prudent course of conduct for our employees and directors is to make sure that any use of firm property or services that is not solely for the benefit of the firm is approved beforehand through the Appropriate Ethics Contact.

### B. Confidentiality

In carrying out the firm's business, employees and directors often learn confidential or proprietary information about the firm, its clients/customers, prospective clients/customers or other third parties. Employees and directors must maintain the confidentiality of all information so entrusted to them, except when disclosure is authorized or legally mandated. Confidential or proprietary information includes, among other things, any non-public information concerning the firm, including its businesses, financial performance, results or prospects, and

78

any non-public information provided by a third party with the expectation that the information will be kept confidential and used solely for the business purpose for which it was conveyed. Employees and directors should refer to the policies set forth in the Compendium under "The Use and Misuse of Information − Policies and Procedures Regarding Confidential or Proprietary Information, The Chinese Wall" and "Additional Policies Regarding the Protection of Information Intellectual Property Belonging to Goldman" for more detailed guidance on this topic.

**C. Fair Dealing**

We have a history of succeeding through honest business competition. We do not seek competitive advantages through illegal or unethical business practices. Each employee and director should endeavor to deal fairly with the firm's clients, service providers, suppliers, competitors and employees. No employee or director should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any unfair dealing practice.

* * *

**E. Protection and Proper Use of Firm Assets**

All employees should protect the firm's assets and ensure their efficient use. All firm assets should be used for legitimate business purposes only.

192.    As discussed below, the Defendants failed to meet their responsibilities and obligations as provided in the Audit Committee Charter, the Corporate Governance Guidelines, and the Code of Business Conduct and Ethics.  The Defendants' illegal course of conduct constituted breaches of their fiduciary duties to Goldman, as well as violations of state and federal law, and resulted in significant harm to the Company.

## IX.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

193.    Plaintiff is a current owner of Goldman common stock and was owner of Goldman common stock during the period relevant to Defendants' wrongful course of conduct alleged herein.  Goldman is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

79

194.    Plaintiff brings this action derivatively to redress injuries suffered, and to be suffered, by the Company as a direct result of the breaches of fiduciary duty, unjust enrichment, gross mismanagement, contribution and indemnification, and violations of §§ 10(b) and 14(a) of the Securities Exchange Act of 1934 and Rules 10b-5 and 14a-9.  Plaintiff will adequately and fairly represent the interests of Goldman in enforcing and prosecuting its rights.  Prosecution of this action, independent of the Goldman Board, is in the best interests of the Company.

195.    The Goldman Board, at the time of filing of this action, consisted of the following Director Defendants: Solomon, Burns, Flaherty, George, Johnson, Kullman, Mittal, Ogunlesi, Oppenheimer, Viniar, Winkelman, Tighe, and Faust.  As alleged above, these Defendants breached their fiduciary duties of loyalty and good faith by (i) making improper statements regarding Goldman's business practices, (ii) engaging in a course of conduct that violated the Company's policies and public statements, and (iii) failing to disclose to the investing public material adverse information regarding Goldman's business.

196.    Plaintiff has not made any demand upon the Goldman Board to bring an action on behalf of the Company asserting claims herein to recover damages for the injuries suffered by Goldman, since such demand would have been a futile, wasteful and useless act, and is therefore excused, for the reasons stated herein.

### A.    Demand is Excused Because the Defendants' Conduct Did Not Constitute a Valid Exercise of Business Judgment

197.    Plaintiff did not make a demand on the Goldman Board prior to instituting this action because the wrongful acts complained of in this Complaint evidence a pattern of conduct showing a wholesale abandonment of the Defendants' fiduciary duties.  Those acts, which are detailed herein, include:

a.      Disregarding multiple red flags and allowing Goldman bankers to engage in pervasive bribery and money laundering schemes;

b.      Allowing Goldman bankers to use the illicit proceeds of these schemes for personal financial reward;

c.      Allowing Blankfein, Solomon, and Viniar to engage in insider selling while in possession of material, non-public information relating to the 1MDB scandal;

d.      Perpetuating woefully inadequate controls over the Company's financial reporting, corporate governance, and risk monitoring, which allowed the illicit bribery and money laundering schemes to begin and persist for years;

e.      Causing Goldman to file materially false and misleading SEC filings; and

f.      Approving a share repurchase program through which Goldman bought back millions of shares of stock at artificially inflated prices.

198.    These acts, and the other improper acts set forth in this Complaint which demonstrate a pattern of misconduct, were not the product of a valid or good faith exercise of business judgment, nor could they have been.

199.    The Defendants' misconduct at the heart of this case constitutes the direct facilitation of violations of federal law, including knowingly and consciously presiding over Goldman's systematic deficiencies and unsound practices in its risk management and oversight of the Company's compliance practices.

200.    The Defendants' blatant and repeated disregard of their responsibility to safeguard the Company against wrongdoing indicate they knowingly adopted, endorsed, or condoned a business strategy that prioritized the consummation of business deals ahead of compliance with

laws, which cannot be considered a legitimate exercise of business judgment.   Demand is therefore excused

> ### B.      Demand is Excused Because the Director Defendants Face a Substantial Likelihood of Liability

201.    Demand is also excused because the Director Defendants face a substantial likelihood of liability for the claims alleged against them in this Complaint, given their awareness or conscious disregard of significant red flags relating to the bribery and money laundering scheme.

202.    More specifically, Defendants Burns, George, Johnson, Mittal, Ogunlesi, and Viniar have each been Directors since at least 2012.  These Defendants consciously disregarded multiple red flags concerning the endemic corruption related to the 1MDB deals, including but not limited to media coverage by highly respected financial publications, "sweeping" corporate governance changes manded by the Federal Reserve in 2013, and the Fed's continuing investigation into the 1MDB deals in 2014.  Moreover, as detailed above, Solomon would have "reviewed" and "scrutinized" the 1MDB deals in 2012 and 2013, also consciously disregarding the multiple red flags concerning the endemic corruption related to those deals.

203.    Additionally, the Risk Committee was charged with the obligation to oversee and monitor Goldman's risk policies and risk management practices, as well as reviewing and approving risk appetite limits at "product levels," while the Audit Committee was charged with overseeing and monitoring "significant legal, compliance or regulatory matters that may have a material impact on the Company's business, financial statements or compliance policies."

204.    Members of the Audit Committee were charged with assisting the Board in overseeing the integrity of the Company's financial statements and the adequacy and reliability of disclosures to its stockholders, including the Company's internal and disclosure controls.  But

Goldman's internal and disclosure controls were deficient, causing the Company to issue materially false and misleading information regarding the bribery and money laundering scheme.

205.   At minimum, demand is excused because the wrongs alleged herein constitute violations of the Company's internal policies and charters and cannot be considered a valid exercise of business judgment.   The Individual Defendants' wrongful conduct was continuous and occurred throughout the Relevant Period.   This conduct has resulted in ongoing and continuous harm to the Company.

206.   The Individual Defendants failed to act, and instead participated in, approved and/or permitted the wrongs herein to occur.   The Board also participated in efforts to conceal or disguise the wrongs from Goldman stockholders or recklessly, knowingly and/or negligently disregarded the wrongs complained of herein, and therefore are not disinterested parties.   As a result, the Individual Defendants cannot exercise independent objective judgment in deciding whether to institute or vigorously prosecute this action, as each member is interested personally in the outcome of such an action, and each member's actions have played a part in subjecting the Company to millions of dollars in liability for potential securities laws violations.

207.   The Board's lack of oversight exposed Goldman to other increased risks, including (i) potential civil and criminal liability, and potential liability for billions of dollars in compensation to the government of Malaysia; (ii) significant damages resulting from the Company's repurchases of stock at prices that were artificially inflated due to Defendants' materially false or misleading statements during the Relevant Period; (iii) investigations by federal prosecutors and the Federal Reserve; (iv) exposure to lawsuits, including a shareholder putative class action asserting federal securities claims against the Company; and (v) serious damage to the Company's reputation and goodwill.

208.    For these reasons, the Board is incapable or unwilling to take the actions required to seek the relief requested in this Complaint.  Because a majority of the Board faces a substantial risk of liability, demand is futile.

## C.    Demand is Futile Because the Directors are Financially Beholden to Goldman

209.    The principal professional occupation of Solomon is his employment as Goldman's CEO, pursuant to which he received and continues to receive substantial monetary compensation and other benefits.  As a result of his high-level position with Goldman, he is admittedly not independent under either the Company's own Director Independence Standards or the listing standards of the NYSE.  Because of the lack of independence, Solomon is incapable of impartially considering a demand, and as a result, demand is futile.

210.    Similarly, prior to being named a Director in 2013, Viniar served as Goldman's CFO, pursuant to which he received and continues to receive substantial monetary compensation and other benefits.  As a result of his high-level position with Goldman, he cannot be considered independent, and is therefore incapable of impartially considering a demand; as a result, demand is futile.

211.    As detailed above, the non-employee Director Defendants each receive lavish compensation packages for their services as Directors.  The continuation of this extravagant compensation to each Director Defendant is dependent upon his or her cooperation with other Board members, and his or her participation and acquiescence in the wrongdoing described in this Complaint.  The Director Defendants are therefore incapable of exercising independent and disinterested judgment, and demand upon them would be futile.

212.    Through their wrongful acts, the Director Defendants were unjustly enriched at the expense of, and to the detriment of, Goldman.  Any suit by the Director Defendants to

remedy the wrongs complained of herein would expose these Defendants to significant personal liability for their breaches of fiduciary duties and other misconduct.  Consequently, demand is futile.

213.   Demand is also excused because the Director Defendants have excessive financial relationships and business entanglements with Goldman:

a.   When William George was Chairman of Medtronic in 2001, Goldman served as Medtronic's financial advisor in its $3.7 billion purchase of MiniMed Inc. and Medical Research Group Inc.; George became a Goldman Director in 2002.

b.   Ellen Kullman was employed by DuPont from 1988 through 2015, serving as Chairman and CEO from 2009 through 2015.  During this time, Goldman was a frequent advisor to DuPont.  For example, in 2015, Goldman served as a financial advisor to DuPont in its $130 billion merger with Dow Chemical.  Also in 2015, Goldman served as a financial advisor to DuPont in its efforts to fend off activist investment firm Trian Fund Management LP, which had announced a plan to break up DuPont and slash costs.

c.   Lakshmi Mittal is the Chairman and CEO of ArcelorMittal, the world's largest steelmaking company.  In 2013, Goldman advised ArcelorMittal on its sale of a $1.1 billion stake in a Canadian iron ore operator to a consortium of Asian steelmakers.  In 2015, Goldman Sachs joined forces with ArcelorMittal to jointly sue Banco Espirito Santo SA over an $835 million loan.  In 2018, Goldman advised ArcelorMittal on the $1 billion acquisition of Indian steel company Essar Steel.

d.   Mark Winkelman was the head of commodity trading firm J. Aron, where Blankfein was hired in the 1980s.  Winkelman was one of Blankfein's earliest and most important champions, and Winkelman appointed Blankfein to head J. Aron's foreign

exchange business in 1984.  When J. Aron was acquired by Goldman, Winkelman and Blankfein moved to Goldman.  Winkelman left Goldman in 1994, but Blankfein returned the favor to Winkelman by appointing him to Goldman's Board in 2014

## X.    CLAIMS AGAINST DEFENDANTS

### COUNT I
**(Breach of Fiduciary Duty Against Director Defendants)**

214.    Plaintiff incorporates by reference and realleges each of the foregoing paragraphs as if fully set forth in this paragraph.

215.    Each of the Director Defendants owed and owe fiduciary duties to Goldman and its stockholders.  By reason of their fiduciary relationships, the Director Defendants specifically owed and owe Goldman the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.

216.    Each of the Director Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry to Goldman by either allowing the Company's employees to engage in the 1MDB fraud or consciously ignoring numerous red flags related to the 1MDB fraud.

217.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

218.    Additionally, the Director Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including the charters of various Board committees that, had they been discharged in accordance with the Director Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged in this Complaint.

219. Accordingly, to the extent Goldman's exculpatory provision applies to the Director Defendants' acts or omissions while acting in their capacity as directors, it cannot immunize them from (i) any non-monetary liability; (ii) monetary liability for their breaches of the duty of loyalty; (iii) monetary liability for acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law; or (iv) monetary liability in connection with any transaction from which they derived an improper personal benefit. As detailed in this Complaint, the Director Defendants' misconduct with respect to the 1MDB fraud: (i) involved breaches of their duty of loyalty; and/or (ii) involved acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law. Goldman's exculpatory provision therefore cannot immunize the Director Defendants from liability for that misconduct.

220. As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, Goldman has sustained and continues to sustain significant damages.

221. As a result of the misconduct alleged in this Complaint, the Director Defendants are liable to the Company

## COUNT II
### (Breach of Fiduciary Duty Against Defendant Blankfein)

222. Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph. This Count is brought against Defendant Blankfein solely in his capacity as an officer.

223. Blankfein owed fiduciary duties to Goldman and its stockholders. By reason of his fiduciary relationship, Blankfein specifically owed Goldman the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.

224.    Blankfein consciously and deliberately breached his fiduciary duties of candor, good faith, and loyalty by either intentionally causing the Company to issue false financial statements or consciously ignoring numerous red flags related to the 1MDB fraud.

225.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

226.    Additionally, Blankfein is not entitled to claim any immunity under Section 102(b)(7) to the extent this claim is asserted against him in his capacity as an officer of the Company.

227.    As a direct and proximate result of Blankfein's breaches of his fiduciary obligations, Goldman has sustained and continues to sustain significant damages.

228.    As a result of the misconduct alleged in this Complaint, Blankfein is liable to the Company.

### COUNT III
### (Unjust Enrichment Against the Individual Defendants)

229.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.

230.    During the Relevant Period, Defendants received bonuses, stock options, stock, or similar compensation from Goldman that was tied to the Company's financial performance, or otherwise received compensation that was unjust in light of Defendants' bad faith conduct, violation of the Company's code of ethics, and self-dealing.

231.    Plaintiff, as a stockholder and representative of Goldman, seeks restitution from Defendants and seeks an order of this Court disgorging all profits, benefits, and other compensation—including any salary, options, performance-based compensation, and stock—obtained by Defendants due to their wrongful conduct alleged in this Complaint.

## COUNT IV
### (Gross Mismanagement Against the Individual Defendants)

232.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

233.    Each of the Individual Defendants had a duty to Goldman and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of the Company.

234.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Goldman in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, the Individual Defendants breached their duties of due care, diligence, and candor in the management and administration of Goldman's affairs and in the use and preservation of the Company's assets.

235.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Goldman to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Goldman, thus breaching their duties to the Company.  As a result, the Individual Defendants grossly mismanaged Goldman.

236.    By reason of the foregoing, Goldman was damaged.

237.    Plaintiff, on behalf of Goldman, has no adequate remedy at law.

## COUNT V
### (Contribution and Indemnification Against the Individual Defendants)

238.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

239.    Goldman is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein that give rise to Defendants' liability to Goldman.

240.    Goldman's alleged liability on account of the wrongful acts, practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Individual Defendants as alleged above, and Goldman is entitled to contribution and indemnification from each Individual Defendant in connection with all such claims that have been, are or may in the future be asserted against, Goldman by virtue of the Individual Defendants' misconduct.

241.    By reason of the foregoing, Goldman was damaged.

242.    Plaintiff, on behalf of Goldman, has no adequate remedy at law.

## COUNT VI
### (Violation of §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Against the Individual Defendants)

243.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

244.    During the Relevant Period, in connection with Goldman's repurchases of Goldman shares, Individual Defendants disseminated or approved false or misleading statements about Goldman as detailed above, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud.  Those false or misleading statements and Individual Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

245.    At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by Individual Defendants, Individual Defendants caused the Company to repurchase millions of shares of its own common stock at prices that

were artificially inflated due to Individual Defendants' false or misleading statements. Individual Defendants engaged in a scheme to defraud Goldman by causing the Company to purchase millions of shares of Goldman stock at artificially inflated prices, as detailed above.

246.    Individual Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Goldman in connection with the Company's purchases of Goldman stock during the Relevant Period.

247.    Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Goldman stock, which were intended to, and did: (a) deceive Goldman regarding, among other things, the 1MDB scandal, the Company's internal controls and compensation practices, and the Company's financial statements; (b) artificially inflate and maintain the market price of Goldman stock; and (c) cause Goldman to purchase the Company's stock at artificially inflated prices and suffer losses when the true facts became

known.  Throughout the Relevant Period, Individual Defendants were in possession of material, adverse non-public information regarding the 1MDB scandal.

248.    Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made, as alleged above.

249.    As described above, Individual Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misstatements and omissions of material facts set forth in this Complaint were either known to Defendants or were so obvious that Defendants should have been aware of them.  Throughout the Relevant Period, Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

250.    Individual Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock.

251.    As a result of Defendants' misconduct, Goldman has and will suffer damages in that it paid artificially inflated prices for Goldman common stock purchased as part of the repurchase program and suffered losses when the previously undisclosed facts relating to the 1MDB fraud were disclosed beginning in November 2018.  Goldman would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by Defendants' false or misleading statements.

252.    As a direct and proximate result of Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of Goldman stock during the Relevant Period.

By reason of such conduct, Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

253.    Plaintiff brings this claim within two years of the discovery of the violation and within five years of the violation.

### COUNT VII
**(Breach of Fiduciary Duty for Insider Selling and Misappropriation of Confidential Information Against Defendants Blankfein, Solomon, and Viniar)**

254.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.

255.    At the time of the stock sales set forth above, Defendants Blankfein, Solomon, and Viniar knew or consciously disregarded the information described in this Complaint regarding the 1MDB fraud and sold Goldman common stock on the basis of that information.

256.    The information described above was proprietary non-public information concerning the Company's unlawful conduct associated with 1MDB.  The information was a proprietary asset belonging to the Company, which Blankfein, Solomon, and Viniar used for their own benefit when they sold Goldman common stock.

257.    Blankfein, Solomon, and Viniar's sales of Goldman common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

258.    Because the use of the Company's proprietary information for their own gain constitutes a breach of the fiduciary duties of Blankfein, Solomon, and Viniar, the Company is entitled to the imposition of a constructive trust on any profits Defendants Blankfein, Solomon, and Viniar obtained thereby.

### COUNT VIII
**(Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Against the Director Defendants)**

259.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

260.    This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

261.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

262.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to shareholders which were contained in the 2016, 2017, and 2018 Proxies. These Proxies contained proposals to Goldman shareholders urging them to elect and re-elect members of the Board and provide advisory votes on issues relating to executive compensation. These Proxies, however, misleadingly suggested that the Board maintained "effective risk management" and omitted any disclosures regarding (i) Goldman's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately disclose a culture of complicity over compliance within Goldman; and (iii) the subpoenas/requests for documents by regulatory bodies related to 1MDB; (iv) the fact that Goldman's compensation program actually encouraged, and consistently rewarded, extreme risk-taking and illegal practices.

263.    By reason of this conduct, the Director Defendants violated Section 14(a) of the Exchange Act.  As a direct and proximate result of this wrongful conduct, Goldman mislead and/or deceived its shareholders by making misleading statements that were an essential link in shareholders heeding Goldman's recommendations to re-elect and elect the current Board and provide advisory votes on executive compensation.

264.    The false and misleading information contained in the Proxies was material to Goldman's shareholders in determining whether to re-elect and elect the current Board and provide advisory votes on executive compensation.  This information was also material to the integrity of the directors who were proposed for election to the Board.  Plaintiff, on behalf of Goldman, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxy Statements in connection with the improper election and reelection of the members of the Board, and advisory votes on executive compensation.

265.    This action was timely commenced within three years of the date of each Proxy Statement and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

(a)    Directing the Individual Defendants to account to Goldman for all damages sustained or to be sustained by the Company by reason of the wrongs alleged herein;

(b)    Requiring the Individual Defendants to return to Goldman all salaries and the value of other remuneration of whatever kind paid to them by the Company during the time they were in breach of the fiduciary duties they owed to Goldman;

(c)      Directing the Individual Defendants to pay interest at the highest rate allowable by law on the amount of damages sustained by the Company as a result of the Individual Defendants' culpable conduct;

(d)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

(e)      Granting such other and further relief as the Court may deem just and proper.

## XII.   JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 19, 2019          Respectfully Submitted,

**SAXENA WHITE P.A.**

*/s/ Steven B. Singer*
Steven B. Singer
10 Bank Street, 8th Floor
White Plains, NY 10606
Phone: (914) 437-8551
Fax: (888) 631-3611

- and -

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White, III
Brandon T. Grzandziel
Adam D. Warden
150 E. Palmetto Park Road Suite 600
Boca Raton, FL 33432
Phone: (561) 394-3399
Fax: (561) 394-3382

*Counsel for Plaintiff Fulton County Employees' Retirement System*

## VERIFICATION

I, Shon Woodall, being duly sworn, declare as follows:

I am the Chairman of Plaintiff Fulton County Employees' Retirement System ("Fulton County" or "Plaintiff") and am authorized to act on its behalf with respect to this litigation and the filing of the Verified Shareholder Derivative Complaint ("Complaint"). Fulton County is a shareholder of The Goldman Sachs Group, Inc., and has been throughout the relevant period defined in the Complaint. Fulton County has retained competent counsel and is ready, willing, and able to pursue this action vigorously on behalf of the Company. I have reviewed the Complaint, and based upon discussions with and reliance upon counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: February 13, 2019

_____

Shon Woodall
Chairman
Fulton County Employees'
Retirement System