UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FULTON COUNTY EMPLOYEES'
RETIREMENT SYSTEM, Derivatively on Behalf
of THE GOLDMAN SACHS GROUP, INC.,

                   Plaintiff,

     v.

LLOYD BLANKFEIN, DAVID M. SOLOMON,
M. MICHELE BURNS, DREW G. FAUST,
MARK A. FLAHERTY, WILLIAM W. GEORGE,
JAMES A. JOHNSON, ELLEN J. KULLMAN,
LAKSHMI N. MITTAL, ADEBAYO O.
OGUNLESI, PETER OPPENHEIMER, JAN E.
TIGHE, DAVID A. VINIAR, and MARK O.
WINKELMAN,

                   Defendants,

and

THE GOLDMAN SACHS GROUP, INC.,

                   Nominal Defendant.

Case No.: 1:19-cv-01562 (VSB)

**ORAL ARGUMENT
REQUESTED**

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS THE VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Sharon L. Nelles (*nelless@sullcrom.com*)
David M.J. Rein (*reind@sullcrom.com*)
Matthew A. Schwartz (*schwartzmatthew@sullcrom.com*)
Benjamin R. Walker (*walkerb@sullcrom.com*)
Julia A. Malkina (*malkinaj@sullcrom.com*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Counsel for Defendants Lloyd Blankfein, David M. Solomon, M. Michele Burns, Mark A. Flaherty, William W. George, James A. Johnson, Ellen J. Kullman, Lakshmi N. Mittal, Adebayo O. Ogunlesi, Peter Oppenheimer, David A. Viniar, and Mark O. Winkelman, and Nominal Defendant The Goldman Sachs Group, Inc.*

May 13, 2019

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ................................................................1

BACKGROUND ...................................................................................4

    A.    The Parties ..............................................................................4

    B.    Allegations of the Complaint .....................................................5

        1.    Fiduciary Duty Claims......................................................5

        2.    Disclosure Claims ...........................................................7

        3.    Claims Predicated on Fiduciary Duty and Disclosure Claims.....9

        4.    Demand Allegations..........................................................9

ARGUMENT......................................................................................10

I.    THIS COURT SHOULD DISMISS THE COMPLAINT BECAUSE
    PLAINTIFF HAS NOT PLED PARTICULARIZED FACTS EXCUSING
    ITS FAILURE TO MAKE A PRE-SUIT DEMAND ...................................10

    A.    Plaintiff Is Subject to Stringent Standards of Particularity to Plead That
        Demand Is Excused...................................................................10

    B.    The Complaint Does Not Adequately Plead a Disabling Conflict as to a
        Majority of the Board...............................................................11

        1.    Plaintiff's Conclusory Theories Challenging Director
            Independence Do Not Show a Disabling Conflict....................12

        2.    Plaintiff Does Not Allege Particularized Facts Demonstrating That
            the Director Defendants Face a Substantial Likelihood of Liability .........14

            a.    Plaintiff Fails to Plead a Substantial Likelihood of Liability
                for Any Breach of Fiduciary Duty .................................16

            b.    "Gross Mismanagement" Is Not a Cognizable Claim ..................25

            c.    Plaintiff Does Not Allege Particularized Facts Showing a
                Substantial Likelihood of Liability for Securities Fraud ..............25

            d.    The Director Defendants Do Not Face a Substantial
                Likelihood of Liability for Supposed Proxy Misstatements..........30

            e.    Plaintiff's Insider Trading Claim Is Asserted Against Only
                Two Director Defendants and Is Deficiently Pled........................33

            f.    Plaintiff Cannot Plead Any Likelihood of Liability for
                Unjust Enrichment, Contribution, and Indemnification ...............34

II.    THIS COURT SHOULD DISMISS THE COMPLAINT BECAUSE
    PLAINTIFF HAS FAILED TO STATE ANY CLAIM ...............................34

CONCLUSION ..................................................................................35

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Albert* v. *Alex. Brown Management Services, Inc.*,
   C.A. No. 762-N, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005) ............................................... 25

*Aronson* v. *Lewis*,
   473 A.2d 805 (Del. 1984) ................................................................................. 1, 10, 11, 30

*ATSI Communications, Inc.* v. *Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ........................................................................................ 28

*Bader* v. *Blankfein*,
   No. 07-cv-1130 (SLT), 2008 WL 5274442 (E.D.N.Y. Dec. 19, 2008),
   *aff'd*, 356 F. App'x 471 (2d Cir. 2009) ..................................................................... 12

*BankUnited, N.A.* v. *Merritt Environmental Consulting Corp.*,
   360 F. Supp. 3d 172 (S.D.N.Y. 2018) .......................................................................... 4

*Barrett* v. *PJT Partners Inc.*,
   No. 16-cv-2841 (VEC), 2017 WL 3995606, at *6 (S.D.N.Y. Sept. 8, 2017) ......................... 27

*Beam* v. *Stewart*,
   845 A.2d 1040 (Del. 2004) ...................................................................................... 14

*Bond Opportunity Fund* v. *Unilab Corp.*,
   87 F. App'x 772 (2d Cir. 2004) ............................................................................... 30, 32

*Brautigam* v. *Blankfein*,
   8 F. Supp. 3d 395 (S.D.N.Y. 2014),
   *aff'd*, 598 F. App'x 53 (2d Cir. 2015) .................................................................... 10, 11, 12

*Brewer* v. *Breen*,
   No. 16-cv-7500 (ER), 2018 WL 565267 (S.D.N.Y. Jan. 23, 2018) ..................................... 11

*Canty* v. *Day*,
   13 F. Supp. 3d 333 (S.D.N.Y. 2014),
   *aff'd*, 599 F. App'x 20 (2d Cir. 2015) .................................................................... 10, 17

*Central Laborers' Pension Fund* v. *Blankfein*,
   34 Misc. 3d 456 (N.Y. Sup. Ct. 2011),
   *aff'd*, 111 A.D.3d 40 (1st Dep't 2013) ................................................................. 2, 12, 13, 14

*Central Laborers' Pension Fund* v. *Dimon*,
   638 F. App'x 34 (2d Cir. 2016) ............................................................................... 18

*Ciresi* v. *Citicorp*,
    782 F. Supp. 819 (S.D.N.Y. 1991),
    *aff'd*, 956 F.2d 1161 (2d Cir. 1992) ........................................................................31

*City of Birmingham Retirement & Relief System* v. *Good*,
    177 A.3d 47 (Del. 2017) ........................................................................................15

*City of Pontiac Policemen's & Firemen's Retirement System* v. *UBS AG*,
    752 F.3d 173 (2d Cir. 2014)............................................................................3, 28, 29

*Crescent/Mach I Partners, L.P.* v. *Turner*,
    846 A.2d 963 (Del. Ch. 2000).................................................................................14

*Dalberth* v. *Xerox Corp.*,
    766 F.3d 172, 183 (2d Cir. 2014).............................................................................28

*David B. Shaev Profit Sharing Account* v. *Armstrong*,
    C.A. No. 1449-N, 2006 WL 391931 (Del. Ch. Feb. 13, 2006),
    *aff'd*, 911 A.2d 802 (Del. 2006)........................................................................16, 25

*DCML LLC* v. *Danka Business Systems PLC*,
    No. 08-cv-5829 (SAS), 2008 WL 5069528 (S.D.N.Y. Nov. 26, 2008)....................32

*Desimone* v. *Barrows*,
    924 A.2d 908 (Del. Ch. 2007)..............................................................................3, 34

*Dura Pharmaceuticals, Inc.* v. *Broudo*,
    544 U.S. 336 (2005)..........................................................................................3, 4, 28

*ECA* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)....................................................................................29

*F5 Capital* v. *Pappas*,
    856 F.3d 61 (2d Cir. 2017).......................................................................................17

*Fink* v. *Komansky*,
    No. 03-cv-0388 (GBD), 2004 WL 2813166 (S.D.N.Y. Dec. 8, 2004)................2, 19

*Fink* v. *Weill*,
    No. 02-cv-10250 (LTS), 2005 WL 2298224 (S.D.N.Y. Sept. 19, 2005)................10

*Fisher* v. *Kanas*,
    467 F. Supp. 2d 275 (E.D.N.Y. 2006) ...............................................................32, 33

*Forsythe* v. *ESC Fund Management Co.*,
    C.A. No. 1091-VCL, 2007 WL 2982247 (Del. Ch. Oct. 9, 2007).....................18, 19

*Grimes* v. *Donald*,
673 A.2d 1207 (Del. 1996) ...................................................................................10

*Halpert Enterprises, Inc.* v. *Harrison*,
362 F. Supp. 2d 426 (S.D.N.Y. 2005).....................................................................20

*Higher Education Management Group, Inc.* v. *Mathews*,
C.A. No. 9110-VCP, 2014 WL 5573325 (Del. Ch. Nov. 3, 2014)....................15, 24

*In re American International Group, Inc. Derivative Litigation*,
700 F. Supp. 2d 419 (S.D.N.Y. 2010),
*aff'd*, 415 F. App'x 285 (2d Cir. 2011)..............................................................12, 34

*In re American Express Co. Shareholder Litigation*,
840 F. Supp. 260 (S.D.N.Y. 1993),
*aff'd*, 39 F.3d 395 (2d Cir. 1994) .......................................................................31, 32

*In re Banco Bradesco S.A. Securities Litigation*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017).....................................................................27

*In re Capital One Derivative Shareholder Litigation*,
952 F. Supp. 2d 770 (E.D. Va. 2013) ......................................................................24

*In re Caremark International Inc. Derivative Litigation*,
698 A.2d 959 (Del. Ch. 1996)......................................................................... *passim*

*In re Citigroup Inc. Shareholder Derivative Litigation*,
No. 07-cv-9841 (SHS), 2009 WL 2610746 (S.D.N.Y. Aug. 25, 2009)............26, 30

*In re Citigroup Inc. Shareholders Litigation*,
C.A. No. 19827-VCL, 2003 WL 21384599 (Del. Ch. June 5, 2003),
*aff'd*, 839 A.2d 666 (Del. 2003).........................................................................19, 21

*In re Citigroup Inc. Shareholder Derivative Litigation*,
964 A.2d 106 (Del. Ch. 2009)...............................................................18, 25, 30

*In re Dow Chemical Co. Derivative Litigation*,
C.A. No. 4349-CC, 2010 WL 66769 (Del. Ch. Jan. 11, 2010).........................14, 21

*In re Facebook, Inc., IPO Securities & Derivative Litigation*,
922 F. Supp. 2d 445 (S.D.N.Y. 2013),
*aff'd*, 797 F.3d 148 (2d Cir. 2015) .........................................................................15

*In re Goldman Sachs Group, Inc. Shareholder Litigation*,
C.A. No. 5215-VCG, 2011 WL 4826104 (Del. Ch. Oct. 12, 2011),
*aff'd*, 44 A.3d 922 (Del. 2012)......................................................................... *passim*

*In re Goldman Sachs Mortgage Servicing Shareholder Derivative Litigation*,
42 F. Supp. 3d 473 (S.D.N.Y. 2012)...............................................................................12, 34

*In re Goldman Sachs Mutual Funds*,
No. 04-cv-2567 (NRB), 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006) ....................................13

*In re Intel Corp. Derivative Litigation*,
621 F. Supp. 2d 165 (D. Del. 2009)....................................................................................19

*In re ITT Corp. Derivative Litigation*,
588 F. Supp. 2d 502 (S.D.N.Y. 2008).......................................................................16, 19, 22

*In re ITT Corp. Derivative Litigation*,
653 F. Supp. 2d 453 (S.D.N.Y. 2009)....................................................................................20

*In re ITT Educational Services, Inc. Securities & Shareholder Derivative Litigation*,
859 F. Supp. 2d 572 (S.D.N.Y. 2012)....................................................................................27

*In re JPMorgan Chase & Co. Derivative Litigation*,
No. 12-cv-03878 (GBD), 2014 WL 1297824 (S.D.N.Y. Mar. 31, 2014)...............................24

*In re JP Morgan Chase Securities Litigation*,
363 F. Supp. 2d 595 (S.D.N.Y. 2005).............................................................................30, 31

*In re Lions Gate Entertainment Corp. Securities Litigation*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016)......................................................................................32

*In re Marsh & Mclennan Cos., Inc. Securities Litigation*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006)....................................................................................26

*In re Morgan Stanley Derivative Litigation*,
542 F. Supp. 2d 317 (S.D.N.Y. 2008)....................................................................................31

*In re Morgan Stanley Information Fund Securities Litigation*,
592 F.3d 347 (2d Cir. 2010)..................................................................................................28

*In re Oracle Corp. Derivative Litigation*,
867 A.2d 904 (Del. Ch. 2004),
*aff'd*, 872 A.2d 960 (Del. 2005)....................................................................................33, 34

*In re PetroChina Co. Securities Litigation*,
120 F. Supp. 3d 340 (S.D.N.Y. 2015),
*aff'd*, 644 F. App'x 13 (2d Cir. 2016)..........................................................................27, 28

*In re SAIC Inc. Derivative Litigation*,
948 F. Supp. 2d 366 (S.D.N.Y. 2013),
*aff'd*, 553 F. App'x 54 (2d Cir. 2014).....................................................................11, 21, 22

*In re Sanofi Securities Litigation*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016)....................................................................................26

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001)................................................................................................29

*Khanna* v. *McMinn*,
    C.A. No. 20545-NC, 2006 WL 1388744 (Del. Ch. May 9, 2006)..........................................13

*King* v. *Baldino*,
    648 F. Supp. 2d 609 (D. Del. 2009),
    *aff'd*, 409 F. App'x 535 (3d Cir. 2010)..........................................................................21, 22

*Korsinsky* v. *Winkelreid*,
    143 A.D.3d 427 (N.Y. App. Div. 2016) ...............................................................................12

*Lousiana Municipal Police Employees Retirement System* v. *Blankfein*,
    No. 08-cv-7605 (LBS), 2009 WL 1422868 (S.D.N.Y. May 19, 2009) .........................2, 12, 13

*Lousiana Municipal Police Employees Retirement System* v. *Pandit*,
    No. 08-cv-7389 (LTS), 2009 WL 2902587 (S.D.N.Y. Sept. 10, 2009)..................................19

*Lenois* v. *Lawal*,
    C.A. No. 11963-VCMR, 2017 WL 5289611 (Del. Ch. Nov. 7, 2017)....................................30

*Loudon* v. *Archer-Daniels-Midland Co.*,
    700 A.2d 135 (Del. 1997) ...................................................................................................33

*Maldonado* v. *Flynn*,
    597 F.2d 789 (2d Cir. 1979)................................................................................................29

*McKenna* v. *Singer*,
    C.A. No. 11371-VCMR, 2017 WL 3500241 (Del. Ch. July 31, 2017) ...................................15

*Oklahoma Firefighters Pension & Retirement System* v. *Corbat*,
    C.A. No. 12151-VCG, 2017 WL 6452240 (Del. Ch. Dec. 18, 2017)...................11, 15, 18, 20

*Orman* v. *Cullman*,
    794 A.2d 5 (Del. Ch. 2002)..................................................................................................14

*Parkcentral Global Hub Ltd.* v. *Porsche Automobile Holdings SE*,
    763 F.3d 198 (2d Cir. 2014)..................................................................................................4

*Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust* v. *Lundgren*,
    579 F. Supp. 2d 520 (S.D.N.Y. 2008)...................................................................................34

*Rahbari* v. *Oros*,
    732 F. Supp. 2d 367 (S.D.N.Y. 2010)..............................................................................14, 15

*Rales* v. *Blasband*,
634 A.2d 927 (Del. 1993) ..........................................................................1, 10, 11

*Rombach* v. *Chang*,
355 F.3d 164 (2d Cir. 2004)....................................................................................26

*Slayton* v. *American Express Co.*,
604 F.3d 758 (2d Cir. 2010)......................................................................................4

*South* v. *Baker*,
62 A.3d 1 (Del. Ch. 2012)................................................................................16, 18

*Spiegel* v. *Buntrock*,
571 A.2d 767 (Del. 1990) ........................................................................................10

*Steinberg* v. *Dimon*,
No. 14-cv-688 (PAC), 2014 WL 3512848 (S.D.N.Y. July 16, 2014) ....................14

*Stone* v. *Ritter*,
911 A.2d 362 (Del. 2006) .............................................................................. *passim*

*Strugala* v. *Riggio*,
817 F. Supp. 2d 378 (S.D.N.Y. 2011)......................................................................12

*Taylor* v. *Kissner*,
893 F. Supp. 2d 659 (D. Del. 2012)....................................................................33, 35

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..................................................................................................28

*Tilden* v. *Cunningham*,
C.A. No. 2017-0837-JRS, 2018 WL 5307706 (Del. Ch. Oct. 26, 2018)................24

**Statutes and Rules**

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 *et seq* ...................26, 31, 35

Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7201 *et seq* ................................................................8

Securities Exchange Act of 1934, Section 10(b), 15 U.S.C. § 78j(b)................................. *passim*

Securities Exchange Act of 1934, Section 14(a), 15 U.S.C. § 78n(a) ................................3, 30, 31

8 Del. C. § 102(b)(7)................................................................................................................15, 24

Federal Rule of Civil Procedure 8(a) ...............................................................................................31

Federal Rule of Civil Procedure 9(b)...........................................................................25, 26, 31, 35

Federal Rule of Civil Procedure 12(b)(6) ................................................................10, 34

Federal Rule of Civil Procedure 23.1 ................................................................. *passim*

## PRELIMINARY STATEMENT

Plaintiff, a purported shareholder of The Goldman Sachs Group, Inc. (together with its subsidiaries, "Goldman Sachs" or "Firm"), runs afoul of bedrock principles of Delaware law in seeking to pursue claims, on behalf of Goldman Sachs, against eleven members of the Firm's Board of Directors ("Director Defendants" and, together with the Firm's Senior Chairman, "Defendants").  These claims, largely for supposed oversight failures and disclosure violations, are based on allegations that the then-Prime Minister of Malaysia and other Malaysian officials, high-level executives of an Abu Dhabi sovereign wealth fund, a Malaysian financier, and two former Goldman Sachs employees operating in Asia participated in a conspiracy to embezzle billions of dollars in proceeds from three bond offerings underwritten by Goldman Sachs for 1Malaysia Development Berhad ("1MDB"), a Malaysian sovereign development company, in 2012 and 2013.

On this motion to dismiss, the law requires Defendants to accept the allegations as true and not contest them.  But even had Plaintiff stated actionable claims based on these allegations (and it has not), to have standing to pursue them, Plaintiff first must demonstrate a valid excuse for failing to make a pre-suit demand on the Board, which is dominated by outside, independent directors—six of whom joined the Board *after* the transactions at issue and all of whom are distinguished individuals in the worlds of business, academia, or government.  A shareholder is absolved of making a demand only if it can demonstrate, based on particularized facts, "a reasonable doubt" that, at the time the complaint is filed, a majority of the board suffers from disabling conflicts of interest or faces "a substantial likelihood" of personal liability.  *Rales* v. *Blasband*, 634 A.2d 927, 934, 936 (Del. 1993); *Aronson* v. *Lewis*, 473 A.2d 805, 814-15 (Del. 1984).  This Plaintiff clearly does not do.

Critically, there is not a single, well-pled allegation in any of the Complaint's 265

paragraphs that connects any of the purported wrongdoing related to the 1MDB bond offerings to the Board.  To the contrary, the Complaint specifically relies on documents that make clear that the two former Goldman Sachs employees named as participants in the conspiracy actively concealed their misconduct from the Firm and concedes that the Firm had extensive controls and risk management procedures.  Presupposing that a company's directors acted improperly, which is all the Complaint does, simply because of misconduct by company employees does not comport with Delaware law.  *See, e.g.*, *Fink* v. *Komansky*, 2004 WL 2813166, at *4 (S.D.N.Y. Dec. 8, 2004) (dismissing claims based "'on a presumption that employee wrongdoing would not occur if directors performed their duty properly'").

Plaintiff's allegations do not remotely suggest that the Board is inhibited by disabling conflicts.  Plaintiff merely cites to ordinary director's fees and business relationships, which do not compromise a director's independence under settled Delaware law.  Indeed, multiple courts have rejected similar allegations in dismissing prior putative derivative suits against the Goldman Sachs Board.[1]

Nor does the Complaint establish that any director—let alone a majority of the Board— faces a substantial likelihood of personal liability for any of Plaintiff's claims.  Six of the outside directors were not even on the Board at the time of the 1MDB bond offerings in 2012 and 2013.  Moreover, pleading a failure of oversight claim—which is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment," *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996)—requires a particularized showing that a majority

---

[1]    *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *12 (Del. Ch. Oct. 12, 2011), *aff'd*, 44 A.3d 922 (Table) (Del. 2012); *Cent. Laborers' Pension Fund* v. *Blankfein*, 34 Misc. 3d 456, 471, 473, 474 (N.Y. Sup. Ct. 2011), *aff'd*, 111 A.D.3d 40 (1st Dep't 2013); *La. Mun. Police Emps. Ret. Sys.* v. *Blankfein*, 2009 WL 1422868, at *8 (S.D.N.Y. May 19, 2009) ("*LMPERS*").

of directors *knowingly* failed to discharge, or consciously disregarded, their obligations.  Goldman

Sachs' Certificate of Incorporation also generally exculpates directors from fiduciary duty claims

unless based on bad-faith conduct.  Yet the Complaint, which concedes the existence of extensive

controls, offers no particularized allegations of the supposed inadequacies of the Board's

oversight.   Instead, Plaintiff surmises that, because of employee misconduct, the Director

Defendants must have failed to establish sufficient controls.  "Delaware courts routinely reject

[such] conclusory allegation[s] that because illegal behavior occurred, internal controls must have

been deficient, and the board must have known so."  *Desimone* v. *Barrows*, 924 A.2d 908, 940

(Del. Ch. 2007).  As the Delaware Supreme Court has made clear, a shareholder, like Plaintiff,

cannot evade the pre-suit demand requirement simply by "equat[ing] a bad outcome with bad

faith."  *Stone* v. *Ritter*, 911 A.2d 362, 373 (Del. 2006).

Likewise, Plaintiff's disclosure-based theories do not expose the directors to a substantial

likelihood of liability.  Plaintiff attempts to state derivative claims under Sections 10(b) and 14(a)

of the Securities Exchange Act of 1934, alleging that descriptions of Goldman Sachs' risk

management procedures in its public filings were false.  But Plaintiff points to no statement

guaranteeing that those procedures would always succeed—in fact, the statements cautioned that

employee misconduct might nonetheless occur—and does not identify anything that was false in

any of the challenged statements.  To the extent that Plaintiff's claims boil down to a theory that

the 1MDB-related employee misconduct should have been disclosed, Second Circuit law is clear

that Defendants "do not have a duty 'to disclose uncharged, unadjudicated wrongdoing.'"  *City of

Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014).  The

Complaint also contains no allegations satisfying Plaintiff's burden to plead particularized facts

creating a "strong inference" that any Defendant acted with the requisite scienter.  *Dura Pharms.*,

*Inc.* v. *Broudo*, 544 U.S. 336, 345 (2005).  Plaintiff's claim alleging false proxy statements fails

for additional reasons, including that Plaintiff does not allege any economic loss or challenge any

shareholder vote.

Finally, for the same reasons that Plaintiff cannot plead that a majority of Goldman Sachs'

Board faces a substantial likelihood of liability, the Complaint also should be dismissed for failure

to state a claim.

## BACKGROUND[2]

### A.    The Parties

Nominal defendant The Goldman Sachs Group, Inc., a Delaware corporation, "is a leading

global investment banking, securities and investment management firm that provides a wide range

of financial services to a substantial and diversified client base."  (Compl. ¶¶ 14, 31.)  At the time

of the 1MDB bond transactions in 2012 and 2013, Goldman Sachs had offices in over 30 countries,

more than 30,000 employees, and annual revenues exceeding $34 billion.  (Ex. B at 1, 7, 117; Ex.

C at 1, 6, 123.)

Goldman Sachs' Board had thirteen directors when the Complaint was filed.  (Compl.

¶¶ 16-28.)  Two of those directors, Drew Faust and Jan Tighe, who were appointed to the Board

in July 2018 and December 2018, respectively, were voluntarily dismissed from this action.  (Order

at 2, Dkt. No. 19.)   The Complaint names the remaining eleven members of the Board as

---

[2]     For the limited purpose of this motion, Defendants are required to accept the well-pled allegations of the Complaint.  *See Parkcentral Global Hub Ltd.* v. *Porsche Auto. Holdings SE*, 763 F.3d 198, 202 (2d Cir. 2014).  The Court may also consider "'documents incorporated into the complaint by reference'" and "'legally required public disclosure documents filed with the SEC,'" *Slayton* v. *Am. Express Co.*, 604 F.3d 758, 763 n.2 (2d Cir. 2010), as well as "documents 'integral' to the complaint . . . , even if not attached or incorporated by reference" and "facts of which judicial notice may properly be taken," *BankUnited, N.A.* v. *Merritt Envtl. Consulting Corp.*, 360 F. Supp. 3d 172, 183 (S.D.N.Y. 2018).  Citations to "Ex. __" refer to exhibits to the Declaration of Julia A. Malkina, dated May 13, 2019.  Unless otherwise stated, all exhibits cited by Defendants are documents incorporated by reference or integral to the Complaint.

Defendants along with Lloyd Blankfein, Goldman Sachs' Senior Chairman and former CEO, who is not on the Board. (Compl. ¶¶ 15-28.) Of the Director Defendants, only three, David Solomon, David Viniar, and Mark Winkelman, have served as members of Goldman Sachs' management or been employed by the Firm, although Mr. Winkelman left the Firm in 1999. (Compl. ¶¶ 16, 27, 28; Ex. D at 24.) The remaining eight Director Defendants are current or former respected leaders of some of the world's best-known corporations and other highly sophisticated business executives. (Ex. D at 19-23.) They include current or former CEOs of DuPont, Fannie Mae, and ArcelorMittal; former CFOs of Apple and Delta; and current or former directors of Amgen, Anheuser-Busch, Cisco, Dell, Exxon Mobil, and Target. (*Id.*)

Plaintiff claims to have been a shareholder of Goldman Sachs "at all relevant times." (Compl. ¶ 13.)

### B.   Allegations of the Complaint

The Complaint asserts eight causes of action: (i) four Delaware state law fiduciary duty claims (Counts I, II, IV, and VII); (ii) two disclosure claims under the federal securities laws (Counts VI and VIII); and (iii) two additional claims—unjust enrichment and contribution and indemnification (Counts III and V)—that are predicated on the fiduciary duty and disclosure claims. (Compl. ¶¶ 214-65.)

### 1.   Fiduciary Duty Claims

Plaintiff's fiduciary duty claims center on three 1MDB bond offerings underwritten by Goldman Sachs in 2012 and 2013. (Compl. ¶¶ 43-74.) 1MDB represented to the Firm and others that (i) the first two bond offerings, in 2012, were intended to fund "1MDB's anticipated acquisition of Malaysian power production company Tanjong Energy" and additional "[e]nergy companies in Malaysia" (Compl. ¶¶ 43, 64), and (ii) the third bond offering, in 2013, was intended to fund a joint venture with Abu Dhabi to make investments in "energy and strategic real estate"

(Compl. ¶ 71; Ex. G).  The 2012 offerings were guaranteed by International Petroleum Investment Company (together with its subsidiaries, "IPIC")—an Abu Dhabi sovereign wealth fund that "invests in multi-billion dollar acquisitions and stakes in global companies"—which helped the bonds earn a higher credit rating.  (Compl. ¶¶ 3, 48.)  In total, the bond offerings raised over $6.5 billion for 1MDB.  (Compl. ¶ 3.)

Goldman Sachs, through, in part, its "[Business] Intelligence Group," carried out "compliance review[s]" of each bond offering, and the offerings were also evaluated by at least two of the Firm's transaction review committees, its "Capital Committee" and "Suitability Committee."  (Compl. ¶¶ 54-55, 66, 70.)  The transactions were structured such that Goldman Sachs initially "purchased the entire issuance," thereby "tak[ing] on all of the risk," and then "resold [the bonds] to investors."  (Compl. ¶¶ 44, 67, 70.)  Contemporaneously, 1MDB represented that it "considered all of its options in raising debt" and "chose th[is] structure to 'ensure the timely completion of [its] economic initiative[s].'"  (Ex. G; see Exs. F, H.)  Plaintiff alleges that the Firm earned approximately $600 million in reselling the bonds.  (Compl. ¶¶ 3, 74.)

According to the Complaint, after each 1MDB bond transaction closed and Goldman Sachs transferred the funds to 1MDB's designated bank accounts, a group of co-conspirators "looted the bond offerings" by "siphoning off billions of dollars" using shell companies and bank accounts unrelated to Goldman Sachs.  (Compl. ¶¶ 8, 53, 68, 71, 87.)  This conspiracy allegedly included then-Prime Minister of Malaysia Najib Razak, IPIC executives Khadem al-Qubaisi and Mohamed al-Husseiny, Malaysian financier Jho Low, and two former Goldman Sachs employees in Asia who worked on the transactions, Tim Leissner and Roger Ng.  (Compl. ¶¶ 8, 53, 87.)  Najib and the two IPIC executives have since been arrested in their home countries.  (Compl. ¶¶ 6, 8.)  In November 2018, U.S. federal prosecutors unsealed criminal charges against Low, Leissner, and

Ng, as well as an August 2018 guilty plea by Leissner.  (Compl. ¶¶ 90, 95.)

The charging documents explicitly allege that Leissner and Ng "conspired" to "circumvent [Goldman Sachs'] internal controls" with respect to the 1MDB bond transactions and "to conceal . . . information from [Goldman Sachs'] Compliance Group and [Business] Intelligence Group in order to prevent them from attempting to stop [the Firm] from participating in" the transactions.  (Ex. I ¶¶ 20-21; Ex. J ¶¶ 19-20.)  Plaintiff nonetheless claims that the Director Defendants breached their fiduciary duties by "allowing [Goldman Sachs] employees to engage in the 1MDB fraud or consciously ignoring numerous red flags related to the 1MDB fraud." (Compl. ¶¶ 214-21, 232-37.)  But four of the outside Director Defendants were not on the Board at the time of the 1MDB bond offerings, and Plaintiff does not assert, because it cannot, that the Director Defendants—who are tasked with overseeing Goldman Sachs' many business areas spanning the globe—had any involvement in the offerings or the slightest inkling of the conspiracy to loot the proceeds (which was deliberately concealed from the Firm's control functions and committees).

In addition to its fiduciary duty claims against the Director Defendants, the Complaint asserts that Messrs. Blankfein, Solomon, and Viniar breached their fiduciary duties by selling Goldman Sachs stock while holding "proprietary, non-public information concerning the 1MDB fraud."  (Compl. ¶¶ 254-58.)  The Complaint is silent as to what non-public information they purportedly traded on or how they supposedly became aware of it.

### 2.    Disclosure Claims

Plaintiff contends that Defendants defrauded Goldman Sachs by making, or allowing the Firm to make, three categories of purportedly false statements in its Form 10-Ks from 2013 to 2017.  *First*, Plaintiff challenges tables "present[ing] the operating results" of the Firm's "investment banking segment."  (Compl. ¶¶ 119-24.)  Plaintiff does not dispute the accuracy of any figure in any table, but instead generally alleges that "the debt underwriting results for 2012

and 2013 were . . . due to illicit actions and violations of law" related to 1MDB.  (Compl. ¶ 124.)

*Second*, Plaintiff challenges disclosures that generally described the Firm's potential exposures, risks, and risk management processes.  (Compl. ¶¶ 125-30.)  The Complaint alleges that these statements "did not disclose" 1MDB-related misconduct, and that the Firm's "risk framework was not comprehensive," its "system of internal controls could be easily circumvented," and its "business culture, particularly in Southeast Asia, prioritized consummation of deals ahead of the proper operation of its compliance functions."  (Compl. ¶¶ 125, 130.)  Although ignored by Plaintiff, the challenged disclosures expressly warned that Goldman Sachs "may incur losses as a result of ineffective risk management processes and strategies," and that "[a] failure in [the Firm's] operational systems or infrastructure . . . could . . . damage [its] reputation and cause losses."  (*E.g.*, Ex. C at 119.)  The disclosures also specifically cautioned shareholders that "internal fraud" and "external fraud" were "[p]otential types of loss events." (*E.g.*, *id.* at 117.)

*Third*, Plaintiff challenges certifications signed by Mr. Blankfein and Goldman Sachs' then-CFO pursuant to the Sarbanes-Oxley Act of 2002.  These included that the certifying officers "[d]esigned" "disclosure controls and procedures," "[e]valuated the[ir] effectiveness," and disclosed to Goldman Sachs' audit functions "[a]ny fraud" involving management or employees with a significant role in disclosure controls.  (Compl. ¶ 131.)  The Complaint does not assert that the certifying officers failed to do any of those things.

Plaintiff also alleges that, from 2016 to 2018, the Director Defendants issued, or caused Goldman Sachs to issue, proxy statements containing two categories of purported misstatements. *First*, Plaintiff challenges the proxy statements' general descriptions of the Board's oversight role, such as "[o]ur Board's focus on overseeing risk management enhances our directors' ability to

provide insight and feedback to senior management." (Compl. ¶¶ 155, 163, 171.)  The Complaint claims those statements were false because they "suggested that the Board maintained 'effective risk management,'" and did not disclose "ineffective" controls, "reporting failures," and regulatory "subpoenas/requests for documents" related to 1MDB.  (Compl. ¶¶ 156, 164, 172.)

*Second*, Plaintiff challenges the proxy statements' general descriptions of Goldman Sachs' compensation policies.  These include statements like "[e]mployees should think and act like long-term shareholders" and "[c]ompensation should be carefully designed to be consistent with the [Firm's] safety and soundness." (Compl. ¶¶ 159, 167, 175.)  Plaintiff alleges those statements were false because the Firm "actually encouraged—and consistently rewarded—extreme risk taking and widespread illegal practices."  (Compl. ¶¶ 160, 168, 176.)

### 3.    Claims Predicated on Fiduciary Duty and Disclosure Claims

Finally, Plaintiff asserts unjust enrichment and contribution and indemnification claims predicated on the same allegations that purportedly give rise to Plaintiff's fiduciary duty and disclosure claims.   (Compl. ¶¶ 229-31, 238-42.)   Plaintiff contends that Defendants should "disgorg[e] all profits, benefits, and other compensation . . . due to their [alleged] wrongful conduct," and that Goldman Sachs "is entitled to contribution and indemnification" for claims based on that conduct.  (Compl. ¶¶ 231, 240.)

### 4.    Demand Allegations

Plaintiff did not demand that the Board take action regarding any of the matters alleged in the Complaint.  (Compl. ¶ 197.)  Plaintiff contends that this failure is excused because the Director Defendants: (i) are "[f]inancially [b]eholden" to Goldman Sachs; (ii) "face a substantial likelihood of liability" for Plaintiff's claims; and (iii) did not validly exercise their business judgment by, in effect, failing to uncover and prevent an alleged criminal conspiracy whose participants actively hid their misconduct from the Firm and authorities across the globe, intentionally circumventing

the Firm's system of internal controls by concealing information from its compliance and oversight functions.  (Compl. ¶¶ 197-213; Ex. I ¶¶ 20-21; Ex. J ¶¶ 19-20.)

## ARGUMENT

I. **THIS COURT SHOULD DISMISS THE COMPLAINT BECAUSE PLAINTIFF HAS NOT PLED PARTICULARIZED FACTS EXCUSING ITS FAILURE TO MAKE A PRE-SUIT DEMAND.**

### A. Plaintiff Is Subject to Stringent Standards of Particularity to Plead That Demand Is Excused.

Under Federal Rule of Civil Procedure 23.1, a shareholder that seeks to sue derivatively on behalf of a corporation without first demanding that its directors do so must "'allege with particularity'" why demand should be excused.  *Brautigam* v. *Blankfein*, 8 F. Supp. 3d 395, 403 (S.D.N.Y. 2014), *aff'd*, 598 F. App'x 53 (2d Cir. 2015).  That threshold requirement reflects the "cardinal precept" of corporate law that "directors, rather than shareholders, manage the business and affairs of the corporation."  *Aronson*, 473 A.2d at 811.  Because "[t]he decision to bring a law suit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation," *Spiegel* v. *Buntrock*, 571 A.2d 767, 773 (Del. 1990), "the corporation, acting through its board . . . must make the decision whether or not to assert the claim," *Grimes* v. *Donald*, 673 A.2d 1207, 1215 (Del. 1996).  When seeking to excuse demand, the "pleading standard [is] higher than the normal standard applicable to the analysis of a pleading challenged under Rule 12(b)(6)," *Fink* v. *Weill*, 2005 WL 2298224, at *3 (S.D.N.Y. Sept. 19, 2005), and meeting it "is 'a difficult feat,'" *Canty* v. *Day*, 13 F. Supp. 3d 333, 345 (S.D.N.Y. 2014), *aff'd*, 599 F. App'x 20 (2d Cir. 2015).

Because Goldman Sachs is incorporated in Delaware, "the substantive law of Delaware" applies in determining whether demand is excused.  *Brautigam*, 8 F. Supp. 3d at 400 n.7.  When challenging board inaction, a plaintiff must allege particularized facts that "create a reasonable

doubt" that, at the time the complaint was filed, a majority of the board "could have properly exercised its independent and disinterested business judgment," *Rales*, 634 A.2d at 934, which is an inquiry into the directors' disinterestedness and independence, *In re SAIC Inc. Deriv. Litig.*, 948 F. Supp. 2d 366, 377 (S.D.N.Y. 2013), *aff'd*, 553 F. App'x 54 (2d Cir. 2014).   When challenging affirmative board action, a plaintiff must make particularized factual allegations that "raise a reasonable doubt" that, at the time the complaint was filed, (i) a majority of the board was "disinterested and independent" or (ii) "the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814.

    **B.**    **The Complaint Does Not Adequately Plead a Disabling Conflict as to a Majority of the Board.**

    To justify its failure to make a demand on the Board under *Rales* or the first prong of *Aronson*, Plaintiff must plead particularized facts demonstrating that a majority of Goldman Sachs' thirteen-member Board—that is, at least seven directors—at the time of the Complaint's filing suffered from conflicts disabling them from considering a demand.  *See, e.g.*, *Brewer* v. *Breen*, 2018 WL 565267, at *5 (S.D.N.Y. Jan. 23, 2018); *Brautigam*, 8 F. Supp. 3d at 404.[3]  Plaintiff cannot satisfy its pleading burden.   Of the thirteen directors, Plaintiff already has impliedly conceded the independence of the two directors it dismissed from its suit, Ms. Faust and Ms. Tighe (Order at 2, Dkt. No. 19), and Plaintiff thus must show that *seven of the eleven* remaining directors, five of whom (including four outside directors) joined the Board *after* the 1MDB bond

---

[3]    Two Director Defendants, William George and James Johnson, retired from the Board on May 1, 2019.  This does not affect Plaintiff's pleading burden because demand futility is "analyzed with respect to the directors seated as of the date that the complaint was filed." *Okla. Firefighters Pension & Ret. Sys.* v. *Corbat*, 2017 WL 6452240, at *14 (Del. Ch. Dec. 18, 2017).

transactions, are incapable of considering a demand.[4]  In doing so, Plaintiff must overcome the

many decisions rejecting challenges to the independence of prior Goldman Sachs Boards.[5]  For

the Court's convenience, a chart summarizing the Director Defendants is attached as Exhibit A to

the accompanying Malkina Declaration.

> **1.**     **Plaintiff's Conclusory Theories Challenging Director Independence Do Not Show a Disabling Conflict.**

Plaintiff challenges the independence of Goldman Sachs' Board based on the outside

directors' receipt of ordinary director fees and, for four outside directors, alleged business

relationships with Goldman Sachs.  Plaintiff's theories recycle arguments that have repeatedly

been rejected under well-settled Delaware law, including by courts applying that law in other cases

involving the Goldman Sachs Board.

*First*, the fact that the outside Director Defendants were paid fees to serve on the Board is

irrelevant.  (Compl. ¶ 211.)  "'Receipt of director's fees does not suggest a conflict of interest,'"

*Strugala* v. *Riggio*, 817 F. Supp. 2d 378, 387 (S.D.N.Y. 2011), and thus "'[i]t is well established

that allegations that defendants are paid for their services as directors do not excuse demand,'" *In

re AIG, Inc. Deriv. Litig.*, 700 F. Supp. 2d 419, 432 (S.D.N.Y. 2010), *aff'd*, 415 F. App'x 285 (2d

Cir. 2011).  Otherwise, "'every director who receives director's fees would be biased,'" and

demand would always be excused.  *Strugala*, 817 F. Supp. 2d at 387.  Although Plaintiff

characterizes the fees as "lavish" (Compl. ¶ 211), it does not attempt to show that the fees were

---

[4]     Other shareholders have recognized the independence of the Board by making demands on the same topics.  (*See* Ex. E at 77.)

[5]     *See Korsinsky* v. *Winkelreid*, 143 A.D.3d 427, 427-28 (N.Y. App. Div. 2016); *Brautigam*, 8 F. Supp. 3d at 406; *In re Goldman Sachs Mortg. Servicing S'holder Deriv. Litig.*, 42 F. Supp. 3d 473, 485 (S.D.N.Y. 2012); *Goldman Sachs*, 2011 WL 4826104, at *7-12; *Cent. Laborers' Pension Fund*, 34 Misc. 3d at 474-75; *LMPERS*, 2009 WL 1422868, at *5-8; *Bader* v. *Blankfein*, 2008 WL 5274442, at *8-9 (E.D.N.Y. Dec. 19, 2008), *aff'd*, 356 F. App'x 471 (2d Cir. 2009) (all rejecting demand futility allegations and dismissing complaint).

"'sufficiently material . . . in the context of the director's economic circumstances.'"  *In re Goldman Sachs Mut. Funds*, 2006 WL 126772, at *11 (S.D.N.Y. Jan. 17, 2006); *see also, e.g.*, *Khanna* v. *McMinn*, 2006 WL 1388744, at *16 (Del. Ch. May 9, 2006) ("the mere fact that a director receives compensation . . . adds little or nothing to demand-futility analysis, 'without more'—*i.e.*, unless the pleadings demonstrate, for example, that the . . . compensation was somehow 'material' to the director").  This Court thus should follow the other courts rejecting the argument that "director defendants [were] beholden to Goldman [Sachs]," and that demand was excused, based on receipt of director's fees.  *Cent. Laborers' Pension Fund*, 34 Misc. 3d at 471; *see also LMPERS*, 2009 WL 1422868, at *8 ("[Goldman Sachs'] director compensation" not ground for demand excusal).

*Second*, Plaintiff asserts that "excessive financial relationships and business entanglements" show that demand is excused.  (Compl. ¶ 213.)  But the totality of Plaintiff's allegations in this regard are directed to only four of the Board's outside directors, and, in any event, recycle arguments that courts have routinely rejected.

Plaintiff claims that William George, Ellen Kullman, and Lakshmi Mittal lack independence because Goldman Sachs previously acted as "financial advisor" in transactions involving companies chaired by those outside directors.  (Compl. ¶ 213(a)-(c).)  Such allegations are facially deficient, and have carried no weight with other courts that have considered these same assertions.  *See, e.g.*, *Goldman Sachs*, 2011 WL 4826104, at *12 (allegations that Goldman Sachs "'arranged or provided billions of euros in financing to [Mr. Mittal's] company'" "fail to . . . show anything other than a series of market transactions"); *Cent. Laborers' Pension Fund*, 34 Misc. 3d at 474 (similar); *id.* at 473 (rejecting as "entirely speculative" theory that Mr. George lacked independence due to "'longstanding business relationship'" between Medtronic and Goldman

Sachs); *Steinberg* v. *Dimon*, 2014 WL 3512848, at *4 (S.D.N.Y. July 16, 2014) ("financial advisory relationships" not disabling conflict).

Plaintiff also asserts that Mr. Winkelman "champion[ed]" and "appointed" Mr. Blankfein to a position at another firm 35 years ago and speculates that Mr. Blankfein "returned the favor . . . by appointing" Mr. Winkelman to Goldman Sachs' Board.  (Compl. ¶ 213(d).)  Even putting aside that Plaintiff offers no facts to support its theory, precedent recognizes (i) that, because previous business relationships between board members and executives are commonplace, they are "not enough to overcome the presumption of a director's independence," *Orman* v. *Cullman*, 794 A.2d 5, 27 (Del. Ch. 2002); *see, e.g.*, *Beam* v. *Stewart*, 845 A.2d 1040, 1051 (Del. 2004) ("friends[hips]" and "business relationships" between directors not disabling conflicts); *Crescent/Mach I Partners, L.P.* v. *Turner*, 846 A.2d 963, 980 (Del. Ch. 2000) ("15-year professional and personal relationship" between director and company chairman and CEO not disabling conflict), and (ii) that "the mere fact that a director played a role in nominating new directors does not mean that the new director is beholden to the nominating director," *In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *9 (Del. Ch. Jan. 11, 2010).

Because Plaintiff's allegations do not come close to pleading with particularity that a majority of the thirteen-member Board was disabled from considering a demand, this Court should join the many other courts that have found Goldman Sachs' Boards independent.

> **2.      Plaintiff Does Not Allege Particularized Facts Demonstrating That the Director Defendants Face a Substantial Likelihood of Liability.**

Plaintiff's failure to comply with the pre-suit demand requirement also is not excused by any threat of personal liability for Plaintiff's claims.  Under Delaware law, potential personal liability "qualifies as an interest for the purpose of excusing demand . . . only 'rarely,' 'where defendants' actions were so egregious that a *substantial likelihood* of director liability exists.'"

*Rahbari* v. *Oros*, 732 F. Supp. 2d 367, 378 (S.D.N.Y. 2010) (emphasis added; alteration omitted); *see also Higher Educ. Mgmt. Grp., Inc.* v. *Mathews*, 2014 WL 5573325, at *6 (Del. Ch. Nov. 3, 2014) ("'substantial likelihood'" standard "'difficult to meet'").

"Directors of Delaware corporations owe two fiduciary duties: the duty of care and the duty of loyalty." *McKenna* v. *Singer*, 2017 WL 3500241, at *15 (Del. Ch. July 31, 2017). Because Goldman Sachs' Certificate of Incorporation specifically immunizes directors from "liability for breaches of the duty of care," the Director Defendants can face liability only for breaches of the duty of loyalty. *Goldman Sachs*, 2011 WL 4826104, at *18. To plead a breach of the duty of loyalty based on lack of oversight, Plaintiff must allege particularized facts demonstrating that "the directors acted with scienter; *i.e.*, there was an 'intentional dereliction of duty' or 'a conscious disregard' for their responsibilities, amounting to bad faith." *Id.* at *12; *see City of Birmingham Ret. & Relief Sys.* v. *Good*, 177 A.3d 47, 55 (Del. 2017) ("'showing of bad faith is a *necessary condition* to director oversight liability'"); *Stone*, 911 A.2d at 370 ("showing of bad faith . . . is essential to establish director oversight liability"); *Corbat*, 2017 WL 6452240, at *1 ("To imply director liability, the response of the directors must have been in bad faith. The inaction must suggest, not merely inattention, but actual scienter.").[6] Because pleading such facts is particularly difficult, "[t]he likelihood of directors' liability is significantly lessened where, as here, the corporate charter exculpates the directors from [such] liability." *Goldman Sachs*, 2011 WL 4826104, at *18. Plaintiff falls well short of that pleading burden.

---

[6] The Court may "take[] judicial notice of the provisions of [Goldman Sachs'] certificate of incorporation." *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 922 F. Supp. 2d 445, 460 n.13 (S.D.N.Y. 2013), *aff'd*, 797 F.3d 148 (2d Cir. 2015). The Certificate of Incorporation's exculpatory provision states that directors "shall not be liable" for "breach of fiduciary duty . . . except to the extent that such exemption . . . is not permitted" by Delaware law. (Ex. K at Art. 12.) Delaware law allows corporations to exculpate directors from liability for all breaches of fiduciary duty except breaches of the duty of loyalty, 8 Del. C. § 102(b)(7), which, for Plaintiff's claims, requires pleading bad faith, *see Good*, 177 A.3d at 55.

-15-

a.     **Plaintiff Fails to Plead a Substantial Likelihood of Liability for
Any Breach of Fiduciary Duty.**

Plaintiff alleges that the Director Defendants face a substantial likelihood of liability for

breaching their fiduciary duties by failing to exercise proper oversight relating to the 1MDB bond

transactions.  (Compl. ¶¶ 214-21.)  "Plaintiffs face a formidable challenge" in establishing demand

futility for claims based on a supposed failure of board oversight—so-called *Caremark* claims, *In*

*re ITT Corp. Deriv. Litig.*, 588 F. Supp. 2d 502, 508-09 (S.D.N.Y. 2008); "[s]atisfying the

plaintiff's burden in a *Caremark* case is a difficult task," *David B. Shaev Profit Sharing Account*

v. *Armstrong*, 2006 WL 391931, at *5 (Del. Ch. Feb. 13, 2006), *aff'd*, 911 A.2d 802 (Del. 2006).

"'[O]nly a sustained or systematic failure of the board to exercise oversight . . . will establish the

lack of good faith that is a necessary condition to liability.'"  *Goldman Sachs*, 2011 WL 4826104,

at *19.

To plead such a failure, Plaintiff cannot simply point to alleged wrongdoing by employees

and conclude *ex post facto* that the Director Defendants failed to exercise adequate oversight.

Otherwise, plaintiffs could evade the demand requirement simply by "equat[ing] a bad outcome

with bad faith."  *Stone*, 911 A.2d at 373; *see also, e.g.*, *South* v. *Baker*, 62 A.3d 1, 14 (Del. Ch.

2012) ("'A stockholder cannot displace the board's authority [over a corporation's claims] simply

by describing [a] calamity and alleging that it occurred on the directors' watch.'").  As a result, to

plead a substantial likelihood of liability, Plaintiff must allege particularized facts demonstrating

that "the directors *knew* that they were not discharging their fiduciary obligations," either by

showing that (i) "the directors *utterly failed* to implement any reporting or information system or

controls" (which the Complaint concedes is not the case here), or (ii) "having implemented such a

system or controls" (as the Complaint makes clear the Board did), "*consciously failed* to monitor

or oversee its operations" (which the Complaint does not allege with particularity).  *Stone*, 911

-16-

A.2d at 370 (emphasis added).  In doing so, Plaintiff may not, as the Complaint does, resort to the "'group accusation mode of pleading demand futility.'"  *Canty*, 13 F. Supp. 3d at 344.  "'Delaware law does not permit the wholesale imputation of one director's knowledge to every other for demand excusal purposes.'"  *F5 Capital* v. *Pappas*, 856 F.3d 61, 83 (2d Cir. 2017).  The Complaint "'must plead facts *specific to each director*.'"  *Id.*

### i.  *Plaintiff Concedes That the Director Defendants Implemented Oversight Mechanisms*.

The Complaint does not attempt to plead that the Director Defendants "utterly failed" to implement an oversight system; rather, it concedes, as it must, the existence of extensive mechanisms and controls.  For example, Plaintiff acknowledges that the Board "maintain[ed] several standing committees to monitor specific aspects of [the Firm's] business." (Compl. ¶ 185.)  The "Audit Committee" "'assist[ed] the Board in its oversight of (i) the integrity of [Goldman Sachs'] financial statements [and] (ii) the [Firm's] compliance with legal and regulatory requirements." (Compl. ¶ 186.)  The "Risk Committee" "'assist[ed] the Board in its oversight of [the Firm's] overall risk-taking tolerance and management of financial and operational risks.'" (Compl. ¶ 188.)  Similarly, the Complaint recognizes that Goldman Sachs, through, in part, its "[Business] Intelligence Group," carried out "compliance review[s]" of the 1MDB bond transactions, and they were also evaluated by at least two of the Firm's transaction review committees, its "Suitability Committee" and "Capital Committee." (Compl. ¶¶ 54-55, 66, 70.)  Plaintiff also admits that the Firm's "Enterprise Risk Management framework" was "'designed to enable comprehensive risk management processes,'" including for "'legal, compliance, conduct, regulatory and reputational risk exposures.'" (Compl. ¶ 184 (alterations omitted).)  These concessions are fatal to Plaintiff's oversight claims.  *See Goldman Sachs*, 2011 WL 4826104, at *23 (no oversight claims where "Goldman [Sachs] had an Audit Committee in place that was

'charged with assisting the Board in its oversight of the [Firm's] management . . . of risks'" and "[t]he Director Defendants exercised their business judgment in choosing and implementing a risk management system that they presumably believed would keep them reasonably informed").

Hindsight allegations that Goldman Sachs' extensive oversight system had "weaknesses" and could be "circumvented" (Compl. ¶¶ 88, 91) because it did not detect and prevent alleged wrongdoing related to 1MDB (which was deliberately concealed from the Firm) are not the same as saying an oversight system did not exist, and plainly are insufficient to state a *Caremark* claim. *See, e.g.*, *Cent. Laborers' Pension Fund* v. *Dimon*, 638 F. App'x 34, 38 (2d Cir. 2016) (demand not excused where "plaintiffs claim[ed] only 'that JPMorgan's controls were . . . *inadequate*,' not that they did not exist"); *Corbat*, 2017 WL 6452240, at *17 (allegations that "board could have done a better job addressing [certain compliance] issues" were "not enough to state a *Caremark* claim"). Plaintiff's theory that the Director Defendants knew or should have known about the specifics of the 1MDB transactions or alleged wrongdoing by virtue of their committee memberships has been rejected by Delaware courts. (Compl. ¶¶ 184-92.) "[N]umerous Delaware decisions make clear" that "an allegation that the underlying cause of a corporate trauma falls within the delegated authority of a board committee does not support an inference that the directors on that committee knew of and consciously disregarded the problem." *South*, 62 A.3d at 17.

### ii. *Plaintiff Fails to Plead the Director Defendants Consciously Disregarded Their Oversight Duties.*

Plaintiff's allegations that the "Board failed to respond to . . . warning signs" related to the 1MDB bond offerings (Compl. ¶ 4) also do not plead that a majority of the directors "'consciously failed to monitor'" Goldman Sachs' oversight mechanisms, *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009). The law is clear that directors cannot be liable unless "they ignore 'red flags'" that, at a minimum, (i) "actually come to their attention," and (ii) "warn[]

of compliance problems." *Forsythe* v. *ESC Fund Mgmt. Co.*, 2007 WL 2982247, at *7 (Del. Ch. Oct. 9, 2007); *see also, e.g.*, *In re Citigroup Inc. S'holders Litig.*, 2003 WL 21384599, at *2 (Del. Ch. June 5, 2003) ("'Red flags' are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer."), *aff'd*, 839 A.2d 666 (Del. 2003).  The fundamental failure of the Complaint, however, is that it never bothers to connect its so-called "red flags" to the Board.  *See, e.g.*, *In re Intel Corp. Deriv. Litig.*, 621 F. Supp. 2d 165, 174 (D. Del. 2009) (demand not excused where "Plaintiff fails to identify what the Directors actually knew about the 'red flags' and how they responded to them"); *La. Mun. Police Emps. Ret. Sys.* v. *Pandit*, 2009 WL 2902587, at *8 (S.D.N.Y. Sept. 10, 2009) (demand not excused where "even if Plaintiff had adequately alleged 'red flags,' Plaintiff has failed to proffer specific factual allegations regarding the individual directors' conduct in response to these alleged 'red flags'"); *Fink*, 2004 WL 2813166, at *4 (demand not excused "[w]here plaintiff has 'not pled with particularity that the directors ignored obvious danger signs of employee wrongdoing'").  Notably, the Complaint often "refers to the 'Director Defendants'" or "the 'Board,'" "rather than to individual Director Defendants." *ITT Corp.*, 588 F. Supp. 2d at 511.  "Whether the Directors face a substantial likelihood of liability must be determined on a director-by-director basis, and thus Plaintiff['s] conflation of all the directors into a single entity is insufficient under Rule 23.1." *Id*.

***Structure of the transactions***.  Plaintiff theorizes that the Director Defendants must have known that they were not exercising proper oversight because: (i) the 1MDB bond transactions required Goldman Sachs "to take on all of the risk" pending its sale of the bonds (Compl. ¶¶ 3, 44, 70); (ii) the bonds supposedly were "expensive and mispriced" (Compl. ¶¶ 3, 45); (iii) the "pricing and fees" purportedly were hidden "from the public" (Compl. ¶¶ 3, 47); (iv) IPIC "guarantee[d]" the bonds (Compl. ¶¶ 3, 48); (v) Goldman Sachs was selected as underwriter on "a no-bid basis"

(Compl. ¶¶ 49, 69); and (vi) Goldman Sachs supposedly "received an abnormally high fee" (Compl. ¶¶ 3, 46, 74-75).  Fatally, however, Plaintiff alleges *nothing whatsoever* to show that even a single outside director knew about any of those alleged facts at the time of the three transactions in 2012 and 2013.  Plaintiff thus fails to plead that "'the board *knew* of evidence of corporate misconduct . . . yet acted in bad faith by consciously disregarding its duty to address that misconduct.'"  *Corbat*, 2017 WL 6452240, at *15; *see also, e.g.*, *Halpert Enters., Inc.* v. *Harrison*, 362 F. Supp. 2d 426, 432 (S.D.N.Y. 2005) ("Plaintiff alleges a scheme with which some employees at JPM Chase were familiar, but never, except with conclusory allegations, conveys that the scheme occurred with the Board's knowledge or systemic failure to engage in proper oversight.").

Plaintiff's inability to allege director knowledge is unsurprising, given the role of a Board responsible for overseeing a large multinational company.  As *Caremark* recognizes, "[m]ost of the decisions that a corporation . . . makes are, of course, not the subject of director attention."  698 A.2d at 968.  Under Delaware law, "the board will be required only to authorize *the most significant* corporate acts or transactions: mergers, changes in capital structure, fundamental changes in business, appointment and compensation of the CEO, etc."  *Id.* (emphasis added).  The 1MDB bond offerings were not the sort of fundamental corporate-level transactions that would have been subject to Board scrutiny, much less—as the Complaint speculates—"raised suspicions at the Board level" (Compl. ¶ 74).  *See In re ITT Corp. Deriv. Litig.*, 653 F. Supp. 2d 453, 463 (S.D.N.Y. 2009) ("Directors cannot be expected to be involved in or have knowledge of all aspects of [the company's] daily operations, even significant aspects of daily operation.").

Moreover, the Complaint itself shows that the elements of the transactions Plaintiff cites were not "red flags," even if the Board had known about them.  For example, by Plaintiff's own admission, 1MDB required Goldman Sachs "to take on all of the risk" of the billions of dollars of

bonds for a time (Compl. ¶ 44); it is unsurprising that the Firm would have earned a greater amount for assuming that exposure (Compl. ¶ 46).  Similarly, Plaintiff's own sources state that 1MDB represented that it "considered all of its options in raising debt" and "chose" the deals' principal funding "structure to 'ensure the timely completion of [its] economic initiative[s].'"  (Ex. G; *see* Exs. F, H.)  And a "guarantee" by IPIC, which, according to the Complaint, "invests in multi-billion dollar acquisitions and stakes in global companies," only bolstered the deals' apparent legitimacy.  (Compl. ¶ 48.)  Plaintiff's theory that the Board should have been reflexively suspicious of bond offerings by a sovereign development company owned and controlled by a U.S. ally, and guaranteed by a sovereign wealth fund owned and controlled by another U.S. ally, is without basis in law or fact.  In short, Plaintiff fails "to plead with particularity allegations that, if true, would [have] give[n] the [Goldman Sachs] [B]oard cause for suspicion."  *Dow*, 2010 WL 66769, at *13 (finding that "alleged 'red flag'" regarding "bribery" was "simply . . . not a 'red flag'").

    ***Media reports***.  Plaintiff's cherry-picked media reports related to 1MDB also do not establish that any Director Defendant consciously chose to ignore his or her oversight duties.  Those reports largely comprised commentary on the structure of the transactions and criticisms of the deals by Malaysian opposition party candidates who were motivated to criticize the ruling party.  (*See* Compl. ¶¶ 4, 6, 58-62, 76-82, 87.)  Even putting aside that the reports could not have warned any Director Defendant of the alleged embezzlement scheme, again, Plaintiff does not assert a critical, predicate fact, *i.e.*, that any of these articles "ever came to the attention of the [B]oard."  *Citigroup*, 2003 WL 21384599, at *2.  Where a complaint "do[es] not allege that any member of the Board actually read, or learned the contents of, any of the[] articles," it cannot adequately plead conscious disregard of oversight duties.  *SAIC*, 948 F. Supp. 2d at 385; *see King*

v. *Baldino*, 648 F. Supp. 2d 609, 624 (D. Del. 2009) (no disregard of oversight duties where no facts pled "indicating that members of the Board were privy to . . . the 2006 *Wall Street Journal* articles"), *aff'd*, 409 F. App'x 535 (3d Cir. 2010).  A board member has no duty to "review every national (and local) blog, newspaper, Twitter feed, and televised news program for evidence of potential illegality in their corporate operations." *SAIC*, 948 F. Supp. 2d at 385-86.  The "creation of such an extensive information-acquisition duty for directors with respect to information out in the wider world—as opposed to information possessed by the company—is simply incompatible with . . . *Caremark*." *Id.* at 386.

   ***Alleged employee concerns***.  Plaintiff also asserts that two Goldman Sachs employees in Asia expressed "concerns" regarding the 1MDB bond deals, including that profits were "excessive."  (Compl. ¶¶ 3, 50-53, 65, 69.)  Once again, Plaintiff does not plead that a single director, not even ones on the Board at the time of the 1MDB transactions in 2012 and 2013, knew of those supposed concerns.  Putting aside that the alleged "concerns" related to business risk, not misconduct, it is axiomatic that "allegations regarding . . . awareness of misconduct by employees without a connection to [the Board are] insufficient to show that [the directors] consciously . . . failed to monitor . . . operations." *ITT Corp.*, 588 F. Supp. 2d at 513.  Even assuming there were "failures by employees to report deficiencies to the Board, there [would still be] no basis for an oversight claim seeking to hold the directors personally liable for such failures." *Stone*, 911 A.2d at 373.

   ***Low's purported role***.  Plaintiff's allegations about Jho Low (Compl. ¶¶ 3, 36-39, 54-55, 62, 64, 72-73, 92) do not plead that the Director Defendants knew about and "'conscious[ly] disregard[ed]'" Low's role in the 1MDB bond transactions, *Goldman Sachs*, 2011 WL 4826104, at *12.  In fact, the Complaint relies on sources conceding that Leissner and Ng "conspired" "to

circumvent [Goldman Sachs'] internal controls" and "to conceal" Low's "role in the bond transactions" and "other information from [Goldman Sachs'] Compliance Group and [Business] Intelligence Group." (Ex. I ¶¶ 20-21; Ex. J ¶¶ 19-20.)

At most, the Complaint asserts that certain unnamed Goldman Sachs employees—not the Board—knew that Low was associated with individuals or entities involved in the 1MDB bond transactions. (*See* Compl. ¶ 54 (alleging that "Leissner informed the Global Co-Head of the [Business] Intelligence Group that Low was present for" a "meeting in Abu Dhabi with IPIC"); Compl. ¶ 55 (similar); Compl. ¶ 72 (alleging that Leissner told "[a] member of Goldman's Capital Committee" that "Low 'was an advisor alongside other prominent figures to the King of Malaysia at the time of the creation of 1MDB'").) Nothing in the Complaint remotely suggests that the Board knew this. And even if Plaintiff had adequately pled that those matters were brought to the Director Defendants' attention, they would not have been a "red flag." The Complaint does not claim that, at the time of the transactions, Goldman Sachs had any evidence that Low was engaged in illegal conduct related to 1MDB or otherwise.

***Federal Reserve scrutiny***. Based on newspaper articles, Plaintiff alleges that, in 2013, the Federal Reserve required Goldman Sachs "to tighten its oversight of risk," and, in 2014, after the 1MDB bond transactions, "raised concerns" in hindsight that they posed "reputational risk." (Compl. ¶¶ 5, 83-84, 202.) Plaintiff does not claim that the Federal Reserve "raised concerns" with the Board prior to the transactions, much less that the Board ignored any such concerns. Nor does the Complaint say anything at all about the Board's role in these issues. Regardless, comments about potential "reputational risk" could not have put the Director Defendants on notice of an extraordinary criminal scheme involving high-ranking members of two sovereign governments, including a sitting prime minister, much less establish the bad-faith conduct

Case 1:19-cv-01562-VSB   Document 28   Filed 05/13/19   Page 33 of 45

necessary to plead a claim against the Director Defendants. *See, e.g.*, *In re JPMorgan Chase & Co. Deriv. Litig.*, 2014 WL 1297824, at \*5 (S.D.N.Y. Mar. 31, 2014) (Office of the Comptroller of the Currency letter provided to board stating that certain portfolios lacked adequate documentation "did not put the Board on notice of facially improper business risks or illegal activity").

Lastly, insofar as Plaintiff asserts that Goldman Sachs had a culture that encouraged excessive risk-taking (Compl. ¶¶ 1, 10, 91, 98 n.33, 100, 105, 130, 135), Delaware law does not recognize such a claim, *see Tilden* v. *Cunningham*, 2018 WL 5307706, at \*16 (Del. Ch. Oct. 26, 2018) (no director liability for "'failure to predict the future and to properly evaluate business risk'"); *Goldman Sachs*, 2011 WL 4826104, at \*23 (no bad faith where "Goldman [Sachs'] board and management made decisions," which "involved taking objectively large risks, including particularly reputational risks").[7]  In any event, the Complaint alleges no particularized facts indicating that the Board knew of any supposed culture of excessive risk-taking.

In short, Plaintiff does not plead with anything close to the requisite particularity that any

---

[7]     Several of the Complaint's allegations, such as those concerning Federal Reserve scrutiny in "early 2014" and media attention "[b]eginning in 2015 and 2016," post-date the 1MDB bond transactions.  (Compl. ¶¶ 5-6; *see* Compl. ¶¶ 4, 7, 75-88.)  These allegations are also deficient because "a red flag must alert defendants to conduct *that is ongoing* and that could be stopped using the newly-acquired information."  *In re Capital One Deriv. S'holder Litig.*, 952 F. Supp. 2d 770, 787 (E.D. Va. 2013) (emphasis added).  "Put simply, th[ese] flag[s] w[ere] raised too late to serve as a warning to [D]efendants" regarding the bond transactions.  *Id.*  Further, Plaintiff's conclusory assertion, unsupported by any actual facts, that the "Board would have learned" of the alleged misconduct "merely by directing a search of Goldman's internal email system" (Compl. ¶ 7) is contradicted by sources cited in the Complaint that make clear that the wrongdoing related to 1MDB was actively concealed from the Firm, *see supra* at 7, and, in any event, alleges no more than that the directors were, at most, negligent in fulfilling their duty of care, which is a fully exculpated claim.  *See Higher Educ. Mgmt. Grp., Inc.* v. *Mathews*, 2014 WL 5573325, at \*11 n.63 (Del. Ch. Nov. 3, 2014) ("Due to [the company's] exculpation clause under 8 Del. C. 102(b)(7), there would be no recourse for Plaintiffs and no substantial likelihood of liability if the Director Defendants' only failing was that they had not become fully informed.").

-24-

Director Defendant, let alone a majority of the Board, was guilty of "'a conscious disregard' for their responsibilities, amounting to bad faith." *Goldman Sachs*, 2011 WL 4826104, at \*12; *see Armstrong*, 2006 WL 391931, at \*1 (allegations that "some admittedly troubling things happened at Citigroup, that the directors had erected . . . systems designed to detect such misconduct, [and] that for some reason the system[s] failed to work" "[p]lainly . . . do not state a claim for relief").[8]

### b.    "Gross Mismanagement" Is Not a Cognizable Claim.

Plaintiff alleges that Defendants "breached their duties of due care, diligence, and candor in the management and administration of Goldman's affairs and in the use and preservation of the Company's assets." (Compl. ¶¶ 232-37.)  "Delaware law does not recognize an independent cause of action" for "gross mismanagement" separate from claims for breaches of the duties of care or loyalty, *Citigroup*, 964 A.2d at 114 n.6, and Plaintiff's fiduciary duty claims fail for the reasons explained above—the Certificate of Incorporation protects the Director Defendants from liability except for claims based on bad-faith conduct, and nothing in the Complaint comes close to alleging such conduct.

### c.    Plaintiff Does Not Allege Particularized Facts Showing a Substantial Likelihood of Liability for Securities Fraud.

Plaintiff next claims that Defendants violated Section 10(b) of the Exchange Act by making three categories of false statements in Goldman Sachs' Form 10-Ks, and "caus[ing]" the Firm "to repurchase millions of shares of its own common stock at prices that were artificially inflated" by

---

[8]    Plaintiff's claim that Mr. Blankfein breached his fiduciary duties "in his capacity as an officer" is irrelevant to demand excusal because he was not a director when the Complaint was filed, and thus the issue poses no risk of liability for any director.  (Compl. ¶¶ 222-28, 232-37.)  In any event, the claim should be dismissed because Plaintiff's allegation that Mr. Blankfein "reviewed the [1MDB] deals" with a "focus[] on making sure 1MDB officials fully understood" their structure (Compl. ¶ 103) does not show that he "was 'recklessly uninformed' or acted 'outside the bounds of reason,'" as required to state a claim, *Albert* v. *Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at \*4 (Del. Ch. Aug. 26, 2005).

those statements.   (Compl. ¶¶ 243-53.)   "In addition to the 'stringent requirements of factual particularity' required to show that demand is excused [under Rule 23.1], [Plaintiff's] securities fraud allegations are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')."   *In re Citigroup Inc. S'holder Deriv. Litig.*, 2009 WL 2610746, at *9 (S.D.N.Y. Aug. 25, 2009).   Plaintiff fails to adequately allege falsity, scienter, and reliance for each challenged statement.

*Falsity*.   It is black-letter law that Plaintiff must "do more than say that the statements . . . were false." *Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004).   The Complaint "must demonstrate with specificity why and how that is so."   *Id*.   Plaintiff does not satisfy that basic requirement for any of the three categories of statements it challenges.

*i. Operating results.*   The Complaint points to no financial figure in any reported operating results that was false; nor does it explain how the results were misleading.   (*See* Compl. ¶¶ 119-24.)   "Absent an allegation that [the corporation] reported income that it did not actually receive, the allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability." *In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 470 (S.D.N.Y. 2006); *see In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016) (sales figures not false despite allegations that they "were inflated" by "illegal marketing and kickback scheme").

*ii. Risk disclosures.*   Plaintiff does not claim that any of the matters identified in Goldman Sachs' risk disclosures were not potential risks, or that the Firm did not have any of the risk management processes described in those disclosures.   (*See* Compl. ¶¶ 125-30.)   Simply claiming that those processes were "not comprehensive" and "could be easily circumvented" (Compl. ¶ 130) provide no grounds for a claim because Plaintiff's characterizations (i) lack any factual

underpinning and (ii) ignore that the risk disclosures—which expressly warned that the Firm "[m]ay incur losses as a result of ineffective risk management processes and strategies," and that "[a] failure in [the Firm's] operational systems or infrastructure . . . could . . . damage [its] reputation and cause losses" (*e.g.*, Ex. C at 119)—did not guarantee that Goldman Sachs would always successfully manage risks.  Plaintiff is not allowed to plead fraud through hindsight.  *See, e.g.*, *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 648 (S.D.N.Y. 2017) ("allegations that [bank's internal] controls must have been deficient because they may have failed to detect some weaknesses in its financial reports or disclosures" insufficient where challenged statements "do not purport to guarantee that [bank's] controls will perform perfectly"); *In re ITT Educ. Servs., Inc. Sec. & S'holder Deriv. Litig.*, 859 F. Supp. 2d 572, 581 (S.D.N.Y. 2012) ("Plaintiff's allegations of specific instances of unethical or fraudulent practices do not render Defendants' broad statements regarding compliance misleading.").

     *iii.   Sarbanes-Oxley certifications.*   Plaintiff does not plead any particularized facts showing why Goldman Sachs' Sarbanes-Oxley certifications were false—*e.g.*, that the certifying officers did not in fact design internal control procedures, evaluate their effectiveness, or make the fraud disclosures described in the certifications.  (*See* Compl. ¶¶ 131-35.)  Instead, Plaintiff merely asserts that the certifications were false because alleged wrongdoing related to 1MDB occurred.  Courts have consistently rejected such attempts to bootstrap Sarbanes-Oxley certifications into securities fraud claims.  *See, e.g.*, *Barrett* v. *PJT Partners Inc.*, 2017 WL 3995606, at *6 (S.D.N.Y. Sept. 8, 2017) (no claims based on Sarbanes-Oxley certifications where complaint did not allege that certifying officers "failed to evaluate the effectiveness of [company's] controls" or "were aware of" unreported "deficienc[ies] or material weakness[es] in [its] internal controls"); *In re PetroChina Co. Sec. Litig.*, 120 F. Supp. 3d 340, 359 (S.D.N.Y. 2015) (no claims based on

Sarbanes-Oxley certifications where complaint did not plead that "internal controls in relation to *financial reporting* were insufficient"), *aff'd*, 644 F. App'x 13 (2d Cir. 2016).  In any event, none of the directors signed the certifications, and thus do not face any potential liability for them.

   ***Omissions***.  Plaintiff cannot save its claims by rebranding the alleged misstatements as omissions.  (*See* Compl. ¶¶ 118, 125, 135, 137.)  Omissions are inactionable unless "the corporation is subject to a duty to disclose the omitted facts."  *Dalberth* v. *Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014).  Plaintiff does not plead any facts giving rise to a duty to disclose matters related to 1MDB when the challenged statements were made.  As the Second Circuit has made plain, "companies do not have a duty 'to disclose uncharged, unadjudicated wrongdoing.'"  *UBS*, 752 F.3d at 184; *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 365 (2d Cir. 2010) ("[D]efendants were not obligated to suggest . . . that . . . employees may have engaged in activities that might later be determined to run afoul of the securities laws.").

   ***Scienter***.  Defendants also do not face a substantial likelihood of liability on the securities fraud claims because, even if Plaintiff had alleged falsity, Plaintiff fails to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura*, 544 U.S. at 345.  "[A]n inference of scienter must be . . . cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  To satisfy those stringent pleading requirements, a plaintiff must allege particularized facts (i) "constituting strong circumstantial evidence of conscious misbehavior or recklessness," or (ii) "showing that the defendants had both motive and opportunity to commit the fraud."  *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

   Here, Plaintiff fails to allege with sufficient particularity conscious misbehavior or recklessness.  As discussed *supra* at pages 18-25, the Complaint makes no specific allegations

suggesting that any Defendant knew that the challenged statements were false or acted in a manner that was "'highly unreasonable, representing an extreme departure from the standards of ordinary care,'" as required to plead recklessness.  *UBS*, 752 F.3d at 187.

Similarly, the Complaint contains no particularized allegations of motive or opportunity for any Defendant, and certainly not at the time any specific statement was made.  Instead, it generally asserts that Defendants received compensation for their services (Compl. ¶¶ 209-11), and that the Firm's overall "business culture" was focused on "consummation of deals" (Compl. ¶¶ 130, 135).[9]  But the law is clear that "[m]otives that are generally possessed by most corporate directors and officers do not suffice."  *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  Plaintiff is required to "assert a concrete and personal benefit to the individual [D]efendants resulting from the fraud," which it entirely fails to do.  *Id.*; *see, e.g.*, *ECA*, 553 F.3d at 201 (rejecting allegations that "defendants were motivated because an inflated stock price or improved corporate performance would increase their compensation").

*Reliance*.   Plaintiff does not plead that Goldman Sachs relied on the purported misrepresentations in repurchasing its stock.  The Second Circuit has held that "approval of the transaction by a disinterested majority of the board possessing authority to act and fully informed of all relevant facts" bars a Section 10(b) claim because "[t]he knowledge of the disinterested majority must in such event be attributed to the corporation and its stockholders, precluding deception."  *Maldonado* v. *Flynn*, 597 F.2d 789, 793 (2d Cir. 1979).  Applying that binding precedent, another court in this District rejected the same argument Plaintiff makes here—that a

---

[9]   Plaintiff alleges in passing that "numerous Defendants' compensation was tied to [Goldman Sachs'] financial performance." (Compl. ¶ 115.)  The Complaint does not specify which Defendants supposedly received incentive-based compensation, or how such compensation was calculated.  In any event, the Second Circuit has made clear that "'incentive compensation can hardly be the basis on which an allegation of fraud is predicated.'"  *ECA* v. *JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009).

derivative Section 10(b) claim can lie where "the directors approved the stock repurchases while *knowing* about the alleged misstatements." *Citigroup*, 2009 WL 2610746, at *10 (because bank's stock repurchases "were approved by a majority of disinterested directors—and because those directors were, according to plaintiffs, fully informed of the facts underlying the alleged fraudulent statements—plaintiffs cannot show that the directors 'engaged in some form of deception'").  The exact same reasoning applies here.[10]

> **d.    The Director Defendants Do Not Face a Substantial Likelihood of Liability for Supposed Proxy Misstatements.**

Plaintiff claims that the Director Defendants violated Section 14(a) of the Exchange Act by making two categories of false statements in Goldman Sachs' proxy filings from 2016 to 2018. (Compl. ¶¶ 259-65.)  To state a Section 14(a) claim, a complaint must allege that "(1) a proxy statement contained a material misrepresentation or omission, which (2) caused [plaintiff's] injury, and (3) the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Bond Opportunity Fund* v. *Unilab Corp.*, 87 F. App'x 772, 773 (2d Cir. 2004).  Where, as here, "plaintiffs assert Section 14(a) claims

---

[10]    Of the six Board "acts" that Plaintiff asserts are subject to *Aronson*'s second prong (Compl. ¶¶ 197-200), only the Board's "approv[al] [of the] share repurchase" at supposedly "inflated prices" was actually an affirmative Board action (Compl. ¶ 197(f)).  The repurchase cannot excuse demand because it is unaccompanied by any particularized allegations that could overcome the presumption under the business judgment rule that the Board "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *Aronson*, 473 A.2d at 812.  Other than the Complaint's securities fraud allegations, which fail for the reasons discussed above, Plaintiff pleads "nothing that would explain how buying stock at the market price . . . could possibly be so one sided that no reasonable and ordinary business person would consider it adequate consideration." *Citigroup*, 964 A.2d at 137.  In any event, Delaware courts have held that where, as here, "an exculpatory charter provision exists," demand is excused as futile under *Aronson*'s second prong only if a plaintiff can plead that "a majority of the board faces a substantial likelihood of liability for non-exculpated claims," which Plaintiff has failed to do. *Lenois* v. *Lawal*, 2017 WL 5289611, at *14 (Del. Ch. Nov. 7, 2017).

-30-

grounded in alleged fraudulent conduct, they are subject to heightened pleading requirements [of the PSLRA and Rule 9(b)], even if they disclaim reliance on a fraud theory." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005).[11] But Plaintiff's Complaint does not even comport with Rule 8(a)'s notice pleading standard, much less plead "particularized allegations that, construed as true, would indicate a substantial likelihood of Section 14(a) liability," as required to establish demand futility. *In re Morgan Stanley Deriv. Litig.*, 542 F. Supp. 2d 317, 324 (S.D.N.Y. 2008).

*First*, as with its Section 10(b) claim, Plaintiff does little more than quote general descriptions of the Board's role in managing risk and then label those descriptions false because they allegedly "suggested that the Board maintained 'effective risk management,'" and did not disclose unspecified internal control failures related to 1MDB.  (Compl. ¶¶ 155-57, 163-65, 171-73.)  Similarly, the Complaint quotes general descriptions of Goldman Sachs' compensation policies and processes and then concludes that those descriptions were false because the Firm supposedly encouraged and rewarded "extreme risk taking and widespread illegal practices." (Compl. ¶¶ 158-61, 166-69, 174-77.)  Those generalities do not plead falsity.  (*See supra* at 26-28.)

Plaintiff also cannot recast its proxy misstatement theories as omissions claims.  Like Section 10(b), Section 14(a) "does not impose a duty to disclose uncharged, unadjudicated wrongdoing or mismanagement." *Ciresi* v. *Citicorp*, 782 F. Supp. 819, 823 (S.D.N.Y. 1991), *aff'd*, 956 F.2d 1161 (2d Cir. 1992); *see also In re Am. Express Co. S'holder Litig.*, 840 F. Supp. 260, 268 (S.D.N.Y. 1993) ("[T]he Second Circuit has consistently rejected attempts to 'dress up'

---

[11]     *See, e.g.*, Compl. ¶ 153 (Defendants "failed to disclose the 1MDB fraud"); Compl. ¶¶ 160, 168, 176 (statements regarding "compensation structures" were false because structures "actually encouraged . . . widespread illegal practices"); Compl. ¶ 263 (Defendants caused Goldman Sachs to "deceive[] its shareholders by making misleading statements").

mismanagement and breach of fiduciary duty claims 'in a § 14(a) suit of clothes.'"), *aff'd*, 39 F.3d 395 (2d Cir. 1994).  As to Plaintiff's allegation that the proxy statements did not disclose regulatory subpoenas or requests related to 1MDB (Compl. ¶¶ 156, 164, 172), Goldman Sachs *disclosed that very information* on June 30, 2016—*before* two of the three proxy statements Plaintiff challenges (Compl. ¶ 89).  The Complaint pleads no facts suggesting that the Firm should have done so earlier. In any event, even presuming some delay, "a government investigation, without more, does not trigger a generalized duty to disclose."  *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016) (no duty to disclose SEC subpoenas and Wells notices).

*Second*, Plaintiff does not claim that "'the economic harm that it suffered occurred as a result of the alleged misrepresentations,'" as required to plead loss causation.  *DCML LLC* v. *Danka Bus. Sys. PLC*, 2008 WL 5069528, at *2 (S.D.N.Y. Nov. 26, 2008).  In fact, the Complaint does not allege *any* economic loss caused by the purportedly false proxy statements, instead claiming only that they interfered with "proper governance," and caused shareholders to cast an advisory "vote[] in support of compensation" to Mr. Blankfein.  (Compl. ¶¶ 165, 169.)

*Third*, the Complaint fails to plead transaction causation, *i.e.*, that the purportedly false proxy statements were "an essential link in the accomplishment of the transaction" giving rise to this lawsuit.  *Bond Opportunity Fund*, 87 F. App'x at 773.  Plaintiff offers only vague allegations that the supposed misstatements induced shareholders to elect the Board and to provide advisory votes on Mr. Blankfein's compensation *without contesting those elections or votes*.  (Compl. ¶¶ 161, 169, 177); *see, e.g.*, *Fisher* v. *Kanas*, 467 F. Supp. 2d 275, 283 (E.D.N.Y. 2006) (allegations that proxy statements "misled shareholders by not providing them with the opportunity to consider [purportedly omitted information] in their voting decisions" insufficient where plaintiff

"does not seek to enjoin or nullify the results of the election").[12]

> **e.**   **Plaintiff's Insider Trading Claim Is Asserted Against Only Two Director Defendants and Is Deficiently Pled.**

Plaintiff's theory that Messrs. Blankfein, Solomon, and Viniar breached their fiduciary duties by selling Goldman Sachs stock while holding "proprietary, non-public information regarding the 1MDB fraud" fails for at least two reasons.  *First*, because this claim names only two directors (Messrs. Solomon and Viniar), it cannot create a substantial likelihood of liability for a majority of the Board, and thus is irrelevant to the question of demand excusal.  The Court's analysis can stop here.  *Second*, even if the Court were to look further at these allegations, they are wholly conclusory and do not plead a viable claim, much less establish a substantial likelihood of liability.  (Compl. ¶¶ 254-58.)

Plaintiff's boilerplate allegations that Messrs. Blankfein, Solomon, and Viniar sold Goldman Sachs stock "while in the possession of material, non-public information," and "knew or recklessly disregarded the unlawful practices detailed in this Complaint" fall far short of pleading with particularity either possession of material non-public information or scienter.  (Compl. ¶ 149.) "'Insider trading claims depend importantly on proof that the selling defendants acted with scienter,'" and will fail if a complaint's allegations "are conclusory and do nothing to show that [the defendants] were in possession of material nonpublic information when they sold their stock," *Taylor* v. *Kissner*, 893 F. Supp. 2d 659, 673 (D. Del. 2012), and that their trades were "motivated, in whole or in part, by the substance of that information," *In re Oracle Corp. Deriv. Litig.*, 867

---

[12]   The Complaint states in passing that Defendants made the purportedly false statements underlying Plaintiff's disclosure claims "[i]n breach of their fiduciary duties." (Compl. ¶ 114; *see* Compl. ¶ 153.)  Such drive-by allegations are insufficient to state a claim with the particularity required by Rule 23.1, and, in any event, Defendants had no duty to make the disclosures demanded by Plaintiff because "'a board is not required to engage in self-flagellation and draw legal conclusions implicating itself in a breach of fiduciary duty . . . prior to a formal adjudication of the matter.'"  *Loudon* v. *Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997).

A.2d 904, 934 (Del. Ch. 2004), *aff'd*, 872 A.2d 960 (Del. 2005).  The Complaint also does not

assert that "either the timing or the size of [Defendants'] stock sales were unusual relative to any

of these individuals' historical trading practices."  *Pirelli Armstrong Tire Corp. Retiree Med.*

*Benefits Tr.* v. *Lundgren*, 579 F. Supp. 2d 520, 535 (S.D.N.Y. 2008) (rejecting insider trading

allegations as basis for excusing demand).

> **f.     Plaintiff Cannot Plead Any Likelihood of Liability for Unjust**
> **Enrichment, Contribution, and Indemnification.**

Plaintiff bases its unjust enrichment and contribution and indemnification claims on the

same theories used to support its breach of fiduciary duty and disclosure claims.  (Compl. ¶¶ 230-

31, 239-40.)  Because Plaintiff cannot demonstrate a substantial likelihood of director liability for

any of its predicate claims, the Director Defendants do not face a substantial likelihood of liability

for unjust enrichment or contribution and indemnification either.  *See, e.g.*, *AIG*, 700 F. Supp. 2d

at 446 (dismissing unjust enrichment and contribution claims based on "failure [of predicate

claims] to satisfy the requirements of" Rule 23.1); *Goldman Sachs Mortg. Servicing*, 42 F. Supp.

3d at 487 (dismissing contribution and indemnification claims because plaintiffs "failed to

establish that demand is excused" for predicate claims).

## II.     THIS COURT SHOULD DISMISS THE COMPLAINT BECAUSE PLAINTIFF HAS FAILED TO STATE ANY CLAIM.

For essentially the same reasons discussed above, the Complaint also should be dismissed

under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

*First*, the Complaint fails to state any non-exculpated claim for breach of fiduciary duty

(Counts I, II, IV, and VII).  Under *Caremark*, pleading the conscious malfeasance necessary to

state a disloyalty claim requires well-founded allegations that Defendants "knew that internal

controls were inadequate, [and] that the inadequacies could leave room for illegal or materially

harmful behavior," yet "chose to do nothing."  *Desimone*, 924 A.2d at 940.  The Complaint does

not meet that demanding standard.  Nor does Plaintiff plead the "scienter" or "possession of material nonpublic information" necessary to show that Messrs. Blankfein, Solomon, or Viniar breached their fiduciary duties by trading Goldman Sachs stock.  *Taylor*, 893 F. Supp. 2d at 673.

*Second*, the Complaint does not plead any Exchange Act violations (Counts VI and VIII) with the particularity required by the PSLRA and Rule 9(b).  The Complaint does not adequately allege a single false statement, let alone scienter or reliance for Plaintiff's securities fraud claim.  (*See supra* at 25-30.)  And for Plaintiff's proxy misstatement claim, the Complaint also is devoid of particularized allegations of "economic harm" caused by the challenged proxy statements or that those statements were "an essential link in the accomplishment of the transaction" giving rise to this lawsuit.  (*See supra* at 30-33.)

*Finally*, because Plaintiff's claims for unjust enrichment and contribution and indemnification (Counts III and V) are based entirely on the Complaint's defective allegations that Defendants breached their fiduciary duties and committed disclosure violations, those claims also fail as a matter of law.  (*See supra* at 34.)

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint in its entirety and with prejudice.

Respectfully submitted,

/s/ *Sharon L. Nelles*

Sharon L. Nelles (*nelless@sullcrom.com*)
David M.J. Rein (*reind@sullcrom.com*)
Matthew A. Schwartz (*schwartzmatthew@sullcrom.com*)
Benjamin R. Walker (*walkerb@sullcrom.com*)
Julia A. Malkina (*malkinaj@sullcrom.com*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Counsel for Defendants Lloyd Blankfein, David M. Solomon, M. Michele Burns, Mark A. Flaherty, William W. George, James A. Johnson, Ellen J. Kullman, Lakshmi N. Mittal, Adebayo O. Ogunlesi, Peter Oppenheimer, David A. Viniar, and Mark O. Winkelman, and Nominal Defendant The Goldman Sachs Group, Inc.*

May 13, 2019