**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FULTON COUNTY EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of THE GOLDMAN SACHS GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> LLOYD BLANKFEIN, DAVID M. SOLOMON, M. MICHELE BURNS, MARK A. FLAHERTY, WILLIAM W. GEORGE, JAMES A. JOHNSON, ELLEN J. KULLMAN, LAKSHMI N. MITTAL, ADEBAYO O. OGUNLESI, PETER OPPENHEIMER, DAVID A. VINIAR, and MARK O. WINKELMAN, <br><br> Defendants, <br><br> and <br><br> THE GOLDMAN SACHS GROUP, INC., <br><br> Nominal Defendant. | Case No.: 1:19-cv-1562 (VSB) <br><br> JURY TRIAL DEMANDED |

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION..............................................................................1

II.   INTRODUCTION ........................................................................................2

III.  JURISDICTION AND VENUE.......................................................................9

IV.   PARTIES .....................................................................................................9

    A.    Plaintiff..............................................................................................9

    B.    Nominal Defendant............................................................................9

    C.    The Individual Defendants ...............................................................10

V.    THE 1MDB SCANDAL...............................................................................13

    A.    Background of Goldman and the Creation of the Business Standards
        Committee ........................................................................................13

    B.    Defendant Blankfein Lays the Groundwork for Goldman's 1MDB Deals...........20

    C.    "What the F**k is Going on With This?": Goldman's Nonfunctioning
        Internal Controls Fail to Heed a Series of Blatant Red Flags in Connection
        with the First 1MDB Bond Offering..................................................26

    D.    Goldman's Internal Controls Again Fail to Stop Illegal Activity and Detect
        Low's Involvement in Project Maximus.............................................35

    E.    Goldman's Internal Controls Fail to Stop Illegal Activity for the Third Time
        in Less Than a Year in 1MDB's Third and Largest Bond Offering ....................40

    F.    Defendants Fail to Act Despite Being Presented with Actual Evidence of
        Goldman's Broken Internal Controls .................................................47

        1.    The Federal Reserve's Scrutiny Should Have Prompted an Immediate
            Investigation by the Board ....................................................47

        2.    Despite Actual Knowledge of Goldman's Deficient Internal Controls
            and Federal Reserve Scrutiny, Blankfein Meets with Low for a Third
            Time as Goldman Continues to do Business with Him...........................49

        3.    Murders and Arrests Arising From the 1MDB Fallout Should Have
            Alerted Defendants to the Corruption at the Heart of 1MDB.................50

G.     The Massive Fallout From the 1MDB Scandal was Swift and Severe ................52

     1.     Defendants' Failure to Ensure that Goldman Had Effective Internal Controls and Compliance Functions Has Spawned Multiple Criminal, Civil, and Regulatory Actions ..............................................................52

     2.     Goldman's "Rogue Banker" Defense is Widely Ridiculed as Not Credible ..................................................................................61

     3.     Defendants' Misconduct Has Exposed Goldman to Widespread Condemnation and Billions of Dollars of Damages ................................67

H.     The Emerging Truth About Goldman's Role in the 1MDB Causes a Massive Decline in Goldman's Stock Price ......................................................71

VI.     THE DEFENDANTS VIOLATED SECTION 10(b) OF THE EXCHANGE ACT AND BREACHED THEIR FIDUCIARY DUTIES BY KNOWINGLY OR RECKLESSLY ISSUING MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD ..................................................72

A.     Defendants Caused Goldman Sachs to Conduct a Massive Stock Repurchase Program ......................................................................72

B.     In Connection with the Share Repurchases, Defendants Issued Materially False and Misleading Statements ......................................................75

     1.     False and Misleading Statements Regarding Goldman's Financial Results ....................................................................................75

     2.     False Statements Regarding Goldman's Risk Exposure and Risk Management ..............................................................................77

     3.     False Statements Regarding Goldman's Internal Controls ......................80

C.     In Repurchasing Stock, Goldman Relied on Defendants' False and Misleading Statements ..............................................................83

D.     Neither the Statutory "Safe Harbor" Nor the "Bespeaks Caution" Doctrines Apply to Defendants' Misrepresentations ............................................85

E.     Defendants' Misstatements and Omissions Damaged Goldman ..........................85

F.     Defendants Blankfein, Solomon, and Viniar Unlawfully Profited at Goldman's Expense by Selling Shares While in Possession of Non-Public Information .......86

VII.   THE DEFENDANTS VIOLATED SECTION 14(a) OF THE EXCHANGE ACT
AND SEC RULE 14a-9, AND BREACHED THEIR FIDUCIARY DUTIES BY
CAUSING THE COMPANY TO FILE MATERIALLY MISLEADING PROXY
STATEMENTS ................................................................................................... 90

    A.   Defendants Caused Goldman to Issue Materially False and Misleading
Statements in the 2016 Proxy ............................................................... 91

    B.   Defendants Caused Goldman to Issue Materially False and Misleading
Statements in the 2017 Proxy ............................................................... 95

    C.   Defendants Caused Goldman to Issue Materially False and Misleading
Statements in the 2018 Proxy ............................................................... 99

VIII.   ADDITIONAL DAMAGES TO GOLDMAN ........................................... 103

IX.   DEFENDANTS WERE OBLIGATED TO SAFEGUARD THE COMPANY'S
INTERESTS ..................................................................................................... 104

    A.   The Duties of All Defendants ........................................................... 104

    B.   The Board and its Committees Were Expressly Charged with Overseeing
and Monitoring Goldman's Compliance Function and Risk Exposure ............. 106

X.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS.................... 112

    A.   Demand is Excused Because the Defendants' Conduct Did Not Constitute a
Valid Exercise of Business Judgment ................................................. 113

    B.   Demand is Excused Because the Director Defendants Face a Substantial
Likelihood of Liability ....................................................................... 115

    C.   Demand is Futile Because the Directors are Financially Beholden to
Goldman ............................................................................................ 117

XI.   CLAIMS AGAINST DEFENDANTS ........................................................ 120

XII.   PRAYER FOR RELIEF .............................................................................. 129

XIII.   JURY DEMAND ........................................................................................ 130

## I.     NATURE OF THE ACTION

1.     Plaintiff Fulton County Employees' Retirement System ("Fulton County" or "Plaintiff"), a shareholder of The Goldman Sachs Group, Inc. ("Goldman" or the "Company"), brings this shareholder derivative action on behalf of Goldman against the Company's current and former officers and directors identified below (collectively, "Defendants"), arising from Defendants' breaches of fiduciary duties and violations of state and federal law from at least January 1, 2012 through the present (the "Relevant Period").[1]  In 2012 and 2013, Goldman raised $6.5 billion in three bond offerings for a Malaysian sovereign wealth fund that was nothing more than a fraudulent sham through which Malaysia's corrupt former prime minister and his associates looted the vast majority of the investment proceeds—a historic scandal that *The Wall Street Journal* called "one of the largest financial frauds in history."  Goldman arranged these offerings despite myriad prominent red flags that were utterly disregarded by the senior-most officers and directors of the Company.  After the scheme was revealed, the fallout was profound: two senior Goldman executives have been indicted or entered guilty pleas to date, and the Company faces numerous international investigations and legal proceedings, with potential liability exceeding $7 billion.  This action seeks to hold Defendants accountable for their conscious disregard of their oversight obligations, breaches of fiduciary duties and other misconduct related to Goldman's participation in this massive fraud that has significantly damaged the Company.

---

[1] While Goldman is named as a nominal defendant in this action, any reference to "Defendants" does not encompass the Company. Plaintiff, through its undersigned counsel, has conducted an investigation into the facts supporting the allegations in this Complaint, including a review of (i) filings by Goldman with the U.S. Securities and Exchange Commission ("SEC"); (ii) findings or allegations by government entities in connection with investigations and indictments of the misconduct in this action; (iii) investigative news articles; (iv) securities analysts' reports about Goldman; (v) wire and press releases; and (vi) additional information readily obtainable on the Internet.  Plaintiff believes that discovery will elicit further evidentiary support for its allegations.

## II.   **INTRODUCTION**

2.      1Malaysia Development Berhad ("1MDB") was a Malaysian government owned and controlled investment fund created in 2009 by former Prime Minister Najib Razak and his right-hand man Jho Low, ostensibly to attract foreign investment and development for the benefit of the Malaysian people.  As would be ultimately revealed, however, 1MDB was nothing more than a vehicle for unprecedented government corruption in which Najib, Low and their close associates—aided by senior Goldman executives—looted billions of dollars to fund lavish lifestyles, bribe government officials, rig an election, and imprison or murder opposition leaders. Indeed, a report posted on the Harvard Law School Forum on Corporate Governance and Financial Regulation stated that "1MDB isn't just one of the biggest financial crimes of the century; it is a crime against an entire country and a catastrophic human, social and political tragedy."

3.      From 1MDB's inception, Goldman's senior-most officers and directors were intimately involved with the fund and its management, including several in-person meetings with Najib and Low beginning in 2009 that were personally attended by former Goldman CEO and Chairman, Defendant Lloyd Blankfein, among others.  Shortly thereafter, the Company began providing financial advisory services to 1MDB, and on March 19, 2012, 1MDB engaged Goldman as the "sole bookrunner and arranger" for a $1.75 billion bond offering touted as "Asia's biggest" deal of its kind—the first of three such offerings, each raising more money than the last.

4.      The red flags regarding 1MDB, Najib and Low were both legion and present from the onset of Goldman's relationship with the fund.  Significantly, as early as 2010 and again during the Relevant Period, Goldman rejected Low as a private wealth management client, citing "significant adverse information" along with "questionable sources of wealth"—often tell-tale signs of criminal activity.  Indeed, Goldman's compliance department was adamant on multiple occasions that the bank had "zero appetite for a relationship with" Low and should not do business

2

with him.  Similarly, Najib faced intense public scrutiny for reportedly corrupt and kleptocratic practices that sparked one hundred thousand protesters to take to the streets in April 2012—just as Goldman was conducting the first bond offering—in the largest democratic protest in Malaysia's history.  In addition, the recent history of 1MDB at the time raised serious concerns.  In 2010, 1MDB fired its first auditor Ernst & Young ("E&Y") after it sought financial statements to verify the valuation and assets of a joint venture with a little-known company based in the British Virgin Islands.  That same year, multiple news reports questioned the propriety of 1MDB's financial dealings, including multiple criticisms that the fund relied on a "heavily leveraged business model" that was not "sustainable" and was "worrying."

5.     Moreover, the first bond offering was extraordinarily suspicious on its face.  First, Goldman structured the offering as essentially a private placement rather than a traditional bond offering, with Goldman purchasing the entire issue and then quickly selling it to investors that the Company had already lined up, thereby providing an immediate payday for 1MDB officials. Second, Goldman received an abnormally high fee of $192.5 million for the offering—a stunning 11% take that dwarfed the customary 0.5% fee and that, as a *Bloomberg* article stated, "***should have been a bright warning to its highest executives***."[2]  Third, Goldman obtained the engagement on a no-bid basis despite the fact that the Asian bond underwriting market was highly competitive, which strongly indicated that Goldman obtained the business through bribery or other malfeasance. Fourth, when Goldman asked investment bank Lazard to provide a valuation of power plants 1MDB was supposed to purchase with funds from the offering, Lazard refused because "***the deal smacked of political corruption***."  Fifth, the offering included a guarantee on the 1MDB debt from an Abu Dhabi government fund with ties to Low, even though Goldman's Middle Eastern

---

[2] Unless otherwise indicated, all emphasis has been added.

headquarters "***found the idea preposterous and declined to get involved***," and despite the fact that the managing director of the Abu Dhabi fund "had a reputation for taking kickbacks."

6.     Aside from the obvious warning signs prevalent in the deal itself, several high-ranking Goldman executives raised emphatic concerns regarding the legitimacy of 1MDB and the propriety of Goldman's involvement in the offering.  For instance, Alex Turnbull, a Singapore-based Goldman Vice President, stated that he emailed several Goldman executives saying, "***What the f\*\*k is going on with this? The pricing is nuts, what is the use of the funds?***"  In addition, David Ryan, President of Goldman in Asia, expressed serious concerns over the Company's excessive fee from the transaction, the viability of 1MDB's debt load and the inexperience of 1MDB's management in overseeing multi-billion-dollar investments.  These well-founded (and prescient) concerns were overruled by then-Goldman President Gary Cohn, who had pushed an internal Goldman mandate to "monetize the state"—that is, to capitalize on business deals with nations and sovereign wealth funds, especially those in emerging markets, to earn lucrative fees without U.S. regulatory restrictions.  The bond offering closed in May 2012, and almost immediately thereafter, Leissner, Ng and Low funneled millions of dollars to Prime Minister Najib and his associates, with nearly $577 million—more than one-third of the net proceeds—being diverted to a shell company to fund various bribes and other illicit activities.

7.     Shortly after the first bond offering closed, major international business publications contemporaneously and repeatedly criticized 1MDB, publicly highlighting the very red flags that Defendants consciously ignored.  For instance, a June 2012 *International Financing Review* article remarked that Goldman had turned 1MDB into "what appears to be a fee-printing machine," emphasizing that the offering was unjustifiably overpriced and questioning why the Abu Dhabi fund would be needed to guarantee the debt.  A July 2012 *Financial Times* article

similarly questioned the pricing of the deal and also asked "why an Abu Dhabi government investment fund would guarantee what is essentially Malaysian sovereign debt."

8.     Despite the litany of red flags plaguing 1MDB that were publicly reported at the time of the first offering, Goldman's senior officers and directors consciously disregarded the Company's widespread corporate governance deficiencies that enabled the deal.  This was a remarkable violation of their fiduciary duties, especially considering the Company's recent history of numerous catastrophic scandals and illegal behavior, including 34 major legal and regulatory actions that resulted in Goldman paying out nearly $10 billion in fines and settlements since 1998—including a $550 million penalty that Goldman paid in 2010 as a result of the infamous Abacus fraud, which at the time was the largest fine paid by a bank for misconduct arising from the Great Recession.  Defendants were thus well aware that a corrupt corporate culture festered throughout the Company during the Relevant Period, a culture that the U.S. Attorney for the Eastern District of New York later confirmed "***was highly focused on consummating deals, at times prioritizing this goal ahead of the proper operation of its compliance functions***."

9.     Following the Great Recession and these widely reported scandals, and in an effort to rehabilitate its reputation and appease regulator's scrutiny, Goldman instituted a new committee—the Business Standards Committee ("BSC")—to purportedly reform its business and compliance practices.  Beginning with the directors and senior management who set behavioral standards, the BSC instituted a series of key recommendations to mandate a "higher standard of care," ensure "reputational sensitivity and awareness," and increase "individual and collective accountability."  As the 1MDB fraud makes clear, however, these proclamations were nothing more than lip service.  Indeed, Goldman's central role in a fraud the magnitude of 1MDB—where (i) internal compliance and control systems could be easily overridden by senior management; (ii)

5

widely-reported red flags could be utterly ignored; (iii) a series of high-profile, highly abnormal deals featured obvious signs of criminal activity, including the fact that the key player in the 1MDB fraud was someone Goldman was supposedly prohibited from doing business with; and (iv) executives who emphatically voiced concerns regarding these issues could be ignored, stamped down or fired—could only occur if Goldman's compliance and governance systems were deficient or illusory, and if senior management and the Board were either utterly derelict in their primary oversight responsibilities or complicit in the scheme.

10.     Underscoring Defendants' oversight failures, following the completion of the first bond offering, Defendants allowed Goldman to double and then triple down on the 1MDB fraud, arranging two additional bond offerings over just a few months, the last of which came shortly before Malaysia's May 2013 national elections.  Goldman completed these offerings despite the same prominent red flags plaguing the deals and mounting public criticism regarding the deals. For instance, with regard to the second 1MDB offering, a June 2012 *International Financing Review* article noted that the deal was overpriced by nearly double, which directly contravened one of the key recommendations of the BSC—that Goldman ensure the offering was suitable for the Malaysian government and people.  With respect to the third 1MDB offering, a May 2013 *Financial Times* article emphasized that it was "highly unusual for the use of proceeds not to be spelt out in more detail," and that Goldman was "facing sharp criticism" for "the hurried nature of the deal" ahead of national elections.  In total, the three bond offerings raised $6.5 billion, over $3 billion of which were funneled to illicit bank accounts and shell companies belonging to Najib, Low and other corrupt Malaysian government and 1MDB officials, with hundreds of millions of dollars used to rig the May 2013 election in Najib's favor.

11.     By early 2014, the 1MDB offerings attracted the attention of the Federal Reserve, which warned Goldman about its inadequate vetting of the deals and questioned why 1MDB had issued such large bond offerings in the first place.  Yet, even facing intense scrutiny from the Company's primary U.S. regulator, Defendants took no action to investigate Goldman's involvement with 1MDB or to prevent further entanglements.  Instead, Defendants turned a blind eye to obviously deficient controls, promoted complicit senior executives, awarded other culpable executives tens of millions of dollars in golden parachutes, and allowed the Company to buy back its shares at inflated prices knowing of the impending risks of losses due to the 1MDB scandal.

12.     The 1MDB house of cards came crashing down soon thereafter.  In March 2016, Leissner—Goldman's lead banker on the 1MDB deals—was subpoenaed by the DOJ in connection to a probe linked to 1MDB.  That same year, two high-ranking Abu Dhabi officials connected to 1MDB were fired and arrested for their ties to 1MDB.  1MDB reportedly amassed $13 billion of debt as of April 2016 from the offerings and other transactions.  Former Prime Minister Najib lost his re-election bid in May 2018, ending a 61-year reign for his party.  Since Najib's election defeat, he has been arrested and hit with 38 charges related to the 1MDB scandal.  Low is on the run and is believed to be hiding in China.

13.     The full extent of Goldman's complicity in the 1MDB scandal became public in late 2018, when charges of conspiracy to commit money laundering and conspiracy to violate the Foreign Corrupt Practices Act in connection with 1MDB against Leissner and Ng were unsealed in the Eastern District of New York.  Leissner has pled guilty to the charges, admitting in his plea that he "conspired with other employees and agents of Goldman Sachs," and it was "very much in line of the culture of Goldman Sachs to conceal facts from certain compliance and legal employees."  Ng's indictment made clear that Goldman's "business culture" was "highly focused

on consummating deals, at times *prioritizing this goal ahead of the proper operation of its compliance functions*." The indictment further alleged that Goldman's "*system of internal accounting controls could be easily circumvented*." Days later, it was revealed that Defendant Blankfein was identified in an affidavit filed in support of Leissner's arrest warrant as personally meeting with the Prime Minister and others implicated in the 1MDB deals to discuss Goldman's business with them. Soon thereafter, Malaysia announced that it would seek a "full refund" of the fees Goldman earned from the offerings and for other damages, filing criminal charges against Goldman, Leissner and Ng.

14.     Defendants' utter disregard for the myriad red flags throughout the Relevant Period exposed Goldman to billions of dollars in potential liabilities. Indeed, the Malaysian government has instituted legal proceedings against Goldman seeking damages of $7.5 billion, and the Company is on the precipice of a criminal prosecution by various U.S. regulators and the Department of Justice. Based on myriad 1MDB red flags over the better part of a decade, a majority of the Goldman Board of Directors either knew or consciously disregarded that the 1MDB offerings were entirely corrupt. Defendants cast aside their fiduciary duties in the name of fees and profits, actively fostering a corporate culture that placed a premium on closing deals over compliance and condoning a system whereby Goldman's controls could be "easily circumvented." Indeed, with respect to the "criminal" bankers on the 1MDB deal, *Defendant Solomon has since admitted that Goldman "owns that, that's on us."*

15.     Defendants are liable to Goldman for breaches of their fiduciary duties, for liability under Sections 10(b) and 14(a) of the Securities Exchange Act of 1934, and other violations of state law. Accordingly, Defendants face a substantial likelihood of liability for their misconduct,

such that they cannot make an objective decision to bring claims for damages that they have caused to the Company.

## III.   JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

17.     Venue is proper in this Court because Goldman has its principal place of business in this District, Plaintiff's claims arose in this District, and Goldman has suffered and will continue to suffer harm in this District.

## IV.   PARTIES

### A.    Plaintiff

18.     Plaintiff Fulton County Employees' Retirement System ("Plaintiff" or "Fulton County") oversees all matters relating to the management and payment of pension and retirement benefits to all eligible employees of Fulton County, Georgia.  Fulton County is, and at all relevant times was, a shareholder of Nominal Defendant Goldman.

### B.    Nominal Defendant

19.     Nominal Defendant The Goldman Sachs Group, Inc. ("Goldman" or the "Company") is incorporated under the laws of Delaware and located within this District at 200 West Street, New York, New York, 10282.  Goldman is a leading global investment banking, securities, and investment management firm that specializes in providing a wide range of financial services to its clients.  Goldman is a bank holding company and a financial holding company regulated by the Board of Governors of the Federal Reserve System under the U.S. Bank Holding Company Act of 1956.

### C.    The Individual Defendants

20.    Defendant Lloyd C. Blankfein ("Blankfein") has served as senior chairman of Goldman Sachs since 2019, and chairman and chief executive from 2006 until the end of 2018. He was elected to the Board in 2003.  In fiscal year 2016 Goldman paid Blankfein $20,206,898 in total compensation; his base salary was $2 million.  In 2017, Blankfein's total compensation was $21,995,266; his base salary was unchanged at $2 million.   In 2018, Blankfein's total compensation was $23,390,658, and his base salary remained $2 million.

21.    Defendant David Solomon ("Solomon") is Chairman and Chief Executive Officer. In July 2018, Solomon was named CEO, succeeding Lloyd Blankfein as of October 1, 2018, and became chairman at the end of 2018. Prior to this, he was President and Chief Operating Officer from January 2017 to September 2018, and joint head of the investment banking division from July 2006 to December 2016, during the time of the 1MDB offerings. In 2017, Solomon's total compensation was $16,376,111.00; his base salary was $1,850,000.  In 2018, Solomon's total compensation was $20,662,835; his base salary was $1,887,500.

22.    Defendant M. Michele Burns ("Burns") has served as a Director at Goldman since 2011. Burns is also Chair of the Compensation Committee and a member of the Risk and Governance Committees.  From 2012 through 2018, Burns was awarded more than $4 million in fees, stock awards, and other compensation for her service on the Board.

23.    Defendant Mark Flaherty ("Flaherty") has served as a Director at Goldman since 2014. He also is a member of Audit, Governance and Risk Committees. From 2014 through 2018, Flaherty was awarded more than $2.3 million in fees, stock awards, and other compensation for his service on the Board.

24.    Defendant William W. George ("George") served as a Director at Goldman from 2002 until he retired from the Board in 2019. George served as Chair of the Public Responsibilities

Committee and was a member of the Compensation and Governance Committees. From 2012 through 2018, George was awarded more than $4 million in fees, stock awards, and other compensation for his service on the Board.

25.     Defendant James A. Johnson ("Johnson") served as a Director at Goldman from 1999 until he retired from the Board in 2019. He was a member of the Compensation, Governance, and Public Responsibilities Committees. From 2012 through 2018, Johnson was awarded more than $4 million in fees, stock awards, and other compensation for his service on the Board.

26.     Defendant Ellen Kullman ("Kullman") has served as a Director at Goldman since 2016. She serves as the Chair of the Public Responsibilities Committee and is a member of the Compensation and Governance Committees.  From 2016 through 2018, Kullman was awarded more than $1 million in fees, stock awards, and other compensation for her service on the Board.

27.     Defendant Lakshmi Mittal ("Mittal") has served as a Director at Goldman since 2008. He is also a member of the Compensation, Governance and, Public Responsibilities Committees. From 2012 through 2018, Mittal was awarded more than $3.8 million in fees, stock awards, and other compensation for his service on the Board.

28.     Defendant Adebayo Ogunlesi ("Ogunlesi") has served as a Director at Goldman since 2012. He is the Independent Lead Director, Chair of the Governance Committee, and is an ex-officio member of the Audit, Compensation, Public Responsibilities, and Risk Committees. From 2012 through 2018, Ogunlesi was awarded more than $3.7 million in fees, stock awards, and other compensation for his service on the Board.

29.     Defendant Peter Oppenheimer ("Oppenheimer") has served as a Director at Goldman since 2014. He also is the Chair of the Audit Committee and is a member of the

Governance and Risk Committees.  From 2014 through 2018, Oppenheimer was awarded more than $2.8 million in fees, stock awards, and other compensation for his service on the Board.

30.     Defendant David Viniar ("Viniar") has served as a Director at Goldman since 2013. He also is a member of the Risk Committee. He also served as Executive Vice President of Goldman and Chief Financial Officer from May 1999 - January 2013, and Head of Operations, Technology, Finance and Services Division from December 2002 - January 2013. Viniar was also Head of the Finance Division and Co-head of Credit Risk Management and Advisory and Firmwide Risk from December 2001 - December 2002 and Co-head of Operations, Finance and Resources from March 1999 - December 2001.  From 2013 through 2018, Viniar was awarded more than $3.4 million in fees, stock awards, and other compensation for his service on the Board.

31.     Defendant Mark Winkelman ("Winkelman") has served as a Director at Goldman since 2014. He also is the Chair of the Risk Committee and is a member of the Audit and Governance Committees. From 2014 through 2018, Winkelman was awarded more than $2.3 million in fees, stock awards, and other compensation for his service on the Board.

32.     Defendants Blankfein, Solomon, Burns, Flaherty, George, Johnson, Kullman, Mittal, Ogunlesi, Oppenheimer, Viniar, and Winkelman are collectively referred to herein as the "Individual Defendants."

33.     Defendants Solomon, Burns, Flaherty, George, Johnson, Kullman, Mittal, Ogunlesi, Oppenheimer, Viniar, and Winkelman are collectively referred to herein as the "Director Defendants."

34.     As members of Goldman's Board, the Director Defendants owed Goldman and its shareholders the duty to exercise due care and diligence in the management and administration of the affairs of the Company, including ensuring that Goldman operated in compliance with all

applicable federal and state laws, rules and regulations.  Director Defendants were and are required to act in furtherance of the best interests of Goldman and its shareholders so as to benefit all shareholders equally and not in furtherance of the Director Defendants' personal interest or benefit. Each Individual Defendant owes to Goldman and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

35.     Moreover, as explained in the Company's Proxies, Goldman's Board was "responsible for overseeing the risk management of our firm, which is carried out at the full Board as well as at each of its Committees."  "Effective risk management," the Proxies continued, "underpins everything that we do," and the Board's purported "focus on overseeing risk management enhances our directors' ability to provide insight and feedback to senior management, and if necessary, to challenge management, on our firm's strategic direction."

## V.     THE 1MDB SCANDAL

### A.     Background of Goldman and the Creation of the Business Standards Committee

36.     Goldman is a leading global investment banking, securities and investment management firm that provides a wide range of financial services to a client base that includes corporations, financial institutions, governments and individuals.  Goldman is divided into four main business segments: Investment Banking, Institutional Client Services, Investing & Lending and Investment Management.  Relevant here, Goldman's Investment Banking segment serves public and private sector clients around the world, providing financial advisory services and helping governments and companies raise capital, including through bond offerings.  According to Goldman's 2018 Annual Report, Goldman's total net revenues in 2018 exceeded $36 billion.

37.     In addition to being one of the world's leading financial institutions, Goldman is also one of the most controversial.  One recent report published by the non-profit, non-partisan think tank Better Markets found that between 1998 and 2018, Goldman was the subject of 34 major legal actions, resulting in over $9.8 billion in fines and settlements.[3]  Notably, during this period Goldman received $10 billion in TARP bailouts, in addition to another staggering $864.5 billion in non-TARP bailouts.[4]  By far the vast majority of these legal actions arose from corporate governance failures during the Great Recession and its aftermath—21 in total, resulting in Goldman paying over $9.5 billion in fines and settlements.[5]  These payouts include:

a.     A $5.06 billion settlement for Goldman's role in misleading investors in the course of packaging, securitization, marketing, sale, and issuance of mortgage bonds leading up to the 2008 Financial Crisis.[6]

b.     A $3.15 billion payment for securities law violations in connection with private label mortgage-backed securities purchased by Fannie Mae and Freddie Mac, to settle allegations that Goldman knowingly "unload[ed] low-quality mortgage bonds" on Fannie Mae and Freddie Mac in the run-up to the 2008 Financial Crisis.[7]

---

[3] Better Markets, "Wall Street's Six Biggest Bailed-Out Banks: Their RAP Sheets & Their Ongoing Crime Spree," at 5 (April 9, 2019) available at https://bettermarkets.com/sites/default/files/Better%20Markets%20-%20Wall%20Street%27s%20Six%20Biggest%20Bailed-Out%20Banks%20FINAL.pdf.

[4] *Id*. at 29.

[5] *Id*. at 12.

[6] Suzanne Barlyn, "Goldman Sachs to Pay $5 Billion in U.S. Justice Dept. Mortgage Bond Pact," *Reuters* (Apr. 11, 2016), available at https://www.reuters.com/article/us-goldman-sachs-mbs-settlement/goldman-sachs-to-pay-5-billion-in-u-s-justice-dept-mortgage-bond-pact-idUSKCN0X81TI.

[7] Nathaniel Popper, "Goldman to Pay $3.15 Billion to Settle Mortgage Claims," *The New York Times* (Aug. 22, 2014), available at https://dealbook.nytimes.com/2014/08/22/goldman-to-pay-3-15-billion-to-settle-mortgage-claims/.

      c.     A record (at the time) $550 million fine paid to the SEC to settle the infamous "Abacus" affair, in which it deliberately structured a born-to-lose mortgage investment product that *The Wall Street Journal* described as "one of the worst-performing mortgage deals of the housing crisis."[8]

38.     In response to multiple breakdowns in Goldman's internal controls and compliance functions during and after the Great Recession, in 2010, then-CEO and Chairman Blankfein announced that Goldman was in "need [of] a rigorous self-examination" and "must review our core principles."[9]  Blankfein explained that "there is a disconnect between how we view the firm and how the broader public perceives our roles and activities."[10]  As a result, Goldman announced that it was creating a Business Standards Committee (the "BSC") to "conduct an extensive review of our business standards and practices."  The Committee's mandate "was to "ensure that [Goldman's] business standards and practices are of the highest quality; that they meet or exceed the expectations of our clients, other stakeholders and regulators; and that they contribute to overall financial stability and economic opportunity."[11]  Blankfein explained that the BSC's mission was

---

[8] Aaron Lucchetti, "Abacus Deal: As Bad as They Come," *The Wall Street Journal* (Apr. 20, 2010) available at https://www.wsj.com/articles/SB10001424052748703757504575194521257607284.

[9] "Goldman Sachs to create a Standards Committee," *Crain's New York Business* (May 7, 2010), available at https://www.crainsnewyork.com/article/20100507/FREE/100509874/goldman-sachs-to-create-a-standards-committee.

[10] "Goldman Sets Up Business Standards Committee," *The New York Times* (May 14, 2010), available at https://dealbook.nytimes.com/2010/05/14/goldman-sets-up-its-business-standard-committee/.

[11] Goldman Sachs, "Report of the Business Standards Committee" at 1 (January 2011), available at https://www.goldmansachs.com/who-we-are/business-standards/committee-report/business-standards-committee-report-pdf.pdf.

"consistent with our obligation to ensure that our standards across our business activities are of the highest quality and represent the benchmark for our industry globally."[12]

39.     Following this "rigorous self-examination" and "review," in January 2011 the BSC released its Report (the "BSC Report").[13]   Goldman described the report as "the most extensive review of the firm's business standards and practices in the firm's 144 year history."[14]   Goldman conducted "an extensive review of our business standards and practices" that included "every major business, region and activity of the firm," and engaged two external consulting firms to "provide independent advice" to the BSC.[15]   The process operated under the oversight of a four-member Board committee chaired by Defendant George that met 13 times.  Other notable members of the BSC included Defendant David Solomon, Goldman's current CEO, and J. Michael Evans, the then-Chairman of Goldman Sachs Asia.  Lawyers from Sullivan & Cromwell acted as the BSC's outside counsel.

40.     The BSC Report noted that the Great Recession "has been a challenging period" for the Company, but that Goldman's "senior management and ***Board of Directors recognized this as an opportunity to engage in a thorough self-assessment and to consider how we can and should improve***."[16]   The BSC Report also reiterated that Goldman's "culture has been the

---

[12] "Goldman Sets Up Business Standards Committee," *The New York Times* (May 14, 2010), available   at   https://dealbook.nytimes.com/2010/05/14/goldman-sets-up-its-business-standard-committee/.

[13] Goldman Sachs, "Report of the Business Standards Committee" (January 2011), available at https://www.goldmansachs.com/who-we-are/business-standards/committee-report/business-standards-committee-report-pdf.pdf.

[14] Goldman Sachs, "Business Standards Committee Impact Report" at 3 (May 2013) ("BSC Impact Report"),   available   at   https://www.goldmansachs.com/our-firm/people-and-culture/bcs-report.pdf.

[15] BSC Report at 1.

[16] BSC Report at 1.

cornerstone of our performance for decades," and that the Company must maintain "a constant focus on the reputational consequences of every action we take."[17] "In particular," the Report proclaimed, "our approach must be: not just 'can we' undertake a given business activity, but 'should we.'"[18]

41.     Specifically, the BSC noted that "Goldman Sachs has one reputation.  It can be affected by any number of decisions and activities across the firm.  Every employee has an equal obligation to raise issues or concerns, no matter how small, to protect the firm's reputation."[19]  The BSC made several "key recommendations" to "ensure that our focus on our reputation is as grounded, consistent and pervasive as our focus on commercial success," including:

a.     "Implementing a comprehensive training and professional development program on our Business Principles, core client service values and role-specific client responsibilities";

b.     "***Strengthening our standards for the identification, review, approval and documentation of structured products*** and the framework for evaluating their suitability for various client segments";

c.     "***Implementing enhanced disclosure and origination standards for each business unit*** that is responsible for originating structured product securities";

d.     "Moving certain underwriting and origination activities from the Securities Division to the Financing Group in the Investment Banking Division, and ***implementing***

---

[17] *Id*. at 1-2.

[18] *Id*. at 2.

[19] *Id*. at 4.

*enhanced and consistent policies and procedures on disclosure, approval processes and other controls*"; and

e.    "***Updating and strengthening the Code of Business Conduct and Ethics and requiring employees to certify their compliance***."[20]

42.    The BSC also recommended that a Firmwide Suitability Committee be formed, which would report directly to the BSC, along with an Asia Suitability Committee that would report to the Firmwide Suitability Committee.[21]  The Firmwide Suitability Committee was tasked with the responsibility to oversee recommended changes to the way Goldman marketed and distributed its financial products,[22] with an emphasis on heightened standards of review of the products and services that Goldman offered clients, and accountability for those bankers involved in client transactions.

43.    For example, strategic transactions—which would include those such as 1MDB—would "be subject to heightened review and approval."[23]  This heightened review included ***"new due diligence procedures" such as multiple levels of review and analysis by both bankers on the deal and the Firmwide New Activity Committee*** of deal factors including (i) how losses or gains from the transaction could reasonably be expected to materially impact the client's financial position or have an adverse reputational impact on Goldman; (ii) whether the transaction is likely to have a material impact on the market; (iii) whether the transaction requires the approval of the client's CFO, CEO or Board of Directors; (iv) whether the transaction requires separate disclosure in the client's financial statements or will otherwise be disclosed through a public filing; or (v)

---

[20] *Id.* at 4-5.

[21] *Id.* at 47.

[22] *Id.* at 47.

[23] *Id.* at 29.

whether the transaction represents a large financing commitment by the client.[24]  These measures, the BSC Report explained, "reflect[] our objectives of strengthening client relationships and reputational excellence."[25]

44.    The BSC also focused heavily on ensuring that the products that Goldman was offering to its clients were suitable for them.  The BSC Report stated clearly that Goldman's "policies and procedures must take into account the client segments to which products and transactions are being distributed," explaining that "*[e]ven where the firm does not have any legal responsibility to evaluate the suitability of a structured product, we believe the firm should nonetheless conduct suitability reviews as part of our pre-transaction approval process*."[26]

45.    Importantly, the BSC also confirmed Goldman's commitment to the continued review of a transaction after it had closed, noting that "[p]osttransaction monitoring and follow-up will create greater sales force accountability, greater transparency to clients and a better client experience overall."[27]  Consequently, the BSC Report recommended that Goldman "establish processes to monitor relevant metrics" for clients after the transaction closed.  The BSC further recommended that "[s]ales managers will be responsible for reviewing the results of this monitoring and taking appropriate actions on relevant transactions," including "*a mechanism for escalating issues to sales leadership and the Credit, Legal and Compliance Departments*."[28]

46.    Moreover, the BSC recommended that each of Goldman's business units that originate securities products—such as the 1MDB bonds—be subject to "*consistent policies and*

---

[24] *Id*. at 29-30.

[25] *Id*. at 30.

[26] *Id*. at 30.

[27] *Id*. at 33.

[28] *Id*. at 33.

*standards, approval processes, disclosure requirements and oversight*."[29]  These new controls included that: (i) business units would be required to have written policies and procedures incorporating minimum disclosure standards; (ii) a firmwide transaction oversight committee would review and approve the policies and procedures governing origination activities of each business unit; and (iii) each business unit would be required to designate a business supervisor who is responsible for its origination activities and compliance with applicable policies and procedures.[30]

47.     Significantly, despite the critical need for Goldman to implement these necessary corporate governance reforms given the catastrophic failures of the past, the Company complied with none of these policies prior to facilitating the corrupt 1MDB deals.[31]

**B.     Defendant Blankfein Lays the Groundwork for Goldman's 1MDB Deals**

48.     Against this backdrop of the Board's renewed commitment to effective corporate governance and ensuring that Goldman maintained functioning controls and compliance systems, Goldman began eyeing overseas expansion.  In particular, Goldman looked to expand into the lucrative Asian markets where despite its renewed commitment to compliance, it would not be hindered by the regulations imposed in the U.S. in the wake of the Great Recession.  *CNBC* reported that within Goldman, this "dedication to Asian growth" was "spoken of in tones that

---

[29] *Id*. at 34.

[30] *Id*. at 34.

[31] BSC Impact Report at 2.

almost suggest a religious impulse."[32]  In 2010 alone, over one-quarter of Goldman's new partners were based in Asia.[33]

49.     At the same time, Goldman was seeking to do more deals with sovereign wealth funds in emerging markets. Spearheaded by Gary Cohn, Goldman's then-President and COO—and Defendant Blankfein's chief lieutenant—the strategy was described within Goldman as "monetizing the state."[34]  Cohn had set up a special cross-divisional unit within Goldman to "monetize" sovereign wealth funds by co-investing with them in private equity deals, devising hedging strategies, or—as in the case of 1MDB—raising capital.

50.     Defendants should have been particularly attuned to Goldman's work with foreign nations and sovereign wealth funds due to the heightened risk of violations of the Foreign Corrupt Practices Act—violations of which Ng has been charged with and to which Leissner has since pled guilty.  In its *Resource Guide to the U.S. Foreign Corrupt Practices Act*,[35] the DOJ Criminal Division and the SEC Enforcement Division explain that:

> *[C]ompliance begins with the board of directors* and senior executives setting the proper tone for the rest of the company. . . .  *A well-designed compliance program that is not enforced in good faith, such as when corporate management explicitly or implicitly encourages employees to engage in misconduct to achieve business objectives, will be ineffective*.  DOJ and SEC have often encountered companies with compliance programs that are strong on paper but that nevertheless have significant FCPA violations *because management has failed to effectively implement the program even in the face of obvious signs of corruption*.  This may

---

[32] John Carney, "The Banality of Goldman's Business Standards," *CNBC* (Jan. 12. 2011), available at https://www.cnbc.com/id/41040099.

[33] Katya Wachtel, "Goldman Sach's New Partners Show Exactly Where the Bank is Gazing: Asia," *Business Insider* (Nov. 19, 2010), available at https://www.businessinsider.com/new-goldman-partners-show-where-firm-is-looking-asia-2010-11.

[34] Tom Wright & Bradley Hope, *Billion Dollar Whale* (Hachette Book Group 2018) ("*Whale*") at 182.

[35] U.S. Dept. of Justice, Criminal Division & U.S. Securities and Exchange Commission, Enforcement Division, "A Resource Guide to the U.S. Foreign Corrupt Practices Act" available at https://www.justice.gov/sites/default/files/criminal-fraud/legacy/2015/01/16/guide.pdf.

be the result of aggressive sales staff preventing compliance personnel from doing their jobs effectively and of senior management, more concerned with securing a valuable business opportunity than enforcing a culture of compliance, siding with the sales team.  The higher the financial stakes of the transaction, the greater the temptation for management to choose profit over compliance.[36]

51.     The *Resource Guide* further explains that "both DOJ and SEC place a high premium on self-reporting, along with cooperation and remedial efforts, in determining the appropriate resolution of FCPA matters."[37]  Had Defendants ensured that Goldman's compliance programs were effective, the Board could have ensured that safeguards were in place to prevent Goldman's participation in the 1MDB scheme.

52.     Indeed, Malaysia in particular was notorious for its "institutionalized" corruption, prompting Transparency International to warn in 2012 that "[f]oreign companies looking to supply to the government have to be aware that they're likely to be asked for a bribe."[38]  Goldman's dual strategies of expanding its business into Asia and monetizing the state converged in 2009, when Goldman's then-Southeast Asia Chairman Tim Leissner was introduced to Malaysian financier Jho Low through Roger Ng, at the time a Goldman managing director.  Low was well-connected to politicians and the Malaysian elite, including to Malaysian Prime Minister Najib Razak and to the King, Mizan Zainal Abidin.  Abidin, who was also the Sultan of Terengganu (one of Malaysia's states), wanted to set up an investment fund to manage Terengganu's rich oil and gas wealth. Leissner met with Abidin and Low in early 2009, and secured Goldman a position to advise on the formation of 1MDB's predecessor, the Terengganu Investment Authority ("TIA").[39]  In February

---

[36] *Id.* at 57.

[37] *Id.* at 54.

[38] Jason Ng, "Malaysia Tops Bribery Table," *The Wall Street Journal* (Dec. 11, 2012), available at https://blogs.wsj.com/indonesiarealtime/2012/12/11/malaysia-tops-bribery-table/.

[39] *Whale* at 58.

2009, TIA raised approximately $1.4 billion, with Low working as a consultant with Leissner and Ng to complete this deal.   In July 2009, under orders from Prime Minister Najib and with Low's assistance, the Malaysian Ministry of Finance assumed control of TIA and changed its name to 1Malaysia Development Bhd., or 1MDB. The stated purpose of 1MDB was to pursue investment and development projects for the economic benefit of Malaysia and its people.

53.     From the beginning, Low's involvement raised massive red flags and should have been detected under any minimally functional system of internal controls.  Low has been described as the "Asian Great Gatsby," traveling the planet, dating supermodels and socialites, running up $160,000 bar tabs in Manhattan during Fashion Week, and spending $85 million in an eight-month period between October 2009 and June 2010, on high-stakes Las Vegas gambling, alcohol, and chartering private jets to pay Playboy Playmates and Hollywood celebrities to appear at parties.[40] Indeed, Leissner himself told friends that he considered Low to be a "dodgy" character.[41]

54.     In September 2009, after 1MDB was established, Ng referred Low for a private wealth management account with Goldman's private bank in Switzerland.  In an email copying Leissner, Ng told a private banker at Goldman's Swiss office that Low was "currently our partner in a lot of transactions in [M]alaysia.  Largely the mid-east and [M]alaysia rationship [sic]."[42]  As part of the "onboarding" process, Goldman's compliance personnel reviewed Low's finances and raised questions about the lack of verification regarding the sources of his wealth.[43]  ***Ultimately,***

---

[40] Larry Getlen, "'I Own You! You're my Bitch': Jho Low's Hollywood Power Play" *New York Post* (Sep. 15, 2018), available at https://nypost.com/2018/09/15/i-own-you-youre-my-bitch-jho-lows-hollywood-power-play/.

[41] *Whale* at 50.

[42] *United States v. Leissner*, No. 18-cr-439 (E.D.N.Y.), Complaint and Affidavit in Support of an Application for an Arrest Warrant (Oct. 3, 2018) ("*Leissner* Affidavit") ¶35(a).

[43] *Id.*

*Goldman's Compliance Group refused to approve Low's application based, in part, on unresolved questions concerning the source of his wealth and negative news coverage of his lavish spending.*[44]

55.     By November 2009, news of Low's exploits and questions regarding the source of his wealth were being openly circulated within Goldman.  On November 9, a Goldman banker emailed a *New York Post* article to Leissner and Ng, which noted Low's extravagant spending at New York clubs and stated that "when *The Post* interviewed Malaysian experts at such think tank [sic] as the Council on Foreign Relations, no one had ever heard of [Low] . . . Speculation is brewing over where [Low] is getting his money from."[45]

56.     Nevertheless, on November 22, 2009—ignoring the massive red flags about the source of Low's money that Goldman's own Compliance Group had raised barely two months earlier—*Defendant Blankfein met personally with Low and Prime Minister Najib at the Four Seasons in New York*.  The meeting, set up by Leissner and Ng, was ostensibly to discuss potential deals between Goldman and 1MDB.  Indeed, in an email sent to Leissner, Ng, and others that day, Low set out an agenda for the meeting, which included a "debrief" with Malaysian officials, including Prime Minister Najib and the "1mdb boys."[46]  *Bloomberg* reported that this "high-level gathering laid the groundwork" for the three 1MDB bond offerings.[47]

---

[44] *Id.*

[45] Brian Niemietz, "Big-spending Malaysian is the Mystery Man of City Club Scene" *New York Post* (Nov. 8, 2009), available at https://nypost.com/2009/11/08/big-spending-malaysian-is-the-mystery-man-of-city-club-scene/.

[46] Sridhar Natarajan, "Lloyd Blankfein Was the Unidentified Goldman Executive Present at 2009 1MDB Meeting," *Bloomberg* (Nov. 8, 2018), available at https://www.bloomberg.com/news/articles/2018-11-08/blankfein-said-to-be-in-09-1mdb-meeting-set-up-by-leissner-low.

[47] *Id.*

57.     Goldman employees continued to work with Low in spite of these red flags, following Blankfein's lead and hopeful that exploiting Low's connections to Prime Minister Najib would result in lucrative business for the Company.  For example, in January 2011, Goldman worked with Low on a deal known as Project Gold, in which a private equity firm controlled by Low sought to acquire the assets of a private gold mining company in Kazakhstan.  Goldman's Intelligence Group reviewed the entities and persons involved in the transaction and, upon learning that Low controlled the private equity firm, the Intelligence Group emailed Leissner expressing its concern over Low's control.[48]  Following this response, the Project Gold deal team informed the Intelligence Group that Goldman would instead advise a different private equity firm on the transaction.  Notably, however, the second firm was still controlled by Low.  Upon learning of this fact, the head of Goldman's Intelligence Group in Asia described the new arrangement as "even more problematic."[49]

58.     Shortly thereafter, in March 2011, Leissner again referred Low for a private wealth management account at Goldman—this time, with the Company's Singapore office.  Goldman initiated a "high priority" background check on Low, who was again denied.  In connection with this second attempt, a compliance employee wrote that "***we have pretty much zero appetite for a relationship with this individual***."[50]  Another compliance employee further explained to a Goldman private banker that Low "was reviewed by both my EMEA [Europe, Middle East, and Africa] counterpart and [the Intelligence Group] team, and it was concluded that no business will

---

[48] *Leissner* Affidavit ¶35(b).

[49] Greg Farrell, "Mystery Goldman Exec at 1MDB Meeting Signals New Woes for Bank," *Bloomberg* (Nov. 2, 2018), available at https://www.bloomberg.com/news/articles/2018-11-02/mystery-goldman-exec-at-1mdb-meeting-signals-new-woes-for-bank.

[50] *Leissner* Affidavit ¶35(c).

be allowed due to ***significant adverse information and questionable source of wealth***.  Please be informed that we do not recommend onboarding this client in PWM Singapore."[51]

59.     Notwithstanding the concerns raised by various Goldman units—including the Intelligence Group, two private wealth management divisions, and multiple senior Goldman bankers—and instructions to not do business with Low due to significant questions concerning the corrupt nature of his finances, Low nevertheless worked hand-in-hand with multiple senior Goldman bankers to complete the 1MDB bond offerings.  Defendants failed to ensure that Goldman had effective and functioning controls in place to verify that Goldman bankers followed these warnings and prevented them from doing business with Low.  Indeed, Defendants failed to institute a Board-level compliance system that would have informed ***them*** of individuals surrounded by red flags, like Low, with whom Goldman should sever ties.  Defendants' failure to ensure that these systems were functioning effectively and properly essentially left Goldman with no controls at all.

    **C.**    **"What the F\*\*k is Going on With This?": Goldman's Nonfunctioning Internal Controls Fail to Heed a Series of Blatant Red Flags in Connection with the First 1MDB Bond Offering**

60.     On March 19, 2012, 1MDB engaged Goldman through its Singapore office—***the same office that had rejected Low as a private wealth management client because of concerns about his honesty and integrity***—as the sole bookrunner and arranger for a bond issuance to raise funds for 1MDB's anticipated acquisition of Malaysian power production company Tanjong Energy.  Within Goldman, this bond deal was referred to by the name Project Magnolia.  On its

---

[51] *Id.*

face, the bond offering, touted as "Asia's biggest sole-led dollar-bond sale ex-Japan,"[52] raised myriad red flags, any of which would have been detected by a functioning system of internal controls and compliance systems, and any of which should have immediately brought the deal to a grinding halt.

61.    <u>First</u>, the presence of Low by itself was a major red flag that should have caused Goldman to immediately abandon the deal—indeed, in its own words, Goldman acknowledged that it had "zero appetite"[53] for any relationship with him and that the bank should not do business with him.[54]  But rather than stop the deal in its tracks, Gary Cohn's mandate to "monetize the state" instead "allowed Leissner, Ng, and others to push Project Magnolia to completion despite Low's inextricable intertwinement with the offering.[55]  Emails—a simple search of which would have immediately revealed Low's involvement—obtained from Goldman pursuant to valid search warrants revealed that, during the course of Project Magnolia, Leissner and Ng met with Low on several occasions.

62.    For example, by early March 2012, Goldman's Intelligence Group had initiated a compliance review of Project Magnolia.  As part of that review, on March 27, 2012, **one Goldman executive acknowledged in an email that Low was a "1MDB Operator or intermediary in Malaysia**."[56]  On April 4, 2012, the Capital and Suitability Committee reviewed the deal in a firm-

---

[52] Jonathan Rogers, "Goldman Ruffling Feathers in Asian Debt," *International Financing Review* (June 2, 2012), available at http://www.ifre.com/goldman-ruffling-feathers-in-asian-debt/21021716.fullarticle.

[53] *Leissner* Affidavit ¶35(c).

[54] "Goldman Sachs and the 1MDB Scandal," *Harvard Law School Forum on Corporate Governance and financial Regulation* (May 14, 2019), available at https://corpgov.law.harvard.edu/2019/05/14/goldman-sachs-and-the-1mdb-scandal/.

[55] *Whale* at 182.

[56] *Id.*

wide meeting.  ***During this meeting, Leissner informed the Global Co-Head of the Intelligence Group that Low was present for a March 5 meeting in Abu Dhabi with IPIC, an Abu Dhabi government investment fund which would guarantee the bond***.[57]  The Intelligence Group failed to investigate the contact with Low any further—despite the red flags associated with Low's two failed attempts to become a private wealth management client and his involvement with Project Gold—instead simply concluding that Goldman "should ask that any payments from any of participants to any intermediaries are declared and transparent."[58]  By early April, news of Low's involvement in the 1MDB deals had spread outside of the Intelligence Group and the Capital and Suitability Committee.  In an email dated April 3, 2012, a Goldman employee noted "that Jho Low is also known to have close friends/contacts in Abu Dhabi." Later that day, another Goldman employee wrote in response that "Low was present when [Leissner] met . . . [the] Chairman of IPIC, in Abu Dhabi."  The fact that neither committee killed the deal despite actual knowledge of Low's involvement demonstrates that Goldman's internal controls and compliance systems were irreparably broken.

63.  <u>Second</u>, further cementing the brokenness of Goldman's internal controls and compliance systems, several senior Goldman bankers spoke out against Project Magnolia.  But despite the existence of committees and purported means to escalate matters to compliance, ***these senior bankers were silenced at the behest of Gary Cohn, whose domineering and powerful personality—not only as Goldman's President and COO, but also as Blankfein's trusted lieutenant—"afforded significant cover" to Leissner, Ng, and others involved in 1MDB, and***

---

[57] *Leissner* Affidavit ¶41(d).

[58] *Id*. at ¶41(e).

*"drowned out the voices of those who were uncomfortable" with the deal*,[59] with those who spoke out against the bonds eventually being forced out of Goldman.  For example, David Ryan, President of Goldman in Asia (and Leissner's superior), had visited with 1MDB's staff in Malaysia and came away with concerns over 1MDB's plans to take on so much debt and the inexperience of its management, who had not previously overseen multi-billion-dollar investments.[60]  Ryan also considered Goldman's fee from the transaction to be excessive.

64.     Alex Turnbull, a Singapore-based Vice President in Goldman's special situations unit (and whose father, Malcolm Turnbull, would later become Australia's Prime Minister), also raised concerns internally.  Notably, Turnbull was not even involved in the deal, but his knowledge of how bond markets worked caused him to email colleagues expressing disbelief about Goldman's profits.  Turnbull recalled:

> When the 1MDB deal was done with Goldman I sent an email to some of my colleagues saying, '*What the f\*\*k is going on with this? The pricing is nuts, what is the use of the funds?*' . . .  *And I got a talking-to by compliance*.[61]

65.     Turnbull's email led to a reprimand from Goldman's compliance department—not an investigation as would occur with a functioning system of internal controls—resulting in Turnbull's boss chiding him to remain quiet if he wanted a promotion.[62]  Turnbull later recounted:

> My comments were a penetrating glimpse of the obvious and the concerns I expressed were widely shared by the market participants at the time . . . .  *I called out the insane pricing and bizarre structure at GS when the deal was done and*

---

[59] *Whale* at 182.

[60] *Id.* at 183.

[61] Jamie Smyth & Don Weinland, "Australia PM's Son Says Goldman Sidelined Him After 1MDB Warnings," *Financial Times* (March 8, 2018), available at https://www.ft.com/content/cb0fbf5c-2284-11e8-9a70-08f715791301.

[62] *Id.*

*got yelled at by compliance for casting doubt on the integrity of PFI, the group that did the deal* . . . . As a result, I was 'B-tracked' and resigned.[63]

66.     The fact that multiple senior employees were overruled at the behest of Goldman's highest executives, reprimanded by the compliance department, side-tracked, and eventually forced out of Goldman for voicing well-founded concerns into the obviously corrupt 1MDB offering is glaring evidence that Defendants utterly failed to implement effective internal controls. Indeed, any minimally functioning compliance system would have *required such facts to be brought to the Board's attention*, so that the Board would be informed when multiple employees voicing similar concerns were overruled by senior executives improperly exerting their influence to corrupt the normal review process and sacrifice compliance for profits.

67.     Third, *the $1.75 billion 10-year bond was essentially a private placement*. Goldman structured the deal such that Goldman itself bought the entire issue, which it would then quickly sell to investors it had already lined up in South Korea, China, and the Philippines.  In addition to causing Goldman to take on all of the risk of the $1.75 billion deal, this structure was suspicious because it would result in an immediate payday for Low and other corrupt 1MDB officials.

68.     Fourth, the bond issuance was expensive and mispriced, at 425 basis points over 10-year Treasuries, and a yield just short of 6%.  But comparable oil and energy sector bonds in Asia at that time carried a spread of just 215 basis points over 10-year Treasuries.  Thus, Malaysia would have to pay over 2% more on these bonds as compared to similar debt.

---

[63] Aaron Patrick, "Alex Turnbull's 1MDB Complaints About Goldman Sachs Look Prescient," *Financial Review*, (July 11, 2018), available at https://www.afr.com/markets/market-data/world-markets/alex-turnbulls-1mdb-complaints-about-goldman-sachs-look-prescient-20180710-h12gxa.

69.     Fifth, *Goldman received an abnormal and grossly excessive fee for underwriting the 1MDB bond offering*.  Specifically, 1MDB agreed to pay Goldman: (a) a fee of 1% of the principal amount of the notes, or $17.5 million, as an "arranger fee," and (b) $175 million as a "commission," for a total of approximately $192.5 million.  These fees amounted to roughly 11% of the principal amount of the offering and were to be deducted directly from the subscription proceeds of the bonds.  These fees dwarfed a typical Malaysian investment grade bond deal, which *Bloomberg* explained typically "compare with half a percentage point for underwriting a typical Malaysian investment-grade bond deal, one percentage point for high-yield and mere basis points for government debt."[64]

70.     Sixth, that Goldman received the lucrative 1MDB business on a no-bid basis at such high fee rates in the highly competitive Asian bond underwriting market raised obvious red flags as to whether Goldman obtained the business through bribery or other malfeasance.  *Bloomberg* explained that it was "well-known that Asian governments are loath to pay fees" and that when banks underwrite bonds in some Asian countries, those banks routinely complain of zero fees on government bond and stock sales.[65]  According to *The Wall Street Journal*, "[b]anks that agree to arrange bond offerings for ultralow fees are generally hoping to build relationships with corporate clients for future deals. They are also hoping to generate revenue from related businesses, such as fees for setting up foreign-currency swaps or on bond-trading commissions."[66]

---

[64] Nisha Gopalan, "Rogue Bankers Don't Explain Goldman's 1MDB Mess," *Bloomberg* (Dec. 21, 2018), available at https://www.washingtonpost.com/business/rogue-bankers-dont-explain-goldmans-1mdb-mess/2018/12/21/514b593e-050e-11e9-958c-0a601226ff6b_story.html.

[65] *Id.*

[66] Manju Dalal, "The New Floor for Bond Underwriting Fees: $1," *The Wall Street Journal* (Jan. 3, 2018), available at https://www.wsj.com/articles/the-new-floor-for-bond-underwriting-fees-1-1514973603.

71.     Seventh, the fact that the bond offering was in essence privately placed *ensured that the deal's pricing and fees remained concealed from the public*.  Indeed, one Goldman employee was told to keep all correspondence about the bond off of email, because if word got out that Goldman already had investors lined up in South Korea, China, and the Philippines, its profits would not appear to be justified.[67]  Had the deal been canvassed to a broad base of investors in a public offering, syndicate bankers would find the optimum price point at which the deal could be successfully placed, while secondary trading would lower an issuer's implied cost of funding.

72.     Eighth, as part of the deal, 1MDB obtained a guarantee on the debt from IPIC, an Abu Dhabi government investment fund, which enabled the bond to receive a rating of Aa3 from Moody's.  IPIC typically invests in multi-billion-dollar acquisitions and stakes in global companies, and observers at the time wondered why IPIC would be interested in the fee from guaranteeing another sovereign wealth fund, which is typically modest.  Indeed, *Leissner's own colleagues at Goldman's Middle Eastern headquarters in Dubai—who did regular business with IPIC—"found the idea preposterous and declined to get involved."*[68] IPIC's own finance director raised questions as to why IPIC was involving itself in the deal but was outranked.[69]  As detailed below, IPIC ultimately guaranteed the debt because Leissner, Ng, and Low directed massive bribes to IPIC officials.  In fact, IPIC Managing Director Khadem al-Qubaisi "had a reputation for taking kickbacks on deals, making him incredibly rich,"[70] which should have been apparent through routine due diligence.

---

[67] *Whale* at 186.

[68] *Id.* at 177.

[69] *Id.* at 177.

[70] *Id.* at 178.

73.   <u>Ninth</u>, Leissner had asked investment bank Lazard Ltd. for an independent valuation of the Tanjong Energy power plants (i.e., certain of the assets that were to be purchased by the money raised in the offering) before the deal closed—and Lazard specifically told Goldman that the deal "smacked of political corruption."  According to *The Wall Street Journal*:

> ***Lazard declined, saying it believed 1MDB was overpaying and that the deal smacked of political corruption***. Goldman stepped in and said the plants were worth what 1MDB was paying. 1MDB soon wrote down the power plants by $400 million, and the owner of the plants donated $170 million to 1MDB's charity arm, which Prime Minister Najib Razak used as a political slush fund.[71]

74.   <u>Tenth</u>, any reasonable due diligence should have made Goldman aware of 1MDB's shoddy finances and shady debt financing transactions.  As early as September 2010, Malaysian bankers—including the country's former Finance Minister—sounded alarms that the "the fund's heavily leveraged business model" was "worrying."[72]  In particular, 1MDB reported profits of approximately $100 million in its first year of operations, despite the fact that its only investment was a $1 billion joint venture with PetroSaudi, a mysterious British Virgin Islands-based entity that reportedly had oil and gas interests in the Caspian Sea.[73]

75.   Indeed, 1MDB's own external auditor at the time, E&Y, raised serious issues regarding 1MDB's financial stability.  In early 2010, E&Y sought financial statements from the

---

[71] Tom Wright, "Goldman Sachs ignored 1MDB Warning Signs in Pursuit of Asian Business," *The Wall Street Journal* (Dec. 17, 2018), available at https://www.wsj.com/articles/goldman-sachs-ignored-1mdb-warning-signs-in-pursuit-of-asian-business-11545088802.

[72] Leslie Lopez, "KL Fund's New Loans Plan Raises Eyebrows," *The Straits Times* (Singapore) (Sep. 30, 2010), available at https://www.straitstimes.com/asia/se-asia/kl-funds-new-loans-plan-raises-eyebrows.

[73] Leslie Lopez, "The Big Gamble: Secretive Malaysian Fund Stirs Controversy at Home and Abroad," *Edge Review* (Jul. 25. 2013), available at https://2014.sopawards.com/wp-content/uploads/2014/05/The-Big-Gamble.pdf; Leslie Lopez, "KL Fund's New Loans Plan Raises Eyebrows," *The Straits Times* (Singapore) (Sep. 30, 2010), available at https://www.straitstimes.com/asia/se-asia/kl-funds-new-loans-plan-raises-eyebrows

PetroSaudi joint venture so that it could determine asset ownership and value the assets, shares, and liabilities of this venture.[74]  E&Y then met with 1MDB's Board of Directors on April 5, 2010 to ask for additional information.  Rather than providing that information, 1MDB's Board terminated E&Y without the firm having signed off on the financial statements.[75]  To replace E&Y, 1MDB hired KPMG.  KPMG, however, was sufficiently concerned about the documents that for the 2010 financial year, it issued an "Emphasis of Matter"—defined as a "fundamental uncertaint[y] that could have an adverse impact on a company in the future."[76] This Emphasis of Matter has been described as "a very lukewarm approval of the fund's financial stability" to "anyone following closely"—as Goldman should have been.[77]

76.    Despite this spectacle of red flags, Project Magnolia closed on May 21, 2012.  Had Project Magnolia been subject to any modicum of due diligence—let alone the heightened standards mandated by the BSC Report—Project Magnolia would have been dead on arrival. Indeed, the fact that bankers who spoke out against the deal were actively silenced not only cements the nonfunctioning status of the internal controls, but it also puts to rest any notion that these deals were done in secret and headed by a banker who had gone rogue.

77.    As a result of the complete failure of Goldman's internal controls, nearly $577 million—a sum equivalent to more than one-third of the net proceeds of the Project Magnolia bond offering—was diverted to a shell company (Aabar-BVI) immediately after 1MDB received the

---

[74] Wong Wei-Shen, "PAC Notes 1MDB Changed Auditors Twice in 4 Years," *The Star* (Apr. 8, 2016), available at https://www.thestar.com.my/business/business-news/2016/04/08/pac-notes-1mdb-auditor-changes/.

[75] *Id.*

[76] Leslie Lopez, "The Big Gamble: Secretive Malaysian Fund Stirs Controversy at Home and Abroad," *Edge Review* (Jul. 25, 2013), available at https://2014.sopawards.com/wp-content/uploads/2014/05/The-Big-Gamble.pdf.

[77] *Whale*, at 145-46.

proceeds of the bond offering.[78]  That shell company distributed the funds to officials of IPIC, 1MDB and others.[79]  As just one example of the misappropriation of these funds, one official, Riza Shahriz Bin Abdul Aziz, a relative of Prime Minister Najib and a friend of Low, purchased luxury real estate in the United States and the United Kingdom and funded his movie production company, Red Granite Pictures, which was a producer of the 2013 movie *The Wolf of Wall Street*.

78.     Remarkably, *The Wall Street Journal* later reported that Project Magnolia earned Goldman's highest internal prize, the Michael P. Mortara Award.  The selection committee for the prize congratulated bankers in four Goldman divisions for "solving an important client's problem through outstanding firmwide cooperation."[80]

### D.     Goldman's Internal Controls Again Fail to Stop Illegal Activity and Detect Low's Involvement in Project Maximus

79.     On May 21, 2012, before the ink was even dry on the Project Magnolia deal, Leissner informed a colleague at Goldman that 1MDB had retained Goldman on a no-bid basis as an advisor on a second bond deal with 1MDB.  Known internally as Project Maximus, the second bond offering was designed to raise approximately $1.75 billion for 1MDB and resulted in substantial revenues and other fees for Goldman.

80.     Project Maximus was beset by the same red flags that surrounded Project Magnolia, including the inextricable involvement of Low and the opaque structuring of the deal designed to facilitate illegal bribes and kickbacks.  In addition, Goldman was confronted with several red flags

---

[78] *Leissner* Affidavit ¶45.

[79] *Id*. at ¶¶46-49.

[80] Tom Wright & Liz Hoffman, "Goldman Sachs Ignored 1MDB Warning Signs in Pursuit of Asian Business, *The Wall Street Journal* (Dec. 17, 2018), available at https://www.wsj.com/articles/goldman-sachs-ignored-1mdb-warning-signs-in-pursuit-of-asian-business-11545088802.

that were unique to Project Maximus.  Had Defendants ensured that Goldman's internal controls and compliance systems were functioning properly, these red flags would have been detected, and Project Maximus would have been killed.

81.     First, senior Goldman bankers again spoke out criticizing the deal.  For example, David Ryan, the President of Goldman's Asian operations, argued that Goldman should lower its fee on this bond, given how easy it had been to sell the first bond.[81]  After speaking out Ryan was effectively sidelined on Project Maximus at the behest of Gary Cohn.

82.     Second, to fill the hole of those pushed out due to their criticism of the deal, Goldman brought in a fixer to ensure that deal was consummated.  Specifically, Goldman rehired Mark Schwartz as the new Chairman in Asia to see the deal through.  Schwartz, whose position was senior to that of Ryan's, was a proponent of the 1MDB business.[82]  Schwartz had previously left Goldman in 2002, spending the intervening decade running investment firms with noted convicted felons Raj Rajaratnam and Rajat Gupta—the latter of whom was one of Goldman's directors until 2010.[83]  Schwartz later resigned after news broke that Leissner was subpoenaed.[84]

83.     Third, while Goldman's work on Project Maximus was ongoing, the 1MDB deals were so suspicious **on their face** that they attracted the attention of some of the world's most respected financial publications, which began publicly questioning and criticizing the work that Goldman was doing for 1MDB.  For example, on June 2, 2012, Thomson Reuters' *International*

---

[81] *Leissner* Affidavit ¶¶46-49.

[82] *Whale* at 189.

[83] Susanne Craig, "The Return of Goldman's Mark Schwartz," *The New York Times* (June 12, 2012), available at https://dealbook.nytimes.com/2012/06/12/the-return-of-goldmans-mark-schwartz/.

[84] "Goldman Sachs Asia Chairman to Step Down," *Malay Mail* (Oct. 18, 2016), available at https://www.malaymail.com/news/money/2016/10/18/goldman-sachs-asia-chairman-to-step-down/1229821.

*Financing Review* proclaimed that the "putative tentacles" of Goldman's infamous "vampire squid wrapped around the face of humanity" were "rather extensively and firmly engaged" in the Malaysian government.[85]  The article noted that other banks "have been cheesed off by the cosy [sic] relationship Goldman enjoys with the Malaysian government, and the "***metamorphosis***" of 1MDB from a sovereign wealth fund into "***what appears to be a fee-printing machine***" for Goldman.

84.    The *International Financing Review* further criticized the shady, private structure of the first 1MDB deal, including the IPIC guarantee, noting that "[a] public deal would also have meant more clarity on pricing and fees."  Indeed, the article pointed out that the deal was unjustifiably priced over 215 basis points higher—almost double—than it should have been, which directly contravened the BSC Report's key recommendation for a "suitability review" to ensure that the product was suitable for the Malaysian government and people.  The secretive nature of the deal was especially troubling because, as the article noted, at the time "[i]t was the biggest sole-led bond deal ever printed in ex-Japan Asia."

85.    A month later, on July 2, 2012—again, while Goldman was in the midst of working on Project Maximus—the *Financial Times* published a story describing the first bond offering as "one puzzle wrapped up in another" and questioning several aspects of the deal.[86]  The article recounted how Goldman's rivals "berat[ed]" Goldman "for selling 1MDB an expensive, overly-

---

[85] Jonathan Rogers, "Goldman Ruffling Feathers in Asian Debt," *International Financing Review*, (June 2, 2012), available at http://www.ifre.com/goldman-ruffling-feathers-in-asian-debt/21021716.fullarticle.

[86] Camilla Hall, "1MDB of Malaysia's $1.75bn Bond: One Puzzle Wrapped up in Another" *Financial Times* (July 2, 2012), available at https://www.ft.com/content/6c879300-465c-3a2b-ab04-a35e1d2e831e.

complex structure," noting that the deal would allow Goldman to "soar up the league tables."[87]

Noting the bond's unusual pricing, the article stated:

> According to Reuters' IFR calculations at the time, the bond priced at 425 basis points over 10-year Treasuries, at a yield just short of 6 per cent. Yet Malaysian oil company Petronas, in a similar business and with a higher rating, was trading at just 185 basis points over comparable Treasuries.

86.     "Yet," the *Financial Times* noted, "the pricing of the deal is not its biggest mystery," which was IPIC's involvement in the deal:

> Bankers are wondering why an Abu Dhabi government investment fund would guarantee what is essentially Malaysian sovereign debt. After all, 1MDB has secured a Malaysian state guarantee in the past. Why is a Gulf emirate, many miles away, guaranteeing this bond?[88]

Indeed, in a document prepared by Goldman for IPIC entitled "IPIC: Meeting With Ratings Agencies, Topics to Discuss," IPIC's guarantee for the 1MDB bond issue was characterized as "unusual by previous IPIC standards."[89]  But the reason for its inclusion was simple: IPIC officials received millions of dollars in bribes to offer the guarantee.

87.     Despite some of the most respected financial publications in the world noting these significant red flags in connection with Goldman's underwriting of the first 1MDB bond offering, Goldman's internal controls failed to pick up on any of them, exposing Goldman to massive liability from these obviously suspicious bond offerings.  Goldman's bankers were well-aware of these reports. Indeed, if journalists were able to see these red flags, then there is no question that

---

[87] League tables are rankings of banks based on their deal volumes, which are closely followed and touted by banks, as those that do the most business tend to be more sought after by clients.

[88] *Id.*

[89] *United States v. Certain Rights to and Interests in the Viceroy Hotel Group*, No. 17-cv-4438 (C.D. Cal.) ¶178.

Goldman's purported system of internal controls and compliance measures should have spotted them.

88.     Fourth, IPIC agreed to privately secure the Project Maximus bonds on a bilateral basis with Goldman, a commitment that was never mentioned in the Offering Circular. Specifically, 1MDB entered into a "Collaboration Agreement (Option)" with Aabar-BVI, entitling Aabar-BVI to acquire 49% in 1MDB's energy subsidiary within 10 years, in exchange for Aabar-BVI "procuring the Guarantee from IPIC."[90]

89.     Goldman instituted a compliance review of Project Maximus at an October 10, 2012 firmwide Capital Committee meeting—just months after the financial press had pointed out multiple red flags in relation to Goldman's underwriting of the first 1MDB offering.  Project Maximus closed on or about October 17, 2012.  Goldman's fee for this second 1MDB bond deal was $114 million.  For his role in bringing in the business, Leissner was paid more than $10 million in salary and bonuses in 2012, making him one of Goldman's top-paid employees that year.

90.     The issuance was supposed to raise approximately $1.75 billion for 1MDB's energy company acquisition and "for general corporate purposes (which may include future acquisitions)."[91]  In truth, however, $790,354,855—a sum equivalent to roughly half of the net proceeds of the Project Maximus bond offering—was diverted to a shell company on the same day that 1MDB received the proceeds of this bond sale.[92]  This time, Low used a portion of the siphoned funds to, among other things, purchase jewelry, pay off credit card bills, pay expenses

---

[90] Verified Complaint for Forfeiture *In Rem* ¶187, *United States of Am. v. Real Property Located in London, United Kingdom Titled in the Name of Red Mountain Global Ltd.*, No. 19-cv-1326 (C.D. Cal. Feb. 22, 2019).

[91] *Viceroy* Complaint ¶185.

[92] *Leissner* Affidavit ¶56.

related to a private jet, and transfer money to family members.  Leissner directed that nearly $3 million be transferred from holding company accounts to accounts beneficially owned by 1MDB officials.[93]   These diversions would also have been caught had the BSC Reports' key recommendation to increase "posttransaction monitoring and follow-up" been implemented. Instead, Goldman failed to investigate these glaring red flags, instead sitting by as 1MDB was pillaged, happy to collect its exorbitant fee.

### E.    Goldman's Internal Controls Fail to Stop Illegal Activity for the Third Time in Less Than a Year in 1MDB's Third and Largest Bond Offering

91.    In November 2012, soon after Project Maximus closed, Leissner and Low began working on the next 1MDB bond deal, a proposed $3 billion issuance known as Project Catalyze. One month later, in December 2012, Defendant Blankfein met again with Low, this time at Goldman's headquarters in New York.[94]  *The New York Times* described the meeting as a "one-on-one sit-down" to discuss "investment opportunities in Southeast Asia"—again, disposing of the notion that Low's existence was hidden from anyone at Goldman.

92.    The fact that Goldman's CEO and Chairman even met with Low at this point is extraordinarily compelling evidence of Goldman's utter lack of internal controls and compliance systems.  At the time, Goldman had already stated that it had "zero appetite" to do business with Low; multiple Goldman employees had raised concerns regarding the 1MDB offerings that he quarterbacked, and myriad newspaper articles—including those openly circulated within Goldman—questioned the shady and corrupt source of his finances.  *Any* functioning compliance system would have prevented this meeting from taking place.

---

[93] *Id.* at ¶¶57-58.

[94] Emily Flitter, "Goldman Chairman Met Privately With Fugitive Accused in Malaysian Fraud," *The New York Times* (Nov. 22, 2018), available at https://www.nytimes.com/2018/11/22/business/goldman-blankfein-1mdb-malaysia.html.

93.     In January 2013, Goldman was engaged on Project Catalyze, again on a no-bid basis.  Project Catalyze was encircled by the same red flags as Project Magnolia and Project Maximus, including the inextricable involvement of Low and the opaque structuring of the deal designed to facilitate illegal bribes and kickbacks.  Goldman was also confronted with several red flags that were unique to Project Catalyze, which went unheeded due to Goldman's nonfunctioning internal controls.

94.     First, for the third straight 1MDB offering, senior Goldman bankers spoke out to raise concerns about the deal.  Asia President David Ryan was suspicious when he heard how Goldman won the business, after Leissner met with Prime Minister Najib at the World Economic Forum in Davos, Switzerland, accompanied by Goldman's Vice Chairman for "growth markets," Michael Evans.[95]  Ryan was again overruled by Gary Cohn.  According to *The Wall Street Journal*, Ryan, who had been considered a "rising star" at Goldman, left the Company that year.[96] *Bloomberg* reported that Ryan, who had argued that Goldman should reassess, and potentially end, its relationship with the fund, left Goldman in part due to frustration that his concerns about 1MDB were not heeded.[97]  The Board's failure to implement a compliance system which would have alerted them to situations where senior management's concerns were overruled ensured that Goldman's monitoring and reporting systems would remain deficient.

---

[95] *Whale* at 219.

[96] Justin Baer, Tom Wright & Ken Brown, "Goldman Sachs Ties to Scandal-Plagued 1MDB Run Deep," *The Wall Street Journal* (Dec. 22, 2016), available at https://www.wsj.com/articles/goldman-sachs-ties-to-scandal-plagued-1mdb-run-deep-1482362362.

[97] Shamim Adam, "Gary Cohn Backed Goldman Sachs's 1MDB Dealings, Book Says" *Bloomberg*, (Sep. 13, 2018), available at https://www.bloomberg.com/news/articles/2018-09-13/gary-cohn-backed-goldman-sachs-s-dealings-with-1mdb-book-says.

95.    Second, Goldman's own lawyers also spoke out against the deal.  1MDB officials demanded that the $3 billion worth of immediate proceeds from the deal be deposited into a bank account at the small Swiss private bank BSI, which had just recently expanded into Asia.  Kevin Wong, a Singapore-based partner of Linklaters and one of Goldman's lawyers on the deal, warned in an email that it was unusual to use such a small private bank to deposit the $3 billion in proceeds from the Project Catalyze offering, but his concerns were ignored.[98]  Notably, in 2011, the Monetary Authority of Singapore (Singapore's state bank and financial regulator), launched an inspection of BSI, finding lapses in its policy and processes, and weaknesses in its compliance and control functions.[99]  Indeed, BSI's Singapore unit was subsequently closed by the Monetary Authority for 41 breaches of anti-money laundering rules including failure to conduct enhanced customer due diligence on high risk accounts and to monitor suspicious customer transactions.[100]

96.    Third, Goldman's internal controls and compliance systems should have been instantly alerted to Low's presence, as Goldman bankers had actual knowledge that he was involved with 1MDB from the beginning.  On April 24, 2013, a member of Goldman's Capital Committee emailed Leissner on April 24, 2013 asking about public reports linking Low to 1MDB.  Leissner replied that Low "was an advisor alongside other prominent figures to the King of

---

[98] "Goldman Sachs Probed Over Why It Didn't Alert Authorities to Unusual Funds Movement at 1MDB," *The Straits Times* (June 7, 2016), available at https://www.straitstimes.com/asia/se-asia/goldman-sachs-probed-over-why-it-didnt-alert-authorities-to-unusual-funds-movement-at.

[99] "How a Swiss Bank was Toppled by a Financial Scandal in Malaysia—and What Can be Learned From It," *The Conversation* (Aug. 13, 2018), available at http://theconversation.com/how-a-swiss-bank-was-toppled-by-a-financial-scandal-in-malaysia-and-what-can-be-learned-from-it-100130.

[100] "Goldman Sachs Probed Over Why It Didn't Alert Authorities to Unusual Funds Movement at 1MDB," *The Straits Times* (June 7, 2016), available at https://www.straitstimes.com/asia/se-asia/goldman-sachs-probed-over-why-it-didnt-alert-authorities-to-unusual-funds-movement-at.

Malaysia at the time of the creation of 1MDB."[101]   Had Goldman's internal controls and compliance functions been properly functioning, the Capital Committee would have immediately investigated further and put a stop to the deal.

97.     Fourth, Project Catalyze was suspiciously timed to close just weeks before Malaysia's 2013 general elections, in which Prime Minister Najib narrowly beat out his opponent. Quoting a Malaysian lawyer, *three days before the election*, *Bloomberg* reported that *"[t]he private placement raised too many red flags,* coming so close to the election date. . . .  They were rushing this out and they don't know how to spend it. *We don't know who received this private placement and who they may sell it on to*."[102] *Bloomberg* quoted a Malaysian politician explaining that "[t]he 1MDB transaction has been shrouded in secrecy," and that if Najib lost the election, "[w]e would go back to the renegotiation table and see what would have been a fairer deal should there be any questionable part of the deal mix."

98.     Fifth, Goldman structured Project Catalyze essentially as a private placement, similarly to Project Magnolia and Project Maximus. But due to the hurried nature of the deal that closed shortly before the election, this resulted in Goldman buying the bonds first, and only then asking Standard & Poor's to provide a credit rating for them.  Goldman ended up buying the unrated bonds for just 90 cents on the dollar. [103]  *At the time*, the *Financial Times* reported that one

---

[101] *Leissner* Affidavit ¶65.

[102] Elffie Chew, "Goldman-Arranged Bond Sale Stings Najib Before Malaysia Election" *Bloomberg*, (May 2, 2013), available at https://www.bloomberg.com/news/articles/2013-05-02/goldman-arranged-bond-sale-stings-najib-before-malaysia-election.

[103] Paul Davies, "Goldman in Malaysia: Know Your Client," *Financial Times* (May 2, 2013), available at https://www.ft.com/content/389759ad-41d0-3416-9439-0df463757cdf.

individual it interviewed at S&P "could not think of a single similar example in the case of government-linked bonds."[104]

99.     In January 2013, Goldman's Intelligence Group began conducting a compliance review on Project Catalyze.  After making a series of perfunctory inquiries, Project Catalyze was approved on March 13, 2013, over these red flags that again went unheeded.  Project Catalyze closed on March 19.  For its work, Goldman earned over $283 million.  *Bloomberg* put Goldman's excessive fees into context, noting that in January of that year, Korea Development Bank (which was higher rated than 1MDB) paid just 0.3% for a $500 million debt sale, compared to the 3.1% that constituted Goldman's fees at the time, for a much larger sale.[105]  Days after the $3 billion in proceeds were deposited at BSI, Najib channeled $700 million to help his ruling party with the 2013 Malaysian elections.[106]

100.     Additionally, more than $1.26 billion was diverted to unrelated overseas shell company accounts, including two accounts at Falcon Bank in Singapore.[107]  In addition, other transfers included: (i) on July 3, 2013, $65 million traceable to Project Catalyze was ultimately transferred to an account controlled by Leissner; (ii) on July 19, 2013, Leissner transferred approximately $6 million to an account in the name of a management company that he controlled; and (iii) on September 10, 2013, approximately $27.3 million traceable to Project Catalyze was

---

[104] Jeremy Grant & Paul Davies, "Goldman Sachs Criticised Over $3bn Malaysia Bond Deal," *Financial Times* (May 1, 2013), available at https://www.ft.com/content/ed31cbde-b222-11e2-8540-00144feabdc0.

[105] Elffie Chew & David Yong, "Goldman-Arranged Bond Sale Stings Najib Before Malaysia Election" *Bloomberg* (May 2, 2013), available at https://www.bloomberg.com/news/articles/2013-05-02/goldman-arranged-bond-sale-stings-najib-before-malaysia-election.

[106] "Malaysia PM Najib Razak used $700M donation to win 2013 elections: WSJ," *CNBC* (Dec. 28, 2015), available at https://www.cnbc.com/2015/12/28/wsj-reports-malaysia-pm-najib-razak-used-700m-donation-to-win-2013-elections.html.

[107] *Leissner* Affidavit ¶66.

transferred to a New York jeweler to purchase a 22 carat pink diamond for the Prime Minister's wife.

101.    Later, in July 2013, Prime Minister Najib invited Evans to join him and Abu Dhabi's crown prince on a yacht in Saint Tropez.[108]  As *The Wall Street Journal* described it:

> The bank earned its place through years of cultivating Mr. Najib and a state investment fund he founded. Goldman had raised $6.5 billion for the fund and earned nearly $600 million in fees, making the Malaysian client among its most lucrative.

> Mr. Najib lavished praise on Goldman, said people familiar with the meeting. "Do you see any other bankers on this boat?" one recalls him saying.

*       *       *

102.    In all, Goldman ultimately reaped approximately $600 million in fees relating to the $6.5 billion of 1MDB bond issuances, which is nearly ***two hundred times*** the typical fee for similar transactions.  Most notably, the sheer amount of the fees that Goldman received in connection with the 1MDB bond offerings was a red flag that should have raised suspicions.  These abnormally high fees amounted up to nearly 10% of the bonds—a stunningly high figure compared with half a percentage point fee for underwriting a typical Malaysian investment-grade bond deal, one percentage point fee for high-yield debt, and a fee of mere basis points for government debt.[109] ***The amount Goldman earned from 1MDB alone was nearly equivalent to the $694 million in revenue from its entire global bond underwriting business in the first quarter of 2013.***

---

[108] Justin Baer, "Goldman Sachs Ties to Scandal-Plagued 1MDB Run Deep," *The Wall Street Journal* (Dec. 22, 2016), available at https://www.wsj.com/articles/goldman-sachs-ties-to-scandal-plagued-1mdb-run-deep-1482362362.

[109] Nisha Gopalan, "Rogue Bankers Don't Explain Goldman's 1MDB Mess," *The Washington Post* (Dec. 21, 2018), available at https://www.washingtonpost.com/business/rogue-bankers-dont-explain-goldmans-1mdb-mess/2018/12/21/514b593e-050e-11e9-958c-0a601226ff6b_story.html.

103.    On May 9, 2013, shortly after the election and the last deal closed, *Bloomberg* published an article[110] which again questioned Goldman's suspiciously high fees.  The article noted that Goldman's collective fee on the 1MDB deals:

> [I]s almost as much as Malaysia, Southeast Asia's third-largest economy, pays each month on its debt and compares with Goldman's record $694 million of global bond underwriting fees in the first quarter, according to data compiled by Bloomberg.

104.    According to the article, Goldman's fees from the 1MDB deals were significantly higher when compared to past Malaysian deals with other underwriters:

> Malaysia has sold eight dollar bonds since the start of 1999, raising $7.1 billion, according to data compiled by Bloomberg. The last was in June 2011, when the government issued $2 billion.

> Citigroup, JPMorgan Chase & Co., CIMB Group Holdings Bhd. and HSBC are among the lead underwriters, managing 69 percent of the sales, Bloomberg data show. The banks charged an average 0.47 percent of the bond sales in fees for five deals between 1999 and 2002. The government didn't disclose commissions for the rest of the deals.

105.    The article noted that Goldman reported a 36% increase in investment banking fees in the first quarter of 2013, including a 69% rise in fixed-income underwriting revenue, while fees across the industry gained just 17%.

106.    The *Financial Times*, meanwhile, observed that "Goldman Sachs is facing sharp criticism over its potential profits" for its work on the 1MDB bonds.  The *Times* quoted Malaysian politician Wong Chen, who said, "*[s]omeone must have made a big pile. That margin should*

---

[110] Elffie Chew & Ye Xie, "Goldman Said to Earn $500 Million Arranging Malaysia Bond," *Bloomberg* (May 9, 2013), available at https://www.bloomberg.com/news/articles/2013-05-08/goldman-said-to-earn-500-million-arranging-malaysia-bond.

*rightfully belong [to] the Malaysian government*. We will fight to recoup that margin if we come to power."[111]

107.    Moreover, in large part due to these three bond deals, Goldman's market share in foreign currency bond financing in Malaysia exploded from 4% in 2009, to 29% in 2012, to 66% by mid-2013,[112]a fact that could not have gone unnoticed by the Board.

### F.    Defendants Fail to Act Despite Being Presented with Actual Evidence of Goldman's Broken Internal Controls

108.    The last 1MDB bond offering closed in March 2013, but a series of red flags in the following months and years should have alerted the Board to the rampant illegal conduct enmeshed with those deals.  Instead, the Board ignored these red flags and failed to conduct any kind of investigation or act to safeguard Goldman.

### 1.    The Federal Reserve's Scrutiny Should Have Prompted an Immediate Investigation by the Board

109.    The Board's inaction in the face of these glaring red flags was particularly egregious because in 2013—less than a year after the last 1MDB bond offering and Goldman's purported implementation of the BSC's recommendations, the Federal Reserve required Goldman to implement "sweeping changes" in order "to tighten its oversight of risk."[113]  The *Financial Times* reported that the reforms:

> [R]esulted from a wider questioning of controls, including concerns that committee minutes did not record debate in sufficient detail.

---

[111] Jeremy Grant & Paul Davies, "Goldman Sachs Criticised Over $3bn Malaysia Bond Deal," *Financial Times* (May 1, 2013), available at https://www.ft.com/content/ed31cbde-b222-11e2-8540-00144feabdc0.

[112] *Id.*

[113] John Gapper & Laura Noonan, "NY Fed Told Goldman to Improve Risk Reporting Shortly After 1MDB," *Financial Times* (Nov. 25, 2018), available at https://www.ft.com/content/bc59bc34-f0a0-11e8-ae55-df4bf40f9d0d.

*All of Goldman's company-wide and regional committees were affected by the reforms, which were introduced shortly after the bank financed the last of the 1MDB bonds in March 2013, receiving a total of $600m in fees. They included its capital and client suitability committees, which oversaw the 1MDB financing, and approved all such deals.*

One person close to its Asia Pacific capital committee, which initially reviewed the first 1MDB deal in 2012, said that the *Fed questioned why committees seemed to reject very few deals as being too risky or inappropriate*.

110.    The *Financial Times* further reported that when the Asia Pacific Committee reviewed the first 1MDB bond deal before advancing it for approval to the Capital Committee in New York, Goldman banker Andrea Vella was recorded in the Asia Pacific Committee's minutes as recusing himself from the financing.  Though the purpose of recusal is to screen a conflicted party from participating in the approval of a deal, Vella nevertheless remained in the room and continued to take part in discussions.[114]

111.    The Federal Reserve's scrutiny continued into 2014. *The Wall Street Journal* reported that the Federal Reserve raised concerns with Goldman that the 1MDB deals could have put the firm's reputation at risk.[115]  The *Journal* elaborated that "[b]y early 2014, *The Federal Reserve, Goldman's main U.S. regulator, was scrutinizing the bond deals, questioning the firm on why 1MDB had continued to sell bonds despite holding ample cash*, the people said. *Fed officials were also critical of Goldman's vetting of the 1MDB deals*, noting they had posed reputational risk."

112.    The fact that the Federal Reserve was criticizing the role of Goldman's internal controls and compliance systems in the 1MDB bond offerings should have immediately prompted

---

[114] *Id.*

[115] Justin Baer & Bradley Hope, "Fed Warned Goldman on Malaysia Bond Deals" *The Wall Street Journal* (April 6, 2016), available at https://www.wsj.com/articles/fed-warned-goldman-on-malaysia-bond-deals-1459974246.

the Board to conduct an internal investigation, which would have uncovered the illegal conduct at the heart of these deals.  Instead, the Board did nothing.

> ### 2. Despite Actual Knowledge of Goldman's Deficient Internal Controls and Federal Reserve Scrutiny, Blankfein Meets with Low for a Third Time as Goldman Continues to do Business with Him

113.    On September 25, 2013—despite ongoing Federal Reserve scrutiny into the 1MDB bonds—Blankfein met with Low and Leissner *again* at the Time Warner Center in New York to discuss business opportunities for Goldman in Malaysia, including with 1MDB.

114.    Low also continued to pop up in other deals in which Goldman had a role.  *The Wall Street Journal* reported that, despite the multiple of red flags enveloping Low, Goldman's internal controls were so deficient that bankers were ready, willing, and able to work with him on a 2013 deal that is currently being investigated:

> "Jho Low's appearance is not welcome," one compliance officer wrote to a banker in 2013 when Mr. Low teamed up with a Goldman client to buy a Houston-based oil company. "*But if he is in a very minor role . . . then we may be able to live with it.*" That deal, a takeover of Coastal Energy brokered by Goldman, is being investigated by U.S. prosecutors.[116]

115.    Then, in 2014, 1MDB began planning for an IPO of the power assets owned by its subsidiary 1MDB Energy Holdings Limited ("1MEHL") on the Malaysian stock exchange. 1MEHL was the holding company for 1MDB Energy and 1MDB Energy, the entities that had acquired the Tanjong and Genting power assets, respectively, through issuance of the 2012 bond notes. 1MDB retained Goldman to serve in an advisory capacity, but only after a June 2014 online chat between Low and Leissner, during which the two discussed the need to "suck up to" a 1MDB

---

[116] Tom Wright & Liz Hoffman, "Goldman Sachs ignored 1MDB Warning Signs in Pursuit of Asian Business," *The Wall Street Journal* (Dec. 17, 2018), available at https://www.wsj.com/articles/goldman-sachs-ignored-1mdb-warning-signs-in-pursuit-of-asian-business-11545088802.

official and to send "cakes" to the wife of a politician.[117]  Several months after this chat, a bank account owned and controlled by Leissner and his relative was used to transfer approximately $4.1 million to a high-end New York jeweler, in part, to pay for gold jewelry for the politician's wife.

### 3.   Murders and Arrests Arising From the 1MDB Fallout Should Have Alerted Defendants to the Corruption at the Heart of 1MDB

116.   Beginning in 2015, a series of explosive media accounts began detailing publicly how proceeds from the 1MDB deals were siphoned off to Low, Prime Minister Najib, and their cronies. On top of all of the myriad other red flags that arose since the formation of TIA, Defendants should have required an investigation into Goldman's role in the 1MDB offerings upon learning of their discovery.

117.   On June 18, 2015, *The Wall Street Journal* published an article entitled "Fund Controversy Threatens Malaysia's Leader," detailing how 1MDB indirectly funded Najib's 2013 election campaign.[118]  The article further detailed 1MDB's massive debt load and recounted the criticism that 1MDB endured for conducting a bond offering so close in time to an election— explicitly naming Goldman as an advisor on the deal.   At least four probes into 1MDB followed by Malaysia's police, its Auditor General, a Parliamentary committee, and its central bank.

118.   On July 2, 2015, *The Wall Street Journal* published another article, entitled "Investigators Believe Money Flowed to Malaysian Leader Najib's Accounts Amid 1MDB Probe,"[119] reporting how Malaysian investigators traced nearly $700 million in deposits to what

---

[117] *Leissner* Affidavit ¶72.

[118] Tom Wright, "Fund Controversy Threatens Malaysia's Leader," *The Wall Street Journal* (June 18, 2015), available at https://www.wsj.com/articles/fund-controversy-threatens-malaysias-leader-1434681241.

[119] Tom Wright & Simon Clark, "Investigators Believe Money Flowed to Malaysian Leader Najib's Accounts Amid 1MDB Probe," *The Wall Street Journal* (July 2, 2015), available at https://www.wsj.com/articles/SB10130211234592774869404581083700187014570.

they believed to be Najib's personal bank accounts. The article further noted that this was the first time that Najib had been personally connected to the payouts from 1MDB.

119.    In April 2016, the UAE Central Bank froze the assets of IPIC Managing Director and Aabar Chairman Khadem al-Qubaisi and Aabar CEO Mohamed al-Husseini, who partnered with 1MDB in the bond deals described above.[120]  Months later, in August 2016, these two were dismissed and arrested for their roles in the 1MDB scandal.[121] That two senior figures central to 1MDB were arrested should have been a glaring red flag to Goldman's Board, and should have led to an investigation of the 1MDB deals by the Company.

120.    News outlets also reported on a string of murders related to 1MDB.  Specifically:

a.      On July 29, 2013, Hussain Najadi, the founder of AmBank, one of Malaysia's largest banking groups, was shot dead in broad daylight in front of a temple in Kuala Lumpur.  Najadi's son claimed that his father was executed after gleaning information about 1MDB through his position as AmBank founder, after hundreds of millions of dollars were funneled into Prime Minister Najib's AmBank accounts.[122]

b.      Malaysian deputy public prosecutor Kevin Morais was found dead in a cement-filled oil drum nearly two weeks after he had gone missing on September 4, 2015.

---

[120] "RPT-UAE Freezes Assets of Two Former IPIC Group Officials -Sources," *Reuters* (Apr. 7, 2016), available at https://www.reuters.com/article/emirates-executives-assets-idUSL5N17B045.

[121] Simeon Kerr, "Abu Dhabi Arrests Former Top Finance Official Over 1MDB Scandal," *Financial Times* (Aug. 19, 2016), available at https://www.ft.com/content/bc02aa34-65f1-11e6-8310-ecf0bddad227; "First 1MDB Arrest-Former Senior Fund Manager Faces US Extradition Request in Abu Dhabi," *Sarawak Report* (Mar. 30, 2016), available at http://www.sarawakreport.org/2016/03/first-1mdb-arrest-former-senior-fund-manager-faces-us-extradition-request-in-abu-dhabi-exclusive/.

[122] Romil Patel, "Malaysia 1MDB Scandal: Death Toll Mounts in Multimillion-Dollar Graft Probe," *International Business Times* (March 9, 2016), available at https://www.ibtimes.co.uk/malaysia-1mdb-scandal-death-toll-mounts-multimillion-dollar-graft-probe-1548461.

Morais was reputed to be investigating 1MDB at the time of this death and, speaking in November 2015, Morais's brother said "Kevin was killed for other reasons and I believe these other motives were due to the fact that he knew too much about the criminal acts of those high up in the echelons of power in Malaysia and he needed to be silenced because of that."[123]

\*       \*       \*

121.    Despite the fact that the Federal Reserve's scrutiny of Goldman in 2013 and 2014 conclusively establishes that Defendants knew Goldman's internal controls and compliance procedures were broken, the Defendants utterly failed to act.  Had the Board performed even a cursory investigation, it would have discovered the plain weaknesses in the Company's internal controls that allowed Blankfein to repeatedly meet with Low, and Leissner, Ng, and others to repeatedly engage in bribery, money laundering, and other illicit conduct, to Goldman's detriment. Instead, the Board did nothing, exposing the Company to massive liability and reputational damage when Goldman's complicity in the scandal was revealed by authorities in 2018.

**G.    The Massive Fallout From the 1MDB Scandal was Swift and Severe**

**1.    Defendants' Failure to Ensure that Goldman Had Effective Internal Controls and Compliance Functions Has Spawned Multiple Criminal, Civil, and Regulatory Actions**

122.    Defendants' failure to oversee Goldman's internal controls and compliance functions, and to ensure that they were effective, has spawned multiple criminal indictments, civil actions, and regulatory investigations, and has exposed Goldman to billions of dollars in potential liability.

---

[123] *Id.*

123.    On August 4, 2016, Goldman Sachs filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q").  The Q2 2016 10-Q's discussion of "Regulatory Investigations and Reviews and Related Litigation" innocuously revealed that the Company was subject to an investigation regarding 1MDB, downplaying any responsibility for the massive fraud and making no mention of the massive internal control failures at Goldman:

> [Goldman Sachs] and certain of its affiliates are subject to a number of other investigations and reviews by, and in some cases have received subpoenas and requests for documents and information from, various governmental and regulatory bodies and self-regulatory organizations and litigation and shareholder requests relating to various matters relating to the firm's businesses and operations, including . . . [t]ransactions involving government-related financings and other matters, ***including those related to 1Malaysia Development Berhad (1MDB), a sovereign wealth fund in Malaysia***, municipal securities, including wall-cross procedures and conflict of interest disclosure with respect to state and municipal clients, the trading and structuring of municipal derivative instruments in connection with municipal offerings, political contribution rules, municipal advisory services and the possible impact of credit default swap transactions on municipal issuers[.]

124.    On June 15, 2017, the United States filed a Complaint for Forfeiture *in rem*, captioned *United States v. Certain Rights to and Interests in the Viceroy Hotel Group*, No. 17-cv-4438 (C.D. Cal.).  The action was described as "a civil action in rem to forfeit assets involved in and traceable to an international conspiracy to launder money misappropriated from 1Malaysia Development Berhad," laid out the process by which Goldman underwrote the three 1MDB bonds, and described how the proceeds from those offerings was illegally diverted through a series of shell corporations and accounts.[124]

125.    On November 1, 2018, the U.S. Attorney for the Eastern District of New York unsealed a multi-count information and guilty plea against Leissner revealing that, in a closed

---

[124] *Viceroy* Complaint, ¶6; ¶¶167-188; ¶¶189-225.

proceeding on August 28, 2018, Leissner pled guilty to two counts of conspiracy to violate the

Foreign Corrupt Practices Act and conspiracy to commit money laundering.[125]  As part of his guilty

plea, Leissner admitted to a conspiracy at Goldman, the corrupt nature of the Company's corporate

culture, and the utterly deficient internal controls and compliance protocols:

> During the course of the conspiracy, ***I conspired with other employees and agents of Goldman Sachs very much in line of its culture of Goldman Sachs to conceal facts from certain compliance and legal employees of Goldman Sachs***, including the fact that Jho Low . . . was acting as a intermediary for on behalf of Goldman Sachs, 1MDB, and Malaysian and Abu Dhabi officials. [sic]
>
> As stated in the information, on one occasion in 2012, I told a committee at Goldman Sachs that Jho Low was not involved in one of the bond transactions. This was not true.  I knew that concealing Jho Low's involvement as an intermediary was contrary to Goldman Sachs's stated internal policies and procedures. ***I and several other employees of Goldman Sachs at the time also concealed that we knew that Jho Low was promising and paying bribes and kickbacks to foreign officials to obtain and retain 1MDB business for Goldman Sachs, for the benefit of Goldman Sachs and myself, and using some of the proceeds of the 1MDB bonds to do so***.  I knew that this was contrary to Goldman Sachs's stated policies and procedures.
>
> ***As a result of these bribes and kickbacks, and in movement of the funds through the bribes and kickbacks, Goldman Sachs received substantial business from 1MDB***. The three bond deals and related transactions resulted in substantial fees and revenues for Goldman Sachs, of which and in many cases, it was very proud of at the time.

126.    Despite Leissner stating that he concealed the fact that Low was paying bribes and

kickbacks, Goldman had actual knowledge that Low was involved in the bond offerings, despite

the multitudinous red flags surrounding him.  For example, and as detailed above:

- Defendant Blankfein met with Low on at least three separate occasions to discuss Goldman's business in Malaysia, including business with 1MDB;

- Andrea Vella, Goldman's former Co-Head of Investment Banking in Asia—and Leissner's superior—helped Leissner to structure the 1MDB bonds.  In 2015, Vella

---

[125] *United States v. Leissner*, No. 18-cr-439 (E.D.N.Y.).  Leissner resigned from Goldman in February 2016, when it was discovered that he sent an unauthorized reference letter on Goldman letterhead on behalf of Low to another financial institution.

intervened to save Goldman banker Cyrus Shey from being fired, and "told colleagues at Goldman he was concerned Mr. Shey could go public with details about 1MDB at a time of scrutiny of the business, and he interceded to ensure Mr. Shey wasn't immediately let go. . . ."[126]

- Leissner informed the Co-Head of Goldman's Intelligence Group that Low was present with Leissner in Abu Dhabi in March 2012 to secure the IPIC guarantee on the offerings;

- Leissner emailed a member of Goldman's Capital Committee explaining that Low was an advisor at the time that 1MDB was created;

- Tan Boon-Kee, one of Leissner's colleagues who worked on the 1MDB deals, worked with Low—and continued to work with Low after she left Goldman to become Asia Pacific Head of Banking for Financial Institutions at Goldman rival Deutsche Bank;[127] and

- Goldman executives acknowledge in emails that Low was a "1MDB Operator or intermediary in Malaysia."

127.    Leissner was originally scheduled to be sentenced on January 17, 2019. That date was later adjourned twice, and his sentencing is currently set for December 17, 2019. *The Wall Street Journal* has reported that Leissner is cooperating with the Government against others who are yet to be charged in connection with Goldman's role in the 1MDB debacle.[128] Leissner has further agreed to return $43.7 million, while also admitting that upwards of $200 million flowed from 1MDB to accounts he or a relative controlled.

---

[126] Tom Wright & Liz Hoffman, "Goldman Sach's Ex-CEO Lloyd Blankfein Met Malaysian at Center of 1MDB Scandal," *The Wall Street Journal* (Nov. 9, 2018), available at https://www.wsj.com/articles/goldman-sachss-ex-ceo-met-malaysian-twice-at-center-of-1mdb-scandal-1541779363.

[127] Aruna Viswanatha, Bradley Hope & Jenny Strasburg, "U.S. Investigating Deutsche Bank's Dealings With Malaysian Fund 1MDB," *The Wall Street Journal* (July 11, 2019), available at https://www.wsj.com/articles/u-s-investigating-deutsche-bank-s-dealings-with-malaysian-fund-1mdb-11562798907?mod=hp_lead_pos1.

[128] *Id.*

128.    The United States has also unsealed an indictment of Ng and Low.[129]  Ng was charged with conspiracy to violate the Foreign Corrupt Practices Act and conspiracy to commit money laundering.  Significantly, federal prosecutors alleged in the indictment that "***the business culture at [Goldman], particularly in Southeast Asia, was highly focused on consummating deals, at times prioritizing this goal ahead of the proper operation of its compliance functions***."  The indictment further alleged that **Goldman's "*system of accounting controls . . . could be easily circumvented*."

129.    Ng was detained in Malaysia and extradited to the U.S. on May 3, 2019, and he has since pled not guilty.  Separately, Ng and his family have agreed to surrender about $29 million to authorities in Singapore, which would then repatriate the funds to Malaysia.  Low is still at large and is believed to be in hiding in China.

130.    In November 2018, Goldman partner Andrea Vella, the former Co-Head of Investment Banking in Asia, was put on leave over his role in the 1MDB deals.  That same month, *Bloomberg* reported that Vella matched the description of "Co-Conspirator #4" in the Leissner charging documents, fueling speculation as to whether Vella and other Goldman employees would also be charged in connection with 1MDB.

131.    Additionally, in November 2018, IPIC filed a civil legal action against Goldman and others alleging that they played a role in trying "to corrupt" former executives of IPIC and its subsidiary Aabar, and "mislead" IPIC and Aabar, aiming to further the business of Goldman and 1MDB.[130]  IPIC is a subsidiary of Abu Dhabi state investor Mubadala, and that entity has announced that it has suspended new business dealings with Goldman.  The announcement could

---

[129] *United States v. Low, et al.*, No. 18-cr-538 (E.D.N.Y.).

[130] *Int'l Petroleum Investment Co. v. The Goldman Sachs Group, Inc., et al.*, Index No. 655821/2018 (N.Y. Supr.).

not come at a worse time for Goldman, as Abu Dhabi is embarking on a privatization spree that raises the prospect of several big deals for investment banks. Mubadala manages over $225 billion in assets and holds stakes in some of Abu Dhabi's biggest companies.[131]

132.     In December 2018, the government of Malaysia filed criminal charges against Goldman seeking $7.5 billion from the Company in connection with its role in the 1MDB scandal. Malaysia's attorney general, Tommy Thomas, stated, "Malaysia considers the allegations in the charges against all the accused to be grave violations of our securities laws."[132] Finance Minister Lim Guan Eng later told reporters that an apology alone is "insufficient . . . . ***Apology with $7.5 billion is what matters . . . there has to be accountability***."[133]  On January 24, 2019, *Bloomberg* reported that Malaysian police raided Rahmat Lim & Partners, the law firm that represented Goldman in the 1MDB deals, to search for documents related to the bonds.[134] On June 23, 2019, it was reported that Goldman offered 1 billion ringgit—approximately $241 million—to buy its way out of charges in Malaysia.[135] Current Prime Minister Mahathir Mohamad described the offer

---

[131] Hadeel Al Sayegh & Stanley Carvalho, "Abu Dhabi State Investor Mubadala Halts Business with Goldman Sachs Amid 1MDB Lawsuit," *Reuters* (March 14, 2019), available at https://www.reuters.com/article/us-mubadala-invst-goldman-sachs-1mdb/abu-dhabi-state-investor-mubadala-halts-business-with-goldman-sachs-amid-1mdb-lawsuit-idUSKCN1QV1ZW.

[132] Trista Kelley, "Malaysia Files Criminal Charges Against Goldman Sachs and 2 Ex Bankers, Saying it Seeks Fines 'Well in Excess' of $2.7 Billion," *Business Insider* (Dec. 17, 2018), available at https://www.businessinsider.com/malaysia-files-criminal-charges-against-goldman-sachs-two-ex-bankers-2018-12.

[133] "Malaysia Says Goldman Sachs Must Pay, Apology Not Enough," *Associated Press* (Jan 18, 2019), available at https://www.apnews.com/7b73e0fca7584ebe9b51008652e3745c.

[134] Anisah Shukry, *Bloomberg*, "Malaysian Police Seek 1MDB Deal Documents From Goldman's Lawyer" (Jan. 24, 2019), available at https://www.bloomberg.com/news/articles/2019-01-24/malaysia-police-seek-1mdb-deal-documents-from-goldman-s-lawyer.

[135] Yen Nee Lee, "Goldman Sachs is Offering 'Peanuts' to Compensate for 1MDB, says Malaysian Prime Minister," *CNBC* (June 23, 2019), available at https://www.cnbc.com/2019/06/24/goldman-sachs-offers-peanuts-to-compensate-malaysia-for-1mdb-mahathir.html.

as "peanuts" and responded that "[w]hat Goldman Sachs has offered is not adequate," Goldman's next court date is scheduled for September 30, 2019.

133.    On December 4, 2018, Goldman's Chief Operating Officer John Waldron confirmed to CNBC that Goldman was in "active conversations" with the Department of Justice. The *Financial Times* reported that Department of Justice officials have "spoken to senior executives at the bank, including [current CEO David] Solomon."[136]  On the Company's January 16, 2019 earnings call, Solomon reiterated that the Department of Justice investigation was still "open," and that Goldman was cooperating with both the Department of Justice and other unnamed "regulators."  The *Financial Times* reported on April 24, 2019 that ***Department of Justice staff have recommended that a settlement with Goldman over its role in 1MDB should include a guilty plea <u>at the parent company level</u>***.[137]  Two months later, *The Wall Street Journal* quoted Assistant Attorney General Brian Benczkowski who stated in an interview that "[w]e do anticipate getting into active discussions with Goldman, at this point, in the near future."[138]  Citing an anonymous senior official, the *Journal* further elaborated that the DOJ will "soon . . . try to resolve allegations through a possible criminal settlement."[139]

134.    On February 22, 2019, the United States filed two *in rem* complaints for civil asset forfeiture, a 260-page Complaint captioned *United States v. Real Property Located in London,*

---

[136] Ben McLannahan, "Goldman's Business Culture Criticised by US Officials," *Financial Times* (Nov. 2, 2018), available at https://www.ft.com/content/763db0c4-ddff-11e8-9f04-38d397e6661c.

[137] Kadhim Shubber, "DoJ Staff Push for Goldman Guilty Plea in 1MDB Case," *Financial Times*, (Apr. 24, 2019), available at https://on.ft.com/2GRBfmo.

[138] Aruna Viswanatha, Bradley Hope & Jenny Strasburg, "U.S. Investigating Deutsche Bank's Dealings With Malaysian Fund 1MDB," *The Wall Street Journal* (July 11, 2019), available at https://www.wsj.com/articles/u-s-investigating-deutsche-bank-s-dealings-with-malaysian-fund-1mdb-11562798907?mod=hp_lead_pos1.

[139] *Id.*

*United Kingdom Titled in the Name of Red Mountain Global Ltd.*, No. 19-cv-1326 (C.D. Cal.), and a 261-page Complaint captioned *United States v. Up To $28,174,145.52 in Huntington National Bank Escrow Account Number '7196*, et al., No. 19-cv-1327 (C.D. Cal.). These actions were described as "a civil action in rem to forfeit assets involved in and traceable to an international conspiracy to, among other things, launder money misappropriated from 1Malaysia Development Berhad," and, like the *Viceroy in rem* action, laid out the process by which Goldman underwrote the three 1MDB bonds and described how the proceeds from those offerings was illegally diverted through a series of shell corporations and accounts.[140]

135.    In addition, the Federal Reserve, the SEC, and the New York State Department of Financial Services are all moving forward with separate investigations of Goldman's role in the 1MDB scandal. The New York DFS, which oversees Goldman's state-chartered banking unit, subpoenaed Goldman and several of its employees, asking them to appear for interviews in early 2019.

136.    Singapore has also expanded its criminal investigation of 1MDB to include Goldman Sachs. Authorities in that country are investigating whether portions of the $600 million in fees that Goldman earned from the three bond deals flowed through a Singapore subsidiary.

137.    Finally, other financiers and financial firms have found themselves part of the 1MDB scandal:

        a.    In May 2018, former Prime Minister Najib lost his reelection campaign, ending a 61-year reign for his party. Since his election defeat, Najib has been arrested and

---

[140] *Red Mountain* Complaint ¶6; ¶¶167-188; ¶¶189-986; *Huntington Nat'l* Complaint ¶6; ¶¶167-188; ¶¶189-986.

hit with 38 charges relating to the 1MDB scandal, and his trial is slated to begin on August 19, 2019;

b.      Movie production company Red Granite Pictures, founded by Prime Minister Najib's stepson and close Low friend Riza Aziz, paid $60 million to settle U.S. Justice Department claims it financed the movie *The Wolf of Wall Street* with money siphoned from 1MDB;

c.      Tan Boon-Kee, one of Leissner's former colleagues who left Goldman to become Deutsche Bank's former Asia Pacific Head of Financial Institutions, has been questioned by Singaporean authorities for her role in the scandal.  The DOJ subsequently opened an investigation into Deutsche Bank, specifically focusing on Boon-Kee's communications with Low;

d.      On July 10, 2018, Switzerland's Office of the Attorney General announced that six individuals and two Swiss banks are suspected of involvement in using financing intended for 1MDB for other purposes, "most particularly for the personal enrichment of the persons involved";

e.      Central Bank of Malaysia Governor Muhammad Ibrahim resigned in June 2018, as questions swirled over the role the central bank played in a land purchase deal from Najib's government, who in turn used the proceeds to pay off 1MDB's debts. The Central Bank has instituted a review of the deal;

f.      The Monetary Authority of Singapore, that nation's central bank, has fined UBS Group AG, DBS Group Holdings Ltd., Credit Suisse Group AG, United Overseas Bank Ltd. and Standard Chartered Plc, among others, for anti-money laundering violations in the wake of the 1MDB scandal;

g.      Falcon Private Bank Ltd., the Zurich-based bank linked to at least $3.8 billion of 1MDB fund flows, was ordered to cease operations in Singapore while Switzerland threatened to withdraw its license if there were any further breaches of money-laundering regulations;

h.      BSI SA, a 143-year-old Swiss bank that handled the proceeds of the third 1MDB offering, lost its license to do business in Singapore for breaches of money laundering rules.  Singapore charged three BSI executives with crimes linked to their dealings with 1MDB, with two of the executives pleading guilty;

i.      Switzerland's financial regulator announced that it will conduct a detailed review of JPMorgan Chase & Co.'s anti-money laundering controls after finding the bank seriously breached regulations in its dealings with 1MDB;

j.      Singapore has banned at least eight financial professionals in connection with 1MDB; and

k.      In 2017, Malaysia's finance ministry and 1MDB reached a $1.2 billion settlement with Abu Dhabi's sovereign wealth fund over a debt dispute. Malaysia is now seeking to challenge an arbitration award that requires it to make multi-billion-dollar payments to IPIC.

## 2.      Goldman's "Rogue Banker" Defense is Widely Ridiculed as Not Credible

138.    Fallout from the 1MDB scandal has roiled Goldman's corporate ranks and alumni network.  In October 2018, Defendant Blankfein, who met with Low on at least three occasions, stepped down as CEO of Goldman "to pursue other interests."  On February 1, 2019, Goldman announced that it would not pay out deferred bonuses that Blankfein and two other former top executives earned in prior years, and will instead await the outcome of an investigation into 1MDB.

Blankfein stands to lose as much as $7 million if the full amount of the bonus is withheld. Goldman also said it might claw back some of the $23 million it paid new CEO David Solomon in 2018.

139.    In November 2018, Blankfein laid the blame for Goldman's role in the 1MDB scandal on so-called rogue employees, stating "these are guys who evaded our safeguards and lie."[141]   In January 2019, Defendant Solomon also pinned the blame on Leissner and apologized to the Malaysian people for Leissner's role in the fraud.[142]   Referring to Leissner, Solomon has since stated that Goldman hired, promoted, and made partner "a criminal," admitting that Goldman "owns that, that's on us."[143]

140.    Indeed, almost immediately, news reports began to surface casting aspersions over, and calling into significant doubt, Goldman's denials of wrongdoing and attempts to portray Leissner and Ng as rogue employees.   For example, *The Wall Street Journal* reported that Andrea Vella, who was Goldman's former Co-Head of Investment Banking in Asia, Leissner's superior, and who is widely believed to be Co-Conspirator #4 in Leissner's charging documents, helped Leissner to structure the 1MDB bonds.[144]   The *Journal* further reported that in 2015, Vella

---

[141] Tom Wright & Liz Hoffman, "Goldman Sach's Ex-CEO Lloyd Blankfein Met Malaysian at Center of 1MDB Scandal," *The Wall Street Journal* (Nov. 9, 2018), available at https://www.wsj.com/articles/goldman-sachss-ex-ceo-met-malaysian-twice-at-center-of-1mdb-scandal-1541779363.

[142] Kevin Dugan, "Goldman Sachs CEO Sticks to 'Rogue Banker' 1MDB Defense," *New York Post* (Jan. 16, 2019), available at https://nypost.com/2019/01/16/goldman-sachs-ceo-sticks-to-rogue-banker-1mdb-defense/.

[143] Yun Li, "Goldman Sachs CEO Says Firm Reflecting on How it Hired, Promoted 'A Criminal' in 1MDB Case," *CNBC* (Apr. 29. 2019), available at https://www.cnbc.com/2019/04/29/goldman-sachs-ceo-david-solomon-firm-reflecting-on-leissner-1mdb-case.html.

[144] Tom Wright & Liz Hoffman, "Goldman Sach's Ex-CEO Lloyd Blankfein Met Malaysian at Center of 1MDB Scandal," *The Wall Street Journal* (Nov. 9, 2018), available at https://www.wsj.com/articles/goldman-sachss-ex-ceo-met-malaysian-twice-at-center-of-1mdb-scandal-1541779363.

personally interceded to prevent Goldman banker Cyrus Shey, who also worked on the 1MDB deals, from being fired:

> *Mr. Vella told colleagues at Goldman he was concerned Mr. Shey could go public with details about 1MDB at a time of scrutiny of the business*, and he interceded to ensure Mr. Shey wasn't immediately let go, according to the person. Mr. Shey later got a $1.5 million private loan from Mr. Leissner. . . .[145]

141.    *The Wall Street Journal* also recently reported that one of Leissner's colleagues on the 1MDB deals, Tan Boon-Kee, was the focus of a DOJ investigation into 1MDB-related matters.[146]  Boon-Key almost certainly communicated with Low while at Goldman, as the *Journal* reported that after she left Goldman, she communicated with Low in her new position as Deutsche Bank's Asia Pacific Head of Banking for Financial Institutions.[147]

142.    In addition to identification of specific bankers involved in the 1MDB deals, news reports have sharply criticized Goldman's "rogue banker" defense as bordering on the absurd. Indeed, an article in the *Harvard Law School Forum on Corporate Governance and Financial Regulation* described Goldman's "rogue employee" argument as the "'Four Monkeys' defense: see no evil, hear no evil, speak no evil, and keep all the money."[148]  Indeed, the article continued, "any relationship that generated an apparent record of $600 or so million over a mere ten months would be expected to get the very close attention of Goldman's most senior officers, including the

---

[145] *Id.*

[146] Aruna Viswanatha, Bradley Hope & Jenny Strasburg, "U.S. Investigating Deutsche Bank's Dealings With Malaysian Fund 1MDB," *The Wall Street Journal* (July 11, 2019), available at https://www.wsj.com/articles/u-s-investigating-deutsche-bank-s-dealings-with-malaysian-fund-1mdb-11562798907?mod=hp_lead_pos1.

[147] *Id.*

[148] "Goldman Sachs and the 1MDB Scandal," *Harvard Law School Forum on Corporate Governance and financial Regulation* (May 14, 2019), available at https://corpgov.law.harvard.edu/2019/05/14/goldman-sachs-and-the-1mdb-scandal/.

then-co-head of investment banking and now CEO, David Solomon, as well as the CEO at that

time."  The article continued:

> Goldman is trying to force-fit multiple, longtime, senior officers who were or are partners (plus whoever else might be behind all the redactions in the transcript of the hearing for Leissner's plea agreement) into the "rogue" category.  In addition, ***there were dozens of Goldman Sachs top bankers, partners and executives, including the then-CEO (Blankfein), the then-COO/later President (Gary Cohn), and the then-co-head of investment banking/now-CEO (Solomon), presumably flyspecking the 1MDB relationship, the bond offerings and the other deals***.
>
> ***Nevertheless, Goldman wants the world to believe that no one at Goldman was smart enough to get a hint of one of the biggest frauds in the world happening right under their noses in a multi-year, multi-deal relationship that stretched from junior bankers to the most senior executives at the bank***.
>
> For example, it was Vice Chairman Michael Evans who had "a casual conversation" at the billionaires gathering in Davos, Switzerland in 2012 with the former prime minister that landed the third no bid offering for $3 billion. Just over a year after that offering, which provided "hundreds of millions of dollars" in bribes to re-elect the prime minister, Vice Chairman Evans reportedly was on the $500 million superyacht "Topaz" off the French Riviera with the former prime minister and the crown prince of Abu Dhabi discussing future exclusive and lucrative deals for Goldman. Not only had money stolen from 1MDB paid in part for the Topaz to be built, it also paid for renting it for that very trip and meeting. (This is in addition to the $250 million superyacht Jho Low had built for himself with stolen 1MDB money.)
>
> Yet, Goldman's position is that a "rogue" banker lied and fooled all of the smartest, highest paid bankers in the world, all of Goldman's risk, compliance, legal and audit systems and controls, and all of Goldman's management.  That is exactly what Goldman is peddling and wants everyone to believe . . . .
>
> ***Doesn't Goldman brag about having the worlds' state-of-the-art, high-tech, comprehensive systems and multiple, robust layers of compliance, risk, legal, audit and management designed to ensure that something like this could never happen, even at fractions of the size of this fraud and these fraudulent activities? Aren't they supposed to be experts at due diligence?***

143.    *Bloomberg* confirmed the analysis in the *Harvard Law School Forum*, interviewing

ten former Goldman partners at their annual former partners dinner on December 12, 2018, and

writing that "[t]o them, it's the biggest threat to Goldman's reputation since the firm's post-crisis

makeover."[149]  Dennis Suskind, the former Goldman partner who **hired** Blankfein, was quoted by *Bloomberg* as saying "[i]t doesn't smell right. . . .   The thing about the firm is that **they should have been monitoring it closer**."[150]  Michael Dubno, Goldman's former chief technology officer, described the fallout from 1MDB as "a terrifying thing.  **We were more careful, more clean – so whenever you see something like this it is very disturbing**."[151]

144.    CNBC also interviewed several current and former Goldman employees, describing them as "doubt[ing] the firm's rogue banker defense."[152]  These employees explained that due to their size and structure, the 1MDB deals should have been heavily reviewed:

> [D]eals as large as those that helped create the $6.5 billion 1MDB fund require scrutiny from several top firm-wide committees. The 2012 and 2013 bond transactions at the heart of 1MDB were "bought deals" that meant **Goldman had to use its capital to buy newly created securities before offloading them to investors**. That's riskier than in more typical arrangements where Goldman is merely distributing bonds to investors.[153]

145.    According to *Bloomberg*, "[s]uch 'hard underwriting' is highly unusual in the aftermath of the financial crisis, as banks are careful about meeting capital requirements. . . . All

---

[149] Max Abelson & Sridhar Natarajan, "Lloyd Blankfein's Final Days at Goldman Clouded by 1MDB Scandal," *Bloomberg*, (Dec. 13, 2018), available at https://www.bloomberg.com/news/articles/2018-12-13/lloyd-blankfein-s-final-days-at-goldman-clouded-by-1mdb-scandal.

[150] *Id.*

[151] *Id.*

[152] Hugh Son, "As Goldman's 1MDB Scandal Deepens, Insiders Doubt the Firm's Rogue Banker Defense," *CNBC*, (Dec. 18, 2018), available at https://www.cnbc.com/2018/12/17/as-goldmans-1mdb-mess-deepens-insiders-doubt-the-firms-rogue-banker-defense.html.

[153] *Id.*

this should have triggered a wringer of committee approvals, especially because bank capital—so precious after the financial crisis—was at risk."[154]

146.     *CNBC* further reported that Steven Scherr, who became Goldman's CFO in November 2018, was "[a]mong those who approved" 1MDB, and that former CEO Blankfein and current CEO David Solomon "also reviewed the deals."[155]   Indeed, *CNBC* quoted one incredulous former Goldman employee, who still has dealings with the Company, as saying **"[a]nyone who's been there a long time knows you can't do big things without senior people knowing, period**. No matter how senior you are, there's always somebody above you. ***So a lot of people had to decide they were comfortable committing billions of dollars to this***."[156]   The *Financial Times* added that:

> The 1MDB deals were scrutinised by at least 30 Goldman executives, including Mr. Blankfein and his successor David Solomon, sources have said. But they focused on making sure 1MDB officials fully understood that they had picked a fundraising structure that would allow Goldman to make unusually large sums in exchange for taking on additional risk. By contrast, when the outsized nature of Goldman's 1MDB fees first emerged, senior executives at rival banks told me they would never have dared take such proposals to their internal risk committees for fear of being laughed out of the room.[157]

147.     Indeed, the *Financial Times* reported that "[u]nder the Bank Secrecy Act, Goldman employees had an obligation to be especially careful when dealing with people linked to Najib

---

[154] Nisha Gopalan, "Rogue Bankers Don't Explain Goldman's 1MDB Mess," *Bloomberg* (Dec. 21, 2018), available at https://www.bloomberg.com/opinion/articles/2018-12-21/rogue-bankers-don-t-explain-goldman-s-gs-1mdb-mess.

[155] Hugh Son, "As Goldman's 1MDB Scandal Deepens, Insiders Doubt the Firm's Rogue Banker Defense," *CNBC*, (Dec. 18, 2018), available at https://www.cnbc.com/2018/12/17/as-goldmans-1mdb-mess-deepens-insiders-doubt-the-firms-rogue-banker-defense.html.

[156] *Id.*

[157] Brooke Master, "Goldman Sachs has some serious questions to answer," *The Irish Times,* (Nov. 6, 2018), available at https://www.irishtimes.com/business/financial-services/goldman-sachs-has-some-serious-questions-to-answer-1.3688252.

Razak, the former Malaysian prime minister" because "[t]he law requires enhanced due diligence when handling transactions connected to a 'politically exposed person.'"[158]

148.   *The New York Times* was much more blunt in its assessment.  While Blankfein tried to brush the case aside, stating "[t]hese are guys who evaded our safeguards, and lie. Stuff like that's going to happen," the *Times* wrote that Goldman "seems unlikely to be able to slough off its role in the looting of a multibillion-dollar Malaysian government investment fund as the work of a few miscreants."[159]   The article went on to note:

> A partnership at Goldman is one of the most coveted positions on Wall Street, so labeling high-level managers as uncontrolled rogues as a way to avoid criminal charges may not play well with prosecutors, especially when the deals were so lucrative for the company.

### 3.   Defendants' Misconduct Has Exposed Goldman to Widespread Condemnation and Billions of Dollars of Damages

149.   The 1MDB scandal has also significantly impacted Goldman's bottom line.  In 2018, Goldman's share price has performed the worst among its bank peers, plummeting 34% "thanks to negative headlines tied to the 1MDB scandal," as *CNBC* reported.[160]   *The Economist* similarly noted that as of April 2019, **Goldman's "share price has under-performed an index of**

---

[158] Ben McLannahan, "Goldman's Business Culture Criticised by US Officials," *Financial Times* (Nov. 2, 2018), available at https://www.ft.com/content/763db0c4-ddff-11e8-9f04-38d397e6661c.

[159] Peter Henning, "Goldman Blames Rogue Staff for Its 1MDB Scandal. That May Not Wash," *The New York Times*, (Nov. 15, 2009), available at https://www.nytimes.com/2018/11/15/business/dealbook/goldman-sachs-1mdb.html.

[160] Hugh Son, "Goldman Sachs Says it Was Lied to in 1MDB Scandal That has Plagued its Stock," *CNBC* (Dec. 17, 2018), available at https://www.cnbc.com/2018/12/17/goldman-sachs-says-it-was-lied-to-in-1mdb-scandal-that-has-plagued-its-stock.html.

*other bank stocks by 10.3 percentage points, suggesting that the scandal may have wiped as much as $9.1bn off its value*."[161]

150.    The potential liability from Malaysia's criminal charges against Goldman alone is enormous.  As detailed above, the criminal charges Malaysia filed against Goldman in December 2018 seek $7.5 billion from the Company in connection with 1MDB.

151.    Initial reports from analysts estimated that Goldman could be liable for up to $2.5 billion.  In particular, UBS reported in December 2018 that "potential fines typically range from the $600 million banking fees Goldman earned from 1MDB transactions to the $2.5 billion sum embezzled from the funds."[162]  Goldman's stock was downgraded by Morgan Stanley analysts who cited regulatory concerns.

152.    As Goldman's involvement in the scandal deepened, analysts continued to increase their estimates of Goldman's exposure.  Wells Fargo analyst Mike Mayo reported that Goldman could face up to $5 billion in costs tied to 1MDB, as well as another 18 months of "overhang" on the Company's performance.[163]  He further noted that "one issue has been and remains the silence of the CEO to investors"—unfavorably comparing Goldman's response to the 1MDB scandal to JPMorgan's response to the 2012 "London Whale" incident.  Meanwhile, *The Economist* noted that:

---

[161] "A New Era at Goldman Sachs Starts in the Shadow of a Scandal," *The Economist* (Apr. 15, 2019), available at https://www.economist.com/finance-and-economics/2019/04/15/a-new-era-at-goldman-sachs-starts-in-the-shadow-of-a-scandal.

[162] Elizabeth Dilts, "Goldman Sachs Likely to Boost Legal Reserves for 1MDB: Analysts," *Reuters* (Dec. 5, 2018), available at https://www.reuters.com/article/us-goldman-sachs-1mdb/goldman-sachs-likely-to-boost-legal-reserves-for-1mdb-analysts-idUSKBN1O42C8.

[163] Hugh Son, "Goldman Sachs Says it Was Lied to in 1MDB Scandal That has Plagued its Stock," *CNBC* (Dec. 17, 2018), available at https://www.cnbc.com/2018/12/17/goldman-sachs-says-it-was-lied-to-in-1mdb-scandal-that-has-plagued-its-stock.html.

As far as 1MDB is concerned, the big worry for shareholders is the size and scope of the penalties. *A large fine is all but inevitable*. It could be based on the $600m Goldman earned from the bond issuance—or the $2.7bn American authorities say was stolen from the proceeds. That will be multiplied by anything up to four, depending on the degree to which the firm is found culpable. That Goldman is co-operating with the DoJ will bring the multiplier down; if the DoJ decides the firm's oversight of compliance procedures was inadequate, it will be towards the higher end. Steven Chubak of Wolfe Research, an equity-research firm, *thinks the total will be somewhere between $1bn and $4bn*.[164]

153.    In 4Q2019, Goldman's provision for litigation and regulatory proceedings surged to $516 million – from just $9 million a year earlier. *CNBC* reported that "most of that [increase] is tied to the 1MDB case, according to a person with direct knowledge of the matter."[165]

154.    Privately, *Goldman executives have conceded that Goldman could be on the hook for a year's worth of earnings—approximately $10 billion*. *Fox Business* has reported that:

> [P]eople with knowledge of the thinking of these senior executives say internally Goldman believes the liability could be much larger than the roughly $2 billion originally estimated and could cost about $10 billion, essentially wiping out a year's worth of earnings. . . .
>
> "The senior people at Goldman believe a year of earnings could be on the line because of this scandal," said one senior Wall Street executive with ties to senior Goldman executives.[166]

155.    In addition to significant damages, Defendants' misconduct has exposed Goldman to substantial reputational damages. *The Economist* observed that:

> *No one is more aware of the value of a brand than Goldman Sachs*. The investment bank, founded in 1869, has advised the biggest and best American companies on the value of theirs for the past 150 years. Yet *these are troubling*

---

[164] "A New Era at Goldman Sachs Starts in the Shadow of a Scandal," *The Economist* (Apr. 15, 2019), available at https://www.economist.com/finance-and-economics/2019/04/15/a-new-era-at-goldman-sachs-starts-in-the-shadow-of-a-scandal.

[165] Hugh Son, "Goldman CEO Solomon on Ex-Banker's Role in 1MDB Scandal: 'We Apologize to the Malaysian People,'" *CNBC*, (Jan. 16, 2019), available at https://www.cnbc.com/2019/01/16/goldman-sachs-ceo-solomon-addresses-1mdb-scandal.html.

[166] Lydia Moynihan & Charles Gasparino, "Goldman Malaysia Fund Headache Could Cost a 'Year of Earnings': Company Execs," *Fox Business* (Feb. 13, 2019), available at https://www.foxbusiness.com/financials/company-execs-goldman-malaysia-fund-headache-could-cost-a-year-of-earnings.

*times for its own brand, tarnished by association with a fraud-ridden Malaysian state-run fund*, 1MDB, and hurt by the bank's failure to adapt after the global financial crisis.

*       *       *

*The first task for David Solomon, who took over as chief executive last October, is to clean up Goldman's reputation*.[167]

156.     Noting that Goldman was "once again the villain," *Quartz* reported that:

*A decade ago, when the financial crisis swamped the world, Goldman Sachs was the undisputed villain of Wall Street.*

*While other banks were perceived as greedy or incompetent (and often both), Goldman had an unsurpassed aura of sinister venality*. . . .

For the past 10 years, Goldman has tried to sanitize that reputation and promote what can only be called the softer side of investment banking. When Lloyd Blankfein retired as CEO and handed the reins to David Solomon in July, it seems that the worst of its publicity challenges had been laid to rest.

*Now, they're all rushing back*.[168]

157.     *Fox Business* noted that "Goldman's reputation as the world's premier investment bank has faced such severe damage for its work with the fund that Solomon made a rare appearance on the firm's fourth quarter earnings conference call in January"[169] during which he apologized to the people of Malaysia.

---

[167] "A New Era at Goldman Sachs Starts in the Shadow of a Scandal," *The Economist* (Apr. 15, 2019), available at https://www.economist.com/finance-and-economics/2019/04/15/a-new-era-at-goldman-sachs-starts-in-the-shadow-of-a-scandal.

[168] Oliver Staley, "Goldman Sachs is Once Again the Villain," *Quartz* (Nov. 2, 2018), available at https://qz.com/1449125/in-the-1mbd-scandal-goldman-sachs-is-the-villain-once-again/.

[169] Lydia Moynihan & Charles Gasparino, "Goldman Malaysia Fund Headache Could Cost a 'Year of Earnings': Company Execs," *Fox Business* (Feb. 13, 2019), available at https://www.foxbusiness.com/financials/company-execs-goldman-malaysia-fund-headache-could-cost-a-year-of-earnings.

70

H.    **The Emerging Truth About Goldman's Role in the 1MDB Causes a Massive Decline in Goldman's Stock Price**

158.    On March 7, 2016, *Bloomberg* published an article entitled "Ex-Goldman Banker to Malaysia Fund Said Subpoenaed in U.S. Probe," reporting that the U.S. Justice Department had subpoenaed Leissner in late February in connection with a probe linked to 1MDB.  Following this news, Goldman's stock price fell $3.75 per share, or 2.41%, to close at $151.60 on March 8, 2016.

159.    On November 8, 2018, *Bloomberg* reported on the personal involvement of Goldman's then-CEO, Lloyd Blankfein, in a meeting to establish ties with Malaysia and its new sovereign wealth fund that was referenced in the court documents unsealed the prior week. In a November 8, 2018 article entitled "Goldman's Blankfein Said to Have Attended 2009 1MDB Meeting," *Bloomberg* noted that "Blankfein was the unidentified high-ranking Goldman Sachs executive referenced in U.S. court documents who attended a 2009 meeting with the former Malaysian prime minister," and that "[t]he meeting was arranged with the help of men who are now tied to the subsequent plundering of the 1MDB fund[.]" On this news, Goldman's stock price fell by $9.00, or nearly 4%, closing at $222.65 on November 9, 2018.

160.    Days later, on November 12, 2018, Malaysian government officials denounced Goldman Sachs's role in the 1MDB scandal.  New Malaysian Prime Minister Mahathir Mohamad stated that "[t]here is evidence that Goldman Sachs has done things that are wrong" and "[o]bviously we have been cheated through the compliance by Goldman Sachs people." Meanwhile, the country's Finance Minister Lim Guan Eng said that Malaysia would seek a "full refund" of the approximately $600 million in fees that the Company earned in connection with 1MDB's $6.5 billion bond deal.  On this news, Goldman's stock price fell $16.60 per share, or nearly 7.5%, to close at $206.05 on November 12, 2018.

71

161.    On December 17, 2018, multiple news outlets reported that Malaysia had filed criminal charges against Goldman Sachs and two former executives for their role in the 1MDB fraud and money-laundering scandal. That same day, in response to these charges, Goldman Sachs denied any wrongdoing through its spokesman Edward Naylor, who stated: "We believe these charges are misdirected and we will vigorously defend them and look forward to the opportunity to present our case.  The firm continues to cooperate with all authorities investigating these matters."  Following this news, Goldman's stock price fell $4.76 per share, or 2.76%, to close at $168.01 on December 17, 2018.

## VI.    THE DEFENDANTS VIOLATED SECTION 10(b) OF THE EXCHANGE ACT AND BREACHED THEIR FIDUCIARY DUTIES BY KNOWINGLY OR RECKLESSLY ISSUING MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

### A.    Defendants Caused Goldman Sachs to Conduct a Massive Stock Repurchase Program

162.    In breach of their fiduciary duties to Goldman and its shareholders, and in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, Defendants issued, and caused the Company to issue, statements that, in light of Goldman's utterly deficient internal controls and the illicit money laundering and bribery scheme detailed above, were materially false or misleading when made.  Defendants' misrepresentations artificially inflated the price of Goldman's shares, causing the Company to purchase shares at artificially inflated prices through its significant stock repurchase program.

163.    By causing Goldman to conduct share repurchases, Defendants signaled to investors their purported belief that Goldman shares were trading at a discount, which caused investors to purchase shares and thereby drive the price up.  Further, and relatedly, the Company's repurchasing of shares artificially inflated its financial metrics such as earnings per share, as the repurchases resulted in fewer outstanding shares.  The artificial inflation of Goldman shares was

both financially beneficial to Defendants, as numerous Defendants' compensation was tied to the Company's financial performance, and helped mask Goldman's illicit activities described herein, thereby helping to perpetuate them.

164.    In sum, as detailed in the chart below, between September 2012 and September 2018, Goldman repurchased over 150 million shares of its stock, paying over $26 billion:

| Repurchase Date (Three months ending unless otherwise noted) | Common shares (In millions) | Average cost per share | Total Cost (In Millions) |
|---|---|---|---|
| December 2018 (year-end)[170] | 13.9 | $236.22 | $3,294 |
| September 2018[171] | 5.3 | $234.93 | $1,224 |
| June 2018[172] | 0 | $0 | $0 |
| March 2018[173] | 3.0 | $264.32 | $800 |
| December 2017 (year-end)[174] | 29.0 | $231.87 | $6,721 |
| September 2017[175] | 9.6 | $225.12 | $2,169 |
| June 2017[176] | 6.6 | $221.92 | $1,466 |
| March 2017[177] | 6.2 | $243.22 | $1,500 |
| December 2016 (year-end)[178] | 36.6 | $165.88 | $6,069 |
| September 2016[179] | 7.8 | $162.83 | $1,275 |
| June 2016[180] | 11.1 | 156.60 | $1,744 |

---

[170] 2018 Form 10-K at p. 163.

[171] 3Q 2018 Form 10-Q at p. 67.

[172] 2Q 2018 Form 10-Q at p. 67.

[173] 1Q 2018 Form 10-Q at p. 63.

[174] 2017 Form 10-K at p. 166.

[175] 3Q 2017 Form 10-Q at p. 64.

[176] 2Q 2017 Form 10-Q at p. 64.

[177] 1Q 2017 Form 10-Q at p. 63.

[178] 2016 Form 10-K at p. 172.

[179] 3Q 2016 Form 10-Q at p. 68.

[180] 2Q 2016 Form 10-Q at p. 68.

| | | | |
|---|---|---|---|
| March 2016[181] | 10.0 | $154.44 | $1,550 |
| December 2015 (year-end)[182] | 22.1 | $189.41 | $4,195 |
| September 2015[183] | 5.4 | $196.00 | $1,050 |
| June 2015[184] | 1.2 | $208.20 | $245 |
| March 2015[185] | 6.8 | $185.18 | $1,250 |
| December 2014 (year-end)[186] | 31.8 | $171.79 | $5,469 |
| September 2014[187] | 7.1 | $176.00 | $1,250 |
| June 2014[188] | 7.8 | $160.89 | $1,250 |
| March 2014[189] | 10.3 | $166.58 | $1,720 |
| December 2013 (year-end)[190] | 39.3 | $157.11 | $6,170 |
| September 2013[191] | 10.2 | $161.59 | $1,650 |
| June 2013[192] | 10.5 | $152.80 | $1,600 |
| March 2013[193] | 10.1 | $150.53 | $1,520 |
| December 2012 (year-end)[194] | 42.0 | $110.31 | $4,640 |
| September 2012[195] | 11.8 | $106.17 | $1,250 |

---

[181] 1Q 2016 Form 10-Q at p. 65.

[182] 2015 Form 10-K at p. 180.

[183] 3Q 2015 Form 10-Q at p. 71.

[184] 2Q 2015 Form 10-Q at p. 75.

[185] 1Q 2015 Form 10-Q at p. 73.

[186] 2014 Form 10-K at p. 190.

[187] 3Q 2014 Form 10-Q at p. 77.

[188] 2Q 2014 Form 10-Q at p. 77.

[189] 1Q 2014 Form 10-Q at p. 74.

[190] 2013 Form 10-K at p. 200.

[191] 3Q 2013 Form 10-Q at p. 85.

[192] 2Q 2013 Form 10-Q at p. 87

[193] 1Q 2013 Form 10-Q at p. 79.

[194] 2012 Form 10-K at p. 191.

[195] 3Q 2012 Form 10-Q at p. 78.

| June 2012[196] | 14.3 | $104.81 | $1,500 |
| March 2012[197] | 3.3 | $111.28 | $362 |

165.    In conducting share repurchases, Defendants falsely signaled to the public that they believed Goldman shares were undervalued and that the repurchases were the best use of the Company's cash.  The share repurchases also had the effect of growing the Company's earnings per share—as share repurchases lower the number of shares outstanding, on which earnings per share are based—as well as its return on assets, return on equity, and other metrics.  Together, these actions helped inflate Goldman's share price.

### B.    In Connection with the Share Repurchases, Defendants Issued Materially False and Misleading Statements

166.    During the Relevant Period, Defendants issued materially false and misleading statements and omissions in the Company's Forms 10-K and 10-Q.

#### 1.    False and Misleading Statements Regarding Goldman's Financial Results

167.    On February 28, 2014, Goldman filed its Form 10-K for the year ended December 31, 2013 (the "2013 Form 10-K"), which was signed by Defendants Blankfein, Burns, George, Johnson, Mittal, Ogunlesi, and Viniar, along with several non-defendant directors including Cohn.

168.    The 2013 Form 10-K's Management Discussion and Analysis section presented the operating results of Goldman's investment banking segment, which includes debt underwriting for 2012 and 2013, on page 60 as follows:

---

[196] 2Q 2012 Form 10-Q at p. 77.

[197] 1Q 2012 Form 10-Q at p. 72.

| in millions | | Year Ended December | |
| --- | --- | --- | --- |
| | **2013** | 2012 | 2011 |
| Financial Advisory | **$1,978** | $1,975 | $1,987 |
| Equity underwriting | **1,659** | 987 | 1,085 |
| Debt underwriting | **2,367** | 1,964 | 1,283 |
| Total Underwriting | **4,026** | 2,951 | 2,368 |
| Total net revenues | **6,004** | 4,926 | 4,355 |
| Operating expenses | **3,475** | 3,330 | 2,995 |
| **Pre-tax earnings** | **$2,529** | $1,596 | $1,360 |

169.     On February 23, 2015, Goldman filed its Form 10-K for the year ended December 31, 2014 (the "2014 Form 10-K"), which was signed by defendant directors Blankfein, Burns, Flaherty, George, Johnson, Mittal, Ogunlesi, Oppenheimer, Viniar, and Winkelman, along with several non-defendant directors including Cohn.

170.     The 2014 Form 10-K's Management Discussion & Analysis section presented the operating results of Goldman's investment banking segment, which includes debt underwriting for 2012 and 2013, on page 59 as follows:

| $ in millions | | Year Ended December | |
| --- | --- | --- | --- |
| | **2014** | 2013 | 2012 |
| Financial Advisory | **$2,474** | $1,978 | $1,975 |
| Equity underwriting | **1,750** | 1,659 | 987 |
| Debt underwriting | **2,240** | 2,367 | 1,964 |
| Total Underwriting | **3,990** | 4,026 | 2,951 |
| Total net revenues | **6,464** | 6,004 | 4,926 |
| Operating expenses | **3,688** | 3,479 | 3,333 |
| **Pre-tax earnings** | **$2,776** | $2,525 | $1,593 |

171.     Defendants substantially reiterated these false and misleading statements on page 195 in Goldman's Form 10-K for the year ended December 31, 2015 (the "2015 Form 10-K"), listing identical results for its 2013 pre-tax earnings attributable to debt underwriting.[198]

172.     These financial results were materially false and misleading when made because the debt underwriting results for 2012 and 2013 were not the result of legitimate and lawful

---

[198] The 2015 Form 10-K was signed by Blankfein, Burns, Flaherty, George, Johnson, Mittal, Ogunlesi, Oppenheimer, Viniar, and Winkelman, along with several non-defendant directors including Cohn.

business practices, but instead due to illicit actions and violations of law arising from and relating to the 2012 and 2013 1MDB bond offerings that would have been prevented if Defendants had properly maintained the Company's internal controls and compliance systems.

### 2. False Statements Regarding Goldman's Risk Exposure and Risk Management

173. Despite nearly two pages of reporting in the subsection entitled "Selected Country Exposures," the 2013 Form 10-K did not disclose Goldman's role in, or knowledge of, the bribery schemes arising from the 1MDB deals.[199] Defendants substantially reiterated these false and misleading statements and omissions in the 2014 Form 10-K[200] and 2015 Form 10-K.[201]

174. Under the section entitled "Operational Risk Management," the 2013 Form 10-K states:

> Operational risk is the risk of loss resulting from inadequate or failed internal processes, people and systems or from external events. Our exposure to operational risk arises from routine processing errors as well as extraordinary incidents, such as major systems failures. *Potential types of loss events related to internal and external operational risk include*:
>
> - *Clients, products and business practices*;
>
> \* \* \*
>
> *We maintain a comprehensive control framework designed to provide a well-controlled environment to minimize operational risks*. The Firmwide Operational Risk Committee, along with the support of regional or entity-specific working groups or committees, provides oversight of the ongoing development and implementation of our operational risk policies and framework. Operational Risk Management is a risk management function independent of our revenue-producing units, reports to our chief risk officer, and is responsible for developing and implementing policies, methodologies and a formalized framework for operational

---

[199] 2013 Form 10-K at p. 114.

[200] 2014 Form 10-K at pp. 110-111.

[201] 2015 Form 10-K at pp. 108-09.

risk management with the goal of minimizing our exposure to operational risk.[202]

175.     Defendants substantially reiterated these false and misleading statements in the 2014 Form 10-K,[203] 2015 Form 10-K,[204] 2016 Form 10-K,[205] and 2017 Form 10-K.[206]  These false and misleading statements were also reiterated in Goldman's Forms 10-Q filed quarterly during this period.[207]  Defendant Blankfein signed each of the 10-Qs through the second quarter of 2018, and upon Blankfein's retirement, Defendant Solomon signed the 10-Qs beginning in the third quarter of 2018.

176.     Under the heading "Risk Identification and Reporting," the 2013 Form 10-K states:

The core of our operational risk management framework is risk identification and reporting. ***We have a comprehensive data collection process, including firmwide policies and procedures, for operational risk events***.

We have established policies that require managers in our revenue-producing units and our independent control and support functions to escalate operational risk events. ***When operational risk events are identified, our policies require that the events be documented and analyzed to determine whether changes are required in our systems and/or processes to further mitigate the risk of future events***.

In addition, our firmwide systems capture internal operational risk event data, key metrics such as transaction volumes, and statistical information such as performance trends. We use an internally-developed operational risk management

---

[202] 2013 Form 10-K at p. 117.

[203] 2014 Form 10-K at p. 112.

[204] 2015 Form 10-K at p. 110.

[205] 2016 Form 10-K at p. 105. The 2016 Form 10-K was filed on February 27, 2017 and signed by defendant directors Blankfein, Burns, Flaherty, George, Johnson, Kullman, Mittal, Ogunlesi, Oppenheimer, Viniar, and Winkelman.

[206] 2017 Form 10-K at pp. 99-100.  The 2017 Form 10-K was filed on February 26, 2018, and signed by defendant directors Blankfein, Burns, Flaherty, Geroge, Johnson, Kullman, Mittal, Ogunlesi, Oppenheimer, Viniar, and Winkelman.

[207] 1Q 2014 Form 10-Q at 169; 2Q 2014 Form 10-Q at 175; 3Q 2014 Form 10-Q at 178; 1Q 2015 Form 10-Q at 160; 2Q 2015 Form 10-Q at 167; 3Q 2015 Form 10-Q at 162; 1Q 2016 Form 10-Q at 149; 2Q 2016 Form 10-Q at 156; 3Q 2016 Form 10-Q at 156; 1Q 2017 Form 10-Q at 141; 2Q 2017 Form 10-Q at 146; 3Q 2017 Form 10-Q at 146; 1Q 2018 Form 10-Q at 137; 2Q 2018 Form 10-Q at 145; 3Q 2018 Form 10-Q at 145.

application to aggregate and organize this information. ***Managers from both revenue-producing units and independent control and support functions analyze the information to evaluate operational risk exposures and identify businesses, activities or products with heightened levels of operational risk. We also provide periodic operational risk reports to senior management, risk committees and the Board***.[208]

177.    Defendants substantially reiterated these false and misleading statements in the 2014 Form 10-K,[209] 2015 Form 10-K,[210] 2016 Form 10-K,[211] and 2017 Form 10-K.[212] These false and misleading statements were also reiterated in Goldman's Forms 10-Q filed quarterly during this period, which were signed by Blankfein through the second quarter of 2018 and signed by Solomon beginning in the third quarter of 2018.[213]

178.    The foregoing statements were materially false and misleading when made because Goldman's risk framework was not comprehensive.  Indeed, as Leissner's guilty plea and the Indictment filed against Ng and Low reveal, Goldman's system of internal controls could be easily circumvented and the Company's business culture, particularly in Southeast Asia, prioritized consummation of deals ahead of the proper operation of its compliance functions.  Thus, despite the multitude of red flags regarding 1MDB and having actual knowledge that Low was inextricably linked to 1MDB, the 1MDB deals were approved after a cursory review because of Goldman's nonfunctioning internal controls.

---

[208] 2013 Form 10-K at p. 118.

[209] 2014 Form 10-K at p. 111.

[210] 2015 Form 10-K at p. 111.

[211] 2016 Form 10-K at p. 106.

[212] 2017 Form 10-K at p. 100.

[213] 1Q 2014 Form 10-Q at 170; 2Q 2014 Form 10-Q at 176; 3Q 2014 Form 10-Q at 179; 1Q 2015 Form 10-Q at 161; 2Q 2015 Form 10-Q at 168; 3Q 2015 Form 10-Q at 163; 1Q 2016 Form 10-Q at 150; 2Q 2016 Form 10-Q at 157; 3Q 2016 Form 10-Q at 157; 1Q 2017 Form 10-Q at 142; 2Q 2017 Form 10-Q at 146; 3Q 2017 Form 10-Q at 146; 1Q 2018 Form 10-Q at 138; 2Q 2018 Form 10-Q at 146; 3Q 2018 Form 10-Q at 146.

### 3.    False Statements Regarding Goldman's Internal Controls

179.    The 2013 Form 10-K also contained two certifications signed by Blankfein and

then-CFO Harvey Schwartz.  The first certification stated:

> 1. I have reviewed this Annual Report on Form 10-K for the year ended December
> 31, 2013 of The Goldman Sachs Group, Inc.;

> 2. *Based on my knowledge, this report does not contain any untrue statement of*
> *a material fact or omit to state a material fact necessary to make the statements*
> *made, in light of the circumstances under which such statements were made, not*
> *misleading with respect to the period covered by this report*;

> 3. Based on my knowledge, the financial statements, and other financial
> information included in this report, fairly present in all material respects the
> financial condition, results of operations and cash flows of the registrant as of, and
> for, the periods presented in this report;

> 4. The registrant's other certifying officer(s) and I are responsible for establishing
> and maintaining disclosure controls and procedures (as defined in Exchange Act
> Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as
> defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

>> (a) *Designed such disclosure controls and procedures, or caused such*
>> *disclosure controls and procedures to be designed under our supervision,*
>> *to ensure that material information relating to the registrant, including*
>> *its consolidated subsidiaries, is made known to us by others within those*
>> *entities*, particularly during the period in which this report is being prepared;

>> (b) Designed such internal control over financial reporting, or caused such
>> internal control over financial reporting to be designed under our
>> supervision, to provide reasonable assurance regarding the reliability of
>> financial reporting and the preparation of financial statements for external
>> purposes in accordance with generally accepted accounting principles;

>> (c) *Evaluated the effectiveness of the registrant's disclosure controls and*
>> *procedures and presented in this report our conclusions about the*
>> *effectiveness of the disclosure controls and procedures*, as of the end of
>> the period covered by this report based on such evaluation; and

>> (d) Disclosed in this report any change in the registrant's internal control
>> over financial reporting that occurred during the registrant's most recent
>> fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual
>> report) that has materially affected, or is reasonably likely to materially
>> affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting*.[214]

180.     The 2014 Form 10-K,[215] 2015 Form 10-K,[216] 2016 Form 10-K,[217] and 2017 Form 10-K[218] contained substantially similar false certifications.    Substantially similar false certifications were also contained in Goldman's Forms 10-Q filed quarterly during this period, with Blankfein signing the certifications through the second quarter of 2018 and Solomon signing them beginning in the third quarter of 2018.[219]

181.     The second certification, also signed by Blankfein and Schwartz, stated:

Pursuant to 18 U.S.C. § 1350, the undersigned officer of The Goldman Sachs Group, Inc. (the "Company") hereby certifies that the Company's Annual Report on Form 10-K for the year ended December 31, 2014 (the "Report") fully complies

---

[214] 2013 Form 10-K at Ex. 31.1.

[215] 2014 Form 10-K at Ex. 31.1.

[216] 2015 Form 10-K at Ex. 31.1. These false and misleading certifications were signed by Blankfein and then-CFO Schwartz.

[217] 2016 Form 10-K at Ex. 31.1. These false and misleading certifications were signed by Blankfein and then-CFO Schwartz.

[218] 2017 Form 10-K at Ex. 31.1. These false and misleading certifications were signed by Blankfein and CFO Martin Chavez.

[219] 1Q 2014 Form 10-Q at Ex. 31.1; 2Q 2014 Form 10-Q at Ex. 31.1; 3Q 2014 Form 10-Q at Ex. 31.1; 1Q 2015 Form 10-Q at Ex. 31.1; 2Q 2015 Form 10-Q at Ex. 31.1; 3Q 2015 Form 10-Q at Ex. 31.1; 1Q 2016 Form 10-Q at Ex. 31.1; 2Q 2016 Form 10-Q at Ex. 31.1; 3Q 2016 Form 10-Q at Ex. 31.1; 1Q 2017 Form 10-Q at Ex. 31.1; 2Q 2017 Form 10-Q at Ex. 31.1; 3Q 2017 Form 10-Q at Ex. 31.1; 1Q 2018 Form 10-Q at Ex. 31.1; 2Q 2018 Form 10-Q at Ex. 31.1; 3Q 2018 Form 10-Q at Ex. 31.1.

with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934 and that *the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company*.[220]

182.    The 2014 Form 10-K,[221] 2015 Form 10-K,[222] 2016 Form 10-K,[223] and 2017 Form 10-K[224] contained substantially similar false certifications. Substantially similar false certifications were also contained in Goldman's Forms 10-Q filed quarterly during this period, with Blankfein signing the certifications through the second quarter of 2018 and Solomon signing them beginning in the third quarter of 2018.[225]

183.    The foregoing certifications were materially false and misleading when made because they did not disclose that Goldman's system of internal controls were nonfunctioning and could be easily circumvented, including because the Company's business culture, particularly in Southeast Asia, prioritized consummation of deals ahead of the proper operation of its compliance functions.

---

[220] 2013 Form 10-K at Ex. 32.1.

[221] 2014 Form 10-K at Ex. 32.1.

[222] 2015 Form 10-K at Ex. 32.1. These false and misleading certifications were signed by Blankfein and then-CFO Schwartz.

[223] 2016 Form 10-K at Ex. 32.1. These false and misleading certifications were signed by Blankfein and then-CFO Schwartz.

[224] 2017 Form 10-K at Ex. 32.1. These false and misleading certifications were signed by Blankfein and CFO Martin Chavez.

[225] 1Q 2014 Form 10-Q at Ex. 32.1; 2Q 2014 Form 10-Q at Ex. 32.1; 3Q 2014 Form 10-Q at Ex. 32.1; 1Q 2015 Form 10-Q at Ex. 32.1; 2Q 2015 Form 10-Q at Ex. 32.1; 3Q 2015 Form 10-Q at Ex. 32.1; 1Q 2016 Form 10-Q at Ex. 32.1; 2Q 2016 Form 10-Q at Ex. 32.1; 3Q 2016 Form 10-Q at Ex. 32.1; 1Q 2017 Form 10-Q at Ex. 32.1; 2Q 2017 Form 10-Q at Ex. 32.1; 3Q 2017 Form 10-Q at Ex. 32.1; 1Q 2018 Form 10-Q at Ex. 32.1; 2Q 2018 Form 10-Q at Ex. 32.1; 3Q 2018 Form 10-Q at Ex. 32.1.

C.      **In Repurchasing Stock, Goldman Relied on Defendants' False and Misleading Statements**

184.    In repurchasing shares in connection with the stock repurchase program, Goldman relied on Defendants' false or misleading statements, either directly or through the "fraud on the market" doctrine articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), or through the doctrine articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

185.    Throughout the Relevant Period, Goldman justifiably expected Defendants to disclose material information as required by law and SEC regulations in the Company's periodic filings with the SEC.  Goldman would not have repurchased its securities at artificially inflated prices had Defendants disclosed all material information then known to them, as detailed in this Complaint. Thus, reliance by Goldman should be presumed with respect to Defendants' omissions of material information as established under the *Affiliated Ute* presumption of reliance.

186.    Additionally, the "fraud on the market" presumption applies to Defendants' misstatements of material fact or failures to disclose material facts.  At all relevant times, the market for Goldman's common stock was efficient, for the following reasons, among others:

a.      Goldman's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.      As a regulated issuer, Goldman filed periodic reports with the SEC and the NYSE;

c.      Goldman's common-stock trading volume was substantial on a daily basis, averaging tens of millions of shares per day throughout the Relevant Period;

d.      Goldman regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press

83

releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e.     Goldman was followed by numerous securities analysts employed by major brokerage firms, who wrote reports that were distributed to those brokerage firms' sales force and certain customers, and each of those reports was publicly available and entered the public marketplace; and

f.     The market price of Goldman's stock reacted rapidly to new information entering the market.

187.   As a result of the foregoing, the market for Goldman's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Goldman's stock.  The foregoing facts indicate the existence of an efficient market for trading of Goldman stock and support application of the fraud-on-the-market doctrine.

188.   Goldman relied on the integrity of the market price for the repurchase of its stock and is entitled to a presumption of reliance with respect to Defendants' misstatements and omissions alleged in this Complaint.

189.   Had Goldman known of the material adverse information not disclosed by Defendants or been aware of the truth behind Defendants' material misstatements, the Company would not have repurchased Goldman stock at artificially inflated prices and been damaged thereby.

**D.**     **Neither the Statutory "Safe Harbor" Nor the "Bespeaks Caution" Doctrines Apply to Defendants' Misrepresentations**

190.     Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA") nor the judicially created "bespeaks caution" doctrine applicable to forward-looking statements under certain circumstances applies to any of the false or misleading statements pleaded in this Complaint.   None of the subject statements constituted a forward-looking statement; rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Goldman's present financial condition and its internal controls, among other things.

191.     Alternatively, to the extent any of the false or misleading statements pleaded in this Complaint could be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Further, to the extent the PSLRA's safe harbor would otherwise apply to any forward-looking statements pleaded in this Complaint, Defendants are liable for those false or misleading statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Goldman or a Defendant who knew the statement was materially false or misleading when made.

**E.**     **Defendants' Misstatements and Omissions Damaged Goldman**

192.     Throughout the Relevant Period, the price of Goldman's common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above.   Defendants engaged in a scheme to deceive the market and a course of conduct that operated as a fraud or deceit on Goldman, which repurchased shares at artificially inflated prices.   When Defendants' prior misrepresentations and fraudulent conduct were disclosed

and became apparent to the market, the price of Goldman stock fell as the prior artificial inflation dissipated.  As a result of its purchases of Goldman shares during the Relevant Period, the Company suffered damages under the federal securities laws.

193.    On November 8, 2018, the last trading day before news reports revealed Blankfein's meetings with Low, Goldman common stock traded at $231.65 per share.

194.    Defendants' disclosures over the next several weeks revealed to the market the false and misleading nature of Defendants' statements and omissions.  Throughout the next several weeks, additional news about the scandal, including the charges filed by the government of Malaysia, revealed the scope of Goldman's involvement in the 1MDB scandal.

195.    In response to those disclosures, the price of Goldman common stock declined precipitously.  Over a period of several weeks, as new information about the scandal continued to be revealed, Goldman's share price plummeted by approximately 33%, falling from its November 8, 2018 share price of $231.65 to close as low as $156.35 on December 24, 2018, wiping out billions of dollars of market capitalization during that time.

196.    The decline in Goldman's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to the market.  The timing and magnitude of the decline in the Company's share price negates any inference that the losses suffered by Goldman were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

### F.    Defendants Blankfein, Solomon, and Viniar Unlawfully Profited at Goldman's Expense by Selling Shares While in Possession of Non-Public Information

197.    Defendants Blankfein, Solomon, and Viniar took advantage of the artificial inflation in Goldman's share price caused by Defendants' false and misleading statements.  These Defendants collectively sold or otherwise disposed of millions of dollars' worth of Goldman stock

Case 1:19-cv-01562-VSB   Document 35   Filed 07/12/19   Page 91 of 135

during that time, all while in the possession of material, non-public information.  The Company's

share price was also lifted during this time by the share repurchase program, which was approved

by the Defendants when they knew or recklessly disregarded the unlawful practices detailed in this

Complaint.

198.    As detailed in the chart below, between 2015 and 2017, before the full extent and

the impact of the 1MDB scandal on Goldman became known, Blankfein sold or otherwise disposed

of over 750,000 shares of Goldman common stock for a total of over $30.6 million through his

exercise of options:

| Transaction Date | Number of Shares Exercised | Exercise Price Per Share | Sell Price Per Share | Total Benefit from Exercise of Stock Options |
|---|---|---|---|---|
| 5/18/2015 | 8,625 | $131.64 | $205.05 | $633,194.03 |
| 5/19/2015 | 100,811 | $131.64 | $205.00 | $7,395,696.58 |
| 6/18/2015 | 96,227 | $131.64 | $215 | $8,021,482.72 |
| 6/19/2015 | 7,959 | $131.64 | $215 | $663,462.24 |
| 11/23/2015 | 1,750 | $131.64 | $189.19-$190.86 | $102,104.84 |
| 11/24/2015 | 1,750 | $131.64 | $187.42-$189.11 | $99,227.40 |
| 11/25/2015 | 1,750 | $131.64 | $188.85-$189.38 | $100,589.71 |
| 11/16/2016 | 104,614 | $199.84 | $205.79-211.19 | $1,175,048.39 |
| 11/18/2016 | 104,614 | $199.84 | $211.29-$211.32 | $1,197,894.40 |
| 11/20/2017 | 161,052 | $204.16 | $237.83-$238.78 | $5,567,549.38 |
| 11/21/2017 | 161,052 | $204.16 | $238.65-$239.42 | $5,671,817.32 |
| Total | 750,204 | | | $30,628,067.02[226] |

199.    These sales were highly unusual, because even though he could have sold shares

prior to May 18, 2015, Blankfein had not sold any shares and had not exercised any options since

November 28, 2012.  This gap in insider transactions occurred when Goldman's stock price was

increasing rapidly, driven by performance juiced from the large fees gained by the 1MDB

---

[226] Includes disposal of shares of Goldman stock withheld to fund the exercise price and satisfy withholding obligations in connection with the exercise of stock options on 11/16/16, 11/18/16, 11/20/17, and 11/21/17.

offerings.  In May and June 2015, Blankfein exercised options on 213,622 shares, netting nearly $17 million.  By early 2016, the media had reported that Leissner had taken a leave of absence from Goldman under a cloud of corruption, and on Low's involvement with 1MDB and embezzlement of funds.  In November 2016 Blankfein exercised options on 209,228 shares, netting over $2 million.  In November 2017, Blankfein further exercised options on 322,104 shares, netting over $11 million.  Moreover, as detailed above, the truth about Goldman's involvement in 1MDB came to light in November 2018.  Blankfein's sales of Goldman shares between 2015 and 2017 were motivated by his non-public knowledge that if revelations of Goldman's conduct with respect to 1MDB were made public—including that he had personally met with the central player in the 1MDB corruption scandal at least three times—Goldman would be revealed to be so culpable in the fraud that its share price would drop.

200.    As detailed in the charts below, between 2017 and 2018, before the full extent and the impact of the 1MDB scandal on Goldman became known, Solomon sold or otherwise disposed of over 372,000 shares of Goldman common stock for a total gain of over $40 million on almost $90 million in total stock sold, through both open market transactions and through his exercise of options.  As news reports indicated, Solomon was among those who would have reviewed the 1MDB offerings.  Thus, in 2017 and 2018, he possessed material non-public information about the true extent of the risk that Goldman faced from its role in the 1MDB scandal.  Nevertheless, motivated by this information, he traded on this information at inflated prices, netting nearly $40 million.

Exercise of stock options

| Transaction Date | Number of Shares Exercised | Exercise Price Per Share | Sell Price Per Share | Total Value Sell | Total Benefit from Exercise of Stock Options |
|---|---|---|---|---|---|
| 2/21/2017 | 94,564 | $204.16 | $252.17-$252.18 | $23,846,282.62 | $4,540,096.38 |
| 11/20/2017 | 47,282 | $204.16 | $238.68-$238.78 | $11,289,702.24 | $1,636,609.12 |
| 11/21/2017 | 47,282 | $204.16 | $239.28-$239.42 | $11,319,833.80 | $1,666,740.68 |
| 11/24/2017 | 42,987 | $78.78 | $237.94-$238.13 | $10,233,957.81 | $6,847,441.95 |
| 1/29/2018 | 64,000 | $78.78 | $271.53-$271.65 | $17,380,423.49 | $12,338,503.49 |
| 5/14/2018 | 9,750 | $78.78 | $244.67-$244.69 | $2,385,679.26 | $1,617,574.26 |
| 7/18/2018 | 27,125 | $78.78 | $232.08-$232.10 | $6,295,517.28 | $4,158,609.78 |
| 8/1/2018 | 27,125 | $78.78 | $237.92-$238.00 | $6,455,110.85 | $4,318,203.35 |
| Total | 360,115 | | | $89,206,507.36 | $37,123,779.02[227] |

Stock sales

| Transaction Date | Number of Shares | Price Per Share | Total Value |
|---|---|---|---|
| 2/7/2017 | 4,165 | $240.08 | $999,939.03 |
| 2/7/2017 | 2,085 | $240.08 | $500,571.60 |
| 8/7/2017 | 3,260 | $231.59 | $754,997.42 |
| 11/13/2017 | 2,400 | $238.49 | $572,385.12 |
| 5/14/2018 | 405 | $242.30 | $98,131.95 |
| Total | 12,315 | | $2,926,025.11 |

201.    As detailed in the charts below, between 2014 and 2018, before the full extent and the impact of the 1MDB scandal on Goldman became known, Viniar sold or otherwise disposed of over 600,000 shares of Goldman common stock for a total of over $28.2 million.  Viniar began

---

[227] Includes disposal of shares of Goldman stock withheld to fund the exercise price and satisfy withholding obligations in connection with the exercise of stock options on each of the transaction dates.

engaging in heavy selling from November 2016 onwards.  Like Blankfein and Solomon, Viniar

was motivated to sell due to his knowledge that Goldman was heavily involved in the 1MDB

scandal

Exercise of stock options

| Transaction Date | Number of Shares Exercised | Exercise Price Per Share | Sell Price Per Share | Total Benefit from Exercise of Stock Options |
|---|---|---|---|---|
| 10/29/2014 | 135,312 | $131.64 | $186.17 | $7,378,089.79 |
| 11/11/2016 | 75,000 | $199.84 | $204.14-$204.22 | $312,551.93 |
| 11/14/2016 | 39,000 | $199.84 | $209.30-$209.33 | $368,959.92 |
| 11/15/2016 | 39,184 | $199.84 | $210.99 | $436,900.53 |
| 2/13/2017 | 70,380 | $204.16 | $246.93-$246.95 | $3,011,465.00 |
| 8/1/2017 | 100,000 | $204.16 | $227.79-$227.84 | $2,367,299.42 |
| 10/20/2017 | 100,000 | $204.16 | $245.19 | $4,102,890.51 |
| Total | 558,876 | | | $17,978,157.06[228] |

Stock sales

| Transaction Date | Number of Shares | Price Per Share | Total Value |
|---|---|---|---|
| 11/21/2017 | 25,000 | $238.02 | $5,950,507.50 |
| 1/18/2018 | 17,500 | $251.19 | $4,395,795.25 |
| Totals | 42,500 | | $10,346,302.75 |

## VII.   THE DEFENDANTS VIOLATED SECTION 14(a) OF THE EXCHANGE ACT AND SEC RULE 14A-9, AND BREACHED THEIR FIDUCIARY DUTIES BY CAUSING THE COMPANY TO FILE MATERIALLY MISLEADING PROXY STATEMENTS

202.    Defendants also violated Section 14(a) of the Exchange Act and SEC Rule 14a-9

by causing Goldman Sachs to issue proxy statements that failed to disclose the 1MDB fraud or the

seriously deficient internal controls and compliance practices that allowed the 1MDB scheme to

---

[228] Includes disposal of shares of Goldman stock withheld to fund the exercise price and satisfy withholding obligations in connection with the exercise of stock options on 11/11/16, 11/14/16, 11/15/16, 2/13/17, 8/1/17, and 10/20/17.

begin and helped perpetuate it. Defendants' failure to disclose those material facts likewise constitutes a breach of their fiduciary duties.

### A. Defendants Caused Goldman to Issue Materially False and Misleading Statements in the 2016 Proxy

203. On April 8, 2016, Defendants Blankfein, Ogunlesi, Burns, Flaherty, George, Johnson, Mittal, Oppenheimer, Viniar, and Winkelman caused Goldman to issue its 2016 Proxy Statement in connection with the 2016 annual stockholders meeting to be held on May 20, 2016. In the 2016 Proxy Statement, the Defendants solicited stockholder votes to, among other things: (i) elect and re-elect themselves to the Board; and (ii) approve executive compensation. With respect to each of these solicited votes, these Defendants issued materially false or misleading statements.

204. The 2016 Proxy also described the Board's key role in risk oversight:

***Our Board's focus on overseeing risk management enhances our directors' ability to provide insight and feedback to senior management, and, if necessary, to challenge management, on our firm's strategic direction***

\* \* \*

Our Board is responsible for overseeing the risk management of our firm, which is carried out at the full Board as well as at each of its Committees, and in particular the Risk Committee.

Board risk management oversight includes:

- Strategic and financial considerations

- Legal, regulatory and compliance risks

- Other risks considered by committees

Risk Committee risk management oversight includes:

- Overall risk-taking tolerance and risk governance, as well as the Risk Appetite Statement (in coordination with our full Board)

- Liquidity, market, credit, operational and model risks

91

- Our Capital Plan, capital ratios and capital adequacy

- Technology and cybersecurity risks

Audit Committee risk management oversight includes:

- Financial, legal and compliance risk, in coordination with our full Board

- Coordination with our Risk Committee, including with respect [to] our risk assessment and risk management practices

Compensation Committee risk management oversight includes:

- Design firmwide compensation program and policies that are consistent with the safety and soundness of our firm and do not raise risks reasonably likely to have a material adverse effect on our firm

- Jointly with our Risk Committee, annual CRO [Chief Risk Officer] compensation-related risk assessment . . .

Governance Committee risk management oversight includes:

- Managing risks related to board composition and board and executive succession

Public Responsibilities Committee risk management oversight includes:

- Brand and reputational risk, including client and business standards considerations as well as reports regarding the Firmwide Reputational Risk Committee that review certain transactions that may present heightened reputational risk

- Environmental, social and governance risk.[229]

*   *   *

Risk Management

***Effective risk management underpins everything that we do, and compensation is carefully designed to be consistent with the safety and soundness of our firm***.

Our CRO presents his annual risk assessment jointly to our Compensation Committee and our Risk Committee in order to assist them with evaluating this design.

---

[229] 2016 Proxy at 29.

- This assessment is focused on whether our program is consistent with regulatory guidance requiring that financial services firms ensure that variable compensation does not encourage imprudent risk-taking.

- Our CRO's view was that the various components of our compensation programs and policies work together to balance risk and reward in a manner that does not encourage imprudent risk-taking.[230]

205.    The 2016 Proxy Statement misleadingly suggested that the Board maintained "effective risk management" and omitted any disclosures regarding (i) Goldman's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately disclose a culture that "was highly focused on consummating deals, at times prioritizing this goal ahead of the proper operation of its compliance functions" within Goldman; and (iii) the subpoenas/requests for documents by regulatory bodies related to 1MDB.

206.    The 2016 Proxy Statement harmed Goldman Sachs by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors and resulted in the reelection of directors who subjected Goldman to significant monetary and reputational damages.  As a result of the misleading statements in the 2016 Proxy Statement, Goldman Sachs stockholders voted to re-elect Blankfein, Burns, Cohn, Flaherty, George, Johnson, Mittal, Ogunlesi, Oppenheimer, Viniar, Winkelman and elect Kullman to the Board.

207.    The 2016 Proxy Statement also urged stockholders to approve an advisory vote to approve executive compensation:

> Our Board and Compensation Committee recognize the fundamental interest our shareholders have in executive compensation. We continued our shareholder outreach program in 2015, and shareholder feedback obtained through these efforts, as well as the results of our prior Say on Pay votes, played an important role in our Compensation Committee's decisions regarding our executive compensation. Our 2015 Say on Pay vote received overwhelming shareholder support (97% of votes

---

[230] *Id.* at 40.

cast), which our Compensation Committee believes indicates a very positive response to our program.[231]

208.    Highlights from the 2016 Annual Proxy related to the firm's compensation practices included:

Priority on Risk Management and Sound Compensation Practices.

*Our Compensation Committee considers our firm's safety and soundness in making all executive compensation determinations. Together with our Risk Committee, the Compensation Committee meets annually with our CRO to discuss his risk-related assessment of our compensation program.*[232]

*   *   *

Our Compensation Principles guide our Compensation Committee in its review of compensation at our firm, including the Committee's determination of NEO [named executive officer] compensation . . .

*   *   *

- *Paying for Performance.  Firmwide compensation should directly relate to firmwide performance over the cycle.*

- *Encouraging Firmwide Orientation and Culture.  Employees should think and act like long-term shareholders, and compensation should reflect the performance of the firm as a whole.*

- *Compensation should be carefully designed to be consistent with the safety and soundness of our firm. Risk profiles must be taken into account in annual performance reviews, and factors like liquidity risk and cost of capital should also be considered.*[233]

209.    Those statements misleadingly conveyed that Goldman's compensation structures emphasized the functioning of effective internal controls and encouraged long-term stockholder value.   In reality, Goldman's compensation system actually encouraged—and consistently rewarded—extreme risk taking and widespread illegal practices.

---

[231] *Id.* at 60.

[232] *Id.* at 6.

[233] *Id.* at 39.

210.    Under this false impression, numerous Goldman stockholders voted in support of compensation to Defendant Blankfein, totaling $23 million in 2015 and causing damage to Goldman, without the benefit of material information regarding Blankfein's continued and ongoing failure to address the 1MDB fraud.

### B.    Defendants Caused Goldman to Issue Materially False and Misleading Statements in the 2017 Proxy

211.    On March 17, 2017, Defendants Blankfein, Ogunlesi, Burns, Flaherty, George, Johnson, Kullman, Mittal, Oppenheimer, Viniar, and Winkelman caused Goldman to issue its 2017 Proxy Statement in connection with the 2017 annual stockholders meeting held on April 28, 2017. In the 2017 Proxy Statement, these Defendants solicited stockholder votes to, among other things: (i) elect and re-elect themselves to the Board; and (ii) approve executive compensation.  With respect to each of these solicited votes, these Defendants issued materially false or misleading statements.

212.    The 2017 Proxy also described the Board's key role in risk oversight:

*Our Board's focus on overseeing risk management enhances our directors' ability to provide insight and feedback to senior management, and, if necessary, to challenge management, on our firm's strategic direction.*[234]

\* \* \*

Our Board is responsible for overseeing the risk management of our firm, which is carried out at the full Board as well as at each of its Committees, and in particular the Risk Committee.

Board risk management oversight includes:

- Strategic and financial considerations

- Legal, regulatory and compliance risks

- Other risks considered by committees

---

[234] 2017 Proxy at 29.

Risk Committee risk management oversight includes:

- Overall risk-taking tolerance and risk governance

- Our Risk Appetite Statement (in coordination with our full Board)

- Liquidity, market, credit, operational and model risks

- Our Capital Plan, capital ratios and capital adequacy

- Technology and cybersecurity risks

Public Responsibilities Committee risk management oversight includes:

- Brand and reputational risk, including client and business standards considerations as well as reports regarding the Firmwide Reputational Risk Committee that review certain transactions that may present heightened reputational risk

- Environmental, social and governance risk.

Compensation Committee risk management oversight includes:

- Firmwide compensation program and policies that are consistent with the safety and soundness of our firm and do not raise risks reasonably likely to have a material adverse effect on our firm

- Jointly with our Risk Committee, annual CRO compensation-related risk assessment …

Audit Committee risk management oversight includes:

- Financial, legal and compliance risk, in coordination with our full Board

- Coordination with our Risk Committee, including with respect [to] our risk assessment and risk management practices

Governance Committee risk management oversight includes:

- Managing risks related to board composition and board and executive succession[235]

\* \* \*

Risk Management

---

[235] *Id.* at 30.

*Effective risk management underpins everything that we do, and compensation is carefully designed to be consistent with the safety and soundness of our firm.*

Our CRO presents his annual risk assessment jointly to our Compensation Committee and our Risk Committee in order to assist them with evaluating the design of our program.

- This assessment is focused on whether our program is consistent with regulatory guidance requiring that financial services firms ensure that variable compensation does not encourage imprudent risk-taking.

- Our CRO's view was that the various components of our compensation programs and policies work together to balance risk and reward in a manner that does not encourage imprudent risk-taking.[236]

213. The 2017 Proxy Statement misleadingly suggested that the Board maintained "effective risk management" and omitted any disclosures regarding (i) Goldman's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately disclose a culture that "was highly focused on consummating deals, at times prioritizing this goal ahead of the proper operation of its compliance functions" within Goldman; and (iii) the subpoenas/requests for documents by regulatory bodies related to 1MDB.

214. The 2017 Proxy Statement harmed Goldman by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors and resulted in the reelection of directors who subjected Goldman to significant monetary and reputational damages. As a result of the misleading statements in the 2017 Proxy Statement, Goldman stockholders voted to re-elect Blankfein, Burns, Flaherty, George, Johnson, Mittal, Ogunlesi, Oppenheimer, Kullman, Viniar, and Winkelman to the Board.

215. The 2017 Proxy Statement also urged stockholders to approve an advisory vote to approve executive compensation:

Our Say on Pay vote gives our shareholders the opportunity to cast an advisory vote to approve the compensation of all of our NEOs. We currently include this advisory

---

[236] *Id.* at 44.

vote on an annual basis; at this meeting our shareholders will vote on an advisory basis to determine the future frequency of our Say on Pay votes.[237]

216.    Highlights from the 2017 Annual Proxy related to the firm's compensation practices included:

Compensation Committee Risk Management Oversight Includes:

- *Firmwide compensation program and policies that are consistent with the safety and soundness of our firm and do not raise risks reasonably likely to have a material adverse effect on our firm*

- *Jointly with our Risk Committee, annual CRO compensation-related risk assessment . . .* [238]

\* \* \*

Our Compensation Principles guide our Compensation Committee in its review of compensation at our firm, including the Committee's determination of NEO compensation . . .

\* \* \*

- *Paying for Performance.  Firmwide compensation should directly relate to firmwide performance over the cycle.*

- *Encouraging Firmwide Orientation and Culture.  Employees should think and act like long-term shareholders, and compensation should reflect the performance of the firm as a whole.*

- *Compensation should be carefully designed to be consistent with the safety and soundness of our firm. Risk profiles must be taken into account in annual performance reviews, and factors like liquidity risk and cost of capital should also be considered.*[239]

217.    Those statements misleadingly conveyed that Goldman Sachs's compensation structures emphasized the functioning of effective internal controls and encouraged long-term

---

[237] *Id.* at 67.

[238] *Id.* at 30.

[239] *Id.* at 43.

stockholder value.   In reality, Goldman's compensation system actually encouraged—and consistently rewarded—extreme risk taking and widespread illegal practices.

218.   Under this false impression, numerous Goldman stockholders voted in support of compensation to Defendant Blankfein, totaling $22 million in 2016 and causing damage to Goldman, without the benefit of material information regarding Blankfein's continued and ongoing failure to address the 1MDB fraud.

**C.   Defendants Caused Goldman to Issue Materially False and Misleading Statements in the 2018 Proxy**

219.   On March 23, 2018, Defendants Blankfein, Ogunlesi, Burns, Flaherty, George, Johnson, Kullman, Mittal, Oppenheimer, Viniar, and Winkelman caused Goldman to issue its 2018 Proxy Statement in connection with the 2018 annual stockholders meeting to be held on May 2, 2018.  In the 2018 Proxy Statement, these Defendants solicited stockholder votes to, among other things: (i) elect and re-elect themselves to the Board; and (ii) approve executive compensation. With respect to each of these solicited votes, these Defendants issued materially false or misleading statements.

220.   The 2018 Proxy also described the Board's key role in risk oversight:

> ***Our Board's focus on overseeing risk management enhances our directors' ability to provide insight and feedback to senior management, and, if necessary, to challenge management, on our firm's strategic direction.***[240]

*   *   *

> Our Board is responsible for overseeing the management of the firm's most significant risks on an enterprise-wide basis.  This oversight is executed by our full Board as well as each of its Committees, in particular our Risk Committee, and is carried out in conjunction with the Board's oversight of firm strategy.

> Board risk management oversight includes:

---

[240] 2018 Proxy at 34.

- Strategic and financial considerations

- Legal, regulatory, reputational and compliance risks

- Other risks considered by Committees

Risk Committee risk management oversight includes:

- Overall risk-taking tolerance and risk governance, including our Enterprise Risk Management Framework

- Our Risk Appetite Statement (in coordination with our full Board)

- Liquidity, market, credit, operational and model risks

- Our Capital Plan, capital ratios and capital adequacy

- Technology and cybersecurity risks, including oversight of management's processes, monitoring and controls related thereto

Public Responsibilities Committee risk management oversight includes:

- Brand and reputational risk, including client and business standards considerations as well as the receipt of reports regarding the Firmwide Reputational Risk Committee regarding certain transactions that may present heightened reputational risk

- ESG (environmental, social and governance) risk.

Compensation Committee risk management oversight includes

- Firmwide compensation program and policies that are consistent with the safety and soundness of our firm and do not raise risks reasonably likely to have a material adverse effect on our firm

- Jointly with our Risk Committee, annual CRO compensation-related risk assessment . . .

Audit Committee risk management oversight includes:

- Financial, legal and compliance risk, in coordination with our full Board

- Coordination with our Risk Committee, including with respect our risk assessment and risk management practices

Governance Committee risk management oversight includes:

100

- Board composition and Board and executive succession[241]

* * *

Risk Management

***Effective risk management underpins everything that we do, and compensation is carefully designed to be consistent with the safety and soundness of our firm.***

Our CRO presents his annual risk assessment jointly to our Compensation Committee and our Risk Committee in order to assist them with evaluating this design.

- This assessment is focused on whether our program is consistent with regulatory guidance requiring that financial services firms ensure that variable compensation does not encourage imprudent risk-taking.

- Our CRO's view was that the various components of our compensation programs and policies work together to balance risk and reward in a manner that does not encourage imprudent risk-taking.[242]

221.    The 2018 Proxy Statement misleadingly suggested that the Board maintained "effective risk management" and omitted any disclosures regarding (i) Goldman's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately disclose a culture that "was highly focused on consummating deals, at times prioritizing this goal ahead of the proper operation of its compliance functions" within Goldman; and (iii) the subpoenas/requests for documents by regulatory bodies related to 1MDB.

222.    The 2018 Proxy Statement harmed Goldman Sachs by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors and resulted in the reelection of directors who subjected Goldman to significant monetary and reputational damages.  As a result of the misleading statements in the 2018 Proxy Statement, Goldman Sachs

---

[241] *Id.* at 35.

[242] *Id.* at 48.

stockholders voted to re-elect Blankfein, Burns, Flaherty, George, Johnson, Mittal, Ogunlesi, Oppenheimer, Viniar, Winkelman and Kullman to the Board.

223.    The 2018 Proxy Statement also urged stockholders to approve an advisory vote to approve executive compensation:

> Our Say on Pay vote gives our shareholders the opportunity to cast an advisory vote to approve the compensation of all of our NEOs. We currently include this advisory vote on an annual basis.[243]

224.    Highlights from the 2018 Annual Proxy related to the firm's compensation practices included the following:

Compensation Committee Risk Management Oversight Includes:

- *Firmwide compensation program and policies that are consistent with the safety and soundness of our firm and do not raise risks reasonably likely to have a material adverse effect on our firm.*

- *Jointly with our Risk Committee, annual CRO compensation-related risk assessment . . .*[244]

*   *   *

Our Compensation Principles guide our Compensation Committee in its review of compensation at our firm, including the Committee's determination of NEO compensation . . .

*   *   *

- *Paying for Performance.  Firmwide compensation should directly relate to firmwide performance over the cycle.*

- *Encouraging Firmwide Orientation and Culture.  Employees should think and act like long-term shareholders, and compensation should reflect the performance of the firm as a whole.*

- *Discouraging Imprudent Risk-Taking.  Compensation should be carefully designed to be consistent with the safety and soundness of our firm. Risk profiles must be taken into account in annual performance*

---

[243] *Id.* at 69.

[244] *Id.* at 35.

> *reviews, and factors like liquidity risk and cost of capital should also be considered.*[245]

225.    Those statements misleadingly conveyed that Goldman's compensation structures emphasized the functioning of effective internal controls and encouraged long-term stockholder value.    In reality, Goldman's compensation system actually encouraged—and consistently rewarded—extreme risk taking and widespread illegal practices.

226.    Under this false impression, numerous Goldman stockholders voted in support of compensation to Defendant Blankfein, totaling $24 million in 2017 and causing damage to Goldman, without the benefit of material information regarding Blankfein's continued and ongoing failure to address the 1MDB fraud.

## VIII.    ADDITIONAL DAMAGES TO GOLDMAN

227.    In addition to the damages caused to Goldman detailed above, Defendants' misconduct has wrought extreme reputational damage upon Goldman.    This is especially harmful to Goldman because the Company's business is built on its reputation and its clients' trust.    As Goldman's Business Principles state, "[o]ur assets are our people, capital and reputation.    If any of these is ever diminished, ***the last is the most difficult to restore***. We are dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us. ***Our continued success depends upon unswerving adherence to this standard***."    Goldman's 2018 Proxy further noted that "[o]ur Board has long recognized the importance of oversight of the firm's culture and reputation, and recent events serve to underscore that we must remain resolute in this focus."

228.    Defendants breached this trust by acting in direct contravention of Goldman's publicly-touted credo.    This reputational harm undoubtedly translates into long-term damage to

---

[245] *Id.* at 47.

the Company, and has already begun with analysts, such as Morgan Stanley, Bank of America/Merrill Lynch, and Atlantic Equities, downgrading the Company.  According to data compiled by Bloomberg, between November 2018 and January 2019, another ten firms lowered their price targets for Goldman's shares.[246]

229.    The costs to Goldman in terms of lost revenue and profits from its illicit conduct have yet to fully materialize.  Initial reports, however, suggest the costs associated with the scandal will continue to grow, perhaps into the tens of billions.  These include costs incurred in defending against, and the potential settlement of, civil and criminal legal proceedings brought against the Company related to the 1MDB scandal.

## IX.    DEFENDANTS WERE OBLIGATED TO SAFEGUARD THE COMPANY'S INTERESTS

### A.    The Duties of All Defendants

230.    By reason of their positions as officers and/or directors of Goldman and because of their ability to control the business, corporate, and financial affairs of the Company, Defendants owed Goldman and its shareholders the duty to exercise due care and diligence in the management and administration of the affairs of the Company, including ensuring that Goldman operated in compliance with all applicable federal and state laws, rules and regulations.  Defendants were and are required to act in furtherance of the best interests of Goldman and its shareholders so as to benefit all shareholders equally and not in furtherance of Defendants' personal interest or benefit. Each director and officer owes to Goldman and its shareholders the fiduciary duty to exercise good

---

[246] These companies included Barclays, Credit Suisse, Daiwa Securities, Evercore ISI, Keefe, Bruyette & Woods, RBC Capital Markets, Sandler O'Neill & Partners, Societe Generale, Wells Fargo Securities, and Wolfe Research.

faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

231.    Because of their positions of control and authority as directors or officers of Goldman, Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts complained of in this Complaint.  Due to their positions with Goldman, Defendants had knowledge of material non-public information regarding the Company.

232.    To discharge their duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls and financial and corporate affairs of the Company.  By virtue of such duties, the officers and directors of Goldman were required to, among other things:

a.    Manage, conduct, supervise, and direct the employees, businesses and affairs of Goldman in accordance with laws, rules and regulations, and the charter and by-laws of Goldman;

b.    Ensure that Goldman did not engage in imprudent or unlawful practices and that the Company complied with all applicable laws and regulations;

c.    Remain informed as to how Goldman was, in fact, operating, and, upon receiving notice or information of imprudent or unsound practices, to take reasonable corrective and preventative actions, including maintaining and implementing adequate financial and operational controls;

d.    Supervise the preparation, filing, or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by Goldman, and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of officers of the Company;

e.   Preserve and enhance Goldman's reputation as befits a public corporation;

f.   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business; and

g.   Refrain from unduly benefiting themselves and other Goldman insiders at the expense of the Company.

**B.    The Board and its Committees Were Expressly Charged with Overseeing and Monitoring Goldman's Compliance Function and Risk Exposure**

233.    Among the Board's most critical duties is overseeing the Company's compliance function and risk management structure.  Goldman's 2017 Annual Report to shareholders, for example, states that "[r]isk management governance starts with the Board, which both directly and through its committees, including its Risk Committee, oversees our risk management policies and practices implemented through the E[nterprise] R[isk] M[anagement] framework."  This ERM framework, Goldman explained "is designed to enable comprehensive risk management processes" including "legal, compliance, conduct, regulatory and reputational risk exposures." The Annual Report explains that:

> *The Board receives regular briefings on firmwide risks*, including liquidity risk, market risk, credit risk, operational risk and model risk from our independent control and support functions, including the chief risk officer, *and on compliance risk and conduct risk from the head of Compliance, on legal and regulatory matters from the general counsel, and on other matters impacting our reputation from the chair of our Firmwide Client and Business Standards Committee*. The chief risk officer, as part of the review of the firmwide risk portfolio, regularly advises the Risk Committee of the Board of relevant risk metrics and material exposures, including risk limits and thresholds established in our risk appetite statement.

234.    Further, the Board maintains several standing committees to monitor specific aspects of Goldman's business.  Specifically among these are the Audit Committee, the Compensation Committee, the Corporate Governance and Nominating Committee, the Risk

106

Committee, and the Public Responsibilities Committee.  The following chart illustrates the membership of these committees:

| | Audit Committee | Compensation Committee | Corporate Governance and Nominating Committee | Risk Committee | Public Responsibilities Committee |
|---|---|---|---|---|---|
| M. Michele Burns | | Chair | • | • | |
| Drew G. Faust | | | • | • | • |
| Mark Flaherty | • | | • | • | |
| William W. George | | • | • | | Chair |
| James A. Johnson | | • | • | | • |
| Ellen J. Kullman | | • | • | • | |
| Lakshmi N. Mittal | | • | • | | • |
| Adebayo O. Ogunlesi* | * | * | Chair | * | * |
| Peter Oppenheimer | Chair | | • | • | |
| Jan E. Tighe | • | | • | • | |
| David A. Viniar | | | | • | |
| Mark O. Winkelman | • | | • | Chair | |

*Ex officio member of all committees*

235.    The Audit Committee is currently comprised of Oppenheimer, Ogunlesi, Flaherty, non-defendant Tighe, and Winkelman. According to Goldman's Audit Committee Charter, the Audit Committee's purpose is to, among other matters, "assist the Board in its oversight of (i) the integrity of the Company's financial statements [and] (ii) the Company's compliance with legal and regulatory requirements. . . ."

236.    The Audit Committee's Charter in effect during the Relevant Period specifically provided that the job of the Committee is, among other things:

To discuss with the Director of Internal Audit periodically:

•    The adequacy of the Company's internal controls.

- Progress against the Internal Audit plan and the rationale for any changes thereto.

- Internal Audit's control risk assessment, including any significant findings and management's responses thereto.

- The Internal Audit function and responsibilities and any scope restrictions encountered during the execution of Internal Audit responsibilities.

- Internal Audit's assessment of the procedures and controls around the firm's risk management functions.

- Key performance measures regarding the operation and effectiveness of Internal Audit.

\*      \*      \*

To discuss with management periodically the guidelines and policies that govern the process by which risk assessment and risk management is undertaken, coordinating with the Risk Committee, as appropriate.

\*      \*      \*

To discuss with the Company's General Counsel and/or Chief Compliance Officer any significant legal, compliance or regulatory matters that may have a material impact on the Company's business, financial statements or compliance policies.

237.    The Board's Risk Committee is currently comprised of a majority of the Board, and currently consists of Ogunlesi, Winkelman, Burns, non-defendant Faust, Flaherty, Kullman, Oppenheimer, non-defendant Tighe, and Viniar.  The Risk Committee's Charter states that its purpose is to "assist the Board in its oversight of the Company's overall risk-taking tolerance and management of financial and operational risks . . . ."  The Chair of the Risk Committee is **required** to liaise with the Chair of the Audit Committee "to assist that Committee in its review of the Company's risk assessment and risk management matters . . . ."

238.    The Risk Committee's Charter specifically provides that the job of the Committee is to, among other things:

a.      Review and discuss with management the Company's operational risk strategy and operational risk policies and controls.

b.      Review and discuss with management the Company's model risk strategy and model risk policies and controls.

c.      Review and discuss with management (and approve as appropriate) the Company's Enterprise Risk Management Framework.

d.      To discuss with management periodically risk assessment and risk management matters, including the policies related thereto, coordinating with the Audit Committee, as appropriate.

e.      Receive, as and when appropriate, reports from Internal Audit and members of management on the results of risk management reviews and assessments.

239.    In addition, the 2017 Annual Report significantly stated that "[t]he Board, directly or indirectly through its Risk Committee, approves limits and thresholds included in our risk appetite statement, at firmwide, business and **product levels**."

240.    Goldman also maintained a Code of Business Conduct and Ethics (the "Code"). The Code states in relevant part that:

> This Code of Business Conduct and Ethics (the "Code") embodies the commitment of The Goldman Sachs Group, Inc. and its subsidiaries *to conduct our business in accordance with all applicable laws, rules and regulations and the highest ethical standards. All employees and members of our Board of Directors are expected to adhere to those principles and procedures* set forth in this Code that apply to them . . . .

> The Code should be read in conjunction with Our Business Principles, which provide in part that, "Integrity and honesty are at the heart of our business. *We expect our people to maintain high ethical standards in everything they do, both in their work for the firm and in their personal lives*. Our Business Principles are attached to this Code. Each employee, consultant and director should also read and be familiar with the portions of the Compendium of Firmwide Compliance Policies (the "Compendium") applicable to such employee, consultant or director, which Compendium is not part of this Code.

109

## SECTION I

### A. Compliance and Reporting

Employees and directors should strive to identify and raise potential issues before they lead to problems, and should ask about the application of this Code whenever in doubt. Any employee or director who becomes aware of any existing or potential violation of this Code should promptly notify, in the case of employees, an appropriate contact listed in the Directory of Contacts included in the Compendium and, in the case of directors and the Chief Executive Officer, the Chief Financial Officer and the Principal Accounting Officer (the "Senior Financial Officers"), one of the firm's General Counsel (we refer to such contacts as "Appropriate Ethics Contacts"). The firm will take such disciplinary or preventive action as it deems appropriate to address any existing or potential violation of this Code brought to its attention.

Any questions relating to how these policies should be interpreted or applied should be addressed to an Appropriate Ethics Contact.

### B. Personal Conflicts of Interest

A "personal conflict of interest" occurs when an individual's private interest improperly interferes with the interests of the firm. Personal conflicts of interest are prohibited as a matter of firm policy, unless they have been approved by the firm. *In particular, an employee or director must never use or attempt to use his or her position at the firm to obtain any improper personal benefit for himself or herself, for his or her family members, or for any other person*, including loans or guarantees of obligations, from any person or entity.

Service to the firm should never be subordinated to personal gain and advantage. Conflicts of interest should, to the extent possible, be avoided.

*Any employee or director who is aware of a material transaction or relationship that could reasonably be expected to give rise to a conflict of interest or perceived conflict of interest should discuss the matter promptly with an Appropriate Ethics Contact*.

### C. Public Disclosure

It is the firm's policy that the information in its public communications, including SEC filings, be full, fair, accurate, timely and understandable. All employees and directors who are involved in the company's disclosure process, including the Senior Financial Officers, are responsible for acting in furtherance of this policy. In particular, these individuals are required to maintain familiarity with the disclosure requirements applicable to the firm and are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about the firm to others, whether within or outside the firm, including the firm's independent auditors. In addition, any employee or director who has a supervisory

110

role in the firm's disclosure process has an obligation to discharge his or her responsibilities diligently.

## D. Compliance with Laws, Rules and Regulations

***It is the firm's policy to comply with all applicable laws, rules and regulations***. It is the personal responsibility of each employee and director to adhere to the standards and restrictions imposed by those laws, rules and regulations. . . .

Generally, it is both illegal and against firm policy for any employee or director who is aware of material nonpublic information relating to the firm, any of the firm's clients or any other private or governmental issuer of securities to buy or sell any securities of those issuers, or recommend that another person buy, sell or hold the securities of those issuers.

More detailed rules governing the trading of securities by the firm's employees and directors are set forth in the Compendium. Any employee or director who is uncertain about the legal rules involving his or her purchase or sale of any firm securities or any securities in issuers that he or she is familiar with by virtue of his or her work for the firm should consult with an Appropriate Ethics Contact before making any such purchase or sale.

## SECTION II

## A. Corporate Opportunities

Employees and directors owe a duty to the firm to advance the firm's legitimate business interests when the opportunity to do so arises. Employees and directors are prohibited from taking for themselves (or directing to a third party) a business opportunity that is discovered through the use of corporate property, information or position, unless the firm has already been offered the opportunity and turned it down.

More generally, employees and directors are prohibited from using corporate property, information or position for personal gain or competing with the firm. Sometimes the line between personal and firm benefits is difficult to draw, and sometimes both personal and firm benefits may be derived from certain activities.

The only prudent course of conduct for our employees and directors is to make sure that any use of firm property or services that is not solely for the benefit of the firm is approved beforehand through the Appropriate Ethics Contact.

## B. Confidentiality

In carrying out the firm's business, employees and directors often learn confidential or proprietary information about the firm, its clients/customers, prospective clients/customers or other third parties. Employees and directors must maintain the confidentiality of all information so entrusted to them, except when disclosure is

authorized or legally mandated. Confidential or proprietary information includes, among other things, any non-public information concerning the firm, including its businesses, financial performance, results or prospects, and any non-public information provided by a third party with the expectation that the information will be kept confidential and used solely for the business purpose for which it was conveyed. Employees and directors should refer to the policies set forth in the Compendium under "The Use and Misuse of Information – Policies and Procedures Regarding Confidential or Proprietary Information, The Chinese Wall" and "Additional Policies Regarding the Protection of Information Intellectual Property Belonging to Goldman" for more detailed guidance on this topic.

### C. Fair Dealing

We have a history of succeeding through honest business competition. We do not seek competitive advantages through illegal or unethical business practices. Each employee and director should endeavor to deal fairly with the firm's clients, service providers, suppliers, competitors and employees. No employee or director should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any unfair dealing practice.

\* \* \*

### E. Protection and Proper Use of Firm Assets

All employees should protect the firm's assets and ensure their efficient use. All firm assets should be used for legitimate business purposes only.

241.   Defendants failed to meet their responsibilities and obligations as provided in the Audit Committee Charter, the Corporate Governance Guidelines, and the Code of Business Conduct and Ethics.   The Defendants' illegal course of conduct constituted breaches of their fiduciary duties to Goldman, as well as violations of state and federal law, and resulted in significant harm to the Company.

## X.   **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

242.   Plaintiff is a current owner of Goldman common stock and was owner of Goldman common stock during the period relevant to Defendants' wrongful course of conduct alleged herein.   Goldman is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

243. Plaintiff brings this action derivatively to redress injuries suffered, and to be suffered, by the Company as a direct result of the breaches of fiduciary duty, unjust enrichment, gross mismanagement, contribution and indemnification, and violations of §§ 10(b) and 14(a) of the Securities Exchange Act of 1934 and Rules 10b-5 and 14a-9. Plaintiff will adequately and fairly represent the interests of Goldman in enforcing and prosecuting its rights. Prosecution of this action, independent of the Goldman Board, is in the best interests of the Company.

244. The Goldman Board, at the time of filing of this action, consisted of the following Director Defendants: Solomon, Burns, Flaherty, George, Johnson, Kullman, Mittal, Ogunlesi, Oppenheimer, Viniar, and Winkelman. As alleged above, Defendants breached their fiduciary duties of loyalty and good faith by, *inter alia*, (i) making improper statements regarding Goldman's business practices; (ii) engaging in a course of conduct that violated the Company's policies and public statements; (iii) failing to disclose to the investing public material adverse information regarding Goldman's business; (iv) affirmatively adopting, implementing, and condoning a business culture which prioritized consummation of deals ahead of the proper operation of its compliance functions; and (v) consciously disregarding numerous red flags of misconduct related to the 1MDB scandal.

245. Plaintiff has not made any demand upon the Goldman Board to bring an action on behalf of the Company asserting claims herein to recover damages for the injuries suffered by Goldman, since such demand would have been a futile, wasteful and useless act, and is therefore excused, for the reasons stated herein.

**A.     Demand is Excused Because the Defendants' Conduct Did Not Constitute a Valid Exercise of Business Judgment**

246. Plaintiff did not make a demand on the Goldman Board prior to instituting this action because the wrongful acts complained of in this Complaint evidence a pattern of conduct

113

showing a wholesale abandonment of the Defendants' fiduciary duties. Those acts, which are detailed herein, include:

      a.      Disregarding multiple red flags and allowing Goldman bankers to engage in pervasive bribery and money laundering schemes;

      b.      Allowing Goldman bankers to use the illicit proceeds of these schemes for personal financial reward;

      c.      Allowing Blankfein, Solomon, and Viniar to engage in insider selling while in possession of material, non-public information relating to the 1MDB scandal;

      d.      Perpetuating woefully inadequate controls over the Company's financial reporting, corporate governance, and risk monitoring, which allowed the illicit bribery and money laundering schemes to begin and persist for years;

      e.      Causing Goldman to file materially false and misleading SEC filings; and

      f.      Approving a share repurchase program through which Goldman bought back millions of shares of stock at artificially inflated prices.

247.    These acts, and the other improper acts set forth in this Complaint which demonstrate a pattern of misconduct, were not the product of a valid or good faith exercise of business judgment, nor could they have been.

248.    The Defendants' misconduct at the heart of this case constitutes the direct facilitation of violations of federal law, including knowingly and consciously presiding over Goldman's systematic deficiencies and unsound practices in its risk management and oversight of the Company's compliance practices.

249.    The Defendants' blatant and repeated disregard of their responsibility to safeguard the Company against wrongdoing indicate they knowingly adopted, endorsed, or condoned a

business strategy that prioritized the consummation of business deals ahead of compliance with laws, which cannot be considered a legitimate exercise of business judgment. Demand is therefore excused

**B.    Demand is Excused Because the Director Defendants Face a Substantial Likelihood of Liability**

250.    Demand is also excused because the Director Defendants face a substantial likelihood of liability for the claims alleged against them in this Complaint, given their awareness or conscious disregard of significant red flags relating to the bribery and money laundering scheme due to the breakdown in Goldman's internal controls and compliance functions.

251.    More specifically, Defendants Burns, George, Johnson, Mittal, Ogunlesi, and Viniar have each been Directors since at least 2012. These Defendants consciously disregarded multiple red flags concerning the endemic corruption related to the 1MDB deals, including but not limited to media coverage by highly respected financial publications, "sweeping" corporate governance changes demanded by the Federal Reserve in 2013, and the Fed's continuing investigation into the 1MDB deals in 2014. Moreover, as detailed above, Solomon would have "reviewed" and "scrutinized" the 1MDB deals in 2012 and 2013, also consciously disregarding the multiple red flags concerning the endemic corruption related to those deals.

252.    Additionally, the Risk Committee was charged with the obligation to oversee and monitor Goldman's risk policies and risk management practices, as well as reviewing and approving risk appetite limits at "product levels," while the Audit Committee was charged with overseeing and monitoring "significant legal, compliance or regulatory matters that may have a material impact on the Company's business, financial statements or compliance policies."

253.    Members of the Audit Committee were charged with assisting the Board in overseeing the integrity of the Company's financial statements and the adequacy and reliability of

disclosures to its stockholders, including the Company's internal and disclosure controls. But Goldman's internal and disclosure controls were deficient, causing the Company to issue materially false and misleading information regarding the Company's internal controls and compliance functions, and the bribery and money laundering scheme.

254.    At minimum, demand is excused because the wrongs alleged herein constitute violations of the Company's internal policies and charters and cannot be considered a valid exercise of business judgment. The Individual Defendants' wrongful conduct was continuous and occurred throughout the Relevant Period. This conduct has resulted in ongoing and continuous harm to the Company.

255.    The Individual Defendants failed to act, and instead participated in, approved and/or permitted the wrongs herein to occur. The Board also participated in efforts to conceal or disguise the wrongs from Goldman stockholders or recklessly, knowingly and/or negligently disregarded the wrongs complained of herein, and therefore are not disinterested parties. As a result, the Individual Defendants cannot exercise independent objective judgment in deciding whether to institute or vigorously prosecute this action, as each member is interested personally in the outcome of such an action, and each member's actions have played a part in subjecting the Company to millions of dollars in liability for potential securities laws violations.

256.    The Board's lack of oversight exposed Goldman to other increased risks, including (i) potential civil and criminal liability, and potential liability for billions of dollars in compensation to the government of Malaysia; (ii) significant damages resulting from the Company's repurchases of stock at prices that were artificially inflated due to Defendants' materially false or misleading statements during the Relevant Period; (iii) investigations by federal prosecutors and the Federal Reserve; (iv) exposure to lawsuits, including a shareholder putative

116

class action asserting federal securities claims against the Company; and (v) serious damage to the Company's reputation and goodwill.

257.    For these reasons, the Board is incapable or unwilling to take the actions required to seek the relief requested in this Complaint.  Because a majority of the Board faces a substantial risk of liability, demand is futile.

### C.    Demand is Futile Because the Directors are Financially Beholden to Goldman

258.    The principal professional occupation of Solomon is his employment as Goldman's CEO, pursuant to which he received and continues to receive substantial monetary compensation and other benefits.  As a result of his high-level position with Goldman, he is admittedly not independent under either the Company's own Director Independence Standards or the listing standards of the NYSE.  Because of the lack of independence, Solomon is incapable of impartially considering a demand, and as a result, demand is futile.

259.    Similarly, prior to being named a Director in 2013, Viniar served as Goldman's CFO, pursuant to which he received and continues to receive substantial monetary compensation and other benefits.  As a result of his high-level position with Goldman, he cannot be considered independent, and is therefore incapable of impartially considering a demand; as a result, demand is futile.

260.    As detailed above, the non-employee Director Defendants each receive lavish compensation packages for their services as Directors.  In fact, in a lawsuit currently pending in the Delaware Court of Chancery, Vice Chancellor Sam Glasscock rejected the Board's arguments on a motion to dismiss that their compensation was not so grossly excessive that it amounted to a

breach of the directors' fiduciary duty of loyalty.[247]  The Court of Chancery explained that the "Board's average compensation is nearly twice that of its peer companies' directors . . . [and] "that Goldman's directors managed an entity no larger or more profitable than its peers, did less, and achieved no better results, in light of this near-double compensation."[248] This, the Court of Chancery explained, "raises at least an inference of unfair transactions."[249]

261.    The continuation of this extravagant compensation to each Director Defendant is dependent upon his or her cooperation with other Board members, and his or her participation and acquiescence in the wrongdoing described in this Complaint.   The Director Defendants are therefore incapable of exercising independent and disinterested judgment, and demand upon them would be futile.

262.    Through their wrongful acts, the Director Defendants were unjustly enriched at the expense of, and to the detriment of, Goldman.  Any suit by the Director Defendants to remedy the wrongs complained of herein would expose these Defendants to significant personal liability for their breaches of fiduciary duties and other misconduct.  Consequently, demand is futile.

263.    Demand is also excused because the Director Defendants have excessive financial relationships, or business or personal entanglements with Goldman, or are otherwise not independent.  *Fortune* reported that Goldman's board "is packed with honchos who led companies that have paid large fees to Goldman, such as Indian steel magnate Lakshmi Mittal and former

---

[247] *Shiva Stein v. Lloyd C. Blankfein, et al.*, C.A. No. 2017-0354-SG (Del. Ch. May 31, 2019).  The majority of Defendants named in the *Stein* action are also Defendants here: Blankfein, Burns, Flaherty, George, Johnson, Kullman, Mittal, Ogunlesi, Oppenheimer, Viniar, and Winkelman.

[248] *Id*. at 23

[249] *Id*.

Fannie Mae chief James Johnson."[250]  *Fortune* went on to note that these directors were favorably disposed to senior management's way of thinking "and are therefore unlikely to act as a check on CEO Lloyd Blankfein and his team."  For example:

      a.      When William George was Chairman of Medtronic in 2001, Goldman served as Medtronic's financial advisor in its $3.7 billion purchase of MiniMed Inc. and Medical Research Group Inc.; George became a Goldman Director in 2002.

      b.      Ellen Kullman was employed by DuPont from 1988 through 2015, serving as Chairman and CEO from 2009 through 2015.  During this time, Goldman was a frequent advisor to DuPont.  For example, in 2015, Goldman served as a financial advisor to DuPont in its $130 billion merger with Dow Chemical.  Also in 2015, Goldman served as a financial advisor to DuPont in its high-profile efforts to fend off activist investment firm Trian Fund Management LP, which had announced a plan to break up DuPont and slash costs.  In 2005, Goldman structured a $3 billion accelerated share repurchase plan for DuPont, which retired 8% of DuPont's outstanding stock over a nine-month period.

      c.      Lakshmi Mittal is the Chairman and CEO of ArcelorMittal, the world's largest steelmaking company.  In 2013, Goldman advised ArcelorMittal on its sale of a $1.1 billion stake in a Canadian iron ore operator to a consortium of Asian steelmakers.  In 2015, Goldman Sachs joined forces with ArcelorMittal to jointly sue Banco Espirito Santo SA over an $835 million loan.  In 2018, Goldman advised ArcelorMittal on the $1 billion acquisition of Indian steel company Essar Steel.

---

[250] Colin Barr, "Why Goldman Should Overhaul its Board," *Fortune* (Apr. 20, 2010), available at http://archive.fortune.com/2010/04/20/news/companies/goldman.board.fortune/index.htm.

        d.      Mark Winkelman was the head of commodity trading firm J. Aron, where Blankfein was hired in the 1980s. Winkelman was one of Blankfein's earliest and most important champions, and Winkelman appointed Blankfein to head J. Aron's foreign exchange business in 1984. When J. Aron was acquired by Goldman, Winkelman and Blankfein moved to Goldman. Winkelman left Goldman in 1994, but Blankfein returned the favor to Winkelman by appointing him to Goldman's Board in 2014.

        e.      Directors William George and M. Michele Burns both serve together at the Stanford Center on Longevity. Burns serves as a Center Fellow and Strategic Advisor, and Johnson chairs the Center's Advisory Council.

        f.      Directors George and Johnson both served together on the Target Corporation board of directors.

## XI.    <u>CLAIMS AGAINST DEFENDANTS</u>

### <u>COUNT I</u>
**(Breach of Fiduciary Duty Against Director Defendants)**

264.    Plaintiff incorporates by reference and realleges each of the foregoing paragraphs as if fully set forth in this paragraph.

265.    Each of the Director Defendants owed and owe fiduciary duties to Goldman and its stockholders. By reason of their fiduciary relationships, the Director Defendants specifically owed and owe Goldman the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.

266.    Each of the Director Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry to Goldman by either

allowing the Company's employees to engage in the 1MDB fraud or consciously ignoring numerous red flags related to the 1MDB fraud.

267.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

268.    Additionally, the Director Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including the charters of various Board committees that, had they been discharged in accordance with the Director Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged in this Complaint.

269.    Accordingly, to the extent Goldman's exculpatory provision applies to the Director Defendants' acts or omissions while acting in their capacity as directors, it cannot immunize them from (i) any non-monetary liability; (ii) monetary liability for their breaches of the duty of loyalty; (iii) monetary liability for acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law; or (iv) monetary liability in connection with any transaction from which they derived an improper personal benefit. As detailed in this Complaint, the Director Defendants' misconduct with respect to the 1MDB fraud: (i) involved breaches of their duty of loyalty; and/or (ii) involved acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law.  Goldman's exculpatory provision therefore cannot immunize the Director Defendants from liability for that misconduct.

270.    As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, Goldman has sustained and continues to sustain significant damages.

271.    As a result of the misconduct alleged in this Complaint, the Director Defendants are liable to the Company.

## COUNT II
### (Breach of Fiduciary Duty Against Defendant Blankfein)

272.     Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.  This Count is brought against Defendant Blankfein solely in his capacity as an officer.

273.     Blankfein owed fiduciary duties to Goldman and its stockholders.  By reason of his fiduciary relationship, Blankfein specifically owed Goldman the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.

274.     Blankfein consciously and deliberately breached his fiduciary duties of candor, good faith, and loyalty by either intentionally causing the Company to issue false financial statements or consciously ignoring numerous red flags related to the 1MDB fraud.

275.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

276.     Additionally, Blankfein is not entitled to claim any immunity under Section 102(b)(7) to the extent this claim is asserted against him in his capacity as an officer of the Company.

277.     As a direct and proximate result of Blankfein's breaches of his fiduciary obligations, Goldman has sustained and continues to sustain significant damages.

278.     As a result of the misconduct alleged in this Complaint, Blankfein is liable to the Company.

## COUNT III
### (Unjust Enrichment Against the Individual Defendants)

279.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.

280.    During the Relevant Period, Defendants received bonuses, stock options, stock, or similar compensation from Goldman that was tied to the Company's financial performance, or otherwise received compensation that was unjust in light of Defendants' bad faith conduct, violation of the Company's code of ethics, and self-dealing.

281.    Plaintiff, as a stockholder and representative of Goldman, seeks restitution from Defendants and seeks an order of this Court disgorging all profits, benefits, and other compensation—including any salary, options, performance-based compensation, and stock—obtained by Defendants due to their wrongful conduct alleged in this Complaint.

## COUNT IV
### (Contribution and Indemnification Against the Individual Defendants)

282.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

283.    Goldman is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein that give rise to Defendants' liability to Goldman.

284.    Goldman's alleged liability on account of the wrongful acts, practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Individual Defendants as alleged above, and Goldman is entitled to contribution and indemnification from each Individual Defendant in connection with all such claims that have been, are or may in the future be asserted against, Goldman by virtue of the Individual Defendants' misconduct.

285.    By reason of the foregoing, Goldman was damaged.

286.    Plaintiff, on behalf of Goldman, has no adequate remedy at law.

## COUNT V
### (Violation of §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5
### Against the Individual Defendants)

287.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

288.    During the Relevant Period, in connection with Goldman's repurchases of Goldman shares, Individual Defendants disseminated or approved false or misleading statements about Goldman as detailed above, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud.  Those false or misleading statements and Individual Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

289.    At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by Individual Defendants, Individual Defendants caused the Company to repurchase millions of shares of its own common stock at prices that were artificially inflated due to Individual Defendants' false or misleading statements.  Individual Defendants engaged in a scheme to defraud Goldman by causing the Company to purchase millions of shares of Goldman stock at artificially inflated prices, as detailed above.

290.    Individual Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon

Goldman in connection with the Company's purchases of Goldman stock during the Relevant Period.

291.    Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Goldman stock, which were intended to, and did: (a) deceive Goldman regarding, among other things, the 1MDB scandal, the Company's internal controls and compensation practices, and the Company's financial statements; (b) artificially inflate and maintain the market price of Goldman stock; and (c) cause Goldman to purchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known. Throughout the Relevant Period, Individual Defendants were in possession of material, adverse non-public information regarding the 1MDB scandal.

292.    Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made, as alleged above.

293.    As described above, Individual Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth in this Complaint were either known to Defendants or were so obvious that Defendants should have been aware of

them.  Throughout the Relevant Period, Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

294.    Individual Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock.

295.    As a result of Defendants' misconduct, Goldman has and will suffer damages in that it paid artificially inflated prices for Goldman common stock purchased as part of the repurchase program and suffered losses when the previously undisclosed facts relating to the 1MDB fraud were disclosed beginning in November 2018.  Goldman would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by Defendants' false or misleading statements.

296.    As a direct and proximate result of Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of Goldman stock during the Relevant Period. By reason of such conduct, Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

297.    Plaintiff brings this claim within two years of the discovery of the violation and within five years of the violation.

### COUNT VI
**(Breach of Fiduciary Duty for Insider Selling and Misappropriation of Confidential Information Against Defendants Blankfein, Solomon, and Viniar)**

298.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.

299.    At the time of the stock sales set forth above, Defendants Blankfein, Solomon, and Viniar knew or consciously disregarded the information described in this Complaint regarding the 1MDB fraud and sold Goldman common stock on the basis of that information.

126

300.     The information described above was proprietary non-public information concerning the Company's unlawful conduct associated with 1MDB.  The information was a proprietary asset belonging to the Company, which Blankfein, Solomon, and Viniar used for their own benefit when they sold Goldman common stock.

301.     Blankfein, Solomon, and Viniar's sales of Goldman common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

302.     Because the use of the Company's proprietary information for their own gain constitutes a breach of the fiduciary duties of Blankfein, Solomon, and Viniar, the Company is entitled to the imposition of a constructive trust on any profits Defendants Blankfein, Solomon, and Viniar obtained thereby.

**COUNT VII**
**(Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9**
**Against the Director Defendants)**

303.     Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

304.     This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

305.     SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements

therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

306.   The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to shareholders which were contained in the 2016, 2017, and 2018 Proxies. These Proxies contained proposals to Goldman shareholders urging them to elect and re-elect members of the Board and provide advisory votes on issues relating to executive compensation. These Proxies, however, misleadingly suggested that the Board maintained "effective risk management" and omitted any disclosures regarding (i) Goldman's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately disclose a culture of complicity over compliance within Goldman; and (iii) the subpoenas/requests for documents by regulatory bodies related to 1MDB; (iv) the fact that Goldman's compensation program actually encouraged, and consistently rewarded, extreme risk-taking and illegal practices.

307.   By reason of this conduct, the Director Defendants violated Section 14(a) of the Exchange Act.  As a direct and proximate result of this wrongful conduct, Goldman mislead and/or deceived its shareholders by making misleading statements that were an essential link in shareholders heeding Goldman's recommendations to re-elect and elect the current Board and provide advisory votes on executive compensation.

308.   The false and misleading information contained in the Proxies was material to Goldman's shareholders in determining whether to re-elect and elect the current Board and provide advisory votes on executive compensation.  This information was also material to the integrity of the directors who were proposed for election to the Board.  Plaintiff, on behalf of Goldman, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxy Statements

in connection with the improper election and reelection of the members of the Board, and advisory votes on executive compensation.

309.   This action was timely commenced within three years of the date of each Proxy Statement and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   A determination that this action is a proper derivative action maintainable under the law and that demand was excused as futile;

B.   Declaring that Defendants have breached their fiduciary duties to Goldman;

C.   Determining and awarding to Goldman the damages sustained by it as a result of the violations set forth above from each Defendant, jointly and severally, together with prejudgment and post-judgment interest thereon;

D.   Directing Goldman to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described in this Complaint, including putting forward for a stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other actions as may be necessary;

E.   Extraordinary equitable or injunctive relief as permitted by law or equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets so as to assure that Plaintiff, on behalf of Goldman, has an effective remedy;

F.   Awarding to Goldman restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants, including the proceeds of insider transactions made in violation of federal and state securities laws;

G.      Ordering an accounting of all compensation awarded to the Individual Defendants during the Relevant Period;

H.      Awarding to Plaintiff costs and disbursements related to this action, including reasonable attorneys' fees, consultant and expert fees, costs, and expenses; and

I.      Granting such other and further relief as the Court deems just and proper.

## XIII.   **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: July 12, 2019                     Respectfully Submitted,

**SAXENA WHITE P.A.**
*/s/ Steven B. Singer*
Steven B. Singer
10 Bank Street, 8th Floor
White Plains, NY 10606
Phone: (914) 437-8551
Fax: (888) 631-3611

- and -

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White, III
Lester R. Hooker
Brandon T. Grzandziel
Adam D. Warden
150 E. Palmetto Park Road Suite 600
Boca Raton, FL 33432
Phone: (561) 394-3399
Fax: (561) 394-3382

**BUCKLEY BEAL**
Michael E. Kramer (*pro hac vice* forthcoming)
600 Peachtree Street, N.E., Suite 3900
Atlanta, GA 30308
Phone: (404) 781-1100
Fax: (404) 781-1101

*Counsel for Plaintiff Fulton County Employees'
Retirement System*

## VERIFICATION

I, Wanda Messina, being duly sworn, declare as follows:

I am the Chairman of Plaintiff Fulton County Employees' Retirement System ("Fulton County" or "Plaintiff") and am authorized to act on its behalf with respect to this litigation and the filing of the Verified Amended Shareholder Derivative Complaint ("Complaint"). Fulton County is a shareholder of The Goldman Sachs Group, Inc., and has been throughout the relevant period defined in the Complaint. Fulton County has retained competent counsel and is ready, willing, and able to pursue this action vigorously on behalf of the Company. I have reviewed the Complaint, and based upon discussions with and reliance upon counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: July _11_, 2019

Wanda Messina
Chairman
Fulton County Employees'
Retirement System