```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
FULTON COUNTY EMPLOYEES'                                    :
RETIREMENT SYSTEM, Derivatively on                          :
Behalf of The Goldman Sachs Group Inc.,                     :
                                                            :                19-CV-1562 (VSB)
                                              Plaintiff,    :
                                                            :                OPINION & ORDER
                          - against -                       :
                                                            :
                                                            :
                                                            :
LLOYD BLANKFEIN, et al.,                                    :
                                                            :
                                              Defendants.   :
                                                            :
------------------------------------------------------------X
```

Appearances:

Steven B. Singer
Saxena White P.A.
White Plains, New York

Maya Saxena
Joseph E. White, III
Lester R. Hooker
Saxena White P.A.
Boca Raton, Florida
*Counsel for Plaintiff*

Gregory Frederick Laufer
Staci Lynn Yablon
Paul, Weiss, Rifkind, Wharton & Garrison LLP
New York, New York
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

  This is a derivative action by Plaintiff Fulton County Employees' Retirement System ("Plaintiff") on behalf of the Goldman Sachs Group Inc. ("Goldman Sachs") against numerous current and former directors and officers of Goldman Sachs in connection with a corporate

scandal involving the Malaysian sovereign wealth fund 1MDB.  Plaintiff alleges breach of fiduciary duty, unjust enrichment, contribution and indemnification, and violations of § 10(b) and § 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Before me is the unopposed motion for preliminary approval of the settlement filed by Plaintiff.  Because I find, at this stage of litigation, that the settlement is fair, reasonable, and the result of good faith negotiation, the motion is GRANTED.

### I. Factual Background[1]

Plaintiff initiated this action against current and former directors and officers of Goldman Sachs ("Defendants" or "Goldman") in connection with a financial scandal involving the Malaysian sovereign wealth fund 1MDB, for which Goldman affiliates underwrote three bond issuances during 2012 and 2013.  1MDB engaged Goldman as the sole bookrunner for the three bond offerings, totaling $6.5 billion, beginning in March 2012.  (SAC ¶ 64.)[2]  According to Plaintiff, after each bond transaction closed, hundreds of millions of dollars were diverted to shell companies controlled by Malaysian financier Jho Low ("Low"), an associate of the former Malaysian prime minister Najib Razak.  (*Id*. ¶¶ 2, 81, 94, 104.)  The assets were then used to fund personal expenses, finance a film production, and influence Malaysian political elections. (*Id*.)

Goldman acknowledged in a Deferred Prosecution Agreement ("DPA") with the United States Department of Justice ("DOJ") that the Goldman bankers arranged and underwrote the deals despite red flags and suspicion of illegal activities surrounding the deals.  (*Id*. ¶¶ 162–85.)

---

[1] The facts in this section are recited for background only, and are not intended to and should not be viewed as findings of fact.

[2] "SAC" refers to the Verified Second Amended Shareholder Derivative Complaint filed on November 13, 2020. (Doc. 67-1.)

Plaintiff noted several red flags related to the deals, such as the suspicious terms, including the immense size and dollar amounts of the deals, the speed with which they were formed, the lack of identifiable uses for the proceeds, their private placement structure, and the excessive fees being paid to Goldman. (*Id.* ¶¶ 71–72, 75, 77, 106, 168–71.) Plaintiff also noted the involvement of suspicious individuals in the deals, including Low, who was previously rejected as a client by Goldman's private wealth division. (*Id.* ¶¶ 58, 61–62, 65–66, 173–82.) Several senior Goldman executives criticized and objected to the deal. (*Id.* ¶¶ 67–70.) The DPA highlighted Goldman's internal control failures in enabling the offerings, including the bankers' failure to verify how the funds were being used, the compliance team's failure to review the deal team's emails and thus detect Low's involvement, and the overall failure to ensure that concerns about apparent misconduct were properly escalated to the appropriate authorities within and outside Goldman. (*Id.* ¶¶ 168–95.)

In October 2020, Goldman announced that it and several affiliates entered into criminal and civil resolutions relating to 1MDB, resulting in over $5 billion in fines, penalties, and disgorgement. (*Id.* ¶¶ 142, 160–65.) Additional actions were taken against current and former Goldman officers, including claw backs, forfeitures, and compensation reductions. (*Id.*) Goldman bankers Tim Leissner and Roger Ng were indicted, with Leissner pleading guilty and Ng convicted of conspiracy and other charges in April 2022. (*Id.* ¶¶ 129, 132–33.)

## II.     Procedural History

Plaintiff commenced this action by filing the initial complaint on February 19, 2019. (Doc. 1.)[3] On July 12, 2019, Plaintiff filed a Verified Amended Shareholder Derivative

---

[3] This case is related to another case before me, *Plaut v. Goldman Sachs Group, Inc., et al.*, 18-cv-12084. Upon filing the lawsuit in this case, Plaintiff filed a Statement of Relatedness citing the similar underlying facts and the overlapping defendants between the two actions. (Doc. 4.) I accepted the cases as related. On June 28, 2021, I granted in part and denied in part the motion to dismiss in the related case. *See Sjunde AP-Fonden v. Goldman*

3

Complaint. (Doc. 35.) Defendants filed a motion to dismiss on September 12, 2019. (Doc. 39.) While the initial motion to dismiss was pending, on October 22, 2020, Goldman entered into the DPA with DOJ. (*See* Docs. 63–67.) On November 16, 2020, I granted Plaintiff's motion for leave to file its Second Verified Amended Shareholder Derivative Complaint. (Doc. 68.) Defendants moved to dismiss the Second Verified Amended Shareholder Derivative Complaint on January 15, 2021. (Doc. 74.) The motion to dismiss is currently pending. On May 13, 2022, Plaintiff filed the motion for preliminary approval of the settlement, a supporting memorandum of law, and the proposed settlement agreement. (Docs. 83–85.)

### III.   Legal Standard

District courts have discretion to approve proposed class action settlements. *See Kelen v. World Fin. Network Nat'l Bank*, 302 F.R.D. 56, 68 (S.D.N.Y. 2014) (citing *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1078 (2d Cir. 1995)). The parties and their counsel are in a unique position to assess the potential risks of litigation, and thus district courts in exercising their discretion often give weight to the fact that the parties have chosen to settle. *See Yuzary v. HSBC Bank USA, N.A.*, No. 12 Civ. 3693(PGG), 2013 WL 1832181, at *1 (S.D.N.Y. Apr. 30, 2013).

Review of a proposed settlement generally involves preliminary approval followed by a fairness hearing. *Silver v. 31 Great Jones Rest.*, No. 11 CV 7442(KMW)(DCF), 2013 WL 208918, at *1 (S.D.N.Y. Jan. 4, 2013). "[C]ourts often grant preliminary settlement approval without requiring a hearing or a court appearance." *Lizondro-Garcia v. Kefi LLC*, 300 F.R.D. 169, 179 (S.D.N.Y. 2014). To grant preliminary approval, a court need only find "probable

---

*Sachs Grp., Inc.*, 545 F. Supp. 3d 120 (S.D.N.Y. 2021). I granted the motion with respect to one defendant and dismissed it with respect to the remaining defendants. *Id*.

cause to submit the [settlement] [proposal] to class members." *Id.* (quoting *In re Traffic Exec. Ass'n*, 627 F.2d 631, 634 (2d Cir. 1980) (internal quotation marks omitted)). Courts conducting this analysis "must make a preliminary evaluation as to whether the settlement is fair, reasonable and adequate." *In re Currency Conversion Fee Antitrust Litig.*, No. 01 MDL 1409, M-21-95, 2006 WL 3247396, at *5 (S.D.N.Y. Nov. 8, 2006) (internal quotation marks omitted). Preliminary approval is typically granted "where the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval." *Silver*, 2013 WL 208918, at *1 (quoting *In re Nasdaq Market–Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997)).

## IV. Discussion

### A. *Preliminary Approval of the Class Settlement*

Having reviewed Plaintiff's submissions, including the memorandum of law in support of its motion, (Doc. 84 ("Mem.")), the settlement agreement, (Doc. 85 ("Settlement Agreement" or "Agreement")), and all other attached exhibits, (*see* Doc. 85-1–4), I conclude that the Settlement Agreement's terms merit preliminary approval.

First, the settlement terms appear to be the result of an extensive and good-faith process, including a two-day mediation presided over by the Honorable Daniel Weinstein (Ret.) and Jed D. Melnick of JAMS (the "Mediators"), who are a "highly experienced mediation team." (Mem. 7.) Leading up to the mediation in February 2022, the parties engaged in numerous conferences and meetings to discuss the strengths and weaknesses of the action, exchanged detailed statements, and held preliminary negotiations. (*See id.*) Judge Weinstein offered the Mediators' proposal on the second day of the mediation process. (*See id.*) The parties accepted the proposal

on February 3, 2022.  (*See id.*)  Plaintiff subsequently conducted discovery to confirm that the Settlement Agreement was fair, adequate, and reasonable.  (*See id.*)  Plaintiff reviewed and analyzed over 667,000 pages of Goldman's documents following the mediation.  (*See id.*)  Plaintiff and Defendants then negotiated and finalized the terms of the Settlement Agreement, which was executed on May 13, 2022.  (*See id.*)  I find that all of the above suggest that the Agreement is the result of good faith and arm's-length negotiations.  *See Balestra v. ATBCOIN LLC*, 2022 WL 950953, at *3 (S.D.N.Y. Mar. 29, 2022) ("I have reviewed the proposed Settlement Agreement, and I find that it is the result of arm's length negotiation between the parties, who were, at the time, both represented by experienced and sophisticated counsel").

Second, the settlement terms do not have any obvious deficiencies and fall within the range of possible approval.  Specifically, the $79.5 million monetary component of the Settlement Agreement is one of the largest settlements of a shareholder derivative action in the Second Circuit's history, and is therefore highly favorable.  (*See* Mem. at 13.)  Goldman agrees that the entirety of these funds, minus the amount allocated to attorneys' fees, will be used for compliance purposes.  (*See id.*)  This is particularly significant because the gravamen of Plaintiff's allegations argue that the transactions would not have occurred had Goldman's compliance and controls been more robust and detected the highly suspicious deals and their terms.  (*See id.*; *see, e.g.*, SAC.)  Plaintiff recognized that, while its claims were meritorious, litigating the claims throughout all stages of litigation would inherently carry significant risk.  (*See* Mem. at 14.)  Specifically, Plaintiff would have to prove its fiduciary duty of oversight claim under the framework put forth in the *Caremark* case, which would require that Plaintiff establish that Defendants either (1) "utterly failed to implement any" oversight mechanisms, or (2) "having implemented such" mechanisms, "consciously failed to monitor" their operations.

*Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (citing *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996)).  Courts have noted that this is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."  *Id.* (quoting *Caremark*, 698 A.2d at 967); *see also In re Pfizer Inc. Shareholder Deriv. Litig.*, 780 F. Supp. 2d 336, 342 (S.D.N.Y. 2011) (citing the "substantial risks" posed by a *Caremark* claim as a factor weighing in favor of settlement approval).  Evaluating the Settlement Agreement "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case," *In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987), I find that the uncertainties of making the required legal showing and the risks to Plaintiff's recovery preliminarily warrant entry of the Settlement Agreement.  Additionally, the Settlement Agreement allows Plaintiff and the derivative members immediate relief while avoiding the uncertainty of protracted litigation.  (*See* Mem. at 19–20.)

       Moreover, the corporate governance reforms in the Settlement Agreement are reasonable and would likely be unachievable through litigation.  The reforms are aimed at enhancing Goldman's compliance program, including requiring the directors and senior management to "provide strong, explicit, and visible support and commitment to its corporate policy against violation of the anti-corruption laws and its compliance codes."  (Mem. 18.)  The Settlement Agreement requires that the Chief Compliance Officer ("CCO") periodically report to the Audit Committee of the Board and allows the inclusion of an internal investigatory staff and external investigators.  (*See id.*)  The Agreement also requires implementation of an anonymous hotline for employees to report matters to the CCO.  (*See id.*)  Lastly, the Agreement requires designation of an outside party to monitor media and industry reports that raise compliance

concerns. (*See id.*) These reforms, which seek to cure the deficiencies that formed the crux of the allegations in this action, would likely be difficult to achieve through litigation and would reasonably satisfy Plaintiff and the derivative members of this action. *See In re FAB Universal Corp. S'holder Derivative Litig.*, 148 F. Supp. 3d 277, 281 (S.D.N.Y. 2015) (recognizing corporate governance reforms as significant benefits in approving the settlement of a derivative class action); *Allred v. Walker*, No. 19-CV-10641 (LJL), 2021 WL 5847405, at *4 (S.D.N.Y. Dec. 9, 2021) (same); *see also In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1067 (Del. Ch. 2015), *as revised* (May 21, 2015), *judgment entered sub nom. In re Activision Blizzard, Inc.Stockholder Litig.*, No. CV 8885-VCL, 2015 WL 2415559 (Del. Ch. May 20, 2015) (highlighting the benefits of the non-monetary terms in a shareholder derivative settlement).

The attorneys' fees and expenses "not to exceed 25% of the Monetary Consideration" also appear reasonable at this point. However, I note that additional materials, like the attorneys' affidavits and billing records, will be examined at the stage of final approval. *See Velez v. Novartis Pharms. Corp.*, No. 04 CIV 09194 CM, 2010 WL 4877852, at *21 (S.D.N.Y. Nov. 30, 2010) ("The federal courts have established that a standard fee in complex class action cases like this one, where plaintiff[']s counsel have achieved a good recovery for the class, ranges from 20 to 50 percent of the gross settlement benefit" and "[d]istrict courts in the Second Circuit routinely award attorneys' fees that are 30 percent or greater." (collecting cases)).

In light of these factors, I preliminarily approve the Settlement Agreement.

### B. *Approval of Notice to the Class*

Rule 23(c)(2)(B) requires that:

> [T]he court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. . . . The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the

> class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).

I have reviewed the proposed plan for providing notice to the Class, which involves: (1) filing a copy of the Stipulation and the Notice (in the form attached as Exhibit B to the Settlement Stipulation) as an exhibit to a Form 8-K with the United States Securities and Exchange Commission; (2) posting a copy of the Stipulation and the Notice in a link on the "Investor Relations" page of the Company's corporate website through the Effective Date of the Settlement; and (3) publishing a Summary Notice (in the form attached as Exhibit C to the Settlement Stipulation) in the *Wall Street Journal* and *New York Times* and by a national wire service. (Mem. 21–22.) After review, I conclude that the form and manner of the proposed notice constitutes the best notice practicable under the circumstances and meets the requirements of due process. The plan also satisfies all of the seven elements of Rule 23(c)(2)(B) identified above.

### V.  Conclusion

For the foregoing reasons, Plaintiff's unopposed motion is GRANTED. The parties submitted a proposed order setting forth the settlement procedure and schedule, (Doc. 85-1 Ex. A), and I will approve the proposed procedure in a separate order to be filed together with this Opinion & Order. The Clerk of Court is respectfully directed to close the open motions on the docket.

SO ORDERED.

Dated: September 16, 2022
      New York, New York

                                        Vernon S. Broderick
                                        United States District Judge