**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FULTON COUNTY EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of THE GOLDMAN SACHS GROUP, INC., | Case No. 1:19-cv-1562 (VSB) |
| Plaintiff, | |
| v. | |
| LLOYD BLANKFEIN, DAVID M. SOLOMON, M. MICHELE BURNS, MARK A. FLAHERTY, WILLIAM W. GEORGE, JAMES A. JOHNSON, ELLEN J. KULLMAN, LAKSHMI N. MITTAL, ADEBAYO O. OGUNLESI, PETER OPPENHEIMER, DAVID A. VINIAR, and MARK O. WINKELMAN, | |
| Defendants, | |
| and | |
| THE GOLDMAN SACHS GROUP, INC., | |
| Nominal Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION**
**<u>FOR FINAL APPROVAL OF SETTLEMENT</u>**

**TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ................................................................................. 1

II.    BACKGROUND AND PROCEDURAL HISTORY ............................................... 4

       A.    Background of the Litigation ................................................................... 4

       B.    Mediation and Discovery ......................................................................... 6

III.   SETTLEMENT TERMS ....................................................................................... 7

       A.    Summary of the Terms of Settlement ...................................................... 7

       B.    The Specific Governance Reforms Secured By the Settlement............................. 8

IV.    THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL ....................... 10

       A.    The Legal Standard Governing Final Settlement Approval ................................ 10

       B.    The Settlement is the Product of Extensive and Arm's-Length
             Negotiations ......................................................................................... 11

       C.    The Settlement is Substantively Fair Under the *Grinnell* Factors ...................... 14

             1.    The Settlement is Superb in Light of the Potential Recovery at
                   Trial.............................................................................................. 15

             2.    The Significant Risks Posed by Continued Litigation Support Final
                   Approval of the Settlement ......................................................... 17

             3.    Continued Litigation Would Have Been Lengthy, Complex, and
                   Costly ......................................................................................... 21

             4.    The Positive Reaction to Date Favors Final Approval ............................ 23

             5.    The Proceedings had Advanced to a Stage Where the Parties Could
                   Understand the Strengths and Weaknesses of Plaintiff's Claims ............ 23

V.     ADEQUATE NOTICE WAS GIVEN OF THE PROPOSED SETTLEMENT............... 24

VI.    CONCLUSION....................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

## CASES

*Allred v. Walker*,
  2021 WL 5847405 (S.D.N.Y Dec. 9, 2021).......................................................... 16, 18

*Bloom v. Anderson*,
  2020 WL 6710429 (S.D. Ohio Nov. 16, 2020) ................................................... 14, 17

*Cent. Laborers' Pension Fund v. Dimon*,
  638 F. App'x 34 (2d Cir. 2016) ............................................................................ 19

*Christine Asia Co. v. Yun Ma*,
  2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) ............................................ 10, 14, 17

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974)................................................................................. 14

*Diep on behalf of El Pollo Loco Holdings, Inc. v. Sather*,
  2021 WL 3236322 (Del. Ch. July 30, 2021)....................................................... 19

*Fulton County Employees Ret. Sys. v. Blankfein*,
  2022 WL 4292894 (S.D.N.Y. Sep. 16, 2022) ............................................... *passim*

*Gonzalez v. PB Hudson LLC*,
  2019 WL 11541374 (S.D.N.Y. Apr. 4, 2019)................................................. 11, 15

*Gordon v. Vanda Pharms. Inc.*,
  2022 WL 4296092 (E.D.N.Y. Sept. 15, 2022)..................................................... 12

*Guevoura Fund Ltd. v. Sillerman*,
  2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019)................................................. 11, 13

*Hubbard v. BankAtlantic Bancorp., Inc.*,
  688 F.3d 713 (11th Cir. 2012)............................................................................. 22

*In re Caremark Int'l Deriv. Litig.*,
  698 A.2d 959 (Del. Ch. 1996)........................................................................ 5, 18

*In re CenturyLink Sales Practices and Sec. Litig.*,
  2020 WL 7133805 (D. Minn. Dec. 4, 2020) ....................................................... 24

*In re Fab Universal Corp. S'holder Derivative Litig.*,
  148 F.Supp.3d 277 (S.D.N.Y. 2015)........................................................ 18, 22, 23

*In re Facebook, Inc. IPO Sec. and Derivative Litig.*,
  2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015) ...................................................... 11

iii

*In re Frontier Communications Corp. S'holders Litig.*,
   2022 WL 4080324 (D. Conn. May 20, 2022) .................................................. 22, 24

*In re Galena Biopharma, Inc. Derivative Litig.*,
   2016 WL 10840600 (D. Or. June 24, 2016) ......................................................... 21

*In re Goldman Sachs Grp., Inc. S'holder Litig.*,
   2011 WL 4826104 (Del. Ch. Oct. 12, 2011) .................................................. 19, 20

*In re NVIDIA Corp. Derivative Litig.*,
   2008 WL 5382544 (N.D. Cal. Dec. 22, 2008) ...................................................... 16

*In re Pacific Enters. Sec. Litig.*,
   47 F. 3d 373 (9th Cir. 1995) ................................................................................. 18

*In re Pfizer Inc. S'holder Derivative Litig.*,
   780 F. Supp. 2d 336 (S.D.N.Y. 2011) ........................................................... *passim*

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2020 WL 4196468 (S.D.N.Y. July 21, 2020) ................................................. 15, 23

*In re Southern Co. S'holder Derivative Litig.*,
   2022 WL 4545614 (N.D. Ga. June 9, 2022) ......................................................... 11

*In re Sturm, Ruger & Co. Sec. Litig.*,
   2012 WL 3589610 (D. Conn. Aug. 20, 2012) ...................................................... 24

*In re Telik, Inc. Sec. Litig.*,
   576 F. Supp. 2d 570 (S.D.N.Y. 2008) ............................................................ 12, 22

*In re Wells Fargo & Co. S'holder Deriv. Litig.*,
   2019 WL 13020734 (N.D. Cal. May 14, 2019) .............................................. 19, 21

*In re Wells Fargo S'holder Derivative Litig.*,
   2017 WL 130282 (N.D. Cal. Jan. 12, 2017) ........................................................ 17

*Isman v. Bradway*,
   2020 WL 4504304 (Del.Ch. Aug 3, 2020) ........................................................... 17

*Lea v. Tal Educ. Group*,
   2021 WL 5578665 (S.D.N.Y. Nov. 30, 2021) ...................................................... 10

*Nichols v. Noom, Inc.*,
   2022 WL 2705354 (S.D.N.Y. July 12, 2022) ....................................................... 17

*Patriot Nat'l In. Sec. Litig.*,
   828 F.App'x 760 (2d Cir. 2020) ........................................................................... 14

*Peace Officers' Annuity & Benefit Fund of Ga. v. DaVita*,
    2021 WL 1387110 (D. Colo. Apr. 13, 2021) ................................................................ 15, 23

*Puglisi v. TD Bank, N.A.*,
    2015 WL 574280 (E.D.N.Y. Feb. 9, 2015) .............................................................. 12

*Salazar v. Spectrum of Creations, Inc.*,
    2019 WL 11343126 (S.D.N.Y. Jan. 11, 2019) ....................................................... 15

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
    258 F. Supp. 2d 254 (S.D.N.Y. 2003) ................................................................. 11

*Thompson v. Cmy. Bank, N.A.*,
    2021 WL 4084148 (N.D.N.Y. Sept. 8, 2021) ....................................................... 13

*Vaccaro v. New Source Energy Partners L.P*,
    2017 WL 6398636 (S.D.N.Y Dec. 14, 2017)........................................................ 24

*W. Palm Beach Police Pension Fund v. DFC Global Corp.*,
    2017 WL 4167440 (E.D. Pa. Sept. 20, 2017)........................................................ 12

## RULES

Fed. R. Civ. P. 23 ................................................................................................ 4, 11, 14

## OTHER AUTHORITIES

7 Alba Conte & Herbert Newberg,
    *Newberg on Class Actions* § 22.110 (4th ed. 2002) ................................................ 11

Plaintiff Fulton County Employees' Retirement System ("Plaintiff") respectfully submits this Memorandum of Law in Support of Plaintiff's Motion for Final Approval of Settlement (the "Approval Motion") in connection with the settlement of the above-captioned shareholder derivative action, brought on behalf of nominal defendant The Goldman Sachs Group, Inc. ("Goldman Sachs," "Goldman" or the "Company").[1]

## I.   <u>PRELIMINARY STATEMENT</u>

The Settlement of this Action is the culmination of more than three years of hard-fought litigation on "possibly the most difficult legal theory in corporation law upon which a plaintiff might hope to win a judgment." *Fulton County Employees Ret. Sys. v. Blankfein*, 2022 WL 4292894, at *3 (S.D.N.Y. Sept. 16, 2022) (Broderick, J.) ("*Blankfein*" or the "Preliminary Approval Order"). The Settlement is comprised of two categories of benefits to the Company: first, a ***$79.5 million*** cash payment from Defendants' insurers (the "Monetary Consideration"), which represents the second largest derivative settlement in Second Circuit history and ranks among the top-twenty such settlements ever; and second, significant corporate governance reforms (the "Reforms") that confer a substantial benefit to Goldman, which this Court noted "***would likely be unachievable***" had this case continued to trial. *Id*. at *4. On September 16, 2022, the Court granted preliminary approval of the Settlement as "fair, reasonable, and the result of good faith negotiation," and approved the Parties' proposed Notice Plan. *Id*. at *1, *4. The Parties have fully complied with the Court-approved Notice Plan, and Plaintiff now respectfully requests that the Court grant final approval of the Settlement for the following compelling reasons.

---

[1] Unless otherwise indicated, all capitalized terms have the same meanings provided in the Stipulation and Agreement of Settlement dated May 13, 2022 (the "Stipulation") or in the accompanying Declaration of Joseph E. White, III in Support of Plaintiff's Motion for Final Approval of Settlement and Motion for an Award of Attorneys' Fees ("White Declaration" or "White Decl."). Unless otherwise noted, all citations to "¶" or to "Ex." refer to paragraphs or exhibits to the White Declaration; all emphasis in this memorandum has been added; and all internal citations and quotation marks have been omitted.

*First*, the $79.5 million Monetary Consideration is outstanding.  Plaintiff not only obtained this extraordinary cash recovery for Goldman, but it also negotiated the requirement that these funds, after the payment of attorneys' fees, must be used solely for compliance purposes.  As the Court noted in its Preliminary Approval Order, "[t]his [requirement] is ***particularly significant because the gravamen of Plaintiff's allegations argue that the transactions would not have occurred had Goldman's compliance and controls been more robust and detected the highly suspicious deals and their terms***."  *Id*. at *3.

*Second*, with respect to the Reforms, Plaintiff consulted with a renowned corporate governance expert, Columbia Law School Professor Jeffrey Gordon, to design corporate governance measures targeting Goldman's culture of non-compliance.  These measures: (i) extend for a full year the Corporate Compliance Program provisions set forth in Goldman's Deferred Prosecution Agreement (the "DPA") with the Department of Justice ("DOJ"); (ii) significantly enhance the authority of the Chief Compliance Officer ("CCO"); (iii) create an anonymous employee hotline that is monitored by the CCO; and (iv) institute external monitoring of public media and industry reports that may raise compliance concerns.  This Court has underscored that the Reforms "seek to cure the deficiencies that formed the crux of the allegations in this action[.]"  *Id*. at *4.  Indeed, in his accompanying declaration, Professor Gordon opines that the Reforms "should significantly reduce the likelihood of a recurrence of the corrupt conduct identified in the criminal proceedings that preceded this litigation."  Gordon Decl., ¶1.

*Third*, while derivative actions in general are notoriously difficult and risky, this Action was especially so, as it was premised upon a *Caremark* fiduciary duty of oversight claim "requir[ing] Plaintiff [to] establish that Defendants either (1) utterly failed to implement any oversight mechanisms, or (2) having implemented such mechanisms, consciously failed to monitor

their operations." *Blankfein*, 2022 WL 4292894, at *3.  The risk inherent in this Action was even greater considering that in order to survive Defendants' motion to dismiss, Plaintiff had to establish the threshold issue of demand futility.  Doing so was fraught with risk, since as of the date the Second Amended Complaint was filed in November 2020, a majority of Goldman's directors were not even on the Board when the Company underwrote the 1MDB deals in 2012 and 2013, and Defendants had strong arguments that there was no evidence that ***any*** director personally reviewed or approved the transactions, nor were they responsible for doing so.  Furthermore, Defendants argued that the Board was not aware of any signs of corruption at the time the deals were underwritten and had implemented effective compliance measures—indeed, one of the key Goldman bankers behind the deals admitted to deliberately circumventing compliance protocols.

Even had Plaintiff prevailed on the motion to dismiss, it would have undoubtedly had to contend with Goldman forming a special litigation committee ("SLC") that would take over the Action and move to terminate it.  This risk was heightened because Goldman had already formed an independent committee in June 2019 to consider demands from three shareholders to pursue claims related to 1MDB, and the Board ultimately voted to reject those demands.  The Board subsequently rejected two additional demands in December 2021.  If the Board ultimately moved to terminate the litigation and the Court sustained Defendants' motion, the Company would recover nothing.  Even if Plaintiff defeated such a motion, it would still have to run the gauntlet of summary judgment, trial, and the inevitable appeals, along with collateral insurance coverage litigation.  An adverse ruling at any of these stages could result in a significantly reduced recovery for Goldman and its shareholders, or ***no recovery whatsoever***.  Significantly, the perceived difficulty and risks of this Action is underscored by the fact that Plaintiff ***was the only shareholder to file a substantive derivative complaint*** related to the 1MDB scandal against Goldman's Board—

a rare development given that high-profile corporate scandals such as the 1MDB debacle normally result in a multitude of securities class action and derivative complaints filed by multiple parties.

*Fourth*, Plaintiff was well informed of the strengths and weaknesses of its claims when negotiating the Settlement.  Plaintiff's extensive litigation efforts over three years included: (i) conducting a thorough investigation of Plaintiff's claims and legal strategy; (ii) drafting three highly detailed and comprehensive complaints; (iii) fully briefing two rounds of motions to dismiss; (iv) consulting with an expert to craft critically-important corporate governance reforms; and (v) reviewing over 667,000 pages of documents produced by Defendants to confirm Plaintiff's assessment that the Settlement is fair, adequate and reasonable.

*Fifth*, the Settlement is the product of extensive, arm's-length negotiations, including a two-day mediation before two nationally recognized and renowned mediators, the Hon. Daniel Weinstein (Ret.) and Jed D. Melnick, which culminated in a mediator's proposal to settle the Action.  The extensive negotiations between the Parties included the submission of detailed mediation statements setting forth each side's claims or defenses, as well as direct and adversarial in-person presentations by the Parties and their counsel at the mediation.

For all of these reasons, Plaintiff submits that the Settlement meets all the requirements of Federal Rule of Civil Procedure 23.1, due process, and applicable case law, and is fair, reasonable, and adequate.  Accordingly, Plaintiff respectfully requests that the Court grant final approval.

## II.    <u>BACKGROUND AND PROCEDURAL HISTORY</u>[2]

### A.    **Background of the Litigation**

On November 1, 2018, the U.S. Attorney for the Eastern District of New York unsealed a multi-count information and guilty plea against Goldman investment banker Timothy Leissner and

---

[2] For a more detailed account, *see generally*, White Decl.  *See also* the Court's summary of the facts in its opinion and order granting preliminary approval to the Settlement, *Blankfein*, 2022 WL 4292894, at **1-2.

unsealed indictments against Goldman banker Roger Ng and financier Jho Low, related to a bribery and kickback scheme involving Malaysian sovereign wealth fund 1MDB.  ¶19.  Following this news, Saxena White conducted an extensive investigation and review of relevant information related to the 1MDB scandal.  ¶22.  Specifically, Plaintiff's Counsel's investigation included a review of: (i) filings by Goldman with the U.S. Securities and Exchange Commission ("SEC"); (ii) news articles, a book about the scandal, and other media reports; (iii) allegations by government entities in complaints related to 1MDB; (iv) securities analyst reports about Goldman; and (v) additional public information related to Defendants and the 1MDB scandal.  *Id.*

On February 19, 2019, Plaintiff Fulton County filed its initial 96-page Verified Shareholder Derivative Complaint, naming as defendants Goldman's Board and various executives, asserting breach of fiduciary duty claims, violations of §§ 10(b) and 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and unjust enrichment based on allegations that Defendants disregarded multiple red flags of misconduct in connection with the 1MDB bond offerings.  ECF No. 1.  On May 13, 2019, Defendants moved to dismiss the complaint.  ECF Nos. 27-29.

On July 12, 2019, Plaintiff filed a Verified Amended Shareholder Derivative Complaint ("Amended Complaint"), incorporating additional allegations related to the 1MDB scandal.  ECF No. 35.  Defendants filed their motion to dismiss on September 12, 2019, arguing, among other things, that demand was not excused because the Amended Complaint failed to plead that the Director Defendants consciously disregarded their oversight duties by disregarding red flags of misconduct as required by *In re Caremark Int'l Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996) and its progeny.  ECF Nos. 39-42.  Plaintiff filed its opposition to the motion to dismiss on November 5, 2019, arguing, among other things, that the Amended Complaint adequately alleged the Board's conscious disregard of numerous red flags.  ECF No. 43.

The motion to dismiss was fully briefed and *sub judice* when, on October 22, 2020, Goldman entered into the DPA with the DOJ, which included a coordinated. resolution of government investigations in the U.S., U.K., Singapore, and elsewhere, and pursuant to which the Board agreed to pay $2.9 billion in fines, penalties, and disgorgement.  ¶¶21, 30.  After credits and netting, Goldman would ultimately pay a total of $5.1 billion in settlements to governmental and regulatory authorities, including a $3.9 billion settlement with the government of Malaysia. ¶21. After reviewing the DPA at length, Plaintiff drafted a Second Amended Complaint ("SAC") to incorporate information from the DPA, and sought leave to amend and file the SAC.  ECF Nos. 65-67.  On November 16, 2020, the Court granted Plaintiff's motion for leave to file the SAC. ECF No. 68.  The Parties engaged in a second round of motion to dismiss briefing from January through May 2021, with each side asserting similar arguments as in their previous briefs.  ECF Nos. 74-76, 78-80.  In addition, Plaintiff filed multiple notices of supplemental authority after the motions to dismiss were briefed.  *See* ECF Nos. 55, 58, 81.  The motion to dismiss was *sub judice* at the time of the Settlement.

### B.    Mediation and Discovery

In November 2021, Defendants approached Plaintiff's Counsel about resolving the litigation through mediation.  ¶33.  The Parties engaged the highly experienced and well-respected mediation team of the Hon. Daniel Weinstein (Ret.) and Jed D. Melnick, Esq. to oversee the two-day mediation scheduled for February 2-3, 2022.  *Id.*   In advance thereof, the Parties exchanged detailed mediation statements and engaged in numerous conferences at which they discussed the strengths and weaknesses of the Action.   *Id*.   During the mediation, Plaintiff's Counsel, Defendants' counsel, and representatives of Goldman and Defendants' insurers participated in vigorous presentations and negotiations.  ¶35.  At the conclusion of the mediation, Judge Weinstein

made a mediator's proposal to settle the Action, which the Parties accepted on February 3, 2022. *Id.*

In connection with the Settlement, Plaintiff conducted substantial discovery to confirm its assessment that the Settlement is fair, reasonable and adequate, including reviewing and analyzing over 667,000 pages of confidential Goldman documents.  ¶¶36-38.  After Plaintiff completed this discovery and confirmed its assessment, the Parties negotiated the final terms of the Settlement, executing the Stipulation on May 13, 2022.  ¶39.  Plaintiff moved for preliminary approval of the Settlement on May 13, 2022.  ECF Nos. 83-85.  On September 16, 2022, the Court granted preliminary approval and approved the notice plan. *Blankfein*, 2022 WL 4292894, at *1, *4; ECF No. 94.

## III.    SETTLEMENT TERMS

### A.    Summary of the Terms of Settlement

The Settlement consists of two main components. *First*, Defendants' insurers will pay the $79.5 million Monetary Consideration to Goldman which, less any Court-approved attorneys' fees, will be used **entirely** for the Company's compliance activities, including funding the Reforms.  Stipulation, §B, ¶1. *Second*, Goldman will adopt the significant corporate governance Reforms detailed in Section B of the Parties' Settlement Agreement and detailed further in Section III.B below. *Id.* §B, ¶2.  In exchange for this consideration, the Settlement provides that Plaintiff will provide a customary global release, on behalf of the Company, of all derivative claims arising from facts alleged in the Action. *Id.* at §§B, D.  The Settlement does not release any recoupment of compensation claims that the Company may have against Tim Leissner or Roger Ng, nor any direct claims of Plaintiff or any other Goldman stockholder, including, without limitation, any direct claims asserted under the federal securities laws. *Id.* at §D.

**B.      The Specific Governance Reforms Secured by the Settlement**

The Settlement provides for significant governance reforms intended to address and prevent the compliance failures that gave rise to the litigation.  As Professor Gordon explains in his declaration, "[T]he Reforms are likely to significantly reduce the likelihood of the kind of serious misconduct that caused such significant economic harm to Goldman and its shareholders" through empowering the "CCO in discovering and acting on compliance problems at an early stage" and "enhancing the flow of compliance-related matters to the Board[.]"  Gordon Decl., ¶37. The Reforms, which will remain in effect for three years (unless otherwise indicated) include:

1.      *Extension of the Corporate Compliance Program Provisions*

Goldman will extend the DPA's Corporate Compliance Program for one year following the DPA's October 22, 2023 expiration.  Stipulation §B, ¶2(a).  The Corporate Compliance Program requires Goldman to enhance its internal controls and compliance programs to, among other things, maintain: (i) an effective system of internal accounting controls; and (ii) a rigorous anti-corruption compliance program.  *Id.*  As Professor Gordon opines, this extension "means a longer period of senior management investment in fashioning and overseeing a durable compliance structure that will identify and block early-on those engagements that could entail bribery or other corruption" and "increases the chance that a compliance culture takes root alongside the business-driven culture of the firm."  Gordon Decl., ¶21.

2.      *Enhancements to the Authority of the Chief Compliance Officer*

Goldman's CCO shall report to the Board (or the Board's Audit Committee) on a periodic basis (but at least quarterly), and the Company shall provide the CCO resources necessary to hire a dedicated internal investigatory staff and to hire external investigators as the CCO determines is appropriate.  Stipulation §B, ¶2(b).  According to Professor Gordon, "[t]he CCO's reporting channel in the Reforms is a significant advance over the Compliance Program in the DPA" because

8

the Reforms "*require regular* reports on compliance matters by the CCO," which "naturally opens a channel and a dialogue about compliance situations before they become flashing red lights." Gordon Decl., ¶25.  Critically, Professor Gordon notes that the Monetary Consideration "will help assure the CCO's authority and independence by creating an initial pot of compliance money that will set the terms for the future." *Id.,* ¶27.  Moreover, Professor Gordon notes that, by "establishing the CCO's quarterly reporting obligation, the Reforms mean that the Board will be regularly apprised of compliance issues within the Company," and therefore red flags "will be brightly apparent" and "'[w]illful blindness' will be much harder to maintain." *Id.*, ¶31.

### 3. *Maintenance of an Anonymous Hotline with Reporting to the CCO*

Goldman will maintain an anonymous hotline that employees may use to report matters to the CCO, which will be managed by Goldman's Compliance Department.  Stipulation §B, ¶2(c). The creation and maintenance of an anonymous hotline "increases the likelihood that troublesome conduct such as what occurred in connection with 1MDB will be reported up the chain to parties who can stop it," and the hotline will "be a source of reporting on serious ethical issues that fall short of legal violations but fail to measure up to the aspirations reflected in" Goldman's Code of Business Conduct and Ethics.  Gordon Decl., ¶33.

### 4. *Maintenance of an External Monitoring Channel*

Goldman will designate an outside party to monitor public media and industry reports that may raise compliance concerns involving the Company, and the external party shall periodically report any such issues directly to the CCO.  Stipulation §B, ¶2(d).  Professor Gordon notes that creation and maintenance of an external monitoring channel "is directly responsive to the circumstances surrounding the 1MDB matter, since various 'eyebrow-raising' aspects of the bond issuances became public through media reports, including the fees, the quick succession of issuances, and the unidentified use of proceeds" and "designates the recipient of such information:

the empowered CCO." Gordon Decl., ¶34.  Moreover, Professor Gordon believes that the external monitoring will allow the Board to "hear of third-party concerns about Goldman's behavior in a systematic, collated way," such that "the Board will be obligated to act" if there are any red flags. *Id*., ¶35.

\* \* \*

In his declaration, Professor Gordon also discusses two approaches to valuing the benefit of these Reforms.  The first approach looks at the market capitalization loss of Goldman following disclosures about Goldman's role in the 1MDB scandal during two periods: in November 2018 and December 2018.  Gordon Decl., ¶46.  Starting with an estimated a loss of shareholder value (*i.e.* a decline in market capitalization) of approximately $12.5 billion, Professor Gordon estimates a "recurrence risk of 5% over a 5-year period." *Id.*  He then determines that if "the Reforms reduce that [5% recurrence] risk by *only* 25%, that would yield a benefit of approximately $150 million conferred on the shareholders." *Id.*  Alternatively, by starting "with out-of-pocket-losses as the measure of harms, $5.1 billion," and applying the same "illustrative (but conservative)" estimates about the risk of recurrence and the reduction of this risk, Professor Gordon calculates that "the Reforms would yield a $64 million benefit to shareholders" under that scenario. *Id*., ¶47.

In sum, the Reforms and the Monetary Consideration provide tremendous value to Goldman and its shareholders, amply supporting final approval of the Settlement.

## IV.   THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL

### A.   The Legal Standard Governing Final Settlement Approval

"In the Second Circuit, [t]here is a strong judicial policy in favor of settlements[.]" *Lea v. Tal Educ. Group*, 2021 WL 5578665, at \*4 (S.D.N.Y. Nov. 30, 2021) (Parker, Mag.); *see also Christine Asia Co. v. Yun Ma*, 2019 WL 5257534, at \*\*8-9 (S.D.N.Y. Oct. 16, 2019) (McMahon,

C.J.) ("compromise of complex litigation is encouraged by the court and favored by public policy"). Courts nationwide recognize that "[s]ettlements of shareholder derivative actions are particularly favored because such litigation is notoriously difficult and unpredictable[.]" *In re Southern Co. S'holder Derivative Litig.*, 2022 WL 4545614, at *5 (N.D. Ga. June 9, 2022).

Federal Rule of Civil Procedure 23.1(c) provides that "[a] derivative action may be settled . . . only with the court's approval." The determination as to whether a settlement should be approved is left to the sound discretion of this Court. *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 257 (S.D.N.Y. 2003) (Sweet, J.). In this regard, the "central question is whether the compromise is fair, reasonable and adequate." *In re Pfizer Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 340 (S.D.N.Y. 2011) (Rakoff, J.). "The role of the court and the criteria considered in evaluating the adequacy and fairness of a derivative settlement are substantially the same as in the class action." 7 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 22.110, at 476 (4th ed. 2002). To assess the fairness and adequacy of settlements, courts look to the substantive terms of the agreement and the negotiation process that produced the settlement. *See*, *e.g.*, *In re Facebook, Inc. IPO Sec. and Derivative Litig.*, 2015 WL 6971424, at *2 (S.D.N.Y. Nov. 9, 2015) (Sweet, J.); *Pfizer*, 780 F.Supp.2d at 340 ("in the context of a derivative action," the Court must consider "whether the settlement is the result of arm's-length negotiations" and "the substantive terms of the settlement").

**B.    The Settlement is the Product of Extensive and Arm's-Length Negotiations**

A "proposed settlement is procedurally fair" when "reached through vigorous, arm's-length negotiations and after experienced counsel had evaluated the merits of Plaintiff's claims through factual and legal investigation." *Gonzalez v. PB Hudson LLC*, 2019 WL 11541374, at *2 (S.D.N.Y. Apr. 4, 2019) (Broderick, J.); *see also Guevoura Fund Ltd. v. Sillerman*, 2019 WL

6889901, at *6 (S.D.N.Y. Dec. 18, 2019) (McMahon, J.) ("A strong initial presumption of fairness attaches to a proposed settlement if it is reached by experienced counsel after arm's length negotiations, and great weight is accorded to counsel's recommendation.").

Here, there can be no question that the Settlement results from extensive, arm's length, and non-collusive negotiations.  Indeed, the Settlement is the product of a two-day mediation facilitated by retired Judge Daniel Weinstein—a co-founder of JAMS—and Jed Melnick, preeminent mediators of complex litigation.[3]  White Decl., ¶¶33, 35.  As Judge Weinstein explains, during the mediation, "the Parties made detailed presentations, [] we discussed the merits of the case," and counsel "for Plaintiff and Defendants presented significant arguments regarding their clients' positions" leading him to "recommend the proposed Settlement as reasonable, arm's-length, and consistent with the risks and potential rewards of the claims asserted in the Action."  Ex. C to White Decl., ¶¶ 7, 9; *see Puglisi v. TD Bank, N.A.*, 2015 WL 574280, at *2 (E.D.N.Y. Feb. 9, 2015) (Brown, Mag.) (mediator's participation "reinforces the non-collusive nature of the settlement").  Numerous courts throughout the country have acknowledged the involvement of Judge Weinstein and Mr. Melnick as a strong factor weighing in favor of settlement approval.  *See e.g.*, *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 576 (S.D.N.Y. 2008) (McMahon, J.) (mediation by Judge Weinstein and Mr. Melnick "strongly supports a finding that they were conducted at arm's-length and without collusion"); *W. Palm Beach Police Pension Fund v. DFC Global Corp.*, 2017 WL 4167440, at *3 (E.D. Pa. Sept. 20, 2017) ("The presumption in favor of the negotiated settlement in this case is strengthened by the fact that settlement was reached in an extended mediation supervised by Judge [Daniel] Weinstein"); *Gordon v. Vanda Pharms. Inc.*, 2022 WL 4296092, at *4 (E.D.N.Y. Sept. 15, 2022) (Bloom, Mag.) ("The participation of [Mr.

---

[3] *See also* Judge Weinstein's biography, available at https://www.jamsadr.com/weinstein/ and Mr. Melnick's biography, available at https://www.jamsadr.com/melnick/.

Melnick, a] highly qualified mediator strongly supports a finding that negotiations were conducted at arm's length and without collusion").

Furthermore, before negotiating the Settlement, the Parties were well informed of the strengths and weaknesses of their claims and defenses, as this Action was intensely litigated for three years by leading practitioners from the corporate defense and shareholder plaintiff bars. As detailed in the White Declaration, Plaintiff's Counsel undertook a comprehensive investigation in preparing three detailed complaints, and the Parties fully briefed two motions to dismiss, which involved detailed research and analysis on many complex legal issues such as demand futility, the duty of oversight, and violations of Sections 10(b) and 14(a) of the Exchange Act. White Decl., ¶¶22-31. The Parties also exchanged detailed mediation statements in advance of the mediation. *Id.*, ¶33. Additionally, after agreeing in principle to the Settlement, Plaintiff's Counsel reviewed more than 667,000 pages of documents produced by Goldman to confirm the fairness of the Settlement. *Id.*, ¶36. Plaintiff's Counsel was thus intimately familiar with the strengths and weaknesses of each side's position and used this knowledge to the advantage of their respective clients. Accordingly, there can be "no question that [Plaintiff's] Counsel was fully informed on the strengths and weaknesses" of the claims "by the time the Stipulation was executed." *Guevoura Fund*, 2019 WL 6889901, at *6 (extensive factual investigation, consultation with experts, document discovery, and discussions between opposing counsel sufficient to show counsel was fully informed).

In addition, Plaintiff's Counsel's conclusion that the proposed Settlement is in the best interests of shareholders supports approval, as "great weight is accorded to counsel's recommendation." *Thompson v. Cmy. Bank, N.A.*, 2021 WL 4084148, at *6 (N.D.N.Y. Sept. 8, 2021). As set forth in its firm resume (*see* Ex. 3 to Ex. E), Plaintiff's Counsel Saxena White is

highly experienced in derivative and other shareholder litigation and has a long and successful track record of representing shareholders in such cases. Moreover, Saxena White is a "federally-certified, minority-and women-owned firm" with attorneys consisting of "women and lawyers of color at above-average ratios"—one of a few such firms representing institutional investors in the shareholder derivative litigation industry—and thus is particularly "suited" to represent the "large and heterogeneous group" of Goldman shareholders. *Bloom v. Anderson*, 2020 WL 6710429, at *9 (S.D. Ohio Nov. 16, 2020).

Defendants and Goldman were also represented by acclaimed and experienced counsel: Sullivan & Cromwell LLP, Winston & Strawn LLP, and Paul, Weiss, Rifkind, Wharton & Garrison LLP, which is further evidence of its procedural fairness.

In sum, as the Court previously concluded at preliminary approval, the Settlement was reached after extensive, arm's-length negotiations by "experienced and sophisticated counsel" who were thoroughly informed of "the strengths and weaknesses of the action." *Blankfein*, 2022 WL 4292894, at *3. Accordingly, this factor weighs in favor of approval.

## C.    The Settlement is Substantively Fair Under the *Grinnell* Factors

In evaluating whether a settlement is substantively fair, reasonable, and adequate, courts in the Second Circuit traditionally consider the factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).[4]   This Court distills the key factors as follows:

(1) the complexity, expense, and likely duration of the litigation; (2) the stage of the proceedings and the amount of discovery completed; (3) the risks of

---

[4] While Rule 23(e)(2), which governs the standards for approval of class action settlements, was amended to instruct courts to consider additional factors in determining whether a settlement is fair, reasonable, and adequate, no such amendments were made to Rule 23.1. Moreover, the "factors set forth in Rule 23(e)(2) have been applied in tandem with" and are meant to "add to, rather than displace" the *Grinnell* factors. *Christine Asia Co.*, 2019 WL 5257534, at *9. The Second Circuit specifically continues to endorse use of the *Grinnell* factors. *In re Patriot Nat'l In. Sec. Litig.*, 828 F.App'x 760, 762-63 (2d Cir. 2020). Regardless, the Settlement easily meets the standards for approval under the Rule 23(e)(2) factors which assess whether: (i) class representatives and class counsel have adequately represented the class; (ii) the proposal was negotiated at arm's length; (iii) the relief provided for the class is adequate; and (iv) the proposal treats class members equitably. Fed. R. Civ. P. 23(e)(2).

> establishing liability and damages; (4) the risks of maintaining the class action through the trial; (5) the lack of any objections; (6) the ability of the defendants to withstand a greater judgment; and (7) that the total settlement amount is within the range of reasonableness in light of the best possible recovery and the attendant risks of litigation.

*See*, *e.g.*, *PB Hudson*, 2019 WL 11541374, at *2; *Salazar v. Spectrum of Creations, Inc.*, 2019 WL 11343126, at *2 (S.D.N.Y. Jan. 11, 2019) (Broderick, J.). As discussed below, all relevant factors strongly support final approval of the Settlement.[5]

### 1.    The Settlement is Superb in Light of the Potential Recovery at Trial

In analyzing whether a settlement falls within the range of reasonableness, courts must judge a settlement "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weakness of plaintiffs' case." *Blankfein*, 2022 WL 4292894, at *3; *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *12 (S.D.N.Y. July 21, 2020) (McMahon, C.J.) (same).

As detailed above, the Settlement creates substantial benefits for Goldman. The $79.5 million Monetary Consideration is the second largest settlement of a shareholder derivative action in the history of the Second Circuit and ranks among the top-twenty largest ever nationwide. *See Blankfein*, 2022 WL 4292894, at *3 (finding fact that this "is one of the largest settlements of a shareholder derivative action in the Second Circuit's history" "highly favorable"); *Peace Officers' Annuity & Benefit Fund of Ga. v. DaVita*, 2021 WL 1387110 at *4 (D. Colo. Apr. 13, 2021) (fact that settlement was "among the top five such recoveries in the history of" the Tenth Circuit demonstrated its adequacy). Moreover, Goldman has agreed to use the entirety of the Monetary Consideration, after the payment of attorneys' fees, for compliance purposes. As monetary recoveries in derivative actions typically can be used for any corporate purpose, the earmarking of

---

[5] The fourth *Grinnell* factor, the risks of maintaining the class action through the trial, is inapplicable in this shareholder derivative action.

these funds for compliance spending is additional evidence that it is a unique remedy narrowly tailored to the needs of the Company.  *See Blankfein*, 2022 WL 4292894, at *3.

The proposed Settlement, moreover, pairs its monetary recovery with significant corporate governance Reforms, which were crafted under the guidance of a distinguished corporate governance expert, Professor Jeffrey N. Gordon of Columbia Law School.  *See Pfizer*, 780 F. Supp. 2d at 341-42 (finding "the settlement is likely to provide considerable corporate benefits to [the company] and its shareholders" where "plaintiffs' corporate governance expert [was] Jeffrey N. Gordon of Columbia Law School").  As detailed above and in Professor Gordon's Declaration, "the Reforms meaningfully reduce the likelihood of a major compliance failure at Goldman and thus create value for its shareholders."  Gordon Decl., ¶18.

As this Court recognized in preliminarily approving the Settlement, the Reforms, which "seek to cure the deficiencies that formed the crux of the allegations in this action, [] would reasonably satisfy Plaintiff and the derivative members of this action."  *Blankfein*, 2022 WL 4292894, at *4.  Likewise, courts widely recognize the substantial benefits conferred upon public corporations and their stockholders through the adoption of corporate governance reforms specifically tailored to the allegations of the case.  *See, e.g.*, *In re NVIDIA Corp. Derivative Litig.*, 2008 WL 5382544, at *3 (N.D. Cal. Dec. 22, 2008) ("strong corporate governance is fundamental to the economic well-being and success of a corporation"); *Allred v. Walker*, 2021 WL 5847405, at *4 (S.D.N.Y Dec. 9, 2021) (Liman, J.) ("Reforms addressing the issues giving rise to the derivative suit are exactly the type courts deem to confer a substantial benefit on the company").

In sum, the Settlement here includes both valuable corporate governance reforms and a substantial financial recovery that will fund Goldman's compliance measures—an extraordinary result for Goldman and its shareholders, weighing heavily in favor of final approval.[6]

### 2.   The Significant Risks Posed by Continued Litigation Support Final Approval of the Settlement

The significant risks to establishing liability and damages also favor final approval of the Settlement.  "In considering these factors, the Court need not adjudicate the disputed issues or decide unsettled questions; rather, the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement."  *Noom*, 2022 WL 2705354, at *9.

As an initial matter, the fact that no other shareholder derivative actions were filed in connection with the widely publicized 1MDB scandal underscores the perceived risk and uncertainty inherent in this Action.  Indeed, cases involving front-page news such as this one routinely attract multiple derivative suits, often in multiple jurisdictions.  *See, e.g., In re Wells Fargo S'holder Derivative Litig.*, 2017 WL 130282, at **1-2 (N.D. Cal. Jan. 12, 2017) (noting eleven firms filed nine separate complaints over the highly publicized account opening scandal); *Isman v. Bradway*, 2020 WL 4504304, at *1 (Del. Ch. Aug 3, 2020)  (five derivative complaints filed by multiple firms relating to Boeing 737 Max crashes and grounding); *Anderson*, 2020 WL 6710429, at *3 (in political bribery scandal, nine shareholder derivative actions filed in the Southern District of Ohio after one filed in the Northern District of Ohio).

---

[6] While a possible recovery in the best of all possible worlds could have been more than the Monetary Consideration, "where, as here, the other *Grinnell* factors weigh in favor of approval, this factor alone does not suggest the settlement is unfair," as "a defendant is not required to 'empty its coffers' before a settlement can be found adequate."  *Christine Asia Co.*, 2019 WL 5257534, at *14 (approving $250 million settlement with multi-national technology giant, Alibaba, where there were more than $1.4 billion in estimated damages); *see also Pfizer*, 780 F. Supp.2d at 338-39 (approving $75 million settlement where there was at least $2.3 billion in damages from a regulatory fine); *Nichols v. Noom, Inc.*, 2022 WL 2705354, at *10 (S.D.N.Y. July 12, 2022) (Parker, Mag.) (even if Defendants "could withstand a greater judgment, [their] ability to do so, standing alone, does not suggest that the settlement is unfair").

While shareholder derivative actions are already by their very nature "notoriously difficult and unpredictable," this case was especially so.  *In re Fab Universal Corp. S'holder Derivative Litig*., 148 F.Supp.3d 277, 284 (S.D.N.Y. 2015) (Sweet, J.); *In re Pacific Enters. Sec. Litig*., 47 F. 3d 373, 378 (9th Cir. 1995) ("[D]erivative lawsuits are rarely successful").  Indeed, numerous unique difficulties made continued litigation of these claims—where Plaintiff had not yet overcome Defendants' motion to dismiss—extremely risky.

First, even before addressing Plaintiff's substantive allegations regarding, among other things, breach of fiduciary duties and violations of the Exchange Act, Plaintiff would have to establish demand futility.  In order to do so, Plaintiff would need to demonstrate that a majority of Goldman's Board of Directors were conflicted and unable to properly consider a shareholder demand.  Determining the operative Board for purposes of this analysis was an issue that the Parties vigorously disputed: Plaintiff argued that the operative Board should be considered as it was constituted as of the initial complaint filing in February 2019, while Defendants argued it should be as of the SAC's filing in November 2020.  If Defendants prevailed on this point, Defendants had credible arguments that demand was not futile because only four of the eleven Board members in November 2020 were directors at the time the 1MDB deals closed in 2012 and 2013.  Accordingly, there was a considerable risk that the Court would hold that demand was not futile and dismiss the case on those grounds without even reaching the merits.  *See Walker*, 2021 WL 5847405, at *4 (calling "demand futility a significant challenge under Delaware law").

Second, the Complaint stood upon a fiduciary duty of oversight claim.  As the Delaware Court of Chancery has emphasized, the theory of liability advanced through such a claim "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."  *Caremark*, 698 A. 2d at 967; *see also Pfizer* 780 F. Supp. 2d at 342 (finding that the

"substantial risks" posed by a *Caremark* claim were a factor weighing in favor of settlement approval); *In re Wells Fargo & Co. S'holder Deriv. Litig.*, 2019 WL 13020734 at *6 (N.D. Cal. May 14, 2019) (noting the difficulty of *Caremark* claims even after plaintiffs had survived motions to dismiss). *Caremark* claims are routinely dismissed at the pleadings stage, and Goldman's directors were further protected by an exculpatory provision in the Company's certificate of incorporation that eliminated liability except as a to breaches of loyalty, acts taken in bad faith, or intentional misconduct. *See, e.g. Cent. Laborers' Pension Fund v. Dimon*, 638 F. App'x 34, 40 (2d Cir. 2016) (affirming dismissal of *Caremark* claim); *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *18 (Del. Ch. Oct. 12, 2011) (dismissing *Caremark* claim, holding that "[t]he likelihood of directors' liability is significantly lessened where, as here, the corporate charter exculpates the directors from [such] liability").

Third, even if Plaintiff was able to defeat Defendants' motion to dismiss, Goldman would likely have formed an SLC that would stay the Action while it investigated Plaintiff's claims, then upon conclusion of its investigation, take over the Action and move to terminate it. Under Delaware law, a properly appointed and constituted SLC, after an investigation and consistent with the Court's view of fairness, can take over and terminate a derivative action as not in the best interests of the company. *See Diep on behalf of El Pollo Loco Holdings, Inc. v. Sather,* 2021 WL 3236322, at **23-24 (Del. Ch. July 30, 2021) (following court's denial of motion to dismiss, company appointed an SLC to investigate plaintiff's claims; after investigation, SLC filed motion to dismiss shareholder derivative litigation, which was granted by the court). Notably, in June 2019, Goldman had formed an independent committee, represented by sophisticated, independent counsel, to consider demands from three shareholders to investigate and pursue claims based on 1MDB and related internal controls. In January 2021, the committee presented its findings to the

directors, and the Board voted to reject the shareholder demands.[7]  In December 2021, the Board

voted to reject two additional demands.[8]

Fourth, Plaintiff's allegations date back to 2012 and involve the responsibilities of an

investment bank's directors and officers with respect to underwriting bond offerings for sovereign

wealth funds.  With respect to the potential liability of the directors that served on the Board at the

time of the 1MDB deals, Defendants argued (i) that the Board had implemented adequate systems

and controls at the Company; (ii) that directors of a major global investment bank like Goldman

are not expected to micromanage the Company's day-to-day business activities; and (iii) that none

of the directors personally approved or had contemporaneous knowledge of the 1MDB

transactions.  Indeed, no Goldman director was criminally or civilly charged in connection with

the scandal, and the factual findings in the DPA largely implicated failures by Goldman's

compliance personnel—***not*** its outside directors.  Furthermore, with respect to the two Goldman

bankers that were criminally indicted, Leissner admitted that he intentionally circumvented

Goldman's internal controls and violated its policies, arguably undercutting Plaintiff's arguments

related to the Board's alleged breaches of fiduciary duty.  *See U.S. v. Timothy Leissner*, No. 1:18-

cr-00439-MKB, ECF No. 30 at 15:15-15:23, 38:23-40:1 (E.D.N.Y. Nov. 9, 2018).[9]  Given that the

amount of any recovery at trial would be based on proportionate liability, there was a risk that a

jury would find that Defendants were responsible for a modest fraction, if any, of Goldman's

damages.

Fifth, Plaintiff faced extraordinary litigation risks if it were to continue prosecuting this

Action, as taking this case through trial would also have created a risk that one or more of the

---

[7] *See* Goldman Sachs 2021 Form 10-K, filed with the SEC on Feb. 25, 2022 at 210, available at:
https://www.goldmansachs.com/ investor-relations/financials/10k/2021/2021-10-k.pdf.
[8] *See id.*
[9] Unreported cases are attached to the White Declaration as Ex. F.

D&O insurance carriers would have invoked a policy exclusion and deny coverage.   The Settlement avoids this added layer of complexity and the uncertainty of protracted litigation between Defendants and their insurers.   *See Wells Fargo,* 2019 WL 13020734, at *6 (noting "prospect of additional or collateral litigation with Individual Defendants' insurers, further prolonging any resolution beneficial to" the company); *In re Galena Biopharma, Inc. Derivative Litig.,* 2016 WL 10840600, at *2 (D. Or. June 24, 2016) (noting the individual defendants' "insurers dispute coverage and if the Action does not settle and continues to be litigated, there is a risk that insurance coverage will be denied and an additional insurance coverage lawsuit may ensue").

In sum, "the Settlement Agreement allows Plaintiff and the derivative members immediate relief while avoiding the uncertainty of protracted litigation." *Blankfein*, 2022 WL 4292894, at *3. Accordingly, the Settlement is an excellent result that falls well within the range of reasonableness, thus strongly supporting final approval of the Settlement.

### 3.   Continued Litigation Would Have Been Lengthy, Complex, and Costly

Assuming the Court would have denied Defendants' motion to dismiss, litigating this case would involve extensive pre-trial proceedings, including voluminous document discovery; dozens of depositions (with a number of key witnesses overseas); preparation of complex expert reports and discovery of the expert witnesses; the negotiation and completion of a complex and voluminous pre-trial order and exhibit lists; and extensive briefing on motions for summary judgment, motions to strike experts and other motions *in limine*.   If Defendants' motions for summary judgment were denied, trial would involve weeks of preparation, mock juries, and a lengthy trial, with numerous fact and expert witnesses to explain the nature of the 1MDB offerings and then to explain Defendant's role in fostering and permitting the illegal conduct, all of which

would have greatly increased costs for the Parties.  Following trial, any judgment would be subject to post-trial motions and a likely appeal, injecting further risk and uncertainty into the equation. *See, e.g.*, *Hubbard v. BankAtlantic Bancorp., Inc.*, 688 F.3d 713, 725 (11th Cir. 2012) (affirming judgment following jury verdict partially in plaintiff's favor).

Obtaining a more favorable resolution than the proposed Settlement would have taken several years and occupied the attention of Goldman management and its executives, while an unfavorable outcome at ***any of those stages*** could have been fatal to the litigation.  "Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk of trial" and thus "weigh[s] in favor of the proposed Settlement."  *Telik*, 576 F.Supp. 2d at 577 (approving settlement before any motion to dismiss had been filed, citing as a factor the "costs and duration of litigating a motion dismiss, conducting merits and class discovery, conducting expert discovery, litigating a motion for summary judgment, preparing for trial, conducting the trial itself, [and] filing post-trial motions"); *see also In re Frontier Communications Corp. S'holders Litig.*, 2022 WL 4080324, at *11 (D. Conn. May 20, 2022) (approving $15.5 million settlement where motion to dismiss was granted and denial of motion to amend on appeal, holding "[a]bsent a settlement, [litigation] costs will only escalate as a result of discovery proceedings, motion practice, trials, and likely appeals").

The Settlement provides Goldman with immediate and meaningful benefits: namely, the $79.5 million Monetary Consideration and Reforms that address its critical compliance function and reduce the likelihood of a recurrence of the misconduct at issue in this Action, while avoiding costly and uncertain continued litigation.  *Fab*, 148 F. Supp. 3d at 282 (derivative settlement "assures immediate corporate reforms . . . and will allow the Company to direct its full attention to its substantive business"); *Pfizer*, 780 F. Supp. 2d at 341 (lauding governance reforms

addressing inadequate compliance because the potential "savings to the company in avoiding such huge fines in the future will be substantial").  Moreover, the Settlement also spares this Court significant judicial resources and time.  *DaVita*, 2021 WL 1387110, at *4 (the presumption in favor of settlement "is especially strong in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation").

### 4.    The Positive Reaction to Date Favors Final Approval

The deadline for shareholders to object to the proposed Settlement has not yet passed.  To date, however, counsel has not heard from any shareholder or representative of a shareholder indicating they are not satisfied with the Settlement.  *Fab*, 148 F. Supp. 3d at 282 ("The reaction of shareholders may be gauged by reference to the extent of objection to the settlement," and a "lack of objections may well evidence the fairness of the Settlement").[10]

Furthermore, Plaintiff is a sophisticated institutional shareholder of the exact type favored by both Congress and the Courts to serve in a leadership capacity in class actions and derivative cases.  Plaintiff has actively overseen the Action since its inception and "believes the terms of the Settlement are fair and reasonable and represent an excellent result for Goldman and its shareholders."  Ex. A to White Decl., ¶4.  *See Signet*, 2020 WL 4196468, at *4 (a "settlement reached under the supervision and with the endorsement of a sophisticated institutional investor…is entitled to an even greater presumption of reasonableness.").

### 5.    The Proceedings had Advanced to a Stage Where the Parties Could Understand the Strengths and Weaknesses of Plaintiff's Claims

"The stage of proceedings and the amount of discovery completed at the time of a Settlement is relevant to parties' knowledge of the strengths and weaknesses of the various claims in the case."  *Frontier*, 2022 WL 4080324, at *12.  When "weighing this factor, the Court need

---

[10] This factor will be further addressed in Plaintiff's reply brief to be filed on January 6, 2023.

not find that the parties have engaged in extensive discovery . . . Instead, it is enough for the parties to have engaged in sufficient investigation of the facts to enable the Court to intelligently make an appraisal of the Settlement.'" *In re Sturm, Ruger & Co. Sec. Litig.*, 2012 WL 3589610, at *7 (D. Conn. Aug. 20, 2012). *See also Vaccaro v. New Source Energy Partners L.P*, 2017 WL 6398636, at *5 (S.D.N.Y Dec. 14, 2017) (Wood, J.) (approving settlement where no discovery taken because plaintiffs were "well-informed" through review of vast amounts of public information); *Frontier*, 2022 WL 4080324, at *13 (same).

Here, Plaintiff was fully aware of the strengths and weaknesses of its claims through its in-depth investigation and research that culminated in the drafting of three highly-detailed complaints; extensive briefing on two motions to dismiss; engaging in extensive settlement negotiations, including a two-day mediation; and reviewing and analyzing over 667,000 pages of internal Goldman documents prior to executing the Stipulation in order to confirm Plaintiff's assessment that the Settlement was fair, adequate and reasonable. *See*, *e.g.*, *In re CenturyLink Sales Practices and Sec. Litig.*, 2020 WL 7133805, at *2 (D. Minn. Dec. 4, 2020) (approving settlement where plaintiffs "pursued several months of confirmatory discovery" after a tentative settlement). Accordingly, this factor weighs in favor of final approval.

## V.      ADEQUATE NOTICE WAS GIVEN OF THE PROPOSED SETTLEMENT

Pursuant to Rule 23.1(c), notice of a proposed settlement of a shareholder derivative action "must be given to shareholders or members in the manner that the court orders." At preliminary approval, this Court reviewed and approved the plan for providing notice, which consisted of: (i) Goldman filing a copy of the Stipulation and Notice as an exhibit to a Form 8-K filed with the U.S. Securities and Exchange Commission; (ii) making these documents accessible on the "Investor Relations" page of Goldman's corporate website and on Plaintiff's Counsel's website; and (iii) publishing the Summary Notice in the *Wall Street Journal* and the *New York Times* and by a

national wire service.  *Blankfein*, 2022 WL 4292894, at *4.  The Parties fully complied with the approved notice plan and will file with the Court proof of compliance prior to the Settlement Hearing in accordance with the Court's Preliminary Approval Order.  ECF No. 94 at 4.

## VI.     <u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiff respectfully requests that this Court grant final approval of the Settlement.

Dated: December 9, 2022                          Respectfully submitted,

**SAXENA WHITE P.A.**

*/s/ Joseph E. White, III*
Joseph E. White, III

Maya Saxena
Joseph E. White, III
Lester R. Hooker
Adam D. Warden
Jonathan Lamet
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Phone: (561) 394-3399
Fax: (561) 394-3382

- and -

**SAXENA WHITE P.A.**
Steven B. Singer
10 Bank Street, 8th Floor
White Plains, NY 10606
Phone: (914) 437-8551
Fax: (888) 631-3611

**SAXENA WHITE P.A.**
Thomas Curry
1000 N. West St., Suite 1200
Wilmington, DE 19801
Phone: (302) 485-0480

**BUCKLEY BEAL**
Michael E. Kramer

600 Peachtree Street, N.E., Suite 3900
Atlanta, GA 30308
Phone: (404) 781-1100
Fax: (404) 781-1101

*Counsel for Plaintiff Fulton County Employees'*
*Retirement System*

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2022, I caused to be filed a true and correct copy of the foregoing with the Clerk of Court via CM/ECF.  Notice of this filing will be sent electronically to all registered parties by operation of the Court's electronic filing system.

*/s/ Joseph E. White, III*
Joseph E. White, III